UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE: )
) Case No. 15-23977-TBM
WESTERN CONVENIENCE STORES, INC. )
EIN: 84-1160742 ) Chapter 11
)
Debtor. )

**MOTION FOR APPROVAL OF RESTRUCTURING SUPPORT AND SETTLEMENT
AGREEMENT (SUNCOR ENERGY (U.S.A.) INC.)**

The Debtor and Debtor in Possession, Western Convenience Stores, Inc. ("Debtor"), by and through its attorneys, Kutner Brinen Garber, P.C., moves the Court pursuant to Bankruptcy Rule 9019(a) for entry of an order approving a Restructuring Support and Settlement Agreement by and between the Debtor, Suncor Energy (U.S.A.) Inc. and certain affiliates of the Debtor, and two inter-related sales agreements, and as grounds therefor states as follows:

**Background**

1.     The Debtor filed for relief under Chapter 11 of the Bankruptcy Code on December 28, 2015.  The Debtor remains a debtor-in-possession.

2.     The Debtor is engaged in business as the operator of a chain of 44 convenience stores that sell gasoline, snack foods, and related products in the States of Colorado and Nebraska.

3.     The Debtor is wholly owned by Hossein Taraghi ("Taraghi").   Taraghi at one time owned thirty seven (37) limited liability companies (the "HDT Entities") that own certain real property leased to the Debtor pursuant to separate leases (each, a "Lease"), including 38 gas stations and convenience stores.  In addition, these limited liability companies also own two (2) other gas stations and convenience stores, which Debtor currently operates, but are not subject to any lease. Each limited liability company owns one property, and all of the limited liability companies were owned by Taraghi either directly or through a holding company known as H.D.T. Limited Liability Company ("HDT").  While the foresaid accounts for 39 retail locations, including an office, the other 6 retail locations are owned by third parties and leased directly to the Debtor.

4.     The Debtor generated approximately $250,000,000 during its 2014 fiscal year in gross sales.  Most of the revenue generated is from the sale of motor fuels which include gasoline and

diesel fuel.  Additional revenue is generated from sales of product from the convenience stores and limited restaurant and liquor sales from certain locations.

5.      In 2011, the Debtor filed a lawsuit in the U.S. District Court for the District of Colorado against Suncor Energy (U.S.A.) Inc. ("Suncor").  Suncor had been a fuel supplier to the Debtor.  The lawsuit asserted various claims which included violation of federal and state antitrust laws.  Suncor defended the suit and asserted a counterclaim against the Debtor and a claim against Hossein Taraghi and Debra Taraghi on their limited guaranty of debt owed to Suncor by the Debtor. Following a trial, the Court entered judgment on August 22, 2014 in favor of Suncor and against the Debtor and the Taraghis, jointly and severally, for $10,235,179.79 plus interest at 7 percent per annum ("Suncor Judgment").

6.      In an effort to resolve and satisfy the Suncor Judgment, the Debtor, Taraghi, Suncor, and the HDT Entities entered into a Forbearance Agreement, including a Security Agreement, a Guaranty Agreement, a Pledge Agreement, and an Aircraft Security Agreement granted by W.C.S. One, LLC, an entity owned by Taraghi.  The Forbearance Agreement was signed on December 23, 2014.  A copy of the Forbearance Agreement is attached hereto as Exhibit A.

7.      The Forbearance Agreement provided the Debtor and other parties to the Agreement with the ability to resolve and make payments to Suncor in order to satisfy the Suncor Judgment for a discounted payoff over time.

8.      The Forbearance Agreement provided, in part, that the Debtor was required to stay current on all of its financial obligations.  The obligations necessarily included all of the Debtor's loans on which the Debtor was a co-obligor along with Taraghi, and all of the mortgage indebtedness of the HDT Entities for which the Debtor was a co-maker.

9.      While the Debtor made payments to Suncor on time on account of the Forbearance Agreement from the date of the Agreement through October 2015, Suncor called a non-curable default under Section 7.1(p) of the Forbearance Agreement on October 16, 2015 ("October 16[th] Default").  The October 16th Default called by Suncor was based on the failure to pay when due the matured amounts under two loans that Debtor and H.D.T. Twenty Eight Limited Liability Company ("HDT 28") had originated with Vectra Bank.  Vectra Bank had sold its underlying promissory notes to an investor in Texas known as VSD 4, LLC.  Suncor called a default and exercised certain of its rights under the Forbearance Agreement.  On October 16, 2015, Suncor transferred the membership

interests in the HDT Entities (except HDT 18) pursuant to transfer documents executed by Taraghi. Based upon the transfer, Taraghi and HDT, LLC ceased to be members of the limited liability companies. Taraghi was removed as the Manager of all of the HDT Entities by Suncor under C.R.S. § 7-80-701(2) and Suncor was appointed Manager. A copy of the Suncor Notice of Event of Default and Exercise of Remedies is attached hereto as Exhibit B. A copy of a representative sample of the assignment of 100% of the member interests in each of the HDT Entities is attached hereto as Exhibit C. A further default was declared by Suncor based upon Offen Petroleum Inc. suing the Debtor and seeking a pre-judgment writ of attachment ("Second Event of Default"). Suncor based upon this Second Event of Default took the same actions it had based upon the October 16 Default. Additionally, Suncor learned that HDT 18 had no lease from the Debtor, and on December 15, 2015 Suncor acted to effect a transfer of the HDT 18 membership interests to Suncor.

10.    In an effort to attempt to stop Suncor from exercising its remedies as a result of the October 16th Default, the Debtor along with Taraghi, Debra Taraghi, the HDT Entities, and certain other entities filed a lawsuit in Denver District Court seeking to enjoin Suncor from the continued exercise of its rights based on the claim of default that the Debtor and co-obligors did not accept. The case was filed on November 13, 2015 as Case No. 2015CV34011. Suncor defended the action and following a day long preliminary injunction hearing on December 8, 2015 and related briefing the Denver District Court Judge denied the Debtor and co-plaintiffs any relief and ruled that it was unlikely that they would prevail in a final hearing, a default had occurred under the Forbearance Agreement and the request for preliminary injunction was denied.

11.    Suncor on December 17, 2015 also noticed two UCC foreclosure sales for mid-February 2015. One with respect to the membership interests in the HDT Entities, and a second with respect to any personal property, excluding inventory, owned by Debtor and located at the retail properties owned by the HDT Entities.

12.    Each Lease referenced in paragraph 3 above is effective January 1, 2015 and ended on December 31, 2015. Following the termination date the Debtor can only holdover as a tenant on a month to month basis, and is subject to eviction by its landlords. A copy of a representative sample of one of the numerous leases is attached hereto as Exhibit D.

13.    On the Debtor's petition date the Debtor faced the following issues: a) the Debtor owed Suncor approximately $7,800,000; b) all of the Debtor's leases to 38 of the stores it operated

and the building that houses Debtor's headquarters would terminate on December 31, 2015; c) the ownership of the member interests in the HDT Entities had previously changed from Taraghi to Suncor as a result of the default under the Forbearance Agreement; d) Suncor could evict the Debtor from 40 stores (38 pursuant to the expired Leases, and 2 which have no lease) it now owned on short notice; and e) the Debtor had no basis on which to reorganize without a reacquisition directly or through Taraghi of the HDT Entities; and f) while the Debtor could attempt to litigate with Suncor, its past two attempts resulted in complete failure and were extremely expensive.

**The Suncor Settlement**

14.     Once the Chapter 11 case was filed, the Debtor and Taraghi immediately embarked on an effort to settle with Suncor on terms they could afford.   Their goal was to reach an accommodation on a payoff price for Suncor and reacquire the HDT Entities.

15.     A settlement agreement was negotiated and reduced to writing.   A copy of the settlement is set forth in the Restructuring Support And Settlement Agreement attached hereto and incorporated herein as Exhibit E, together with the Membership Purchase Agreement and Jet Purchase And Sale Agreement which are also attached and are part of and interrelated with the RSSA as Exhibits F and G (collectively these three agreements are referred to as the "RSSA").

16.     The RSSA allows the Debtor to stay in business pending its approval and implementation as an agreement and through a plan of reorganization that will be consistent with the agreement.   While the RSSA should be reviewed in detail by interested parties, the essential terms of the RSSA provide for the following:

> a. The Debtor and Taraghi may satisfy the $7,800,000 Suncor claim by payment of the sum of $5,000,000 plus the transfer to Suncor of a jet aircraft owned by Taraghi's company W.C.S. One, LLC (with an estimated value of not more than $500,000);

> b.   Taraghi will reacquire from Suncor the HDT Entities, subject to their underlying mortgage debts, so that they can continue to be leased to the Debtor;

> c. The non-Debtor parties to the RSSA will stipulate to final judgment in favor of Suncor in the Denver District Court injunction action thereby ending their request for injunctive and other relief and the Debtor will request similar relief when the RSSA is approved;

> d.  During the period of the RSSA, Suncor will permit the Debtor to operate the convenience stores and gas stations owned by the HDT Entities and in lieu of rent,

the Debtor may make direct payments of the mortgage payments to the lenders who hold first liens on each of the HDT Entities;

e. Once the payments and jet transfer to Suncor are made, the RSSA approved by the Court, and a Plan of Reorganization is confirmed by the Court, the Debtor and Taraghi will be released by Suncor, all of Suncor's liens will be released, and all litigation will have concluded;

f. The Debtor and the co-obligors under the Forbearance Agreement shall release Suncor from all claims, including in the case of the Debtor any claim that could be brought in the Bankruptcy Case with such releases taking effect for the non-debtor parties upon execution of the RSSA and with respect to the Debtor upon Court approval of the RSSA; and

g. In the event that the Debtor or Taraghi default under the RSSA, all relief afforded under the agreement will terminate, the Debtor will have to surrender the HDT Entity member interests and store locations to Suncor, and Suncor will be able to exercise all of its collection rights and remedies.

17.     The RSSA provides that the Debtor has a period of sixty (60) days from the date of the RSSA within which to obtain Court approval of the RSSA in the Debtor's pending Chapter 11 bankruptcy case. The Debtor and Taraghi will have a period of one hundred and eighty (180) days from the date of the RSSA to close on the sale transactions with Suncor under which the $5,000,000 is paid and the jet is transferred.

**Confirmation of Reorganization Plan**

18.     In order to effectuate the RSSA, the Debtor will be required to obtain confirmation of a Plan of Reorganization ("Plan"). In this case, the Debtor intends to reorganize under its Plan by refinancing its debts and paying all creditors in the case in full.

19.     The Debtor has retained the firm of NRC Realty & Capital Advisors, LLC ("NRC") to advise the Debtor on raising capital to refinance all of the convenience stores, arrange for their reacquisition under the RSSA, and pay all creditors in the case in full. The HDT Entities that own the real property, including the convenience stores and gas stations, will be reacquired by Taraghi. These properties along with the business operation of the convenience store locations provide an asset base that will support a loan which will be needed to pay all creditors.

20.     NCR is currently working to put into place a loan to Taraghi and the Debtor of approximately $33 million. As of the date of this Motion, NCR is in the process of obtaining term sheets from prospective institutional lenders who appear willing to provide the financing. A list of

the Debtor's creditors who will be paid with the financing following confirmation of the Plan is attached hereto as Exhibit H.

21.     The confirmation of a Plan in this case is also a requirement of Suncor pursuant to the terms of the RSSA.

**Chapter 11 Priority Claims**

22.     The only way that the Debtor can effectively reorganize and provide funds for the payment of unsecured creditor claims is through the current path of settlement with Suncor and a refinancing of the entire package of assets that includes all of the gas stations and convenience stores. The refinancing will provide the funds to pay all creditors. Any attempt to otherwise reorganize or liquidate through litigation will, if successful at all, provide less than sufficient funds to pay priority claims in this case let alone repay unsecured creditors.

23.     The Debtor has a number of priority claims in this case which would all have to be paid prior to any distribution to unsecured creditors. The priority claims include the following:

     a.    Chapter 11 administrative claims – unknown and variable
     b.    State of Colorado taxes - $1,281,108
     c.    Harpel Oil Co. §503(b)(9) priority claim- $1,842,518.59
     d.    Miscellaneous estimated §503(b)(9) priority claims - $500,000

       Total Priority claims $3,623,626.59

24.     Given the priority claims of $3,623,626.59, it is not possible that enough avoidance actions or unencumbered assets would exist to payoff the priority debt, let alone provide for any payment to unsecured creditors. The proposed settlement with Suncor and refinancing of the outstanding debt provides for full payment of all creditors.

**Legal Analysis**

25.     The law generally favors compromises and settlement of disputes among parties. *See Stanspec Corp. v. Jelco*, 464 F.2d 1184, 1187 (10th Cir. 1972). To evaluate a settlement proposal, a court must "determine whether the settlement is fair and equitable and in the best interests of the estate." *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*, 105 B.R. 971, 976 (D. Colo. 1989). In making this determination, the Court should consider (1) the probable success of the litigation on the merits; (2) any potential difficulty in collection of a judgment; (3) the complexity and expense of the litigation; and (4) the interests of creditors in deference to their reasonable views. *See In re Kopexa Realty Venture Co.*, 213 B.R. 100, 1022 (B.A.P. 10th Cir. 1997); *Official Comm. Of*

*Unsecured Creditors of Western Pac. Airlines v. Western Pac. Airlines (In re Western Pac. Airlines)*, 219 B.R. 575, 579 (D. Colo. 1998).

26.     In evaluating fairness of a settlement and compromise under Rule 9019, the Court is not obligated to conduct an evidentiary hearing. *Depoister v. Mary M. Holloway Foundation*, 36 F.3d 582, 586 (7th Cir. 1994); see also, *In re Armstrong*, 2002 Bankr. LEXIS 301 (B.A.P. 10th Cir. Mar. 28, 2002) ("in approving a settlement, the bankruptcy court is not required to conduct a 'mini-trial on the merits'").

27.     The RSSA represents an exercise of the Debtor's best business judgment with respect to the resolution of the issues with Suncor. The Debtor has concluded that while it may have claims against Suncor that could be litigated, the claims do not exceed the amount which it owes Suncor, $7,800,000. Similarly, the claims would likely not exceed the amount that the Debtor would have to pay to overcome the priority claims in this case. It can also be expected that with litigation, the costs and expenses of the chapter 11 case go much higher to pay for the litigation.

28.     The Suncor settlement results in a resolution of numerous complex issues that have been litigated for many years. The settlement can occur quickly and result in the refinancing of the entire enterprise and the payment of all of the Debtor's creditors.

WHEREFORE, the Debtor prays that the Court enter an Order, approving the Restructuring Support And Settlement Agreement, the Membership Interests Purchase Agreement, and the Jet Purchase And Sale Agreement, authorize the Debtor to take all actions necessary or convenient to implement such Agreements, and for such further and additional relief as to the Court may appear proper.

DATED: January 29, 2016

Respectfully submitted,


By:____*/s/ Lee M. Kutner*_____
      Lee M. Kutner, # 10966

**KUTNER BRINEN GARBER, P.C.**
1660 Lincoln Street, Suite 1850
Denver, CO 80264
Telephone: (303) 832-2400
Telecopy: (303) 832-1510
Email: lmk@kutnerlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 29, 2016, I served by prepaid first class mail a copy of the foregoing **MOTION FOR APPROVAL OF RESTRUCTURING SUPPORT AND SETTLEMENT AGREEMENT (SUNCOR ENERGY (U.S.A.) INC.) AND NOTICE PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1 OF MOTION FOR APPROVAL OF RESTRUCTURING SUPPORT AND SETTLEMENT AGREEMENT (SUNCOR ENERGY (U.S.A.) INC.)** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and these L.B.R. at the following addresses:

Alan K. Motes, Esq.
U.S. Trustee's Office
1961 Stout Street
Suite 12-200
Denver, CO 80294

Kubat Equipment and Service Co.
ATTN: Craig Hoyer
1070 South Galapago Street
Denver, CO 80223

PepsiCo, Inc.
ATTN: Conrad Ragan
1100 Reynolds Blvd.
Winston-Salem, NC 27105

Harpel Oil Company
ATTN: Douglas C. Harpel
5480 Brighton Blvd.
Commerce City, CO 80022

Philip A. Pearlman, Esq.
Jamie N. Cotter, Esq.
Spencer Fane, LLP
1700 Lincoln Street
Suite 2000
Denver, CO 80203

John O'Brien, Esq.
Snell & Wilmer, LLP
1200 Seventeenth Street
Suite 1900
Denver, CO 80202-5854

Craig K. Schuenemann, Esq.
Bryan Cave, LLP
1700 Lincoln Street
Suite 4100
Denver, CO 80203-4541

Mark G. Stingley, Esq.
William J. Maloney, Esq.
Bryan Cave, LLP
1200 Main Street
Suite 3800
Kansas City, Missouri 64105

Adam L. Hirsch, Esq.
Kutak Rock, LLP
1801 California Street
Suite 3000
Denver, CO 80202-2658

Erica F. Houck Englert, Esq.
1801 California Street
Suite 3400
Denver, CO 80202

James B. Holden, Esq.
Lynda L. Atkins, Esq.
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203

Gregory G. Hesse, Esq.
Hunton & Williams, LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202-2799

Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Paul G. Urtz, Esq.
Miller & Urtz, LLC
1660 Lincoln Street
Suite 2850
Denver, CO 80264

Darryl S. Laddin, Esq.
Frank N. White, Esq.
Arnall Golden Gregory, LLP
171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363-1031

Samuel M. Kidder, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, CO 80202-4432

Robert A. Kumin, Esq.
Scott S. Kleypas, Esq.
Robert A. Kumin, P.C.
6901 Shawnee Mission Parkway
Suite 250
Overland Park, KS 66202

Scott A. Clark, Esq.
Burns, Figa & Will, P.C.
Plaza Tower One, Suite 1000
6400 South Fiddlers Green Circle
Greenwood Village, CO 80111

Neal K. Dunning, Esq.
Brown, Berardini, Dunning & Walker,
P.C.
2000 South Colorado Boulevard
Tower Two, Suite 700
Denver, CO 80222

Douglas D. Koktavy, Esq.
Douglas D. Koktavy, P.C.
Building B, Suite 120
10200 East Girard Avenue
Denver, CO 80231

Ronald E. Gold, Esq.
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45208

Peter W. Ito, Esq.
ITO Law Group, LLC
1550 Larimer Street
Suite 667
Denver, CO 80202

Jeffrey N. Pomerantz, Esq.
Jeffrey W. Dulberg, Esq.
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067-4100

Gregory S. Bell, Esq.
Bell, Gould, Linder & Scott, P.C.
322 East Oak Street
Fort Collins, CO 80524

NRC Realty & Capital Advisors, LLC
8601 North Scottsdale Road
Suite 310
Scottsdale, AZ 85253

Jeffrey Cohen, Esq.
c/o Fox Rothschild, LLP
1225 17th Street
Suite 2200
Denver, CO 80202

Suncor Energy (USA), Inc.
717 17th Street, 29th Floor
Denver, CO 80202
ATTN: Legal Affairs

Daniel L. Bray, Esq.
Husch Blackwell, LLP
1700 Lincoln Street
Suite 4700
Denver, CO 80203-4547

Jeffrey Springer, Esq.
Springer & Steinberg, P.C.
1600 Broadway
Suite 1200
Denver, CO 80202

Anthony J. Shaheen, Esq.
Jessica M. Schmidt, Esq.
Holland & Hart, LLP
555 17th Street, Suite 3200
Denver, CO 80201-8749

Vicky Martina

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT is made effective as of December 23, 2014, and is entered into by and among **WESTERN CONVENIENCE STORES, INC.**, a Colorado corporation ("WCS"), **HOSSEIN TARAGHI**, an individual ("H. Taraghi"), and **DEBRA TARAGHI**, an individual ("D. Taraghi," and collectively with WCS, WCS One LLC and H. Taraghi, the "Debtor"), and the parties listed on Schedule I and **WCS ONE LLC**, a Colorado limited liability company (collectively, the "Guarantors"), and **SUNCOR ENERGY (U.S.A.) INC.**, a Delaware corporation ("Suncor").

## RECITALS

A.    Suncor extended commercial credit to WCS in connection with the sale of motor fuels by Suncor to WCS.

B.    WCS's obligations to Suncor were guaranteed in part by H. Taraghi and D. Taraghi.

C.    In May, 2011, WCS refused to pay amounts owed to Suncor for petroleum products sold to WCS.

D.    In response to Suncor's demand that Debtor pay amounts due and owing to Suncor, WCS filed a lawsuit with the District Court of State of Colorado, captioned Civil Action No. 11-cv-01611-MSK-CBS, *Western Convenience Stores, Inc. v. Suncor Energy (U.S.A.) Inc. v. Hossein Taraghi and Debra Lynn Taraghi* (the "Lawsuit").

E.    In the Lawsuit, the Final Judgment has entered against Debtor in favor of Suncor, subject to the pending award for costs and attorneys' fees and related expenses.

F.    Debtor has filed a notice of appeal of the Final Judgment (the "Appeal") in the Lawsuit before the U.S. Court of Appeals for the 10th Circuit (the "10th Circuit").

G.    Debtor wishes to enter into a payment plan for the repayment of the indebtedness owed under the Final Judgment, and following the successful completion of such plan, Debtor shall have satisfied the Total Indebtedness pursuant to the terms and conditions of this Agreement.

H.    To facilitate the payment plan, Debtor has requested that Suncor not pursue any collection efforts under the Final Judgment. Suncor is willing to accommodate Debtor's request, only under the terms and conditions of this Agreement, which will include a dismissal, with prejudice, of the Appeal.

NOW, THEREFORE, in consideration of the covenants and conditions, representations and warranties contained herein, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1

## EXHIBIT A

The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings (such definitions to be equally applicable to the singular and the plural forms thereof):

1.1    "Agreement" shall mean this Forbearance Agreement as originally executed and as amended, restated or supplemented from time to time.

1.2    "Aircraft" shall mean the 1986 Dassauly-Brequet Mystere Falcon 200 Jet owned by WCS One LLC.

1.3    "Aircraft Security Agreement" shall mean that certain Aircraft Security Agreement granted by WCS One LLC for the benefit of Suncor, which encumbers the Aircraft.

1.4    "Appraisal" shall have the meaning set forth in Section 5.19(c).

1.5    "Bankruptcy Code" means the United States Bankruptcy Code, Title 11 U.S.C.

1.6    "Business Day" shall mean every day except a Saturday, Sunday or public holiday in Denver, Colorado.

1.7    "Code" shall mean the Internal Revenue Code of 1986, as amended.

1.8    "Collateral" shall mean all real and personal property, tangible and intangible, and the products and proceeds thereof, which secures the Total Indebtedness, including, without limitation, the Properties, Personal Property and the Aircraft.

1.9    "Control" shall mean the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise. The terms "Controlled" and "Controlling" shall have correlative meanings.

1.10    "Costs, Expenses and Attorneys' Fees" shall mean all reasonable attorneys' fees, consultants' fees, experts' fees, appraisal fees and costs, receivers' fees, and all other costs and expenses.

1.11    "Creditors' Rights Laws" shall have the meaning set forth in Section 4.10

1.12    "D. Taraghi" has the meaning set forth in the Preamble.

1.13    "Debtor" has the meaning set forth in the Preamble.

1.14    "Deeds of Trust" shall mean the deeds of trust granted by the Forbearance Parties on the properties listed on Exhibit A, as the Exhibit may be amended from time to time, encumbering their respective Properties for the benefit of Suncor, which secure this Agreement and the other Obligations, in form and substance satisfactory to Suncor, as amended, restated or supplemented from time to time.

1.15    "Default" shall mean any event which if continued uncured would, with notice or lapse of time or both, constitute an Event of Default.

1.16    "Effective Date" shall mean the date of this Agreement.

1.17    "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may from time to time be amended, and the rules and regulations promulgated thereunder by any governmental agency or authority, as from time to time in effect.

1.18    "ERISA Affiliate" shall mean any trade or business (whether or not incorporated) which is a member of a group of which Debtor or Guarantors is a member and which is under common control within the meaning of Section 414 of the Code, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

1.19    "Event of Default" shall have the meaning set forth in Section 7.1.

1.20    "Final Judgment" shall mean the final judgment issued pursuant to the Opinion and Order Directing Entry of Judgment in favor of Suncor against Debtor, dated August 22, 2014, in the Lawsuit, entered in the same action, as amended by the Court after the filing of the Stipulation for Judgment, to include the pending award for costs and attorneys' fees and related expenses, in the amount of $10,235,179.79, or such other amount as the Court determines.

1.21    "Financing Statement" shall have the meaning set forth in Section 2.9(f).

1.22    "Forbearance Documents" shall mean any and all documents evidencing and securing the Total Indebtedness and shall include, without limitation, the Final Judgment, this Agreement, the Security Documents, the Guaranty Agreement, and any other agreements, documents, or instruments evidencing, securing, or otherwise relating to the Final Judgment, as such agreements, documents, and instruments may be amended, restated or supplemented from time to time.

1.23    "Forbearance Interest Rate" shall mean an annual rate equal to seven percent (7.0%).

1.24    "Forbearance Party" and "Forbearance Parties" shall mean, individually or collectively, as the context requires, Debtor, Guarantors and each other Person that from time to time is or becomes obligated to Suncor under any Forbearance Document.

1.25    "Forbearance Period" shall have the meaning set forth in Section 2.2.

1.26    "GAAP" shall mean those generally accepted accounting principles and practices which are recognized as such by the American Institute of Certified Public Accountants acting through its Accounting Principles Board or by the Financial Accounting Standards Board or through other appropriate boards or committees thereof and which are consistently applied for all relevant periods so as to properly reflect the financial condition, and the results of operations and statement of cash flow of Debtor, except that any accounting principle or practice required to be changed by the Accounting Principles Board or Financial Accounting Standards Board (or other

3

appropriate board or committee of such Boards) in order to continue as a generally accepted accounting principle or practice may so be changed.

1.27   "Governmental Entities" shall mean any governmental or quasi-governmental entity, agency, authority, board, commission, or governing body authorized by federal, state or local laws or regulations as having jurisdiction over Debtor, Guarantors or any of the Properties or the operation thereof.

1.28   "Guarantors" has the meaning set forth in the Preamble.

1.29   "H. Taraghi" has the meaning set forth in the Preamble.

1.30   "Hazardous Substances" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any environmental law.

1.31   "Improvements" shall mean the all buildings and improvements now or hereafter erected on the Land including, without limitation, the fixtures, attachments, appliances, equipment, machinery, and other articles attached to said buildings and improvements.

1.32   "Indebtedness" shall mean for any Person, but without duplication:   (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, including mandatorily redeemable preferred stock, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business and other than property management fees, fees paid under advisory agreements and other reasonable fees paid to affiliates), (f) all indebtedness (excluding non-recourse carve-out guarantees until such Person is called upon to make payments under any of these guarantees, at which time such guarantees shall thereafter be included in the definition of Indebtedness to the extent of the actual liability thereunder) of others secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be seemed by) any lien on property owned or acquired by such Person in an amount equal to the lesser of such Indebtedness or the value of the encumbered property, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such Person of indebtedness of others (excluding non-recourse carve-out guarantees until such time as such Person is called upon to make payments under any of these guarantees, at which time such guarantees shall thereafter be included in the definition of Indebtedness to the extent of the actual liability thereunder), (h) all capital lease obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.   The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefore as a result of such Person's ownership interest in or other relationship with such entity, except to

4

the extent the terms of such Indebtedness provide that such Person is not liable therefor. Indebtedness shall be calculated on a consolidated basis in accordance with GAAP unless otherwise indicated herein.

1.33    "Initial Lump Sum Payment" shall have the meaning set forth in Section 2.3.

1.34    "Land" shall mean that certain real property that is commonly known by the addresses listed on Exhibit A, as the same may be amended from time to time, attached hereto and by this reference incorporated herein, which is owned by the Forbearance Party identified on Exhibit A, as the same may be amended from time to time.

1.35    "Lawsuit" shall have the meaning set forth in the Recitals.

1.36    "Leases" shall have the meaning set forth in the Deed of Trust.

1.37    "Lien or Encumbrance" and "Liens and Encumbrances" shall mean, respectively, each and all of the following: any lease or other right to use; any assignment as security, conditional sale, grant in trust, lien, mortgage, pledge, security interest, title retention arrangement, other encumbrance, or other interest or right securing the payment of money or the performance of any other liability or obligation, whether voluntarily or involuntarily created and whether arising by agreement, document, or instrument, under any law, ordinance, regulation, or rule (federal, state, or local), or otherwise, and any option, right of first refusal, or other interest or right affecting the Properties or any portion thereof.

1.38    "Material Adverse Occurrence" shall mean any occurrence of whatsoever nature (including, without limitation, any adverse determination in any litigation, arbitration or governmental investigation or proceeding) which materially, substantially and adversely affect the present financial condition or operations of a Forbearance Party or materially and substantially impairs the ability of a Forbearance Party to perform its obligations under the Forbearance Documents.

1.39    "Material Indebtedness" shall have the meaning set forth in Section 7.1(p).

1.40    "Minimum Release Value" shall mean the following: (a) $1,000,000 for 16 Fox Tail Circle, Englewood, CO, (b) $300,000 for 4285 Hudson Parkway, Englewood, CO, (c) $500,000 for 2000 Fashion Show Dr., #1906, Las Vegas, Nevada, and (d) $100,000 for 772 Ivywood Court, Highlands Ranch, CO.

1.41    "Obligations" shall mean the obligations of Debtor:

(a)    To pay Suncor any and all amounts owed to Suncor of any kind or nature, including without limitation, the Reduced Indebtedness and all interest thereon, or if an Event of Default has occurred, to pay the Total Indebtedness and all interest thereon;

(b)    To repay to Suncor all amounts advanced hereunder or under any of the other Forbearance Documents on behalf of Debtor, including, without limitation, advances for taxes, levies or insurance on the Collateral; and

5

DEC-1781006-9

(c) To reimburse Suncor, on demand, for all of Suncor's expenses and costs, including the costs described in Section 9.13 of this Agreement and including all Costs, Expenses and Attorneys' Fees incurred by Suncor, in connection with the preparation, administration, amendment, modification or enforcement of this Agreement and the other Forbearance Documents, including, without limitation, any proceeding brought, or threatened, to enforce payment of any of the obligations referred to in the foregoing paragraphs (a) and (b); *provided* that expenses incurred by Suncor prior to the Effective Date for the preparation of the Forbearance Documents shall not be Obligations and shall instead be paid pursuant to a separate fee letter agreement between Debtor and Suncor.

1.42    "Periodic Monthly Payments" shall have the meaning set forth in Section 2.3.

1.43    "Permitted Exceptions" shall mean the exceptions and other matters relating to title to the Properties that are (a) the Liens and Encumbrances expressly disclosed on Exhibit A, (b) taxes for the current year, a lien not presently due and payable, (c) Leases that are unconditionally subordinate to the Deeds of Trust, and (d) distribution utility easements.

1.44    "Person" shall mean any natural person, corporation, firm, association, government, governmental agency or any other entity, whether acting in an individual, fiduciary or other capacity.

1.45    "Personal Property" shall have the meaning set forth in the Deeds of Trust.

1.46    "Plan" shall mean each employee benefit plan covered by Title IV of ERISA whether now in existence or hereafter instituted, of Debtor or any ERISA Affiliate.

1.47    "Pledge Agreement" shall mean that certain Pledge Agreement of even date herewith, granted by WCS and H. Taraghi to Suncor.

1.48    "Promissory Note" has the meaning set forth in Section 5.20.

1.49    "Properties" shall mean the Land together with all of the Improvements, including without limitation the Properties set forth in Exhibit A.

1.50    "Reduced Indebtedness" shall mean $5,349,701.44.

1.51    "Release Payment" shall mean an amount equal to the greater of the following: (a) the appraised value of a Residential Property in the Appraisal multiplied by 1.15, *less* the remaining principal amount of any Indebtedness secured by deeds of trust or mortgages recorded prior to January 1, 2014 (but excluding any unpaid taxes or assessments), as of the proposed date of release or as expressly disclosed on Exhibit A, whichever principal amount is less, or (b) the Minimum Release Value.

1.52    "Residential Property" or "Residential Properties" shall mean the four, residential real properties that are commonly known as follows: (a) 16 Fox Tail Circle, Englewood, CO, (b) 4285 Hudson Parkway, Englewood, CO, (c) 2000 Fashion Show Dr., #1906, Las Vegas, Nevada, and (d) 772 Ivywood Court, Highlands Ranch, CO.

6

1.53   "Second Lump Sum Payment" shall have the meaning set forth in Section 2.3

1.54   "Security Agreement" shall mean that certain Security Agreement of even date herewith, granted by the Forbearance Parties to Suncor.

1.55   "Security Documents" shall mean the Deeds of Trust, the Security Agreement, the Pledge Agreement, the Aircraft Security Agreement, the Stock/LLC Interest Pledges, the Financing Statements and any other agreements, documents, or instruments securing the Total Indebtedness, as such agreements, documents, and instruments may be amended, restated or supplemented from time to time.

1.56   "Separation Agreement" shall have the meaning set forth in Section 1.61.

1.57   "Stipulation for Judgment" shall have the meaning set forth in Section 2.1(a).

1.58   "Stipulated Dismissal" shall have the meaning set forth in Section 2.1(b).

1.59   "Stock/LLC Interest Pledges" shall mean stock powers or limited liability interest powers covering all of Debtor's and Guarantor's ownership interests in the entities being pledged pursuant to the Pledge Agreement.

1.60   "Subsidiary" shall mean, for any Person, any corporation, partnership, limited liability company or other entity of which at least a majority of the securities or other ownership interests is at the time directly or indirectly owned or controlled by such Person and/or one or more Subsidiaries of such Person, and shall include all Persons the accounts of which are consolidated with those of such Person pursuant to GAAP.

1.61   "Subordination Agreement (Equalization)" shall mean that certain Subordination Agreement (Equalization) of even date herewith, granted entered into by and among D. Taraghi, H. Taraghi, and Suncor, where H. Taraghi and D. Taraghi agree, among other things, that all equalization payments and rights to insurance proceeds under that certain Separation Agreement, entered into by Hossein and Debra Taraghi on or about June 14, 2014 (the "Separation Agreement"), are, and shall at all times be, unconditionally subordinate to the Total Indebtedness. H. Taraghi may pay, and D. Taraghi may collect, regularly scheduled equalization payments under the Separation Agreement, so long as no uncured Event of Default has occurred and is continuing under the Forbearance Documents; *provided* that upon the occurrence of an Event of Default, all such payments will stop and payments previously made shall be recoverable by Suncor.

1.62   "Subordination Agreement (Maintenance)" that certain Subordination Agreement (Maintenance) of even date herewith, granted entered into by and among D. Taraghi, H. Taraghi, and Suncor, where H. Taraghi and D. Taraghi agree, among other things, that all maintenance payments under the Separation Agreement, are, and shall at all times be, unconditionally subordinate to the Total Indebtedness. H. Taraghi may pay, and D. Taraghi may collect, regularly scheduled maintenance payments under the Separation Agreement, so long as no uncured Event of Default has occurred and is continuing under the Forbearance Documents; *provided* that upon the occurrence of an Event of Default, all such payments will stop and payments previously made shall be recoverable by Suncor.

DEC-1781006-9

1.63    "Suncor" has the meaning set forth in the Preamble.

1.64    "Total Indebtedness" shall mean the indebtedness owed by Debtor to Suncor under the Final Judgment, *plus* the principal amount of the Promissory Note, if any, collectively in an amount equal to $10,235,179.79, plus Costs, Expenses and Attorneys' Fees incurred in the enforcement of the Final Judgment.

1.65    "UFCA" shall have the meaning set forth in Section 4.10.

1.66    "UFTA" shall have the meaning set forth in Section 4.10.

1.67    "WCS" has the meaning set forth in the Preamble.

Other terms defined herein shall have the meaning ascribed to them herein.

## ARTICLE 2
## THE JUDGMENT

2.1    Stipulation to Judgment and Waiver of Appeal.

(a)    Debtor shall execute the Stipulation and Motion to Amend Final Judgment, attached as Exhibit B (the "Stipulation for Judgment"). The Stipulation for Judgment shall include, among other things, an agreement that the amount of Suncor's taxable costs in the Lawsuit is $15,833.79, and the amount of Suncor's attorneys' fees and related expenses are $4,869,644.56, and Debtor shall agree to withdraw any pleadings challenging such amounts. Suncor and Debtor shall file the Stipulation of Judgment in the Lawsuit, seeking the forthwith entry of Final Judgment against Debtor for the Total Indebtedness. After the Effective Date, interest shall accrue at the Forbearance Interest Rate on the Total Indebtedness. Suncor shall also be entitled to its Costs, Expenses and Attorneys' Fees incurred in the enforcement of the Final Judgment. Suncor shall request that the court enter such Final Judgment in substantially the form attached to the Stipulation for Judgment. Following any Event of Default, Suncor shall file with the court a partial satisfaction of the judgment against Debtor, in the following net amount: (a) the amounts due under the Final Judgment shall be partially satisfied by any payments made by Debtor under this Agreement, which are actually received by Suncor on or after the Effective Date; and (b) Suncor shall be entitled to offset any costs that are incurred by Suncor under the Forbearance Documents or this Agreement, including, without limitation, Suncor's Costs, Expenses and Attorneys' Fees, against such payments.

(b)    Debtor hereby waives any right to appeal the Lawsuit. Debtor shall execute and file with the Court the Dismissal of Appeal, With Prejudice attached as Exhibit C (the "Dismissal of Appeal").

2.2    Forbearance. Provided that no Event of Default has occurred, Suncor agrees to forbear on the initiation or continuation of any and all collection efforts on the Final Judgment or the Forbearance Documents for a period of time from the date of satisfaction of all of the conditions in Sections 3.1, 3.6, and 3.7, until December 19, 2019 (the "Forbearance Period").

8

DEC-1781006-9

2.3     Reduced Indebtedness.  Provided that no Event of Default has occurred, Debtor shall pay to Suncor (at the address in Section 9.3 of this Agreement, or such other address designated by Suncor in writing) the amount of Five Million Three Hundred Forty Nine Thousand, Nine Hundred and Seventy and 44/100 Dollars ($5,349,970.44) during the Forbearance Period, with interest accruing thereon from the Effective Date at the Forbearance Interest Rate.  Such amounts shall be paid as follows:

(a)     On or before December 31, 2014, Debtor shall pay Suncor the amount of One Million One Hundred Thousand and No/100 Dollars ($1,100,000.00) ("Initial Lump Sum Payment").

(b)     On or before September 30, 2015, Debtor shall pay Suncor the amount of One Million Four Hundred Thousand and No/100 Dollars ($1,400,000.00) ("Second Lump Sum Payment").

(c)     Debtor shall pay Suncor the amount of Two Million Eight Hundred Forty Nine Thousand, Nine Hundred and Seventy and 44/100 Dollars ($2,849,970.44), plus accrued interest on the outstanding Reduced Indebtedness, which will be payable as follows:  Debtor shall also make fifty nine (59) monthly principal payments, by wire transfer, in the principal amount of Forty Seven Thousand Four Hundred Ninety Five and 02/100 Dollars ($47,495.02), each, plus interest accruing at the Forbearance Interest Rate on the then outstanding Reduced Indebtedness (collectively, the "Periodic Monthly Payments") with the first Periodic Monthly Payment being due on January 5, 2015 and each subsequent Periodic Monthly Payment being due on the fifth (5th) day of each month thereafter.   Interest on the outstanding principal amount of the Reduced Indebtedness shall accrue from Effective Date based upon the Forbearance Interest Rate computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days that the principal balance is outstanding.  If not sooner paid, the final Periodic Monthly Payment shall be due and payable on December 24, 2019.  By way of example, and not by way of limitation, a sample amortization schedule is attached as Exhibit C, which assumes that all payments are timely made under this Section 2.3, without prepayments of any kind.

All payments shall be by wire transfer to Suncor pursuant to the following wiring instructions, which may be updated by Suncor at any time upon written instructions to Debtor:

|  |  |
|---|---|
| Wire transfer to: | Wells Fargo Bank |
|  | 1740 Broadway |
|  | Denver, CO 80274 |
| Account Number: | 4945069219 |
| ABA Number: | 121000248 |
| Beneficiary: | Suncor Energy (U.S.A.) Inc. |
|  | 717 17th Street, Suite 2900 |
|  | Denver, CO 80202 |

9

Wiring instructions shall be deemed updated immediately upon receipt of updated instructions by Debtor.

2.4     Prepayment of Reduced Indebtedness.     Debtor may prepay the Reduced Indebtedness, either in whole or in part, at any time.  Any such prepayments shall not relieve Debtor of their obligation to continue to make the Periodic Monthly Payments under the payment schedule in this Agreement, and Suncor may continue to require Debtor to strictly comply with all the payment terms thereunder.  If any early partial payments, including any Release Payment made with respect to a Residential Property,  are made, then they will first be applied to reduce the Second Lump Sum Payment, if it is still outstanding, then the final Periodic Monthly Payment due, and then to reduce the number of Periodic Monthly Payments then outstanding.

2.5     No Accord and Satisfaction or Novation. Neither this Agreement nor any of the other Forbearance Documents shall constitute an accord and satisfaction of or novation to the Final Judgment.  Rather, the Total Indebtedness shall remain owing until all of the terms and conditions of the Forbearance Documents have been strictly satisfied.

2.6     Following an Event of Default.  If any Event of Default occurs, then the Total Indebtedness (and _not_ the Reduced Indebtedness) shall remain the applicable amount owing by Debtor to Suncor (less any payments received by Suncor under this Agreement), with interest being continuously accrued at the Forbearance Interest Rate on the entire Total Indebtedness from the Effective Date until all amounts owing under the Final Judgment and the Promissory Note are paid in full.  Upon the occurrence of an uncured Event of Default, Suncor may pursue any and all remedies available to Suncor at law, in equity, under the Final Judgment, this Agreement, or any other Forbearance Documents.

2.7     Suncor's Right to Cure Defaults.     Upon the occurrence and during the continuance of any Default or Event of Default which, in Suncor's sole judgment, would adversely affect Suncor's interest in the Collateral or its rights under the Forbearance Documents, Suncor shall have the right, but not the obligation, to take any action and to advance or expend any funds required to cure such Default or Event of Default, and without limiting the generality of Section 2.8, below, any amounts expended by Suncor in doing so shall constitute advances under this Agreement and additional Obligations evidenced by this Agreement and secured by the Security Documents.

2.8     Advances Secured by Forbearance Documents.     Any amounts advanced or expended by Suncor to cure any Defaults or Events of Default, or to exercise the rights and remedies of Suncor under the terms of any Forbearance Document, or as otherwise permitted by the terms of any Forbearance Document shall, as and when advanced or incurred, constitute additional Obligations evidenced by this Agreement and secured by the Security Documents, whether or not the aggregate of all Obligations shall then or thereafter exceed the face amount of Total Indebtedness.

2.9     Forbearance Documentation and Security.  The Obligations of Debtor to Suncor in connection with the Total Indebtedness are secured by the liens, security interests, and covenants created by this Agreement and the following documents:

10

(a)     the Deeds of Trust;

(b)     the Security Agreement;

(c)     the Pledge Agreement;

(d)     the Aircraft Security Agreement;

(e)     Subordination Agreement (Equalization); and

(f)     UCC-1 financing statement(s) required to perfect Suncor's security interest in the Collateral (the "Financing Statements").

All documentation evidencing the foregoing shall be in form and substance satisfactory to Suncor and shall include consents from such third parties as Suncor deems necessary or appropriate. Nothing in this Agreement prohibits Debtor from communicating with its other lenders, including sharing the terms of this Agreement.

2.10   Guaranty Agreement. Debtor's payment and performance the Obligations shall be guaranteed by Guarantors pursuant to that certain Guaranty Agreement, executed Guarantors (as it may be amended, restated or supplemented from time to time, the "Guaranty Agreement"), in form and substance satisfactory to Suncor.

2.11   Intercreditor Agreements. Suncor may, in its sole discretion, and Debtor shall, upon Suncor's request, enter into such intercreditor and subordination agreements with other creditors of Debtor, as Suncor may deem necessary or desirable, in its sole discretion. Nothing in this Agreement prohibits Debtor from communicating with its other lenders, including sharing the terms of this Agreement.

2.12   Security Interest. As security for the Obligations, Debtor and Guarantors hereby grant to Suncor a security interest in all goods, accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, instruments, investment property, letter-of-credit rights, letters of credit, money, contracts and contracts rights, and other assets of every kind, whether now owned or hereafter acquired by each Debtor and Guarantor, together with all proceeds and products thereof.

2.13   Judgment Liens. Notwithstanding anything in this Agreement or the other Forbearance Documents to the contrary, as additional security for the obligations of Debtor, Suncor may register its Final Judgment, record or file judgment liens in any jurisdiction, and take any other steps Suncor deems, necessary, in its sole discretion, to perfect or continue the perfection and priority of Suncor's judgment liens. Debtor will take such further actions and execute such documents or instruments as Suncor determines necessary or desirable to effectuate the foregoing.

**ARTICLE 3**
**CONDITIONS TO CLOSING**

11

Suncor's obligation to enter into and perform its agreements under this Agreement is subject to the full and complete satisfaction of the following conditions (provided that (i) Suncor may execute this Agreement prior to the satisfaction of any or all such conditions, which shall not constitute a waiver of Suncor's right to require satisfaction of any or all of the following conditions precedent, and (ii) Suncor may, in its sole and absolute discretion, waive any of the following conditions precedent at any time), including receipt and approval by Suncor of the following agreements, documents and instruments, each in form and substance satisfactory to Suncor, in each case as determined by Suncor in its sole and absolute discretion on or before the Effective Date and subsequently:

3.1    Forbearance Documents.  Suncor shall have received and approved fully executed copies of the Forbearance Documents which shall have been duly authorized, executed (and, where appropriate, acknowledged), and delivered by the parties thereto and any and all other documents as Suncor may deem reasonably necessary.

3.2    Review Items.  Suncor shall have received and approved the following, all of which must be in form and substance satisfactory to Suncor:

(a)    Current Financial Statements.  Current financial statements, tax returns and other financial information as Suncor may require for Debtor and Guarantors.

(b)    Corporation, Limited Liability Company, or Partnership Documents.  If any Forbearance Party is a corporation, a limited liability company, or a partnership, (i) certified copies of resolutions of its board of directors or consents of the members of the limited liability company or partners of the partnership, as the case may be, authorizing such Forbearance Party to execute, deliver, and perform the Forbearance Documents and to grant to Suncor the Liens and Encumbrances on the Collateral and certifying the names and signatures of the officer(s), member(s), manager(s), or partner(s), as the case may be, of such Forbearance Party authorized to execute the Forbearance Documents, (ii) the articles of incorporation or organization or certificate of partnership, as the case may be, of such Forbearance Party (iii) the bylaws, operating agreements, or partnership agreements, as the case may be, of such Forbearance Party and all amendments thereto, (iv) any filed or recorded fictitious name certificate for such Forbearance Party and all amendments thereto, and (v) a certificate of good standing from the jurisdiction of formation or organization of such Forbearance Party, and a certificate of qualification authorizing such Forbearance Party to transact business in each State in which it owns the Properties or otherwise conducts business.

3.3    Title and Other Matters.  Title to the Properties, the legal description of the real property, and all documents and other matters relating in any way to the Total Indebtedness or to the Properties must be to the satisfaction of Suncor.

3.4    Satisfactory Due Diligence.  The satisfactory completion by Suncor, in its sole discretion, of Suncor's due diligence into Debtor's and Guarantors' assets and financial status, including the completion of lien and judgment searches.

DEC-1781006-9

3.5     Other Documents and Assurances.  Receipt by Suncor of any other documents and assurances as it may reasonably request to comply with the provisions of this Agreement.

3.6     Stipulation of Judgment and Stipulated Dismissal.  The filing of the Stipulation of Judgment and Stipulated Dismissal in the Lawsuit.

3.7     Stock/Limited Liability Company Interest Certificates.  The original, or a validly issued replacement, stock or limited liability company interest certificates of WCS and each Guarantor shall have been delivered to Suncor.  To the extent necessary the organizational documents of WCS and each Guarantor shall have been amended or restated to permit the certification of the ownership interests and the certification of WCS and each Guarantor shall have occurred.

## ARTICLE 4
## REPRESENTATIONS, WARRANTIES AND COVENANTS

In order to induce Suncor to enter into this Agreement and conditionally reduce the Total Indebtedness, each Forbearance Party, for itself, himself or herself represents, warrants and covenants as follows, which representations, warranties and covenants shall be true and correct as of the execution hereof and shall survive the execution and delivery of the Forbearance Documents:

4.1     Organization of Forbearance Party; Authority to Enter into Agreement.  If any Forbearance Party is a corporation, limited liability company, partnership or trust, the Forbearance Party (and if applicable, each partner, manager or member of the Forbearance Party) is duly formed and validly in existence and in good standing under the laws of the state of its organization and is qualified to do business and is in good standing in each state where the nature of its business makes such qualification necessary.  Each Forbearance Party has the full power and authority to enter into the Forbearance Documents to which it is a party and to execute and carry out the provisions of such Forbearance Documents.  The execution, delivery and performance of the Forbearance Documents have been duly authorized by all necessary action of each Forbearance Party and no other action of any Forbearance Party is required for the execution, delivery and performance of the Forbearance Documents.  The Forbearance Documents which have been executed and delivered pursuant to this Agreement constitute, or, if not yet executed or delivered, will when so executed and delivered, constitute valid and binding obligations of each Forbearance Party, respectively, each enforceable in accordance with its respective terms, except as such enforcement may be limited by bankruptcy or insolvency laws and equitable principles relating to creditors' rights.

4.2     No Conflict; Government Consent.  Neither the execution and delivery by the Forbearance Parties of the Forbearance Documents, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof or thereof will violate in any respect any law, rule, regulation, order, writ, judgment, injunction, decree or award binding on the applicable Forbearance Party or such Forbearance Parties governing documents or any instrument or agreement to which such Forbearance Party is a party or is subject, or by which it, or its Properties, is bound, or conflict with or constitute a default thereunder, or result in the creation or imposition of any Lien or Encumbrance in, of or on the property of the applicable

13

Forbearance Party. No order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any governmental or public body or authority, or any subdivision thereof, is required to authorize, or is required in connection with the execution, delivery and performance of, or the legality, validity, binding effect or enforceability of, any of the Forbearance Documents.

4.3    Financial Statements.    Any financial statements, supporting schedules, and financial reports heretofore delivered to Suncor in connection with the Forbearance Documents by or on behalf of a Forbearance Party are true and correct in all respects, and fairly represent the respective financial conditions of the subjects thereof as of the dates thereof and for the periods covered thereby, and no Material Adverse Occurrence has occurred in the financial conditions presented therein since the respective dates thereof. Such statements and reports for Debtor, Guarantors and the Properties have been prepared in accordance with GAAP.

4.4    No Litigation.    Other than the Lawsuit, there are no actions, suits or proceedings pending, or to the knowledge of the Forbearance Party threatened against or affecting the Forbearance Party, or any of the property or assets of the Forbearance Party, in any court at law or in equity, or before or by any governmental or municipal authority which would substantially and adversely affect the ability of the Forbearance Party to perform their obligations hereunder or under any of the Forbearance Documents to which the Forbearance Party is a party, or might substantially and adversely affect the priority of Suncor's liens and security interests with respect to Debtor's property or assets, except as disclosed to Suncor in writing prior to the Effective Date.

4.5    Marketable Title.    Each of the Forbearance Parties listed on Exhibit A has good and marketable title in fee simple to the real property comprising their respective Properties, free and clear of all Liens and Encumbrances, excepting only the lien for general taxes for the current year and the Permitted Exceptions. Each Forbearance Party has good and marketable title to all of its other property and assets, real and personal, which secure repayment of this Agreement. None of the Properties are subject to a ground lease or similar ownership arrangement. No Liens and Encumbrances encumbering the Property or any other Collateral have been created or granted by any Forbearance Party since January 1, 2014.

4.6    Covenants, Zoning and Codes.    To the best of the Forbearance Parties' knowledge, the Forbearance Parties have complied, and will continue to comply, with all applicable statutes and regulations to be complied with in connection with the operation of the Improvements, including, without limitation and to the extent applicable, all statutes and regulations regarding environmental issues, the Americans with Disabilities Act of 1990, and historical preservation acts and regulations. All permits, consents, approvals or authorizations by, or registrations, declarations, withholding of objections or filings with any governmental body or private entity necessary in connection with the valid execution, delivery and performance of this Agreement, the Forbearance Documents, and any and all other documents executed in connection with any of the foregoing, or presently necessary for the operating of the Improvements, has been obtained and will be valid, adequate and in full force and effect, except any filings necessary to perfect the liens created by the Forbearance Documents. The Improvements will in all respects conform to and comply with all covenants, conditions, restrictions and reservations affecting the Properties, with all applicable zoning, including

14

DEC-1781006-9

parking requirements, subdivision, environmental protection, use and building codes, laws, regulations and ordinances.

.4.7    Compliance with Hazardous Substance Covenants.  The Properties, and the use, occupancy and operation of the Properties will comply with all covenants and agreements of Debtor regarding Hazardous Substances, during the period of the Forbearance Parties' ownership and, to the best of the Forbearance Parties' actual knowledge, presently comply.

4.8    Compliance With Documents.  As of the Effective Date and for so long as the Forbearance Documents remain in effect, each Forbearance Party is and will remain in full compliance with all of the terms and conditions of this Agreement and the Forbearance Documents to which such Forbearance Party is signatory, and no Event of Default has or shall have occurred and be continuing.

4.9    Responsible Parties.  Each Forbearance Party acknowledges and agrees that the acts of each other Forbearance Party and its employees and agents resulting in a violation of the Forbearance Documents will constitute a default by all Forbearance Parties under such Forbearance Documents, and that the violation of any representations, warranties, covenants and agreements of any Forbearance Party resulting in a violation of the Forbearance Documents will constitute a default by all Forbearance Parties under such Forbearance Documents.

4.10    Solvency.  Each Forbearance Party has (a) not entered into the transaction evidenced by this Agreement or any other Forbearance Documents with the actual intent to hinder, delay or defraud any present or future creditor of such Forbearance Party and (b) received reasonably equivalent value in exchange for its obligations under the Forbearance Documents. Giving effect to the Final Judgment and the Promissory Note, the fair saleable value of the assets of each Forbearance Party exceeds and will exceed the total liabilities of such Forbearance Party, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities. Each Forbearance Party is able to pay its debts (including debts arising from any liability on contingent, subordinated, absolute, fixed, matured or unmatured and liquidated or unliquidated claims) as they mature in the normal course of business.  No Forbearance Party intends to incur debts that would be beyond its ability to pay as such debts mature.  No Forbearance Party is engaged in a business or a transaction, or about to engage in a business or a transaction, for which its property would constitute an unreasonably small capital.  No petition in bankruptcy has been filed against any Forbearance Party in the last seven (7) years, and no Forbearance Party in the last seven (7) years has taken advantage of any law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, receivership, arrangement, adjustment, winding-up, liquidation, dissolution, assignment for the benefit of creditors, composition or other relief with respect to its debts or debtors ("Creditors' Rights Laws").  No Forbearance Party is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or the majority of the present fair market value of its assets or property, and no Forbearance Party has any knowledge nor has any reason to know of any Person contemplating the filing of any such petition against any such Forbearance Party.

4.11    ERISA Compliance.  No Forbearance Party has adopted a Plan.  As of the Effective Date and throughout the term of the Total Indebtedness (a) no Forbearance Party is, and none of them will be, an "employee benefit plan," as defined in Section 3(3) of ERISA,

subject to Title I of ERISA, (b) none of the assets of any Forbearance Party constitutes or will constitute, by virtue of the application of 29 C.F.R. Section 2510.3-101(f) as modified by Section 3(42) of ERISA, "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101, (c) no Forbearance Party is, and none of them will be, a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with the Forbearance Parties are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans.

4.12    Prior Transfers. From January 1, 2014 through the Effective Date, no Forbearance Party has merged into or consolidated with any other Person, or sold, transferred, leased or otherwise disposed of (in one transaction or in a series of transactions) any of its assets (other than dispositions in the ordinary course of business), or the stock of any of its Subsidiaries (in each case, whether now owned or hereafter acquired) or, liquidated or dissolved.

4.13    Survival of Representations.    All representations, warranties and covenants contained in this Article 4 shall survive the delivery of the Forbearance Documents, and any investigation at any time made by or on behalf of Suncor shall not diminish its rights to rely on all of such representations and warranties.

## ARTICLE 5
## GENERAL COVENANTS

Until the Obligations are paid and performed in full, each Forbearance Party agrees that, unless Suncor otherwise agrees in writing in Suncor's absolute and sole discretion:

5.1    Reporting Requirements.    Debtor and Guarantors, as applicable, agree to deliver to Suncor financial statements and reports, in form acceptable to Suncor, as follows:

(a)    Not later than ten (10) Business Days following each calendar quarter commencing with the quarter ending December 31, 2014, consolidated quarterly and year-to-date financial statements of Debtor and Guarantors, which shall include a balance sheet, a statement of income and such other financial statements as Suncor may require, all certified as true and correct by Debtor; and

(b)    Within ten (10) Business Days following Suncor's request, (i) such other information respecting the condition or operations, financial or otherwise, of Debtor or Guarantors, or pertaining to the Collateral, as Suncor may from time to time reasonably request, including, but not limited to third party documents related to Debtor's and Guarantors' Indebtedness, bank statements, account ledgers and accounts receivable reports,    and (ii) updates regarding the status of any of the items subject to notice requirements under Section 5.5(a) or (b).

5.2    Taxes and Insurance.    If requested by Suncor, each Forbearance Party shall promptly deliver verification that all real estate taxes and insurance premiums that are due and payable for the Properties have been paid, in form and detail reasonably satisfactory to Suncor.

5.3    Payment of Taxes.    The Forbearance Parties shall pay and discharge, or cause to be paid or discharged, prior to delinquency, all taxes, assessments and other governmental

charges, levies or impositions against or on any of their properties and assets, as well as claims of any kind, which, if unpaid, might become a lien upon any of its properties, unless the same are being contested in good faith by appropriate proceedings diligently conducted and the Forbearance Parties are maintaining adequate reserves therefor (or in the case of taxes that are required to be paid during such contest, the Forbearance Parties have paid such taxes under protest).

5.4     Insurance.

(a)     The Forbearance Parties shall maintain original certificates of insurance policies issued by insurance companies in form and content acceptable to Suncor, providing the insurance coverages reasonably required by Suncor.

(b)     On or before March 15, 2015, Debtor will obtain a five year term life insurance policy covering H. Taraghi, which policy shall remain in effect throughout the Forbearance Period and shall name Suncor as the beneficiary. Debtor will use reasonable efforts to get such policy in the amount of $10,000,000. If Debtor is unable to obtain $10,000,000 in coverage, Debtor will obtain the highest amount below that possible, which in no event shall be less than $7,000,000.   Such insurance policy and will be issued by an insurance company acceptable to Suncor and be in form and content acceptable to Suncor.

5.5     Notices.  Each Forbearance Party, each for itself, himself or herself, as soon as practicable after such Forbearance Party obtains actual knowledge thereof, shall give notice to Suncor of:

(a)     The commencement of any litigation relating to any Forbearance Party or relating to the transactions contemplated by this Agreement;

(b)     The commencement of any arbitration or governmental investigation or proceeding not previously disclosed by the Forbearance Party to Suncor in writing which has been instituted or, to the knowledge of the Forbearance Party, threatened against any Forbearance Party or to which its properties or assets are subject;

(c)     Any new agreement or modification of any existing agreement related to Debtor's or Guarantors' Material Indebtedness, copies of such agreements or modifications will be provided to Suncor within ten (10) days of their execution; and

(d)     Any Default or Event of Default under this Agreement or the Forbearance Documents or any agreement related to Debtor's or Guarantors' Indebtedness to any third party.

5.6     Books and Records, Periodic Audits.  Forbearance Parties shall keep books and records concerning the Properties reflecting all of its business affairs and transactions in accordance with GAAP and permit Suncor, and its representatives and agents at reasonable times and intervals and upon reasonable notice to ay Forbearance Party, to visit all of its offices, discuss its financial matters with officers of such Forbearance Party and its independent public accountants, if any (and by this provision, Forbearance Parties authorize their independent public

17

accountants, if any, to participate in such discussions) and examine any of its books and other corporate records. Such audits shall be at the expense of Debtor.

5.7     Inconsistent Agreements. No Forbearance Party shall enter into any agreement containing any provision that would be violated or breached by such Forbearance Party in the performance of its obligations under any Forbearance Document.

5.8     Accuracy of Information. All factual information heretofore or herewith furnished by or on behalf of each Forbearance Party to Suncor for purposes of or in connection with this Agreement or any transaction contemplated hereby is, and all other such factual information hereafter furnished by or on behalf of each Forbearance Party to Suncor will be true and accurate in every respect on the date as of which such information is dated or certified and no such information contains any misstatement of fact or omits to state a fact or any fact necessary to make the statements contained therein not misleading.

5.9     Compliance with Laws. Each Forbearance Party shall carry on its business activities in compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, and each Forbearance Party will, and will cause each Subsidiary to, comply in all respects with all laws, rules, regulations, orders, writs, judgments, injunctions, decrees or awards to which it may be subject including, without limitation, all environmental laws.

5.10     Conduct of Business. The Forbearance Parties shall maintain and keep their assets, property and equipment in good repair, working order and condition and from time to time make or cause to be made all needed renewals, replacements and repairs.

5.11     Maintain Business. WCS and the Guarantors shall continue to engage primarily in the business being conducted on the Effective Date.

5.12     Consolidation, Merger, Sale or Disposal of Assets. Neither Debtor nor any of the Guarantors shall, without the consent of Suncor:

        (a)     consolidate or merge into or with any other entity; or

        (b)     dissolve, terminate, liquidate in whole or in part; or

        (c)     sell, transfer, lease, or otherwise dispose of all, or substantially all, of its assets during the term of this Agreement.

5.13     Liens and Secondary Financing. Except for the Permitted Exceptions, no Forbearance Party shall permit any liens against any property owned by such Forbearance Party, including the Properties, or any secondary financing on any property owned by such Forbearance Party, including the Properties, without Suncor's approval, which approval may be withheld in Suncor's sole discretion.

5.14     Indebtedness. Without Suncor's prior written consent, no Forbearance Party shall incur or assume any Indebtedness not existing as of the Effective Date and disclosed in writing to

18

Suncor with rights or remedies senior to Suncor, other than the Total Indebtedness and trade debt incurred in the ordinary course of business.

5.15    Distributions.  At any time when no Default or Event of Default exists, WCS and Guarantors may distribute funds, in the ordinary course of business, not needed to pay WCS's or Guarantors' costs or expenses related to the Collateral to H. Taraghi and D. Taraghi.  None of the Forbearance Parties shall make any distributions at any time when any Default or Event of Default has occurred and is continuing, nor shall the Forbearance Parties shall make any extraordinary distributions that are inconsistent with the Forbearance Parties' past business practices.

5.16    Change in Ownership Interests.  After the Effective Date, none of the Forbearance Parties will cause or permit to exist, whether occurring voluntarily or involuntarily, (a) any change in the legal or beneficial ownership of any Forbearance Party, which results in a transfer of the interest of any Forbearance Party or a change of Control of any Forbearance Party, without the prior written consent of Suncor, or (b) any change in the organizational documents of any Forbearance Party without the prior written consent of Suncor.

5.17    Waiver of Homestead Exemption.  To the extent permitted by applicable law, each Forbearance Party hereby waives all rights to any homestead or other exemption to which such Forbearance Party would otherwise be entitled under any present or future constitutional, statutory, or other provision of applicable state or federal law.

5.18    Release of Aircraft.  Debtor shall be entitled to a release of the Aircraft from the Aircraft Security Agreement upon the occurrence of a sale, transfer and/or conveyance of the Aircraft, and upon all of the following terms and conditions being strictly satisfied:

(a)    Debtor makes a written request to Suncor, no earlier than ninety one (91) days after the date that all the requirements of Article 3 have been satisfied and all Security Documents have been duly filed and recorded;

(b)    Debtor pays the Second Lump Sum Payment or, if the Second Lump Sum Payment is not yet due and payable at the time of the sale, Debtor pays the net proceeds of the sale of the Aircraft to Suncor, which shall be applied as a partial pre-payment of the Total Indebtedness;

(c)    No Event of Default has occurred and is continuing, which has not been waived or cured with in any applicable cure period, nor does any Default exist;

(d)    The purchaser of the Aircraft is a bona fide purchaser, and the transaction is otherwise at arms-length, and the Aircraft is sold for reasonable market value consideration;

(e)    Debtor provides Suncor with a copy of the sales contract for Aircraft at least ten (10) Business Days prior to closing; and

(f)    Debtor pays to Suncor any and all Costs, Expenses and Attorneys' Fees incurred by Suncor in effectuating the partial release.

19

5.19    Partial Releases of Residential Properties.  Debtor shall be entitled to a partial release of each of the Residential Properties from the Deeds of Trust, no earlier than ninety one (91) days after the date that all of the following terms and conditions being strictly satisfied:

(a)    Debtor makes a written request to Suncor, no earlier than ninety one (91) days after the date that all the requirements of Article 3 have been satisfied and all Security Documents have been duly filed and recorded;

(b)    Debtor has paid the First Lump Sum Payment, the Second Lump Sum Payment and all Periodic Monthly Payments and other payments then due under the Forbearance Documents;

(c)    Debtor has, at Debtor's sole cost and expense, obtained and provided to Suncor, an appraisal of such Residential Property, from an appraiser acceptable to Suncor in its sole discretion, and with an effective appraisal date not more than thirty (30) days prior to the proposed date of release, in a form and content acceptable to Suncor, in all respects (each, an "Appraisal");

(d)    Debtor pays the Release Payment to Suncor, which shall be applied as a partial pre-payment of the Reduced Indebtedness;

(e)    No Event of Default has occurred and is continuing, which has not been waived or cured with in any applicable cure period; and

(f)    Debtor pays to Suncor any and all reasonable Costs, Expenses and Attorneys' Fees (including, without limitation, public trustee's fees, and title endorsements) incurred by Suncor in effectuating the partial release.

Notwithstanding anything to the contrary herein, the Residential Property located at 16 Fox Tail Circle, Englewood, CO shall not be released pursuant to this Section 5.19 until the Property located at 2000 Fashion Show Dr., #1906, Las Vegas, Nevada has been released pursuant to this Section 5.19.

5.20    Promissory Note.    If the amount of the Final Judgment is less than $10,235,179.79, Debtor, jointly and severally, will execute and deliver to Suncor, within ten (10) days of the issuance of the Final Judgment, a Promissory Note, in form and substance satisfactory to Suncor, in an amount equal to the difference between $10,235,179.79 and the Final Judgment amount (the "Promissory Note").  The Promissory Note will be subject to the terms and conditions of this Agreement.

5.21    Subordination Agreement (Maintenance).    On or before February 15, 2015, H. Taraghi and D. Taraghi, if necessary, will have filed with the District Court for Arapahoe County, State of Colorado a motion to amend the order issued the domestic relations proceeding captioned Case No. 12DR3078, In re Taraghi to the extent necessary to permit the execution and performance of the Subordination Agreement (Maintenance).  Within five (5) Business Days of (i) a court approving the amended order, or (ii) February 1, 2015 if H. Taraghi and D. Taraghi determine amending the order is not necessary, Debtor will deliver to Suncor a fully executed copy of the Subordination Agreement (Maintenance).

20

DEC-1781006-9

## ARTICLE 6
## COVENANTS REGARDING THE PROPERTIES

In addition to the covenants set forth in the Forbearance Documents and those set forth in other sections of this Agreement, Debtor covenants and agrees as follows with respect to the Properties:

6.1     _Alterations._  Debtor will not cause or permit any part of the Properties to be removed, demolished or materially altered without the prior written consent of Suncor.

6.2     _Compliance with Laws._  All work performed in connection with the Properties shall comply with all applicable laws, ordinances, rules and regulations of federal, state, county or municipal governments or agencies now in force or which may be enacted hereafter, and with all directions, rules and regulations of the fire department, health department, building department or other departments of every governmental agency now having or hereafter acquiring jurisdiction over the Properties.

6.3     _Indemnify Suncor._  Debtor shall indemnify and hold Suncor harmless from all liability for any actual or alleged damage or injury of whatsoever nature relating to, arising from or in any way connected with the Properties and/or the construction of any improvements to the Properties or arising out of any Forbearance Party's breach of the provisions of this Agreement or any Forbearance Document, except for the gross negligence or willful misconduct of Suncor. Suncor may commence, appear in or defend any action or proceeding purporting to affect the rights, duties or liabilities of the parties hereto, or the Collateral, including without limitation, the Properties, or any portion thereof, and Debtor shall pay all of Suncor's Costs, Expenses and Attorneys' Fees incurred thereby within a reasonable amount of time not to exceed fifteen (15) days following Suncor's demand. Suncor agrees to notify Debtor of any action or proceeding brought against Suncor under this Section; _provided, however,_ that failure to so notify Debtor shall not affect the obligations of Obligations under this Section. This Section shall survive execution, delivery and performance of this Agreement, the Security Documents and the Forbearance Documents.

6.4     _Personal Property Incorporation._  At Suncor's request, Debtor shall provide to Suncor an inventory of the Personal Property and shall execute or cause to be executed such financing statements as may be reasonably required to perfect Suncor's lien on the same. No Personal Property shall be purchased or installed in the Improvements by any Forbearance Party under any security agreement, conditional sales contract or other agreement wherein the seller reserves a security interest in, or the right to remove or to repossess, such items or to consider them personal property after their incorporation into the Improvements.

6.5     _Further Assurances._  Each Forbearance Party will at any time and from time to time upon the reasonable request of Suncor take or cause to be taken any action, execute, acknowledge, deliver or record any further documents, opinions, mortgages, deeds of trust, security agreements, financing statements or other instruments or obtain such additional insurance as Suncor in its reasonable discretion deems necessary or appropriate to carry out the purposes of this Agreement and to preserve, protect and perfect the security interests intended to

21

be created or preserved in the Collateral, the Properties, and other properties and assets securing the obligations of the Forbearance Parties under this Agreement and the Forbearance Documents.

6.6     Additional Deeds of Trust.  Each Guarantor shall, with respect to each and every piece of real property listed in Exhibit E, upon the earlier of (i) any such property ceasing to be encumbered by a third party, and (ii) within ten (10) days of Suncor's written request, execute and deliver to Suncor a Deed of Trust or mortgage (as determined by Suncor) encumbering such property, in such form as directed by Suncor, in its sole discretion, *provided* that Suncor will not request a Deed of Trust or mortgage on a property that is released by any third party lender in connection with an arm's-length sale of such property by a Guarantor to a bona fide third party purchaser.  Each Guarantor will take or cause to be taken any action, execute, acknowledge, deliver or record any further documents, opinions, environmental indemnities, assignments of rents, consents of lessees, mortgages, deeds of trust, security agreements, financing statements or other instruments or obtain such additional insurance as Suncor in its reasonable discretion deems necessary or appropriate in connection with any additional Deed of Trust.  Upon the delivery of an additional Deed of Trust or mortgage, pursuant to this Section 6.6, the properties subject to such Deed of Trust or mortgage will be deemed a "Property" and the land and improvements connected with such property shall be deemed "Land" and "Improvements" for all purposes in the Forbearance Documents.

## ARTICLE 7
## DEFAULT AND REMEDIES

7.1     Event of Default.  The occurrence of any of the following events shall constitute an event of default hereunder (each, an "Event of Default"):

(a)     Debtor or any other Forbearance Party shall default in the payment of principal or interest or other amounts owing to Suncor under the terms of this Agreement or any other Forbearance Document; *provided, however*, Debtor may cure two late Periodic Monthly Payments per calendar year, and such late Periodic Monthly Payment will not be an event of default, if: (i) the missed Periodic Monthly Payment is paid, in full, within five (5) Business Days of when due; and (ii) Debtor have not missed more than two payments in that calendar year (*e.g.*, Debtor cannot make three or more late Periodic Monthly Payments in any calendar year).  For clarity, this limited cure right applies only to Periodic Monthly Payments and not to the Second Lump Sum Payment. If the Second Lump Sum Payment is not paid in full on or before September 31, 2015, Debtor shall automatically be in default without notice of any kind or any other action from Suncor.

(b)     Any written representation, warranty or disclosure made by any Forbearance Party proves to be materially false or materially misleading as of the date when made, whether or not such representation or disclosure appears in this Agreement, the Forbearance Documents, any certificate, statement or report made pursuant to this Agreement, or any other items submitted by any Forbearance Party in connection with any of the foregoing.

(c)     Any claim or lien shall be filed against the Collateral or any part thereof.

22

(d)     Debtor fails to obtain the life insurance policy as required by <u>Section 5.4(b)</u>.

(e)     There occurs a Material Adverse Occurrence.

(f)     There occurs any event of dissolution or termination of any Forbearance Party.

(g)     This Agreement or any Forbearance Document shall at any time for any reason cease to be in full force and effect.

(h)     Any Forbearance Party shall contest the validity or enforceability of this Agreement, the Guaranty, or any Forbearance Document, or any Forbearance Party shall deny that it has any liability to pay any of the Obligations evidenced by the Forbearance Documents.

(i)     A default shall occur in the due performance and observance by any Forbearance Party of any of the covenants and conditions of this Agreement or the Forbearance Documents, other than a monetary obligation and except as otherwise described in this <u>Article 7</u>, which breach is not cured to Suncor's reasonable satisfaction within the applicable cure period for breach of such covenant or condition, and, if no specific cure period is provided, within ten (10) days of notice of such default being sent by Suncor to Debtor (or such longer time as reasonably required to cure such failure (but in no event longer than thirty (30) days) provided that Debtor gives notice to Suncor of such failure, commences such cure, and provides evidence to Suncor of such commencement, during such ten (10) day period and thereafter diligently attempts to cure same).

(j)     Any Forbearance Party transfers, leases, sells, assigns, conveys or further encumbers all or any portion of such Forbearance Party's interest in any of the Collateral except as expressly permitted by this Agreement.

(k)     Any Forbearance Party shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief for itself under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, or liquidator of a Forbearance Party, or of all or any part of the Collateral, or of any or all of the royalties, revenues, rents, issues, or profits thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due.

(l)     A court of competent jurisdiction shall enter an order, judgment, or decree approving a petition filed against a Forbearance Party, seeking any reorganization, dissolution, or similar relief under any present or future federal, state, or other statute, law, or regulation relating to bankruptcy, insolvency, or other relief for debtors, and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty

23

(60) days (whether or not consecutive) from the first date of entry thereof; or any trustee, receiver, or liquidator of a Forbearance Party or of all or any part of the Properties, or of any or all of the royalties, revenues, rents, issues, or profits thereof, shall be appointed without the consent or acquiescence of a Forbearance Party, and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).

(m)   The assertion of any valid claim of priority over the Security Documents, by title, lien, or otherwise in any legal, administrative, or equitable proceeding, except to the extent such title or lien existed prior to the Effective Date and was disclosed in writing to Suncor, unless such assertion be withdrawn, or effective action satisfactory to Suncor commenced (and thereafter diligently prosecuted) and Suncor is secured against any loss or damage therefrom, within thirty (30) days of the assertion of such claim.

(n)   There shall occur any sale, lease, assignment, conveyance, encumbrance or other transfer of any Collateral or any ownership interests in any Forbearance Party or Subsidiary of a Forbearance Party, except as expressly permitted by this Agreement.

(o)   Not including the Final Judgment, the failure by any Forbearance Party to pay, by the earlier of (i) thirty (30) days following the entry of any final judgment, or (ii) the time such final judgment becomes enforceable as a lien against or results in an attachment or seizure of any property of a Forbearance Party, any judgment against a Forbearance Party.

(p)   Except with respect to trade debt incurred in the ordinary course of business, failure by any Forbearance Party to pay when due any Indebtedness in an outstanding principal amount of $25,000.00 or more in the aggregate ("Material Indebtedness"); or the actual bona-fide default by any Forbearance Party in the performance (beyond the applicable grace period with respect thereto, if any) of any term, provision or condition contained in any agreement or document evidencing or relating to such Material Indebtedness (each, a "Material Indebtedness Agreement"), or any other event shall occur or condition exist, the effect of which default, event or condition is to cause, or permit the holder(s) of such Material Indebtedness to cause, such Material Indebtedness to become due prior to its stated maturity or any commitment to lend under any such loan agreement or other debt instrument to be terminated prior to its stated expiration date; or any Material Indebtedness shall be declared to be due and payable or required to be prepaid or repurchased (other than by a regularly scheduled payment) prior to the stated maturity thereof.

(q)   Notwithstanding anything to the contrary in Section 7(p), a breach of a provision in Material Indebtedness Agreement due to any Forbearance Party's (i) pledge on the Effective Date of equity interests pursuant to the Pledge Agreement or (ii) execution of one or more a promissory notes, including the Promissory Note, on the Effective Date shall not be a default under the Forbearance Documents.   A separate independent breach of any Material Indebtedness Agreement will still be a default.

DEC-1781006-9

Each Forbearance Party, for itself acknowledges and agrees that all uncured non-monetary defaults are conclusively deemed to be and are defaults which impair the security of the Forbearance Documents, and that Suncor shall be entitled to exercise any appropriate remedy, including without limitation, foreclosure of the Forbearance Documents upon the occurrence of any such non-monetary default after the expiration of any cure period, if applicable.

7.2    Remedies.  Upon the occurrence and during the continuance of an Event of Default, Suncor may, in addition to any other remedies which Suncor may have hereunder or under the Forbearance Documents or by law, at its option and without prior demand or notice take any or all of the following actions:

(a)    Declare the Total Indebtedness and other Obligations immediately due and payable.  Upon the occurrence and during the continuance of any Event of Default under Sections 7.1(k) or 7.1(l), above, and without any further action of Suncor, the Total Indebtedness, with all accrued interest and other amounts payable hereunder shall immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by Debtor and the other Forbearance Parties.  Upon the occurrence of any other Event of Default hereunder, the Total Indebtedness, with all accrued interest and other amounts payable hereunder, shall, at the option of Suncor, become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by Debtor and the other Forbearance Parties.  In either case, Suncor may proceed with every remedy available at law or in equity or provided for herein or in any document executed in connection herewith, and all reasonable Costs, Expenses and Attorneys' Fees incurred by Suncor in connection with any remedy shall be deemed indebtedness of Debtor to Suncor and a part of the Obligations.  Suncor may apply the proceeds from any Collateral for the Total Indebtedness or from any other source against any of the Obligations as and in any order it sees fit.

(b)    Without limiting the foregoing, Suncor may enter upon the Properties and complete any construction, all at the risk and expense of Debtor.  In the reasonable exercise of its discretion, Suncor shall have the right at any time to discontinue any work commenced by it or to change any course of action undertaken by it and not be bound by any limitations or requirements of time whether set forth herein or otherwise.  Suncor shall have the right and power to assume any construction contract made by or on behalf of any Forbearance Party in any way relating to the Properties and to take over and use all or any part of the labor, materials, supplies and equipment contracted for, by or on behalf of such Forbearance Party, whether or not previously incorporated into the Improvements, all in the reasonable discretion of Suncor.  In connection with any work of construction undertaken by Suncor pursuant to the provisions of this Section, Suncor may (i) engage builders, contractors, and others for the purpose of furnishing labor, materials and equipment in connection with the work of construction and architects and engineers as reasonably necessary to complete construction of the Properties, (ii) pay, settle or compromise all bills or claims which may become liens against the Collateral or which have been or may be incurred in any manner in connection with completing construction or for the discharge of liens, encumbrances or defects in title of the Collateral, and (iii)

25

take such other reasonable action, including the employment of watchmen to protect the Improvements, or refrain from taking action under this Agreement as Suncor may in its discretion determine from time to time. Suncor shall be entitled to enter into leases with tenants in the exercise of its reasonable business judgment. Debtor shall be liable to Suncor for all sums paid or incurred for completing any such construction whether the same shall be paid or incurred pursuant to the provisions of this Section or otherwise, and all payments made or liabilities incurred by Suncor hereunder of any kind whatsoever shall be paid by Debtor to Suncor upon demand with interest at the rate set forth in this Agreement, and all of the foregoing shall be deemed and shall constitute advances under this Agreement and be secured by the Deeds of Trust, and the other Forbearance Documents. For the purpose of carrying out the provisions and exercising the rights, powers and privileges granted by this Section, each Forbearance Party hereby unconditionally and irrevocably constitutes and appoints Suncor as its true and lawful attorney-in-fact to enter into such contracts, perform such acts and incur such liabilities as are referred to in said Section in the name and on behalf of such Forbearance Party which are reasonably necessary to complete development and construction in connection with the Properties. This power of attorney is coupled with an interest.

(c)     Where defective or unworkmanlike labor or materials are being used in construction, or upon receipt of knowledge of material encroachments to which there has been no consent, Suncor shall have the right to immediately order stoppage of the construction and demand that such conditions be corrected. After issuance of such an order in writing, no further work shall be done on that portion of the Improvements where there are defective or unworkmanlike labor or materials, without the prior written consent of Suncor unless and until said condition has been fully corrected.

(d)     Suncor may foreclose on or realize upon any security for the Total Indebtedness without waiving its rights to proceed against any other security or other entities or individuals directly or indirectly responsible for repayment of the Obligations or waive any and all security for the Obligations as Suncor may in its discretion so determine, and pursue any such other remedy or remedies as Suncor may so determine to be in its best interest as provided herein or in the Forbearance Documents. All remedies of Suncor provided for herein and in any other Forbearance Document are cumulative and shall be in addition to all other rights and remedies provided by law. The exercise of any right or remedy by Suncor hereunder shall not in any way constitute a cure or waiver of default hereunder or under any other Forbearance Document or invalidate any act done pursuant to any notice of default, or prejudice Suncor in the exercise of any of its rights hereunder or under any other Forbearance Documents unless, in the exercise of its rights, Suncor realizes all amounts owed to it under such Forbearance Documents.

(e)     Suncor shall be entitled, as a matter of absolute right and without regard to the value of any security for the Total Indebtedness or the solvency of any person liable therefor, to the appointment of a receiver for the Collateral upon ex parte application to any court of competent jurisdiction. Each Forbearance Party waives any right to any hearing or notice of hearing prior to the appointment of a receiver and each Forbearance Party waives any requirement that a receiver post bond for faithful performance of its duties.

26

# ARTICLE 8
# RELEASES

8.1     <u>Conditional Release of Debtor</u>.  Provided that no Event of Default  has occurred prior to Suncor's receipt of the entire Reduced Indebtedness and all interest payable thereon, and provided that more than ninety one (91) days have passed following Suncor's receipt of the last payment of the Reduced Indebtedness and neither Debtor nor the Guarantors, or any of them, have filed a petition for protection under the Bankruptcy Code, and no other action has been initiated to set aside or challenge the payment of the Reduced Indebtedness to Suncor, then the Total Indebtedness due under the Final Judgment and the Promissory Note shall be considered satisfied and Suncor shall (i) voluntarily and knowingly forever release, discharge, and relinquish Debtor and Guarantors from any and all personal liability for the indebtedness due under the Final Judgment and Forbearance Documents, (ii) upon request of Debtor, file a satisfaction of judgment in the real property records of the counties where the Final Judgment was recorded, and (iii) upon request of Debtor, promptly and completely release the liens and security interests granted by the Forbearance Documents; *provided*  that such releases shall be in forms mutually satisfactory to Debtor and Suncor.

8.2     <u>Release of Suncor</u>.  For independent and valuable consideration, and as a material inducement for Suncor to enter into this Agreement, each of Debtor and the Guarantors hereby unconditionally and fully discharges Suncor and its affiliates and all of their officers, directors, shareholders, employees, agents, attorneys, and the successor of each and every one of them, from any and all claims, causes of action, counterclaims and defenses which exist as of the Effective Date, whether the same are known or unknown, and whether the same arise in connection with the Lawsuit or any other matter irrespective of its nature. *This is intended to be a broad and comprehensive general release.*

8.3     <u>Covenant Not to Sue</u>.  Debtor and Guarantors agrees not to sue, nor initiate nor prosecute any legal, equitable, regulatory or administrative proceedings against Suncor or its representatives that arise out of or are in any way connected with the Lawsuit or the Forbearance Documents, except as may be necessary to enforce the terms and provisions of this Agreement. Debtor and Guarantors further agree, jointly and severally, to indemnify for all Costs, Expenses and Attorneys' Fees incurred by Suncor and/or its representatives, who are sued, or against whom any effort is made to execute upon any judgment, by any Person claiming by or through them with respect to any claim referenced above with respect that arise out of or are in any way connected with the Lawsuit or the Forbearance Documents.

# ARTICLE 9
# MISCELLANEOUS

9.1     <u>No Waiver</u>.  No waiver of any Default or Event of Default or breach by any Forbearance Party hereunder shall be implied from any failure by Suncor to take action on account of such default if such default persists or is repeated, and no express waiver shall affect any Default or Event of Default other than the default specified in the waiver, and it shall be operative only for the time and to the extent therein stated.  Waivers of any covenant, term or condition contained herein shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.  The consent or approval by Suncor to, or of, any act by

27

Debtor requiring further consent or approval shall not be deemed to waive or render unnecessary the consent or approval to, or of, any subsequent similar act.

9.2    Successors and Assigns.  This Agreement is made and entered into for the sole protection and benefit of Suncor, Debtor and the other Forbearance Parties, their successors and assigns, and no other Person or Persons shall have any right of action hereunder.  The terms hereof shall inure to the benefit of the successors and assigns of the parties hereto; provided, however, that any Forbearance Party's interest hereunder cannot be assigned or otherwise transferred without the prior consent of Suncor.

9.3    Notices.  Any notice required or permitted to be given by Debtor or Guarantors or Suncor under this Agreement shall be in writing and will be deemed given (a) upon personal delivery or upon confirmed transmission by telecopier or similar facsimile transmission device, (b) on the first Business Day after receipted delivery to a courier service which guarantees next Business Day delivery, or (c) on the third Business Day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

> If to Debtor or Guarantors:
>
> c/o Fox Rothschild LLP
> 1225 17th Street, Suite 2200
> Denver, CO 80202
> Attn.: Jeffrey Cohen, Esq.
> Fax: (303) 292-1300
>
> If to Suncor:
>
> Suncor Energy (U.S.A.) Inc.
> 717 17th Street, 29th Floor
> Denver, CO 80202
> Attn.: Legal Affairs
> Fax: (303) 793-8057
>
> With copy to:
>
> Husch Blackwell LLP
> 1700 Lincoln Street, Suite 4700
> Denver, CO 80203-4547
> Attention:  Daniel L. Bray, Esq.
> Fax:  (303) 749-7272

9.4    Authority to File Notices.  Debtor irrevocably appoints, designates and authorizes Bank as its agent (said agency being coupled with an interest) to send to any third party any other notice or documents or take any other action that Suncor deems reasonably necessary or desirable to protect its interest hereunder, or under the Forbearance Documents, and will upon request by Suncor, execute such additional documents as Suncor may require to further evidence

28

the grant of the aforesaid right to Suncor. Notwithstanding the foregoing, Suncor will not exercise its right to act as Debtor's agent unless and until an Event of Default has occurred and is continuing.

9.5    Time. Time is of the essence hereof.

9.6    Amendments, etc. No amendment, modification or termination of any provisions of this Agreement or of any of the Forbearance Documents shall in any event be effective unless the same shall be in writing and signed by Suncor and the Forbearance Party or Forbearance Parties, which are parties to such Forbearance Document. No waiver of any provisions of this Agreement or any provisions of this Agreement or of any of the Forbearance Documents nor consent to any departure by Debtor therefrom shall in any event be effective unless the same shall be in writing and signed by Suncor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

9.7    Headings. The article and section headings in no way define, limit, extend or interpret the scope of this Agreement or of any particular article or section.

9.8    Number and Gender. When the context in which the words are used in this Agreement indicate that such is the intent, words in the singular number shall include the plural and vice versa. References to any one gender shall also include the other gender if applicable under the circumstances.

9.9    Joint and Several. If Debtor is more than one Person, then (a) all Persons comprising Debtor are jointly and severally liable for all of the Obligations; (b) all representations, warranties, and covenants made by Debtor shall be deemed representations, warranties, and covenants of each of the Persons comprising Debtor; (c) any breach, default or Event of Default by any of the Persons comprising Debtor hereunder shall be deemed to be a breach, default, or Event of Default of Debtor; and (d) any reference herein contained to the knowledge or awareness of Debtor shall mean the knowledge or awareness of any of the Persons comprising Debtor. With respect to the Guarantors (a) all Persons comprising Guarantors are jointly and severally liable for their obligations under the Guaranty Agreement and other Forbearance Documents; (b) all representations, warranties, and covenants made by Guarantors shall be deemed representations, warranties, and covenants of each of the Persons comprising Guarantors; (c) any breach, default or Event of Default by any of the Persons comprising Guarantors hereunder shall be deemed to be a breach, default, or Event of Default of Guarantors; and (d) any reference herein contained to the knowledge or awareness of Guarantors shall mean the knowledge or awareness of any of the Persons comprising Guarantors.

9.10    Validity. In the event that any provisions of this Agreement shall be held to be invalid, the same shall not affect in any respect whatsoever the validity of the remainder of this Agreement.

9.11    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado, without giving effect to principles of conflict of laws.

9.12   Survival of Warranties.   All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement and of the Forbearance Documents and the extension of the Total Indebtedness hereunder and continue in full force and effect until the Obligations of Debtor hereunder evidenced by this Agreement have been fully paid and satisfied.

9.13   Reasonable Attorneys' Fees and Other Reasonable Costs.   Debtor shall pay all reasonable Costs, Expenses and Attorneys' Fees incurred by Suncor and any participants with Suncor in connection with the Total Indebtedness.   Debtor shall also pay all reasonable Costs, Expenses and Attorneys' Fees of any kind and nature incurred by Suncor in the administration or enforcement of this Agreement or any of the other Forbearance Documents, including, without limitation, Costs, Expenses and Attorneys' Fees incurred by Suncor in protecting its interest in any Collateral for the Total Indebtedness.

9.14   Severability; Titles.   If any provision of this Agreement or of any other Forbearance Document securing or executed in connection with this Agreement is, for any reason and to any extent, invalid or unenforceable, then neither the remainder of the Forbearance Document in which such provision is contained, or the application of the provision to other persons, entities or circumstances, nor any other document referred to in this Agreement, shall be affected by such invalidity or unenforceability, and there shall be deemed substituted for the invalid unenforceable provision the most similar provision which would be valid and enforceable under applicable law.

9.15   Right to Assign Total Indebtedness.   Suncor shall retain the right at all times, with or without Debtor's or Guarantors' consent, to assign all of this Agreement or any portion thereof, together with the Collateral for repayment of the Total Indebtedness, to anyone, and Debtor acknowledges that Suncor shall have the right to share any and all information concerning Debtor or Guarantors with any such prospective assignee.

9.16   No Marshalling.   Each Forbearance Party, for itself and all who may claim through or under it, waive any and all right to have the property and estates comprising the Collateral marshalled upon any foreclosure of the lien and security interests of the Forbearance Documents and agrees that any court having jurisdiction to foreclose such lien may order the Collateral to be sold as an entirety.

9.17   **WAIVER OF RIGHTS.   EACH FORBEARANCE PARTY, EACH FOR ITSELF AND FOR ALL WHO MAY CLAIM THROUGH OR UNDER HIM/HER/IT, WAIVE THE RIGHT TO TRIAL BY JURY ON ANY ISSUES BETWEEN DEBTOR, ANY FORBEARANCE PARTY AND SUNCOR AND TO ANY ISSUES PERTAINING TO THE FORBEARANCE DOCUMENTS AND AS TO ALL MATTERS WHATSOEVER PERTAINING TO THE ACTS OR OMISSIONS OF SUNCOR.**

9.18   Counterparts.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same document.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

DEC-1781006-9

IN WITNESS WHEREOF, Debtor, Guarantors and Suncor have executed this Agreement as of the date first written above by and through their duly authorized representatives.

**DEBTOR:**

**WESTERN CONVENIENCE STORES, INC.,**
a Colorado corporation

By: _____
Name: _____
Title: _____

_____
**HOSSEIN TARAGHI,** an individual

_____
**DEBRA TARAGHI,** an individual

DEC-1781006-9

**GUARANTORS:**

**WCS ONE LLC,**
a Colorado limited liability company

By: _____

Name: _____

Title: _____

**H.D.T. TWENTY EIGHT LLC**
**HDT, LLC**
**HDT 21 LLC**
**H.D.T. ONE LIMITED LIABILITY**
**H.D.T. TWO LIMITED LIABILITY COMPANY**
**H.D.T. THREE LIMITED LIABILITY COMPANY**
**H.D.T. FOUR LIMITED LIABILITY COMPANY**
**H.D.T. FIVE LIMITED LIABILITY COMPANY**
**H.D.T. SIX LIMITED LIABILITY**
**H.D.T. SEVEN LIMITED LIABILITY COMPANY**
**H.D.T. EIGHT LIMITED LIABILITY COMPANY**
**H.D.T. NINE LIMITED LIABILITY COMPANY**
**H.D.T. TEN LIMITED LIABILITY COMPANY**
**H.D.T. ELEVEN LIMITED LIABILITY COMPANY**
**H.D.T. TWELVE LIMITED LIABILITY COMPANY**
**H.D.T. THIRTEEN LIMITED LIABILITY COMPANY**
**H.D.T. FOURTEEN LIMITED LIABILITY COMPANY**
**H.D.T. FIFTEEN LIMITED LIABILITY**
**H.D.T. SIXTEEN LIMITED LIABILITY COMPANY**
**H.D.T. SEVENTEEN LIMITED LIABILITY COMPANY**
**H.D.T. EIGHTEEN LIMITED LIABILITY COMPANY**
**H.D.T. NINETEEN LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY ONE LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY TWO LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY THREE LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY FOUR LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY FIVE LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY SIX LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY SEVEN LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY EIGHT LIMITED LIABILITY COMPANY**
**H.D.T. TWENTY NINE LIMITED LIABILITY**
**H.D.T. THIRTY LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY ONE LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY TWO LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY THREE LIMITED LIABILITY**
**H.D.T. THIRTY FOUR LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY FIVE LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY SIX LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY SEVEN LIMITED LIABILITY COMPANY**
**H.D.T. THIRTY EIGHT LIMITED LIABILITY**

**H.D.T. THIRTY NINE LIMITED LIABILITY COMPANY**
**H.D.T. FORTY LIMITED LIABILITY COMPANY**
**H.D.T. FORTY TWO LIMITED LIABILITY COMPANY**
**H.D.T. FORTY THREE LIMITED LIABILITY COMPANY**
**WESTERN TRUCK ONE, LLC**

By: _____

Name: _____

Title: _____

33
DEC-1781006-9

**SUNCOR:**

**SUNCOR ENERGY (U.S.A.) INC.,**
a Delaware corporation

By: _____
Name: Steven J. Ewing
Title:  Director, Rackforward Sales, Authorized Representative



DATE FILED: Michael E. Korenblat 15 4:28 PM
SUNCOR ENERGY SERVICES INC.
FILING ID: 22AF25A8CFAA4
CASE NUMBER: 717 17th Street, Suite 2600
Denver, Colorado 80202
Telephone: (303) 793-8052
Fax: (303) 793-8057
mkorenblat@suncor.com

<u>**VIA HAND DELIVERY AND E-MAIL**</u>

October 16, 2015

Western Convenience Stores, Inc., et al
c/o Fox Rothschild LLP
1225 17th Street, Suite 2200
Denver, Colorado 80202
Attention: Jeffrey Cohen, Esq.
jcohen@foxrothschild.com

      Re:    **NOTICE OF EVENT OF DEFAULT AND EXERCISE OF REMEDIES**

Mr. Cohen:

On behalf of Suncor Energy (U.S.A.) Inc. ("Suncor"), I am writing with respect to the Forbearance Agreement (the "Suncor Forbearance Agreement"), dated December 23, 2014, by and among (i) Suncor and (ii) Western Convenience Stores, Inc. ("WCS"), Hossein Taraghi ("H. Taraghi"), Debra Taraghi ("D. Taraghi") and WCS One LLC (WCS, H. Taraghi and D. Taraghi, collectively, the "Debtor"), and the parties listed on Schedule 1 to the Suncor Forbearance Agreement (collectively, the "Guarantors") (Debtor and Guarantors collectively, the "Forbearance Parties"). Reference is also made to that certain Pledge Agreement (the "Pledge Agreement"), dated as of December 19, 2014, by and among H.D.T Limited Liability Company ("HDT"), H. Taraghi and Suncor. Except as otherwise indicated herein, terms used but not defined herein shall have the meanings given them in the Suncor Forbearance Agreement.

As you are aware, Debtor, H.D.T. Twenty Eight Limited Liability Company ("HDT 28"), and VSD 4 LLC ("VSD" or "Lender") (as assignee of Vectra Lender Colorado, National Association ("Vectra")) are parties to a separate Forbearance Agreement Extension (the "VSD Forbearance Agreement") relating to a Loan (as defined therein) to WCS in the original stated amount of $5,000,000 and a Corporate Loan (as defined therein) in the principal amount of $1,177,499 to HDT 28.[1] H. Taraghi and Debra Taraghi are guarantors of the Loan and Corporate Loan, and WCS is a guarantor of the Corporate Loan, all on a joint and several basis. Both the Loan and the Corporate Loan matured on October 15, 2014, and there was a Present Default (as defined in the VSD Forbearance Agreement). Pursuant to Section 2 of the VSD Forbearance Agreement, VSD (as the Lender) agreed to forbear with respect to the Present Default for a period ending on October 15, 2015.

As such, the entire amounts owing under the Loan and Corporate Loan were due and payable to VSD at the end of the day on October 15, 2015. Based on WCS's last audited financial statements, as of March 31, 2015, the amount owed to VSD under the Loan was $4,558,757. Based on HDT's unaudited financials, as of March 31, 2015, the amount outstanding on the Corporate Loan was $523,130.72.

---

[1] VSD purchased the debt owed to Vectra under the Loan and the Corporate Loan, as evidenced by two allonges, on or about June 8, 2015.

**EXHIBIT B**

Western Convenience Stores, Inc., et al
October 16, 2015
Page 2 of 3

During our conversation yesterday, Thursday, October 15, 2015 at approximately 4:30 p.m., you confirmed that the entire amount due and owing to VSD had not been paid and would not be timely paid, Debtor had not received an extension of the VSD Forbearance Agreement, and Debtor had not received any new agreement from VSD to forbear on exercising its remedies with respect to the debt due and owing, all as of the end of the day October 15, 2015.

The failure to pay on or before October 15, 2015 this Material Indebtedness owed to VSD is a material breach under Section 7.1(p) of the Suncor Forbearance Agreement and is an Event of Default.

Under the present circumstances, Suncor has elected to exercise certain of its remedies under the Suncor Forbearance Agreement in order to protect its Collateral under the Forbearance Documents.

At 7:39 a.m. Mountain Standard Time, October 16, 2015, pursuant to Section 2.6 and Section 7.2(a) of the Suncor Forbearance Agreement, Suncor accelerated, and hereby gives notice of such acceleration (although such notice is not required under the Forbearance Documents), the Total Indebtedness and other Obligations, which, as a result of such acceleration, are immediately due and payable.

Pursuant to Section 4-9-609 of the Uniform Commercial Code as enacted in the State of Colorado, C.R.S. §§ 4-9-101 *et seq.* (the "UCC"), Suncor took possession of the membership interests in those Guarantors set forth in **Schedule 1** to this letter (the "Transferred Entities") by transferring such membership interests to Suncor pursuant to the powers granted to Suncor in Sections 10 and 11 of the Pledge Agreement, and the rights and powers granted by the LLC Interest Pledges.

As a result, and pursuant to Section 7-80-702(2) of the Colorado Limited Liability Company Act, C.R.S. §§ 7-80-101 *et seq.* (the "LLC Act"), H. Taraghi is no longer a member of HDT, and HDT is no longer a member of the other Transferred Entities. This resulted in the Transferred Entities having no members.

Pursuant to Section 7-80-701(2) of the LLC Act, Suncor, as the holder by assignment of all membership interests in the Transferred Entities consented to Suncor being admitted, and admitted Suncor, as the sole member of the Transferred Entities.

Pursuant to Section 7-80-702(2) of the LLC Act, Suncor, as the entity to whom all of the membership interests in the Transferred Entities were transferred and that was admitted as the only member of the Transferred Entities, has all the rights and powers and is subject to all the restrictions and liabilities previously held by H. Taraghi as to the membership interests in HDT, and HDT as to the membership interests in the other Transferred Entities.

Pursuant to the LLC Act and the Amended and Restated Operating Agreement of each Transferred Entity, Suncor removed H. Taraghi as the Manager of each Transferred Entity and elected itself as the Manager of each Transferred Entity. **Accordingly, Suncor is the owner and Manager of each Transferred Entity, and neither HDT nor H. Taraghi has any authority to act in any manner on behalf of any Transferred Entity.**

In due course, Suncor intends to conduct a foreclosure sale of the Transferred Entities pursuant to the UCC. At that time, the parties will have all of the rights granted, and obligations imposed, by the UCC, as such may have been supplemented or modified by the Forbearance Documents. Prior to the foreclosure sale, Suncor is willing to discuss a potential sale to, or redemption by, the Debtors or HDT, as applicable, in accordance with the UCC.

Western Convenience Stores, Inc., et al
October 16, 2015
Page 3 of 3

Suncor has taken these actions to protect its interests in the Collateral and to thereafter in due course commence the process of a foreclosure sale pursuant to the UCC. Suncor did not take ownership of the Transferred Entities in satisfaction of the Total Indebtedness or any other Obligation. Notwithstanding the actions taken by Suncor, all of the Forbearance Documents remain in full force and effect, including, without limitation, Debtor's covenant not to sue set forth in Section 8.3 of the Forbearance Agreement and Debtor's indemnity obligations including, without limitation, those under Section 17 of the Pledge Agreement.

We would like to meet with you on **Monday, October 19, 2015,** to discuss the assets and obligations of the Transferred Entities and to facilitate the transition of operations of the Transferred Entities (which, for clarity, do not include WCS) to Suncor. Please give me a call to schedule this meeting.

Sincerely,

Michael E. Korenblat
Director, Legal Affairs -- R&M U.S.A.

cc. Maren Skulborstad, Pearson & Paris, P.C. (*via email only*)

**Schedule 1**
**Transferred Entities**

1. H.D.T. Limited Liability Company
2. H.D.T. One Limited Liability Company
3. H.D.T. Two Limited Liability Company
4. H.D.T. Three Limited Liability Company
5. H.D.T. Four Limited Liability Company
6. H.D.T. Five Limited Liability Company
7. H.D.T. Six Limited Liability Company
8. H.D.T. Seven Limited Liability Company
9. H.D.T. Eight Limited Liability Company
10. H.D.T. Ten Limited Liability Company
11. H.D.T. Eleven Limited Liability Company
12. H.D.T. Thirteen Limited Liability Company
13. H.D.T. Fourteen limited Liability Company
14. H.D.T. Fifteen Limited Liability Company
15. H.D.T. Sixteen Limited Liability Company
16. H.D.T. Seventeen Limited Liability Company
17. H.D.T. Nineteen Limited Liability Company
18. H.D.T. Twenty Limited Liability Company
19. H.D.T. Twenty One Limited Liability Company
20. H.D.T. Twenty Two Limited Liability Company
21. H.D.T. Twenty Three Limited Liability Company
22. H.D.T. Twenty Four Limited Liability Company
23. H.D.T. Twenty Five Limited Liability Company
24. H.D.T. Twenty Six Limited Liability Company
25. H.D.T. Twenty Seven Limited Liability Company
26. H.D.T. Twenty Eight Limited Liability Company
27. H.D.T. Twenty Nine Limited Liability Company
28. H.D.T. Thirty Limited Liability Company
29. H.D.T. Thirty One Limited Liability Company
30. H.D.T. Thirty Two Limited Liability Company
31. H.D.T. Thirty Three Limited Liability Company
32. H.D.T. Thirty Four Limited Liability Company
33. H.D.T. Thirty Five Limited Liability Company
34. H.D.T. Thirty Seven Limited Liability Company
35. H.D.T. Thirty Eight Limited Liability Company
36. H.D.T. Thirty Nine Limited Liability Company
37. H.D.T. Forty Limited Liability Company
38. H.D.T. Forty Two Limited Liability Company
39. H.D.T. Forty Three Limited Liability Company

## IRREVOCABLE MEMBERSHIP INTEREST

## ASSIGNMENT SEPARATE FROM CERTIFICATE OF INTEREST

**FOR VALUE RECEIVED,** the undersigned ("Transferor") does hereby contribute, convey, assign, transfer and deliver to *Suncon Energy (U.S.A.) Inc.* (the "Transferee") all of its right, title and interest in and to all the outstanding membership interests in H.D.T. THREE LIMITED LIABILITY COMPANY, a Colorado limited liability company (the "Company" and such membership interests, the "Interests").

The undersigned does irrevocably constitute and appoint the Transferee as its attorney-in-fact, with full power of substitution and re-substitution, to transfer the Interests into the name of the Transferee or its designee on the books of the Company.

Dated as of *8. oJ a~ 10-16 15*.

ASSIGNOR:

H.D.T. LIMITED LIABILITY COMPANY,
a Colorado limited liability company

By: _____
     Hossein Taraghi, Manager

STATE OF COLORADO )
                 )
COUNTY OF *Denver* )

The foregoing instrument was acknowledged before me this *23rd* day of *December*, 2014, by Hossein Taraghi, as Manager of H.D.T. LIMITED LIABILITY COMPANY, a Colorado limited liability company.

Witness my hand and official seal.

My commission expires: *5/14/2016*

_____
Notary Public

DEC-1781182-1

**EXHIBIT C**

## LEASE

1. **Parties.** This Lease, dated January 1, 2015 is made by and between H.D.T. ONE LIMITED LIABILITY COMPANY, (the Landlord), and WESTERN CONVENIENCE STORES, INC. (the Tenant).

2. **Property.** Landlord does hereby lease to Tenant and Tenant hereby leases from Landlord the real property and all improvements located thereon, as described on Schedule A attached hereto and incorporated by reference (the Improvements and the Real Property, collectively the Property).

   This Lease is subject to the terms, covenants and conditions herein set forth and the Tenant covenants as a material part of the consideration for this Lease to keep and perform each and all of said terms, covenants and conditions by Tenant to be kept and performed.

3. **Use.** Tenant shall use the Property for the operation of a convenience store and gasoline service station and shall not use or permit the Property to be used for any other purpose without the prior written consent of Landlord.

4. **Minimum Rent**

   (a) Tenant agrees to pay to Landlord as Minimum Rent, without notice or demand, the monthly sum of SEVEN THOUSAND AND NO/100THS DOLLARS ($7,000.00) in advance, on or before the first (1st) day of each and every successive calendar month during the term hereof. The rent shall commence on January 1, 2015.

   Rent for any period which is for less than on (1) month shall be a prorated portion of the monthly installment herein based upon a thirty (30) day month. Said rental shall be paid to the Landlord, without deduction or offset, in lawful money of the United States of America and at such place as Landlord may. from time to time, designate in writing.

   (b) Tenant agrees to pay as additional rent its proportionate share of operating expenses as provided below in Article 7.

5. **Term.** The Term of this Lease shall commence on January 1, 2015 and expire on December 31, 2015.

**EXHIBIT D**

6. **Additional Charges (Rental Adjustments).** In addition to the Minimum Rent provided in Article 4 hereinabove, and commencing at the same time as any rental commences under this Lease, Tenant shall pay to Landlord the following items, herein called Adjustments:

(a) All real estate taxes, assessments and insurance premiums on the Property, including land, building, and improvements thereon. Said real estate taxes shall include all real estate taxes and assessments that are levied upon and/or assessed against the Property, including any taxes which may be levied on rents. Said insurance shall include all insurance premiums for fire, extended coverage, property damage, liability, rent loss, and any other insurance maintained by Landlord covering the use and operation of the Property.

(b) All costs and expenses of repairing, operating and maintaining the heating, ventilating and air conditioning system for the Property, including the cost of all utilities required in the operation thereof, except those required to be paid directly by Tenant of the Property and all costs and expenses incurred in making alterations or additions to the heating, ventilating and air conditioning system in order to comply with governmental rules, regulations and statutes.

(c) All costs and expenses of Landlord in providing standard services and utilities to the Property, including office janitorial services, window washing and utilities not separately metered.

(d) All costs and expenses incurred by Landlord in operating, managing and maintaining the Property, including all sums expended in connection with general maintenance and repairs, resurfacing, painting. restriping, cleaning, sweeping and janitorial services, window washing, maintenance and repair of stairways, sidewalks, curbs, signs, sprinkler systems, planting and landscaping, lighting and other utilities, maintenance and repair of any fire protection systems, personnel to implement such services, rental and/or depreciation of machinery and equipment used in such maintenance and services, police and fire protection systems, utilities, premiums and other costs and expenses pertaining to snow and ice removal. security systems, utilities, premiums and other costs for workmen(s) compensation insurance, wages, withholding taxes, social security taxes. personal property taxes, fees for required licenses and permits. supplies and charges for management of the Property.

(e) Any parking charges. utilities. surcharges or any other costs levied, assessed or imposed by, or at the direction of, or resulting from

statutes or regulations, or interpretations thereof, promulgated by any governmental authority in connection with the use or occupancy of the Property.

Upon commencement of rental, Landlord shall submit to Tenant a statement of the anticipated monthly Adjustments for the period between such commencement and the following January and Tenant shall pay these Adjustments on a monthly basis concurrently with the payment of the Rent. Tenant shall continue to make said monthly payments until notified by Landlord of a change thereof. April 1 of each year Landlord shall endeavor to give Tenant a statement showing the total Adjustments for the Property for the prior calendar year and tenant's allocable share thereof, prorated from the commencement of rental. In the event the total of the monthly payments which Tenant has made for the prior calendar year is less than the Tenant's actual share of such Adjustments, then Tenant shall pay the difference in a lump sum within ten days after receipt of such statement from Landlord and shall concurrently pay the difference in monthly payments made in the then calendar year and the amount of monthly payments which are then calculated as monthly Adjustments based on the prior year's experience. Any overpayment by Tenant shall be credited towards the monthly Adjustments next coming due. The actual Adjustments for the prior year shall be used for purposes of calculating the anticipated monthly Adjustments for the then current year with actual determination of such Adjustments after each calendar year as above provided: excepting that in any year in which resurfacing is contemplated, Landlord shall be permitted to include the anticipated cost of same as part of the estimated monthly Adjustments. Even though the term has expired and Tenant has vacated the Property, when the final determination is made of Tenant's share of said Adjustments for the year in which this Lease terminates, Tenant shall immediately pay any increase due over the estimated Adjustments previously paid and, conversely, any overpayment made shall be immediately rebated by Landlord to Tenant. Failure of Landlord to submit statements as called for herein shall not be deemed to be a waiver of Tenant's requirement to pay sums as herein provided.

7.  **Uses Prohibited.** Tenant shall not do or permit anything to be done in or about the Property nor bring or keep anything therein which is not within the permitted use of the Property which will in any way increase the existing rate of or affect any fire or other insurance upon the Property or any of its contents, or cause a cancellation of any insurance policy covering said Property or any part thereof or any of its contents. Tenant shall not allow the Property to be used for any improper, immoral, unlawful or objectionable purpose; nor shall Tenant cause, maintain or permit any nuisance in, on or about the Property. Tenant shall not commit or allow to be committed any waste in or upon the Property.

8.  **Compliance with Law.** Tenant shall not use the Property, or permit anything to be done in or about the Property which will in any way

3

conflict with any law, statute, ordinance or governmental rule or regulation no in force or which may hereinafter be enacted or promulgated. Tenant shall, at its sole cost and expense, promptly comply with all laws, statutes, ordinances and governmental rules, regulations or requirements now in force or which may hereafter be in force and with the requirements of any board of fire underwriters or other similar bodies now or hereafter constituted relating to or affecting the condition, use or occupancy of Property, excluding structural changes not related to or affected by Tenant's improvements or acts. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord be a party thereto or not, that Tenant has violated any law, statute, ordinance or governmental rule, regulation or requirement, shall be conclusive of that fact as between the Landlord and Tenant.

9.   **Alterations and additions.**   Tenant shall not make or allow to be made any alterations, additions or improvements to the Property or any part thereof without first obtaining the written consent of the Landlord and any alterations, additions or improvements to or of said Property, but excepting movable furniture and trade fixtures, shall at once become a part of the realty and belong to the Landlord and shall be surrendered with the Property. In the event Landlord consents to the making of any alterations, additions or improvements to the Property by Tenant, the same shall be made by Tenant at Tenant's sole cost and expense. Upon the expiration or sooner termination of the term hereof, Tenant shall, upon written demand by Landlord, given at least thirty (30) days prior to the end of the term, at Tenant's sole cost and expense, forthwith and with all due diligence, remove any alterations, additions or improvements made by Tenant, designated by Landlord to be removed, and Tenant shall, forthwith and with all due diligence, at its sole cost and expense, repair any damage to the Property caused by such removal.

10.   **Repairs.**

(a)   By entry hereunder, Tenant shall be deemed to have accepted the Property as being in good, sanitary order, conditions and repair. Tenant shall, at Tenant's sole cost and expense, keep the Property and every part thereof in good condition and repair (except as hereinafter provided with respect to Landlord's obligation) including, without limitation, the maintenance, replacement and repair of the roof, any store-front doors, window casements, glazing, plumbing, pipes, electrical wiring and conduits, heating and air conditioning systems pertaining to the improvements located on the Property. Tenant shall, upon the expiration or sooner termination of this Lease hereof, surrender the Property to the Landlord in good condition, broom clean, ordinary wear and tear

4

and damage from causes beyond the reasonable control of Tenant excepted.

(b)     Notwithstanding the provisions of Article 10(a) hereinabove, Landlord shall repair and maintain the structural portions of the Property including the exterior walls, unless such maintenance and repairs are caused in part or in whole by the act, neglect, fault or omission of any duty by the Tenant, its agents, servants, employees, invitees, or any damage caused by breaking and entering, in which case Tenant shall pay to Landlord the actual cost of such maintenance and repairs. Landlord shall not be liable for any failure to make such repairs or to perform any maintenance unless such failure shall persist for any unreasonable time after written notice of the need of such repairs or maintenance is given to Landlord by Tenant. Except as provided in Article 24 hereof, there shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Property or in or to fixtures, appurtenances and equipment therein. Tenant waives the right to make repairs at Landlord's expense under any law, statute or ordinance now or hereafter in effect.

11.     **Liens.** Tenant shall keep the Property free from any lien arising out of any work performed, materials, materials furnished or obligations incurred by or on behalf of Tenant. Landlord may require, at Landlord's sole option, that Tenant shall provide to Landlord, at Tenant's sole cost and expense, a lien and completion bond in an amount equal to one and one-half (1 ½) times the estimated cost of any improvements, additions or alterations in the Property which the Tenant desires to make, to insure Landlord against any liability for mechanics and materialmen's liens and to insure completion of the work.

12.     **Assignment and Subletting.** Tenant shall not assign, transfer or encumber this Lease or any part hereof, and shall not sublet, grant licenses or concessions, nor allow any other occupant to come in with or under Tenant, nor shall Tenant permit this Lease or the leasehold estate hereby created to become vested in or owned by any other person, firm or corporation by operation of law or otherwise. Any attempted assignment, transfer, encumbrance or subletting without Landlord's prior consent shall be wholly void and shall constitute a breach of this Lease. Acceptance of rent by Landlord from anyone other than Tenant shall not be construed as a waiver by Landlord of the actions required of this paragraph, nor as a release of Tenant from any obligation or liability under this Lease, but the same shall be taken to be a payment on account by Tenant.

5

13.    **Hold Harmless.** Tenant shall indemnify and hold harmless Landlord against and from any and all claims arising from Tenant's use of the Property or from the conduct of its business or from any activity, work or other things done, permitted or suffered by the Tenant in or about the Property, and shall further indemnify and hold harmless Landlord against and from any and all claims arising from any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from act or negligence of the Tenant, or any officer, agent, employee, guest, or invitee of Tenant, and from all costs, attorney's fees, and liabilities incurred in or about the defense of any such claim or any action or proceeding brought thereon and in case any action or proceeding be brought against Landlord by reason of such claim, Tenant upon notice from Landlord, shall defend the same at Tenant's expense by counsel reasonably satisfactory to Landlord. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in, upon or about the Property, from any cause other than Landlord's negligence; and Tenant hereby waives all claims in respect thereof against Landlord. Tenant shall give prompt notice to Landlord in case of casualty or accidents on the Property.

Landlord or its agent shall not be liable for any loss or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water or rain which may leak from any part of the property or from the pipes, appliances or plumbing works therein or from the roof, street or subsurface or from any other place resulting from dampness or any other cause whatsoever, unless caused by or due to the negligence of Landlord, its agents, servants or employees.

14.    **Subrogation.** As long as their respective insurers so permit, Landlord and Tenant hereby mutually waive their respective rights of recovery against each other for any loss insured by fire, extended coverage and other property insurance policies existing for the benefit of the respective parties. Each party shall apply to their insurers to obtain said waivers. Each party shall obtain any special endorsements, if required by their insurer to evidence compliance with the aforementioned waiver.

15.    **Liability Insurance.** Tenant shall, at Tenant's expense, obtain and keep in force during the term of this lease a policy of comprehensive public liability insurance insuring Landlord and Tenant against any liability arising out of the ownership, use occupancy or maintenance of the Property and all areas appurtenant thereto. Such insurance shall be in the amount of not less than $750,000.00 for injury or death of one person in any one accident or occurrence and in the amount of not less than $1,500,000.00 for injury or death of more than one person in any one accident or occurrence. Such insurance shall further insure Landlord and Tenant against liability for property damage of at least $300,000.00 the

6

limit of any such insurance shall not, however, limit the liability of the Tenant hereunder. Tenant may provide this insurance under a blanket policy, provided that said insurance shall have a Landlord's protective liability endorsement attached thereto. Tenant shall deliver to Landlord, prior to right of entry, copies of said policies of liability insurance required herein or certificates evidencing the existence and amounts of such insurance with loss payable clauses herein or certificates evidencing the existence and amounts of such insurance with loss payable clauses satisfactory to Landlord. All such policies shall be written as primary policies not contributing with and not in excess of coverage which Landlord may carry. Landlord shall be named as an additional insured on all policies required herein.

16.     **Utilities.** Tenant shall pay for all water, gas, heat, light, poser, sewer charges, telephone service and all other services and utilities supplied to the Property, together with any taxes thereon.

17.     **Personal Property Taxes.** Tenant shall pay, or cause to be paid, before delinquency any and all taxes levied or assessed and which become payable during the term hereof upon all Tenant's leasehold improvements, equipment, furniture, fixtures, and any other personal property located in the Property.

18.     **Rules and Regulations.** Tenant shall faithfully observe and comply with the rules and regulations that Landlord shall from time to time promulgate and/or modify. The rules and regulations shall be binding upon the Tenant upon delivery of a copy of them to Tenant. Landlord shall not be responsible to Tenant for the nonperformance of any of said rules and regulations by any other tenants or occupants.

19.     **Holding Over.** If Tenant remains in possession of the Property or any part thereof after the expiration of the term hereof with the express written consent of Landlord, such occupancy shall be a tenancy from month to month at a rental in the amount of the last Monthly Minimum Rent, plus all other charges payable hereunder, and upon all of the terms hereof applicable to a month to month tenancy.

20.     **Entry by Landlord.** Landlord reserves, and shall at any and all times have, the right to enter the Property to inspect the same. to submit said Property to prospective purchasers or tenants, to post notices of non-responsibility, to repair the Property that Landlord may deem necessary or desirable, without abatement of rent, and may for that purpose erect scaffolding and other necessary structures where reasonably required by the character of the work to be performed. always providing that the entrance to the Property shall not be unreasonably blocked thereby, and further providing that the business of the Tenant shall not be interfered

7

with unreasonably. Tenant hereby waives any claim for damages or for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Property, and any other loss occasioned thereby.

21.   **Tenants Default.**   The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

   (a)   The vacating or abandonment of the Property by Tenant;

   (b)   The failure by Tenant to make any payment of rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof by Landlord to Tenant;

   (c)   The failure by Tenant to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by the Tenant, where such failure shall continue for a period of thirty (30) days after written notice thereof by Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion; or

   (d)   The making by Tenant of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt, or a petition of reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days; or the appointment of a trustee or a receiver to take possession of substantially all of Tenant's assets located at the Property or of Tenant's interest in this Lease, where possession is not restored to Tenant within thirty (30) days; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets located at the Property or of Tenant's interest in this Lease, where such seizure is not discharged within thirty (30) days.

22.   **Remedies in Default.** In the event of any such default or breach by Tenant, Landlord may at any time thereafter, in his sole discretion, with or without notice or demand and without limiting Landlord in the exercise of a right or remedy which Landlord may have by reason of such default or breach:

8

(a)     Without terminating this Lease, reenter and attempt to relet or take possession pursuant to legal proceedings and remove all persons and property from the Property. In such event, Landlord may, from time to time, make such alterations and repairs as may be necessary in order to relet the Property or any part thereof for such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable. Upon such reletting, all rentals received by Landlord from such reletting shall be applied: first, to the payment of any costs and expenses of such reletting, including brokerage fees and attorneys fees; second, to the payment of any indebtedness other than rent due hereunder from Tenant to Landlord; third, to the payment of rent due and unpaid hereunder; and the residue, if any, shall be held by Landlord and applied to payment of future rent as the same may become due and payable hereunder. If such rentals received from such reletting during any month be less than that to be paid during that month by Tenant hereunder, Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. No such reentry or taking possession of the Property by Landlord shall be construed as an election on its part to terminate this Lease unless a notice of such intention be given to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

(b)     Terminate this Lease and Tenants right to possession, in which case Tenant shall immediately surrender possession. In addition to any other remedies which Landlord may have, it shall have the right to recover from Tenant (a) as liquidated damages for loss of bargain, and not as a penalty, an amount equal to the excess, if any, of the aggregate amount of rent and other charges equivalent to rent reserved in this Lease for the remainder of the stated term over the aggregate of the then reasonable rental value of the Property under a lease substantially similar to this Lease for the remainder of the stated term, and (b) all other damages and expenses, including reasonable attorneys fees and the cost of recovering the Property, that Landlord has sustained because of Tenants default.

(c)     In addition to any other remedies Landlord may have at law or equity and/or under this Lease, Tenant shall pay upon demand all Landlords costs, charges and expenses, including fees of counsel, agents and others retained by Landlord, whether or not suit is filed, incurred in connection with the recovery under this Lease or for any other relief against Tenant. In the event Landlord or Tenant

9

shall bring any action against the other, the losing party shall pay the successful partys reasonable attorneys fees and court costs.

23. **Default by Landlord**. Landlord shall not be in default unless Landlord fails to perform obligations required to Landlord within a reasonable time, but in no event later than thirty (30) days after written notice by Tenant to Landlord and to the holder of any first mortgage or deed of trust covering the Property whose name and address shall have theretofore been furnished to Tenant in writing, specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlords obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within such thirty (30) day period and thereafter diligently prosecutes the same to completion. In no event shall Tenant have the right to terminate this Lease as a result of Landlords default and Tenants remedies shall be limited to damages and/or injunction.

24. **Reconstruction**. In the event the Property is damaged by fire or other perils covered by extended coverage insurance, Landlord agrees to forthwith repair same, if insurance proceeds fully cover reconstruction and that the decision to reconstruct is the Landlords alone, based upon such things as the amount of damage and the length of time necessary to reconstruct. This Lease shall remain in full force and effect, except that Tenant shall be entitled to a proportionate reduction of the Minimum Rent from the date of damage and while such repairs are being made, such proportionate reduction to be based upon the extent to which the damage and making of such repairs shall reasonably interfere with the business carried on by the Tenant. If the damage is due to the fault or neglect of Tenant or its employees, there shall be no abatement of rent.

In the event the Property is damaged as a result of any cause other than the perils covered by fire and extended coverage insurance, then Landlord shall forthwith repair the same, provided the extent of the destruction be less than ten percent (10%) of the full replacement cost of all the improvements existing on the Property. In the event the destruction to the improvements existing on the Property is to an extent ten percent (10%) or more of the full replacement cost, then Landlord shall have the option: (1) to repair or restore such damage, this Lease continuing in full force and effect, but the Minimum Rent to be proportionately reduced as hereinabove in this Article provided; or (2) give notice to Tenant at any time within sixty (60) days after such damage, terminating this Lease as of the date specified in such notice, which date shall be no more than thirty (30) days after the giving of such notice. In the event of giving such notice, this Lease shall expire and all interest of the Tenant in the Property shall terminate on the date specified in such notice and the Minimum Rent, reduced by a proportionate reduction, based upon the extent, if any,

10

to which such damage interfered with the business carried on by the Tenant in the Property, shall be paid up to date of said such termination.

25.    **Eminent Domain**. If more than twenty-five percent (25%) of the Property shall be taken or appropriated by any public or quasi-public authority under the power of eminent domain, either party hereto shall have the right, at its option, within sixty (60) days after said taking, to terminate this Lease upon thirty (30) days written notice. If either less than or more than twenty-five percent (25%) of the Property is taken (and neither party elects to terminate as herein provided), the Minimum Rent thereafter to be paid shall be equitably reduced. In the event of any taking or appropriation whatsoever, Landlord shall be entitled to any and all awards and/or settlements which may be given and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease.

26.    **General Provisions**.

(a)    **Plats and Riders**. Clauses, plats, riders and addenda, if any, affixed to this Lease are a part hereof. Tenant leases the Property subject to all applicable ordinances and all restrictions, covenants and agreements relating to the development and platting of the Property.

(b)    **Waiver**. The waiver by Landlord of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of rent hereunder by Landlord shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant or condition of this Lease, other than the failure of the Tenant to pay the particular rental so accepted, regardless of Landlords knowledge of such preceding default at the time of the acceptance of such rent.

(c)    **Joint Obligations**. If there be more than one Tenant, the obligations hereunder imposed shall be joint and several.

(d)    **Marginal Headings**. The marginal headings and article titles to the articles of this Lease are not a part of the Lease and shall have no effect upon the construction or interpretation of any part hereof.

(e)    **Time**. Time is of the essence of this Lease and each and all of its provisions in which performance is a factor.

(f)    **Successors and Assigns**. The covenants and conditions herein contained, subject to the provisions as to assignment, apply to and

11

bind the heirs, successors, executors, administrators and assigns of the parties hereto.

(g)   **Recordation.** Neither Landlord nor Tenant shall record this Lease, but a short form memorandum hereof may be recorded at the request of Landlord.

(h)   **Quiet Possession.** Upon Tenant paying the rent reserved hereunder and observing and performing all of the covenants, conditions and provisions on Tenants part to be observed and performed hereunder, Tenant shall have quiet possession of the Property for the entire term hereof, subject to all the provisions of this Lease.

(i)   **Late Charges.** Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or other sums due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Landlord by terms of any mortgage or trust deed covering the Property. Accordingly, if any installment of rent or any sum due from Tenant shall not be received by Landlord or Landlords designee within five (5) days after written notice that said amount is past due, then Tenant shall pay to Landlord a late charge equal to the maximum amount permitted by law [and in the absence of any governing law, ten percent (10%) of such overdue amount], plus any attorneys fees incurred by Landlord by reason of Tenants failure to pay rent and/or other charges when due hereunder. The parties hereby agree that such late charges represent a fair and reasonable estimate of the cost that Landlord will incur by reason of the late payment by Tenant. Acceptance of such late charges by the Landlord shall in no event constitute a waiver of Tenants default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

(j)   **Prior Agreement.** This Lease contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreements or understanding pertaining to any such matters shall be effective for any purpose. No provision of this Lease may be amended or added to except by any agreement in writing signed by the parties hereto or their respective successors in interest. This Lease shall not be effective or binding on any party until fully executed by both parties hereto.

(k)   **Inability to Perform.** This Lease and the obligations of the Tenant hereunder shall not be affected or impaired because the Landlord is

12

unable to fulfill any of its obligations hereunder or is delayed in doing so, if such inability or delay is caused by reason of strike, labor troubles, acts of God, or any other cause beyond the reasonable control of the Landlord.

(l)  **Partial Invalidity.** Any provision of this Lease which shall prove to be invalid, void, or illegal shall in no way effect, impair or invalidate any other provision hereof and such other provision shall remain in full force and effect.

(m)  **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive, but shall, whenever possible, be cumulative with all other remedies at law or in equity.

(n)  **Choice of Law.** This Lease shall be governed by the laws of the State of Colorado.

(o)  **Attorneys Fees.** In the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover for the fees of its attorneys in such action or proceeding, including costs of appeal, if any, in such amount as the court may adjudge reasonable as attorneys fees. In addition, should it be necessary for Landlord to employ legal counsel to enforce any of the provisions herein contained, Tenant agrees to pay all attorneys fees and court costs reasonably incurred.

(p)  **Sale of Property by Landlord.** In the event of any sale of the Property by Landlord, Landlord shall be and is hereby entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease arising out of any act, occurrence or omission occurring after the consummation of such sale; and the purchaser, at such sale or any subsequent sale of the Property shall be deemed, without any further agreement between the parties or their successors in interest or between the parties and any such purchaser, to have assumed and agreed to carry out any and all of the covenants and obligations of the Landlord under this Lease.

(q)  **Subordination, Attornment.** Tenant will in writing subordinate its rights hereunder to the lien any mortgage or deed of trust, to any bank, insurance company or other lending institution, now or hereafter in force against the Property and to all advances made or hereafter to be made upon the security thereof.

Tenant hereby agrees that its leasehold interest hereunder is subordinate to any mortgages now on or hereafter to be placed on,

13

the Property leased hereunder and Tenant shall attorn to any purchaser or any lender pursuant to a foreclosure of the Property, provided, however, that so long as Tenant is not in default under this Lease Agreement, the Tenants quiet possession of the Property leased hereunder shall remain undisturbed, on the terms and conditions stated herein, whether or not the mortgage is in default and notwithstanding any foreclosure or other action brought by the holder of the mortgage in connection therewith.

This Subordination Agreement shall be self-operative and no further instrument or certificate of subordination shall be required from Tenant.

The provisions of this Article to the contrary notwithstanding, and so long as Tenant is not in default hereunder, this Lease shall remain in full force and effect for the full term hereof.

(r)     **Notices**. All notices and demands which may or are to be required or permitted to be given by either party on the other hereunder shall be in writing. All notices and demands by the Landlord to the Tenant shall be sent by United States mail, postage prepaid, addressed to the Tenant at the Property, and to the address hereinbelow, or to such other place as Tenant may from time to time designate in a notice to the Landlord. All notices and demands by the Tenant to the Landlord at the address set forth herein, and to such other person or place as the Landlord may from time to time designate in a notice to the Tenant.

To the Landlord at: H.D.T. One Limited Liability Company
                    9849 East Easter Ave
                    Centennial, CO 80112

To the Tenant at:   Western Convenience Stores, Inc.
                    9849 East Easter Ave
                    Centennial, CO 80112

(s)     **Tenants Statement**. Tenant shall at any time and from time to time, upon not less than three (3) days prior written notice from Landlord, execute, acknowledge and deliver to Landlord or any person designated by Landlord, a statement in writing (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease as so modified is in full force and effect), and the date to which the rental and other charges are paid in advance, if any, and (b) acknowledging that there are not, to Tenants knowledge, any uncured defaults on the part of the

14

Landlord hereunder, or specifying such defaults, if any are claimed, and (c) setting forth the date of commencement of rents and expiration of the term hereof. Any such statement may be relief upon by the prospective purchaser or encumbrancer of all or any portion of the Property. In the event such statement is not so delivered by Tenant as required herein, Landlord shall have the right to deliver such statement on behalf of Tenant and Tenant designates the Landlord as its Attorney-in-fact providing such notice.

(t)   **Authority of Tenant**. If Tenant is a corporation, each individual executing this Lease on behalf of said corporation represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said corporation, in accordance with the bylaws of said corporation, and that this Lease is binding upon said corporation.

(u)   **Construction**. Throughout this Lease, the singular shall include the plural, the plural shall include the singular, and the masculine shall include the feminine wherever the context so requires.

27.   **Modifications for Mortgage**. In the event any lending institution, with whom Landlord has negotiated or shall hereafter negotiate for financing of the Property, shall require a modification of this Lease as a condition to provide such financing, Landlord shall promptly provide written notice of the requirement to the Tenant. If Tenant fails or refuses to make such modification within fifteen (15) days after such notice, this Lease may be terminated by Landlord, provided, however, Tenant shall not be required to make any modifications which materially alter its rights and responsibilities under this Lease.

28.   **Successors and Assigns**. All terms, conditions and covenants to be observed and performed by the parties hereto shall be applicable to and binding upon their respective heirs, administrators, executors, successors and assigns.

EXECUTED this 1st day of January, 2015.

LANDLORD:

H.D.T. ONE LIMITED LIABILITY COMPANY

By:   _____
      Hossein Taraghi, Manager

15

TENANT:

WESTERN CONVENIENCE STORES, INC.

By:   _____
     Hossein Taraghi, President

STATE OF COLORADO

COUNTY OF ARAPAHOE

Subscribed and sworn to before me this 1st day of January, 2015, by Hossein Taraghi as Manager of H.D.T. ONE LIMITED LIABILITY COMPANY, Landlord.

WITNESS my hand and official seal.

My commission expires: _O9/27/18_

**CHARLES DOWDEN**
**NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 20024031523
My Commission Expires September 27 2018

STATE OF COLORADO

COUNTY OF ARAPAHOE

Subscribed and sworn to before me this 1st day of January, 2015, by Hossein Taraghi as President of WESTERN CONVENIENCE STORES, INC., Tenant.

WITNESS my hand and official seal.

My commission expires: _O9/27/18_

**CHARLES DOWDEN**
**NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 20024031523
My Commission Expires September 27 2018

16

## SCHEDULE A

### LEGAL DESCRIPTION

A tract of land situated in the SW ¼, Section 11, and in the NW1/4, Section 14, township 8 South, range 67 West of the 6th P.M, more particularly described as follows:

Commencing at the Southwest corner of said Section 11; thence East along South line of said Section 11, a distance of 567.8 feet, to a point on the East right of way line of U.S. Highway interstate #25; thence on a deflection angle to the left of 56 12', along said right of way line, a distance of 100.00 feet to the true point of beginning; thence continuing on the previous course along said right of way line, a distance of 250.00 feet to a point; thence on a deflection angle to the right of 90.00, a distance of 150.00 feet to a point; thence on a deflection angle to the right of 90.00, a distance of 251.22 feet to a point, thence on a deflection angle to the right of 90 28', a distance of 7.68 feet to a point said point a corner on the Easterly right of way of said U.S. Highway interstate #25, said point also being a point on the South line of said Section 11, located a distance of 739.1 feet East of the Southwest corner of said Section 11; thence continuing on the previous course, a distance of 142.40 feet to the true point of beginning, County of Douglas, State of Colorado.

800 South Wilcox, Castle Rock, CO 80104

17

Store 104

EXECUTION VERSION

## RESTRUCTURING SUPPORT AND SETTLEMENT AGREEMENT

This RESTRUCTURING SUPPORT AND SETTLEMENT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>"), dated as of **January 29, 2016**, is entered into by and among (i) Western Convenience Stores, Inc. (the "<u>Debtor</u>"), (ii) Suncor Energy (U.S.A.) Inc. ("<u>Suncor</u>"), (iii) the HDT named entities set forth on **Exhibit A** (collectively, the "<u>HDT Transferred Entities</u>"), (iv) Hossein D. Taraghi, an individual ("<u>H. Taraghi</u>"), (v) Debra Taraghi, an individual ("<u>D. Taraghi</u>" and collectively with H. Taraghi, the "<u>Taraghis</u>"), (vi) W.C.S. One, LLC ("<u>WCS One</u>"), (vii) Western Truck One, LLC ("<u>WTO</u>"), (viii) H.D.T. Nine Limited Liability Company ("<u>HDT 9</u>"), (ix) H.D.T. Twelve Limited Liability Company ("<u>HDT 12</u>"), and (x) H.D.T. Thirty Six Limited Liability Company ("<u>HDT 36</u>"). The Debtor, Suncor, the HDT Transferred Entities, the Taraghis, WCS One, WTO, HDT 9, HDT 12, and HDT 36 are referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## RECITALS

**WHEREAS**, the Debtor is the debtor and debtor in possession in a Bankruptcy Case pending in the United States Bankruptcy Court for the District of Colorado (the "<u>Bankruptcy Court</u>") filed on December 28, 2015 (the "<u>Petition Date</u>") captioned *In Re: Western Convenience Stores, Inc.*, Case No. 15-23977-TBM (Bankr. D. Colo.) (the "<u>Bankruptcy Case</u>");

**WHEREAS**, in the U.S. District Court for the District of Colorado in the action captioned Civil Action No. 11-cv-01611-MSK-CBS, *Western Convenience Stores, Inc. vs. Suncor Energy (U.S.A.) Inc. v. Hossein Taraghi and Debra Taraghi*, Suncor obtained an Amended Final Judgment against Debtor and the Taraghis, jointly and severally, in the amount of $10,235,179.79 plus interest at 7 percent per annum (the "<u>Federal Judgment</u>");

**WHEREAS**, prior to the Bankruptcy Case being filed, on December 23, 2014, Suncor, Debtor, and the other Parties entered into a Forbearance Agreement (the "<u>Forbearance Agreement</u>") and other Forbearance Documents (as defined in the Forbearance Agreement), including a Security Agreement (the "<u>Security Agreement</u>"), a Guaranty Agreement (the "<u>Guaranty Agreement</u>"), a Pledge Agreement (the "<u>Pledge Agreement</u>"), and an Aircraft Security Agreement granted by WCS One to Suncor (the "<u>Aircraft Security Agreement</u>");

**WHEREAS**, as of the date hereof, Suncor holds a claim against the Debtor, in the aggregate amount of $7,800,000;

**WHEREAS**, as part of its collateral under the Forbearance Documents, Suncor obtained the membership interests in the following limited liability companies, which are all "Guarantors" thereunder, the HDT Transferred Entities, WCS One, WTO, HDT 9, HDT 12, and HDT 36 (the "<u>Membership Interests</u>"), through the delivery of certificates to the Membership Interests (the "<u>LLC Membership Interest Certificates</u>"). Forty (40) of these Guarantors are the HDT Transferred Entities, which own certain retail stores and other real property that was leased to and operated by Debtor;

Exhibit E

EXECUTION VERSION

**WHEREAS**, Suncor also obtained as collateral all of the shares of the Debtor, through the delivery of share certificates evidencing the ownership of the Debtor (the "Share Certificates");

**WHEREAS**, in order to perfect Suncor's security interest in this collateral, Suncor was given physical possession of all of the Membership Interest Certificates and Share Certificates. In addition, H. Taraghi (as then owner of HDT and Debtor, manager of the Transferred Entities, and President of Debtor) personally executed and delivered transfer documents to Suncor, allowing Suncor to take possession of the Membership Interest Certificates and the Share Certificates by transferring them to Suncor upon an Event of Default (as defined in the Forbearance Agreement);

**WHEREAS**, on 12:01 a.m. on October 16, 2015, a non-curable Event of Default occurred under Section 7.1(p) of the Forbearance Agreement as a result of Debtor and H.D.T. Twenty Eight Limited Liability Company ("HDT 28") failing to pay amounts due under promissory notes held by VSD 4 LLC ("VSD 4");

**WHEREAS**, based upon this Event of Default, the Suncor Board of Directors accelerated all Obligations under the Forbearance Agreement effective as of 7:39 a.m. on October 16, 2015, and authorized Suncor to "exercise all or any of its rights and remedies" with respect to the Membership Interests, including the HDT Transferred Entities;

**WHEREAS**, pursuant to C.R.S. § 4-9-609 and Sections 10 and 11 of Suncor's Pledge Agreement, Suncor transferred the membership interests in the HDT Transferred Entities (except H.D.T. Eighteen Limited Liability Company ("HDT 18"), which was transferred later on December 15, 2015, as discussed below) (collectively "Original Transferred LLCs") to Suncor, as evidenced by fully executed Irrevocable Membership Interests Assignments. For clarity, Suncor did not transfer WCS One, WTO, HDT 9, HDT 12, or HDT 36, and H. Taraghi remains the sole manager of those entities;

**WHEREAS**, on October 16, 2015, pursuant to C.R.S. § 7-80-702(2), which provides that a member of an LLC "ceases to be a member upon assignment or transfer of all the member's membership interest," H.Taraghi and H.D.T. Limited Liability Company ("HDT") (which H.Taraghi had previously owned) ceased to be a member of any of the Original Transferred LLCs. Accordingly, the Original Transferred LLCs had no members;

**WHEREAS**, on October 16, 2015, pursuant to C.R.S. § 7-80-701(2), Suncor, which held by assignment all the membership interests in the Original Transferred LLCs, consented to Suncor being admitted as the sole member of each of the Original Transferred LLCs;

**WHEREAS**, on October 16, 2015, Suncor removed the former manager (H.Taraghi) and appointed itself as manager of each of the Original Transferred LLCs;

**WHEREAS**, pursuant to C.R.S. § 7-80-702(2), Suncor, as the sole member and manager of each of the Original Transferred LLCs, has the sole power to act on behalf of any of them. As of October 16, 2015, neither H.Taraghi nor HDT had the authority to act on behalf of any of the Original Transferred LLCs whose membership interests were transferred to Suncor;

2

**EXECUTION VERSION**

**WHEREAS**, on October 16, 2015, Suncor sent a Notice of Event of Default and Exercise of Remedies;

**WHEREAS**, on November 13, 2015, the Debtor, the Taraghis, the HDT Transferred Entities, WCS One, WTO, HDT 9, HDT 12, and HDT 36 (collectively, the "Plaintiffs"), filed an action in the District Court for the City and County of Denver ("State Court Proceeding");

**WHEREAS**, in the State Court Proceeding, the Plaintiffs sought damages under a variety of theories, declaratory judgment regarding the relative rights of the parties and an injunction "prohibiting Suncor from declaring a default and exercising upon its collateral documents and from otherwise interfering with Plaintiffs business and economic relations";

**WHEREAS**, on December 8, 2015, a day-long evidentiary hearing was conducted on Plaintiffs' motion for a preliminary injunction in the State Court Proceeding. After considering written briefs, argument of counsel, 27 exhibits and hearing the testimony of three witnesses called by the Plaintiffs, the Court denied the motion for a preliminary injunction on the grounds that Plaintiffs were unlikely to succeed on the merits;

**WHEREAS**, On December 17, 2015, Suncor filed a motion for summary judgment on all counts in the State Court Proceeding. If unresolved by summary judgment, the case is set for trial commencing June 20, 2016;

**WHEREAS**, on December 7, 2015, Offen Petroleum, Inc. ("Offen") filed a verified complaint in the District Court for the City and County of Denver against the Debtor and H.Taraghi;

**WHEREAS**, in its Sixth Claim for Relief, Offen seeks a prejudgment writ of attachment to enforce its security interest against certain property and proceeds of the Debtor. Seeking such relief constitutes a claim against the collateral securing the Forbearance Agreement, and is another non-curable Event of Default per Section 7.1(c) of the Forbearance Agreement (the "Second Event of Default");

**WHEREAS**, on December 10, 2015, as a protective measure, Suncor adopted a resolution and took (to the extent deemed not already taken) the same actions, in the same order, as taken on October 16, 2015 with respect to the Original Transferred LLCs as set forth above as a result of the Second Event of Default;

**WHEREAS**, in a subsequent review of public records, Suncor learned that HDT 18 was stated to be the owner of a store location in Colorado Springs, which has no lease to Debtor. On December 15, 2015, after learning of the property owned by HDT 18, Suncor acted to effect the transfer all membership interests in HDT 18 to itself, in conformity with its rights under the Forbearance Agreement (and related documents). Suncor was subsequently made the sole member and manager of HDT 18;

**WHEREAS**, a second Notice of Events of Default and Exercise of Remedies was delivered to the Debtor on December 15, 2015;

3

EXECUTION VERSION

**WHEREAS**, on December 17, 2015, pursuant to the Colorado Uniform Commercial Code ("UCC"), C.R.S. § 4-9-611, Suncor sent separate notices for: (i) the sale of the Membership Interests in the HDT Transferred Entities (the "UCC Sale (HDT Transferred Entities)"), and (ii) the sale of any personal property, excluding inventory and specifically including any trade fixtures, at the retail gas stations owned by the HDT Transferred Entities (the "UCC Sale (Debtor Personal Property)");

**WHEREAS**, Debtor, as tenant, and each of the HDT Transferred Entities (except HDT 18 and H.D.T. Thirty Four Limited Liability Company ("HDT 34")), as landlord, are parties to separate Leases for real property that Debtor operates, except that H.D.T. Twenty Three Limited Liability Company ("HDT 23") does not own the real property purportedly subject to the Lease between HDT 23 and Debtor;

**WHEREAS**, each of the Leases expired on December 31, 2015 and has not been renewed or extended. The Debtor currently continues to occupy the premises subject to the Leases and property owned by HDT 18 and HDT 34 that is not subject to any lease; provided that without entering into this Agreement, Debtor shall have no right to continue to do so;

**WHEREAS**, prior to the date hereof, the Parties engaged in good faith, arm's-length negotiations that have led to an agreement regarding the material terms of a restructuring of the Debtor that the Parties now desire to implement (the "Restructuring") in accordance with and subject to the terms and conditions set forth in this Agreement and the plan of reorganization of the Debtor that will be filed on or before the date on which this Agreement is approved by the Bankruptcy Court (the "Plan");

**WHEREAS**, the Restructuring will be implemented through the terms and conditions contained in this Agreement and the Plan providing for, among other things, the solicitation, confirmation and consummation of the Plan in accordance with, and subject to the terms and conditions contained in, this Agreement (the "Plan Transaction");

**WHEREAS**, the terms and conditions in this Agreement, including those required to be contained in the Plan, is the product of good faith, arm's-length negotiations among the Parties and their respective professionals; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the Restructuring on the terms and conditions contained in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>**Definitions.**</u>

In addition to the capitalized terms defined in the Recitals and elsewhere in this Agreement, the following terms, as used in this Agreement, have the meanings set forth below:

4

(a)    "<u>Bankruptcy Rules</u>" means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of title 28 of the United States Code, (ii) the applicable Local Rules of Bankruptcy Practice and Procedure for the Bankruptcy Court and (iii) any general or chamber rules, or standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, and each of the foregoing together with all amendments and modifications thereto that are subsequently made and as applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

(b)    "<u>Business Day</u>" means any day on which banks in Colorado are open for business, except a Saturday or Sunday.

(c)    "<u>Cash or $</u>" means legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

(d)    "<u>Collateral</u>" has the meaning given such term in the Forbearance Agreement.

(e)    "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order (and any exhibits, appendices and related documents) shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Debtor and Suncor.

(f)    "<u>Costs, Expenses, and Attorneys' Fees</u>" shall have the meaning as defined in the Forbearance Agreement.

(g)    "<u>Current Indebtedness</u>" means $7,800,000, which as of the date of this Agreement is the full amount owing to Suncor under the Forbearance Documents.

(h)    "<u>Disclosure Statement</u>" means the disclosure statement, including any exhibits, appendices and related documents, for the Plan, as amended, supplemented or otherwise modified from time to time by the Bankruptcy Court or otherwise, that describes the Plan and is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure and other applicable law, and which shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Debtor and Suncor.

(i)    "<u>Disclosure Statement Order</u>" means an order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation, which order (including any exhibits, appendices or related documents) shall be materially consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Debtor and Suncor.

(j)    "<u>Effective Date</u>" means (A) with respect to all the Parties, except Debtor, the date of this Agreement, and (B) with respect to Debtor, the date this Agreement becomes binding on Debtor in accordance with the provisions of <u>Section 13</u> hereof.

(k)    "<u>Entity</u>" means a Person, estate, trust, governmental unit, and the U.S. Trustee, within the meaning of section 101(15) of the Bankruptcy Code.

(l)     "Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that either (i) the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure (or the equivalent in other jurisdictions), or any analogous rule under the Bankruptcy Rules (or the equivalent in other jurisdictions), may be filed relating to such order, or (ii) the filing of an appeal of the Confirmation Order on grounds that do not challenge or have a potential adverse impact on the requirements of this Agreement (including, without limitation, the Sale Transactions), as determined by Suncor, in its sole and absolute discretion; shall not cause an order not to be a Final Order.

(m)     "Forbearance Documents" has the meaning given such term in the Forbearance Agreement.

(n)     "Governmental Authority" means any United States, Colorado or other international, national, federal, state, municipal or local governmental, regulatory or administrative authority, agency or commission, licensing body or any judicial (including any state or federal court) or arbitral body or other entity exercising executive, legislative, judicial, regulatory, licensing, gaming or administrative powers or functions of government.

(o)     "Jet" shall have the meaning as set forth in the WCS One Sale Agreement (Jet).

(p)     "Leases" mean the leases set forth on **Exhibit B** attached hereto.

(q)     "Material Adverse Event" means any event, change, effect, occurrence, development, circumstance or change of fact occurring after the date hereof that has had, or would reasonably be expected to have, a material adverse impact on the business, results of operations, financial condition, assets or liabilities of the Debtor taken as a whole, or which would materially impair the Debtor's ability to perform its obligations under this Agreement, or the Plan have a materially adverse effect on or prevent or materially delay the consummation of the Restructuring Transactions.

(r)     "Obligations" has the meaning set forth in the Forbearance Agreement.

(s)     "Plan" has the meaning as set forth in the Recitals.

(t)     "Plan Process Documents" means all material agreements, instruments, pleadings, orders or other related documents utilized to implement the Plan and to obtain confirmation of the Plan, including, but not limited to, the Plan, the Disclosure Statement, the Disclosure Statement Order, the ballots, the order of the Bankruptcy Court approving the form of ballots and solicitation procedures and the Confirmation Order, each of which shall contain terms and conditions materially consistent or not inconsistent with this Agreement and shall otherwise be in form and substance reasonably acceptable to the Debtor and Suncor, and as applicable be filed with the Bankruptcy Court.

(u)     "Restructuring Documents" means this Agreement, the Plan Process Documents and the Sale Process Documents.

(v)     "Restructuring Support Period" means the period commencing on the Effective Date and ending automatically (without any requirement that notice be provided to any Party, except pursuant to (ii) below) on the earliest occurrence of any one of the following: (i) the date of any decision, ruling, or order by the Bankruptcy Court not to approve this Agreement, the Suncor Sales Agreement (LLCs), or the WCS One Sale Agreement (Jet),   (ii) upon written notice, at Suncor's sole option, if the Bankruptcy Court has not approved this Agreement, the Suncor Sales Agreement (LLCs), and the WCS One Sale Agreement (Jet) for any reason within sixty (60) days after the date of this Agreement, (iii) a breach by Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, or HDT 36 of any term or condition of this Agreement, the Suncor Sale Agreement (LLCs), or the WCS One Sale Agreement (Jet) or any other of the Plan Process Documents or Sale Process Documents, (iv) the occurrence of any of the events set forth in Section 6(a) and/or its subparts, (v) the date that both the Sale Transactions have closed pursuant to the Suncor Sales Agreement (LLCs) and the WCS One Sale Agreement (Jet) and Suncor has received the Principal Consideration, or (vi) the Sale Transactions Deadline.

(w)     "Restructuring Transactions" means the transactions contemplated by the Plan Process Documents and the Sale Process Documents.

(x)     "Sale Process Documents" means the Suncor Sale Agreement (LLCs), WCS One Sale Agreement (Jet), the Confirmation Order and the Plan, and such other agreements, instruments, pleadings, orders or other related documents contemplated thereby and utilized to consummate the Sale Transactions, each of which shall contain terms and conditions consistent with this Agreement.

(y)     "Sale Transactions" means the purchase and sale transactions contemplated in the Suncor Sale Agreement (LLCs) and WCS One Sale Agreement (Jet).

(z)     "Sale Transactions Deadline" means one hundred and eighty (180) calendar days after the date of this Agreement.

(aa)     "Suncor Sale Agreement (LLCs)" means that certain Membership Interest Purchase and Sale Agreement, with respect to the membership interests of the HDT Transferred Entities, to be entered into by and between Suncor, as seller, and H.Taraghi, as the purchaser, contemporaneously with this Agreement.

EXECUTION VERSION

(bb)    "Solicitation" means the solicitation of votes in connection with the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

(cc)    "WCS One Sale Agreement (Jet)" means that certain Jet Purchase and Sale Agreement, with respect to the Jet, owned by WCS One and secured by Aircraft Security Agreement, to be entered into by and between WCS One, as seller, and Suncor, as purchaser, contemporaneously with this Agreement.

## 2.    Purchase and Sale of the HDT Transferred Entities.

(a)    Sale Transactions – Consideration.

(i)    Consideration for Sale Transactions. Effective upon the mutual execution and delivery of this Agreement, the Suncor Sale Agreement (LLCs), and the WCS One Sale Agreement (Jet), in consideration for the payment of five million U.S. dollars (U.S. $5,000,000) to Suncor and transfer of the Jet to Suncor both on or before the Sale Transactions Deadline (the "Principal Consideration") and other consideration (including, without limitation, the holdover tenancy and license granted by Suncor pursuant to Section 2(f) below and the releases and satisfaction of judgments pursuant to Section 2(g) below), Suncor shall transfer the membership interests of each of the HDT Transferred Entities upon, and subject to, the terms and conditions set forth in the Suncor Sale Agreement (LLCs), the WCS One Sale Agreement (Jet), and this Agreement.

(ii)    Contemporaneous Exchange for New Value. The Parties, including H.Taraghi and WCS One, agree and acknowledge, and waive any right to challenge or contest, that (1) the contemplated transfer by Suncor of its membership interests in each of the HDT Transferred Entities to H.Taraghi, as well as granting H.Taraghi the contracted for release and satisfaction of judgment pursuant to Section 2(g) below, among other consideration, and (2) granting WCS One the contracted for release and satisfaction of judgment pursuant to Section 2(g) below and the WCS One Sale Agreement (Jet), among other consideration; each constitute new value to H.Taraghi and WCS One, respectively, as that term is defined in 11 USC section 547(a)(2) and that the contemplated transfers, release, satisfaction of judgment, and other transactions by Suncor, which all form part of the Sale Transactions, are occurring contemporaneously with the payment and transfer of the Principal Consideration by H.Taraghi and WCS One pursuant to the Suncor Sale Agreement (LLCs), the WCS One Sale Agreement (Jet), and this Agreement.

(b)    Execution and Delivery of Sale Agreements. Contemporaneously with the execution of this Agreement, (i) Suncor and H. Taraghi shall execute and deliver the Suncor Sale Agreement (LLCs), and (ii) Suncor and WCS One LLC (to be executed by H. Taraghi on behalf of WCS One, as its sole manager) shall execute and deliver the WCS One Sale Agreement (Jet).

(c)    Stipulated Final Judgment in State Court Proceeding.

(i)    Upon approval by the Bankruptcy Court of this Agreement pursuant to Section 13, all the Parties agree to file the Stipulation and Motion for Entry of Final Judgment (the "Stipulation") and Final Judgment attached thereto (the "Stipulated Judgment"), in the form attached hereto and marked **Exhibit C**, in the State Court Proceeding; and

8

EXECUTION VERSION

(ii)     Effective as of the Effective Date, upon the direction of Suncor, whether or not the Bankruptcy Court has approved this Agreement, all of the Parties, except Debtor, agree to file the Stipulation and Stipulated Judgment in substantially the form attached hereto and marked **Exhibit C**, in the State Court Proceeding with respect to all Parties, except Debtor.

(d)     Agreements Related to the Stipulation and Stipulated Judgment.

(i)     Effective as of the Effective Date, Plaintiffs, including Debtor, each agree to, and acknowledge the accuracy of, paragraphs 1 through 10 of the Stipulated Judgment, and waive any right to contest, dispute, or challenge such paragraphs, including, without limitation, that (1) Suncor is the owner, sole member, and sole manager of all the HDT Transferred Entities, and (2) H.Taraghi has no right to act on behalf of, or direct the actions of, any of the HDT Transferred Entities.

(ii)     Effective as of the Effective Date, Plaintiffs, including Debtor, hereby waive their rights to appeal the Stipulated Judgment entered in the State Court Action, and, if requested by Suncor, agree to file a waiver of right to appeal the Stipulated Judgment.

(e)     Forbearance by Suncor. During the Restructuring Support Period, Suncor agrees as follows:

(i) not to conduct, and postpone as necessary, the UCC Sale (HDT Transferred Entities);

(ii) to forbear from exercising collection efforts against the Taraghis, WCS One, WTO, HDT 9, HDT 12, and HDT 36 under the Forbearance Documents; provided, Suncor shall retain all other rights under the Forbearance Documents; and

(iii) to forbear from transferring or selling the HDT Transferred Entities, incurring debt on their behalf, or pledging their assets to secure any claim.

(f)     Holdover Tenancy and License.

(i)     Upon the Effective Date, the Parties agree that all the Leases expired on December 31, 2015, and there is no lease for the following two properties currently being occupied and operated by Debtor: (1) 2507 E. Platte Avenue, Colorado Springs, CO (the "HDT 18 Property"), which is owned by HDT 18, and (2) 12867 US Hwy 24/285, Buena Vista, CO (the "HDT 34 Property"), which is owned by HDT 34.

(ii)     During the Restructuring Support Period, (1) the HDT Transferred Entities (except HDT 18, HDT 23, and HDT 34) agree to permit Debtor to continue as a month to month holdover tenant under each of the Leases; provided that Debtor shall perform all of the terms, conditions, and obligations under the Leases, except that in lieu of rent, Debtor shall pay the monthly payments owing by the HDT Entities to the lenders holding first priority position deeds of trusts or mortgages on the real properties subject to the Leases; and (2) HDT 18 and HDT 34 agree to a month to month license of the HDT 18 Property and the HDT 34 Property on the same terms and conditions as the Lease between Debtor and HDT 23, except that in lieu of rent, Debtor shall pay the monthly payments owing by the HDT 18 and HDT 34 to the lenders holding

9

first priority position deeds of trusts or mortgages on the HDT 18 Property and the HDT 34 Property.

(g)   Events Upon Timely Closing of Sale Transactions.   If, and only if, the Restructuring Support Period does not terminate (except pursuant to Section 1(a)(v)(v)), the Confirmation Order is entered and becomes a Final Order on or before the Sale Transactions Deadline, the Sale Transactions close pursuant to the Suncor Sale Agreement (LLCs) and WCS One Sale Agreement (Jet) on or before the Sale Transactions Deadline, and Suncor receives the Principal Consideration on or before the Sale Transactions Deadline (all 4 of which conditions must be satisfied), subject to Section 6.04(c) of the Suncor Sale Agreement (LLCs), Section 9.2(a) of the WCS One Sale Agreement (Jet), and Section 2(i) of this Agreement, then:

(i)   Suncor shall provide notice cancelling the UCC Sale (HDT Transferred Entities) and the UCC Sale (Debtor Personal Property).

(ii)   the indebtedness due under the Federal Judgment, the Promissory Note (as defined in the Forbearance Agreement), and paragraph 7 of the Stipulated Judgment shall be satisfied and released by Suncor.

(iii) if (1) the period of ninety-one (91) days after the date that all of the foregoing conditions have been satisfied (the "91 Day Period") has passed and neither H.Taraghi or WCS One has filed a petition for protection under the Bankruptcy Code, and no other action has been initiated to set aside or challenge the payment and transfer of the Principal Consideration to Suncor (a "Challenge"), or (2) a Challenge is filed during the 91 Day Period, and a Final Order is entered denying the Challenge and affirming that there are no Invalidated Payments (as defined in Section 6.04(c) of the Suncor Sale Agreement (LLCs)) or Invalidated Transfer (as defined in Section 9.2(a) of the WCS One Sale Agreement (Jet)), then to memorialize the satisfaction and release granted in Section 2(g)(ii) above and the WCS One Sale Agreement (Jet) contemporaneously with the closing of the Sale Transactions:

(A)  Suncor shall record a satisfaction of judgment in full of the Federal Judgment and of paragraph 7 of the Stipulated Judgment;

(B)  Suncor will release all liens and security interests it holds with respect to the Collateral, except with respect to the Jet; and

(C)  Suncor will provide the Plaintiffs an officer's certificate confirming the release of the indebtedness pursuant to Section 2(g)(ii) above.

(h)   Events Upon Failure to Timely Close the Sale Transactions. If the Restructuring Support Period terminates, the Confirmation Order is not entered and does not become a Final Order on or before the Sale Transactions Deadline, the Sale Transactions do not close pursuant to the Suncor Sale Agreement (LLCs) and WCS One Sale Agreement (Jet) on or before the Sale Transactions Deadline, or Suncor does not receive the Principal Consideration on or before the Sale Transactions Deadline (the occurrence of any one of the foregoing conditions will trigger all of the following):

**EXECUTION VERSION**

(i) The entire Current Indebtedness, *plus* all Costs, Expenses and Attorneys' Fees incurred by Suncor in connection with this Agreement, any Forbearance Document, or Debtor's bankruptcy proceeding (which shall be deemed indebtedness of Debtor and the Taraghis and part of the Obligations pursuant to Section 7.2(a) of the Forbearance Agreement), *plus* interest at 7% per annum, accruing on all of the foregoing from the date of this Agreement until such amounts are paid in full, shall be immediately due and owing.

(ii) The Suncor Sale Agreement (LLCs) shall terminate, be of no further force or effect, and none of the Parties shall have any right or obligation arising out of or relating to such agreement.

(iii) The WCS One Sale Agreement (Jet) shall remain in full force and effect, and shall close, if not already closed, pursuant to the terms of that agreement.

(iii) Suncor shall have the right, but not the obligation, to move forward immediately, or on such time frame as Suncor determines is appropriate, with the UCC Sale (HDT Transferred Entities), and the UCC Sale (Debtor Personal Property) (collectively, the "UCC Sales").

(iv) The UCC Sales will be conducted pursuant to the process set forth in **Exhibit D** to this Agreement, which each of the Parties, including Debtor, hereby acknowledge and agree is a commercially reasonable process.

(v) Except to the extent prohibited by applicable law, Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, and HDT 36 expressly waive any right to challenge, dispute, or contest in any manner, either directly or indirectly the UCC Sales or the results thereof.

(vi) Debtor will immediately upon Suncor's written request vacate all premises owned by any HDT Transferred Entity.

(vii) Debtor will immediately provide Suncor all documents and records, including electronic documents and records, in its possession, custody, or control regarding or relating to the HDT Transferred Entities.

(i)    Events Upon Invalidated Payments or Invalidated Transfer.

(i) If any portion of the Purchase Price (as defined in the Suncor Sale Agreement (LLCs)) is determined to be an Invalidated Payment or the transfer of the Jet is determined to be an Invalidated Transfer, then the entire Current Indebtedness, plus all Costs, Expenses and Attorneys' Fees incurred by Suncor in connection with this Agreement, any Forbearance Document, or Debtor's bankruptcy proceeding (which shall be deemed indebtedness of Debtor and the Taraghis and part of the Obligations pursuant to Section 7.2(a) of the Forbearance Agreement), plus interest at 7% per annum, accruing on all of the foregoing from the date of this Agreement until such amounts are paid in full, shall be immediately due and owing; but less (1) any portion of Purchase Price that is not determined to be an Invalidated Payment, or (2) the Jet Purchase Price (as defined in the WCS One Sale Agreement (Jet)), if the transfer of the Jet is not determined to be an Invalidated Transfer.

11

(ii) If any portion of the Purchase Price is determined to be an Invalidated Payment, then:

(1) Suncor shall have the right, but not the obligation, to move forward immediately, or on such time frame as Suncor determines is appropriate, with the UCC Sales.

(2) The UCC Sales will be conducted pursuant to the process set forth in **Exhibit D** to this Agreement, which each of the Parties, including Debtor, hereby acknowledge and agree is a commercially reasonable process.

(3) Except to the extent prohibited by applicable law, Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, and HDT 36 expressly waive any right to challenge, dispute, or contest in any manner, either directly or indirectly the UCC Sales or the results thereof.

(4) Debtor will immediately upon Suncor's written request vacate all premises owned by any HDT Transferred Entity.

(5) Debtor will immediately provide Suncor all documents and records, including electronic documents and records, in its possession, custody, or control regarding or relating to the HDT Transferred Entities.

(j)    <u>Debtor Personal Property at HDT Transferred Entities</u>.   Effective as of the Effective Date, Debtor agrees (i) that all of the personal property, including trade fixtures, that was located on the real property owned by each HDT Transferred Entity at the time each such HDT Transferred Entity purchased such real property is owned by such HDT Transferred Entity, and not Debtor, (ii) within fifteen (15) days of the Effective Date, provide Suncor with a list of all personal property, including trade fixtures, that Debtor claims it owns located on any real property owned by any of the HDT Transferred Entities, together with records of Debtor and the HDT Transferred Entities, including fixed asset ledgers, in its possession, custody, or control supporting such claim, and (iii) Debtor agrees to work in good faith with Suncor to determine which personal property, including trade fixtures, located on any of the real property owned by any of the HDT Transferred Entities is actually owned by Debtor, and, upon Suncor's request, to file a stipulation with the Bankruptcy Court identifying all such personal property that Debtor owns, if any.

(k)    <u>Release</u>.   Effective as of the Effective Date, for independent and valuable consideration, and as a material inducement for Suncor to enter into this Agreement, each of Debtor, the debtor-in-possession, the Taraghis, the HDT Transferred Entities, WCS One, WTO, HDT 9, HDT 12, and HDT 36 hereby unconditionally, fully, and forever releases and discharges Suncor and its affiliates and all of their officers, directors, shareholders, employees, agents, attorneys, and the successor of each and every one of them, from any and all claims, causes of action, counterclaims and defenses which exist as of the Effective Date, whether the same are known or unknown, including, without limitation, any claims for a preference or avoidable transfers made by Debtor or the debtor-in-possession to Suncor; provided, however the foregoing release and discharge shall not apply Suncor's obligations under this Agreement. This is intended to be a broad and comprehensive general release.

12

**EXECUTION VERSION**

**3.     Plan Conditions.**

The Parties agree that the Plan shall contain the following terms and conditions, unless waived in writing by Suncor in its sole and absolute discretion:

(a)     Closing of both the Sale Transactions must occur on or before the Sale Transactions Deadline.

(b)     Additional releases of any and all claims against Suncor in a form acceptable to Suncor.

(c)     All other terms of the Plan shall be shall be acceptable in all material respects to Suncor.

**4.     Suncor Covenants Regarding Debtor's Bankruptcy Proceeding.**

(a)     <u>Support of Restructuring Transactions</u>. Upon the terms and subject to the conditions of this Agreement (including, without limitation, <u>Section 3</u> above), Suncor agrees that, for the duration of the Restructuring Support Period it shall:

(i)     support, and take all reasonable actions necessary to facilitate the implementation or consummation of, the Restructuring Transactions or the approval by the Bankruptcy Court of the Restructuring Documents;

(ii)    (A) subject to the receipt by Suncor of an approved Disclosure Statement in accordance with the Solicitation, timely vote, or cause to be voted, all of its claim to accept the Plan, and (B) not change, withdraw or revoke such vote (or cause or direct such vote to be changed, withdrawn or revoked); <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Debtor and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by Suncor at any time following the occurrence of a Material Adverse Event that Suncor in its sole discretion deems significant enough to change the terms and conditions contained in or contemplated by this Agreement;

(iii)   timely vote or cause to be voted all of its claim, for the Plan contemplated that will be filed by this Agreement and not consent to, or otherwise directly or indirectly support, solicit, assist, encourage or participate in the formulation, pursuit or support of, any restructuring or reorganization of the Debtor (or any plan or proposal in respect of the same) other than the Restructuring Transactions; and

(b)     <u>Certain Conditions</u>. The obligations of Suncor set forth in <u>Section 4(a)</u> above are subject to the following conditions:

(i)     the Stipulated Judgment in the State Court Proceeding shall have been entered;

(ii)    the Restructuring Support Period shall not have terminated;

(iii)   the Plan shall meet the conditions set forth in <u>Section 3</u> hereof; and

13

(iv)    the Confirmation Order is entered and becomes a Final Order on or before the Sale Transactions Deadline.

(c)    <u>Rights of Suncor</u>. Nothing contained herein shall (i) limit (A) the ability of Suncor to consult with any other creditor and/or claimant of the Debtor or (B) the rights of Suncor under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Bankruptcy Case so long as such consultation or appearance is not in breach of or inconsistent with the obligations of Suncor hereunder and are not for the purpose of hindering, delaying or preventing the consummation of the Restructuring Transactions; (ii) limit the ability of Suncor to assert or raise any objection permitted above in connection with any hearing on confirmation of the Plan; (iii) limit the ability of Suncor to sell or enter into any transactions in connection with its claim (as applicable) or any other claims against or interests in the Debtor; provided that any transfer of Suncor's claim in the Bankruptcy Case is subject to this Agreement; or (iv) limit the rights of Suncor under its documents.

## 5.    <u>Debtor's Covenants Regarding its Bankruptcy Proceeding</u>.

(a)    <u>Affirmative Covenants</u>. The Debtor agrees that, for the duration of the Restructuring Support Period, unless (x) otherwise expressly permitted or required by this Agreement or the Plan, or (y) otherwise consented to in writing by Suncor, the Debtor shall:

(i)    Upon approval by the Bankruptcy Court of this Agreement pursuant to <u>Section 13</u> of this Agreement, file the Stipulation and Stipulated Judgment;

(ii)    take commercially reasonably efforts to complete the preparation, as soon as reasonably practicable after the date hereof of all Plan Process Documents which are necessary to consummate the Restructuring Transactions consistent with the terms of this Agreement, including, without limitation, <u>Section 3</u>;

(iii)    except where not practicable, provide draft copies of all documents, motions, orders, procedures, agreements and other papers the Debtor intends to file with the Bankruptcy Court primarily related to the Restructuring Transactions to Suncor and its attorneys within two (2) business days prior to the date the Debtor intends to file any such document, motion, order, procedure, agreement or other paper and use commercially reasonable efforts to consult in advance in good faith with Suncor and its attorneys regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(iv)    timely file a formal objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (C) dismissing the Bankruptcy Case;

(v)    timely file a formal objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating the Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(vi)     use commercially reasonable efforts to take all actions (a) contemplated by this Agreement, (b) which are necessary to facilitate the implementation or consummation of the Restructuring Transactions or (c) which are necessary to obtain the approval by the Bankruptcy Court of the Restructuring Documents.

(b)     <u>Negative Covenants</u>. The Debtor agrees that, for the duration of the Restructuring Support Period, unless (x) otherwise expressly permitted or required by this Agreement, or (y) otherwise consented to in writing by Suncor, the Debtor shall not do or permit to occur any of the following:

(i)     propose, support, assist, engage in negotiations in connection with or participate in the formulation of, any restructuring or reorganization of the Debtor (or any plan or proposal in respect of the same) other than the Restructuring Transactions;

(ii)     materially amend or modify the Plan, in whole or in part, in a manner that is not consistent in any material respect with this Agreement;

(iii)     withdraw or revoke the Plan or publicly announce its intention not to pursue the Plan;

(iv)     take any action in connection with the Restructuring Transactions that is not consistent in any material respect with this Agreement;

(v)     amend, withdraw, modify, file or agree to Plan Process Document (including any modifications or amendments thereof) that, in whole or in part, are not consistent in any material respect with this Agreement; <u>provided</u>, that notwithstanding anything to the contrary in this Agreement, or any Plan Process Document, neither the Plan Process Documents nor this Agreement may be amended in any way that would cause a Material Adverse Event to occur to Suncor without the consent of Suncor;

(vi)     move for an order authorizing or directing the assumption or rejection of an executory contract or unexpired lease other than in accordance with this Agreement or the Plan or as otherwise approved in writing by Suncor, unless the executory contract or unexpired lease is unrelated to Suncor or the HDT Transferred Entities and is related to the operation of the Debtor's business;

(vii)     commence an avoidance action or other legal proceeding that challenges the validity, enforceability or priority of the interests of Suncor or the receipt of any  Cash or other property, tangible or intangible from  Suncor;

(viii)     issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock or limited liability company interests;

(ix)     other than as required by the Plan, amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(x)     split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(xi)     redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock or limited liability company interests;

(xii)     acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Debtor, other than in the ordinary course of business;

(xiii)     enter into any commitment or agreement inconsistent with the Restructuring Documents;

(xiv)     take any action, enter into any agreement, contract or other arrangement, amend, supplement or otherwise modify any existing agreement, contract or other arrangement, effect any transaction or commit to enter into or otherwise effect any of the foregoing with any affiliate of the Debtor, or that provides (directly or indirectly) any benefit (economic or otherwise) to, any affiliate of the Debtor (or, in any such case, any employee, officer, director, manager, shareholder, member or partner of the Debtor or any affiliate of the Debtor, or any such individual's parents, spouse or descendants, or any trust or entity which is for the benefit of such individual and/or such individual's relatives), other than any of the foregoing that is done with the reasonable consent of Suncor;

(c)     <u>Automatic Stay</u>. The Debtor acknowledge and agree and shall not dispute that the giving of notice of termination (including of the Restructuring Support Period and/or Suncor's obligations pursuant to <u>Section 6(a)</u>) by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtor hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

## 6.     **Termination of Suncor Obligations.**

(a)     Suncor's obligations under <u>Section 2(e)</u>, <u>Section 2(f)(ii)</u>, <u>Section 2(g)</u>, and <u>Section 4</u> of this Agreement and under the Suncor Sale Agreement (LLCs) shall immediately terminate, without notice of any kind to Debtor, upon the occurrence of any of the following events:

(i)     termination of the Restructuring Support Period;

(ii)     the failure (1) by the Debtor to comply with the provisions of <u>Section 2(d)(ii)</u>, <u>Section 2(f)(ii)</u>, <u>Section 2(j)</u>, <u>Section 3</u>, <u>Section 5(a)</u>, or <u>Section 5(b)</u> of this Agreement; (2) the failure of H.Taraghi to comply with the terms and conditions of the Suncor Sale Agreement (LLCs); (3) the failure of WCS One to comply with the terms and conditions of the WCS One Sale Agreement (Jet); or (4) the failure by the Debtor to comply with any obligations of the Debtor under this Agreement, the Plan Process Documents, the Sale Process Documents, or the Plan;

16

(iii)    any representation made by the Debtor in this Agreement proves to have been materially incorrect on the Effective Date (or such other applicable date with respect to a representation expressly made as to a period of time other than the Effective Date);

(iv)    the Stipulation is not filed in the State Court Proceeding immediately following the Bankruptcy Court's approval of the Agreement pursuant to Section 13 herein, or the Stipulated Judgment is not entered;

(v)    the occurrence of a Material Adverse Event, or the occurrence of any event, change, effect, occurrence, development, circumstance or change of fact that materially impairs the ability of the Debtor to perform their obligations under this Agreement or has a Material Adverse Event on, or prevents or materially delays the consummation of, the Restructuring Transactions;

(vi)    the Bankruptcy Court grants relief that is materially inconsistent with this Agreement in any material respect;

(vii)    the Bankruptcy Court enters an order modifying or terminating the Debtor's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(viii)    the Bankruptcy Court enters an order authorizing or directing the assumption or rejection of an executory contract or unexpired lease other than in accordance with this Agreement or the Plan or as otherwise approved in writing by Suncor, unless the assumption or rejections is accomplished on notice to creditors, including Suncor, does not affect Suncor, and is related to the Debtor's ongoing business operations;

(ix)    the commencement of an avoidance action or other legal proceeding by the Debtor to challenge the validity, enforceability or priority of an interest of Suncor or to seek any Cash or other property, tangible or intangible, from Suncor;

(x)    the Plan as filed is inconsistent with this Agreement;

(xi)    the termination of any order or agreement permitting the use of cash collateral;

(xii)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Bankruptcy Cases;

(xiii)    the failure to satisfy any of the conditions to effectiveness set forth in the Plan by the deadlines set forth in such Plan, except as such conditions may be waived by the Parties;

(xiv)    the Bankruptcy Case is involuntarily dismissed; or

(xv)    the Debtor shall not have complied with any of the following milestones, except to the extent the failure to meet any such milestone is due to the Bankruptcy Court's

scheduling requirements (but not any scheduling requirements that are done or made at the request of the Debtor):

> (A)   the Plan and the Disclosure Statement shall not have been filed with the Bankruptcy Court on or prior to February 28, 2016;

> (B)   the Confirmation Order shall not have been entered by the Bankruptcy Court and become a Final Order by on or before the Sale Transactions Deadline.

## 7.   Good Faith Cooperation; Further Assurances; Acknowledgment; No Solicitation.

During the Restructuring Support Period, the Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all matters relating to their rights hereunder in respect of the Debtor or otherwise in connection with their relationship with the Debtor, (b) all matters concerning the implementation of this Agreement, and (c) the pursuit and support of the Restructuring Transactions (including confirmation of the Plan or consummation of the Sale Transaction). Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement. The acceptance of the Plan by Suncor will not be solicited until Suncor has received the Disclosure Statement and related ballot(s), as approved by the Bankruptcy Court.

## 8.   Plan Process Documents and Sale Process Documents.

During the Restructuring Support Period each Party hereby covenants and agrees (i) to negotiate in good faith the Plan Process Documents and the Sale Process Documents, and (ii) to execute (to the extent such Party is a party thereto) and otherwise support the Plan Process Documents and Sale Process Documents. For the avoidance of doubt, during the Restructuring Support Period, each Party agrees to (a) act in good faith and use commercially reasonable efforts to support and complete successfully the implementation of this Agreement, the Restructuring Documents and the Restructuring Transactions in accordance with the terms of this Agreement, (b) do all things reasonably necessary and appropriate in furtherance of consummating the Restructuring Transactions in accordance with, and within the time frames contemplated by this Agreement and (c) act in good faith and use commercially reasonable efforts to consummate the Restructuring Transactions as contemplated by this Agreement.

## 9.   Representations and Warranties.

(a)   Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

> (i)   each Party that is an Entity is validly existing and in good standing under the laws of the jurisdiction of incorporation of its organization, and has all requisite corporate, limited liability company, partnership or similar authority, and each Party that is an individual is over eighteen years of age, is competent and has full power and authority, to (1) enter into this Agreement, (2) carry out the transactions contemplated under this Agreement and (3) perform its

obligations contemplated under this Agreement; and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)       subject to entry of the Disclosure Statement Order in the case of the Debtor, the execution, delivery and performance by such Party of this Agreement does not and will not (1) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, (2) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party or (3) violate any order, writ, injunction, decree, statute, rule or regulation;

(iii)       subject to entry of the Disclosure Statement Order in the case of the Debtor, the execution, delivery and performance by such Party of this Agreement do not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required for disclosure by the Securities and Exchange Commission and in connection with the Bankruptcy Case, the Plan and the Disclosure Statement; and

(iv)       subject to entry of the Disclosure Statement Order in the case of the Debtor, this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

**10.    Publicity.**

The Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, or HDT 36 shall not issue or make any press release regarding the Bankruptcy, this Agreement, or this Agreement's terms without the prior written consent of Suncor, which may be withheld in Suncor's sole and absolute discretion. The Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, or HDT 36 shall submit drafts to Suncor of any such proposed press release for Suncor's prior review and approval.

**11.    Amendments.**

No amendment, modification or termination of any provisions of this Agreement shall in any event be effective (and shall be void *ab initio*) unless the same shall be in writing and executed and delivered by Suncor and the other Parties.  No waiver of any provisions of this Agreement of any provisions of this Agreement nor consent to any departure therefrom shall in any event be effective (and shall be void *ab initio*) unless the same shall be in writing and signed by Suncor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

EXECUTION VERSION

12.    **Waiver.**

No waiver of any breach, right, obligation, term, or condition of this Agreement (collectively, "matter") hereunder shall be implied from any failure by the other Parties to take action on account of such matter if such matter persists or is repeated, and no express waiver shall affect any matter other than the matter expressly specified in the waiver, and it shall be operative only for the time and to the extent therein stated. Waivers of any matter contained herein shall not be construed as a waiver of any subsequent matter. The consent or approval by any Party to, or of, any act any other Party requiring further consent or approval shall not be deemed to waive or render unnecessary the consent or approval to, or of, any subsequent similar act.

13.    **Effectiveness.**

This Agreement shall become effective and binding upon Debtor upon its approval by the Bankruptcy Court, which shall be put in front of the Bankruptcy Court for consideration on notice to creditors with opportunity for a hearing following the execution of this Agreement by the Parties and a motion brought under Rule 9019 of the Bankruptcy Rules. This Agreement shall become effective and binding on all of the other Parties on the date of the Agreement, subject to the terms and conditions of this Agreement.

14.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF COLORADO, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE OR PROCEEDING ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF COLORADO OR IN THE BANKRUPTCY COURT (AS APPLICABLE) AND THE PARTIES HERETO IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.    **Specific Performance.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

16.   **Construction.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.  The word "including" shall mean "including, without limitation." This Agreement shall not be interpreted or construed for or against any Party, but shall be interpreted and construed fairly as to all Parties, on the express understanding and agreement that the Parties participated equally in the negotiation and preparation of this Agreement, or have had the equal opportunity to do so. Counsel for each of the Parties has cooperated in the drafting and preparation of this Agreement.

17.   **Successors and Assigns; Assignment**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives. Suncor and the HDT Transferred Entities shall have the right to assign, pledge, or otherwise transfer its rights or delegate its duties or obligations under this Agreement without the prior written consent of any other Party. Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, and HDT 36 shall not have the right to assign, pledge, or otherwise transfer its rights or delegate its duties or obligations under this Agreement without the prior written consent of Suncor, which consent may be withheld in Suncor's sole and absolute discretion.

18.   **No Third-Party Beneficiaries.**

Except as expressly provided herein, this Agreement shall be solely for the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, and no other person or entity shall be a third-party beneficiary hereof.

19.   **Prior Negotiations; Entire Agreement.**

This Agreement and the Exhibits attached hereto, the Suncor Sale Agreement (LLCs) and attachments thereto, the WCS One Sale Agreement (Jet) and attachments thereto, and all documents executed pursuant to such agreements, shall constitute the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any and all negotiations, representations, warranties, or agreements with respect to the subject matter hereof prior to the date of this Agreement. Notwithstanding the forgoing or anything else in this Agreement to the contrary, nothing in this Agreement affects, amends, or modifies any of the terms, conditions, rights or obligations under the Federal Judgment, any of the Forbearance Documents, or any of the documents executed or entered into pursuant thereto, all of which remain in full force and effect.

20.   **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or by electronic transmission in .pdf format, which shall constitute effective delivery of this Agreement as to the Parties and shall be deemed to be an original for all purposes.

21.   **Notices.**

Any notice required or permitted under this Agreement must be in writing and will be deemed given (a) upon personal delivery, (b) on the first Business Day after receipted delivery to a courier service which guarantees next Business Day delivery, or (c) on the third Business Day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

(1)   If to the Debtor, the Taraghis, WCS One, WTO, HDT 9, HDT 12, or HDT 36:

Kutner Brinen Garber, P.C.
1660 Lincoln St., Suite 1850
Denver, CO  80264
Attn:  Lee M. Kutner

With a copy to:

Springer & Steinberg, P.C.
1600 Broadway, Suite 1200
Denver, CO  80202
Attn: Jeffrey Springer

(2)   If to Suncor or the HDT Transferred Entities:

Suncor Energy (U.S.A.) Inc.
717 17th Street, 29th Floor
Denver, CO 80202
Attn.: Director, Legal Affairs

22.   **Relationship Among Parties.**

It is understood and agreed that, except as expressly provided in this Agreement, none of the Parties: (a) have any duty of trust or confidence in any kind or form with each other; (b) have or owe any other duties (fiduciary or otherwise (except for the Debtor' fiduciary duties under applicable law)) whatsoever to each other; and (c) have commitments among or between them.

23.   **Representation by Counsel.**

Each Party acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with this Agreement and the Restructuring Transactions contemplated herein. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

24.   **Recitals and Exhibits.**   The Recitals of this Agreement (including the defined terms therein) and the Exhibits attached hereto are, by this reference, all expressly incorporated into and form a part of this Agreement.

25. **Further Assurances.** Each Party agrees to execute and deliver such further and additional instruments, agreements, and other documents, and to perform or do such further acts and things, as are reasonably necessary to carry out or effectuate the terms and provisions of this Agreement.

26. **Capacity to Execute Agreement.** Each Party expressly represents and warrants to the other Parties that such Party is legally competent to execute this Agreement and that such Party is fully authorized and empowered to execute this Agreement. Each Party represents and warrants to the other Parties that such Party is entering into this Agreement without duress and that such Party has reviewed the terms of the Agreement with counsel and with any other advisors that the Party wishes to consult with respect to the Party's decision to enter into this Agreement. Each person or Entity signing this Agreement represents that he, she, or it is fully authorized to sign this Agreement on behalf of the person or Entity for which such person or Entity is signing this Agreement.

27. **Severability.** The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

28. **Time.** Time is of the essence hereof.

29. **Independent Analysis.**

Each of the Parties hereto confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**WESTERN CONVENIENCE STORES, INC.**

By:  _____

Name:  Hossein D. Taraghi

Title:  _President_____

**SUNCOR ENERGY (U.S.A.) INC.**

By:  _____

Name:  Steve Ewing

Title:  Director, Rackforward Sales

**H.D.T. LIMITED LIABILITY COMPANY**

By:     Suncor Energy (U.S.A.) Inc., Manager

      By:_____

      Name:  Steve Ewing

      Title:   Director, Rackforward Sales

**H.D.T. ONE LIMITED LIABILITY COMPANY**

By:     Suncor Energy (U.S.A.) Inc., Manager

      By:_____

      Name:  Steve Ewing

      Title:   Director, Rackforward Sales

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

WESTERN CONVENIENCE STORES, INC.

By: _____

Name: Hossein D. Taraghi

Title: _____

SUNCOR ENERGY (U.S.A.) INC.

By: _____

Name: Steve Ewing

Title: Director, Rackforward Sales

H.D.T. LIMITED LIABILITY COMPANY

By: Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name: Steve Ewing

Title: Director, Rackforward Sales

H.D.T. ONE LIMITED LIABILITY COMPANY

By: Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name: Steve Ewing

Title: Director, Rackforward Sales

**H.D.T. TWO LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:    Director, Rackforward Sales

**H.D.T. THREE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:    Director, Rackforward Sales

**H.D.T. FOUR LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:    Director, Rackforward Sales

**H.D.T. FIVE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:    Director, Rackforward Sales

**H.D.T. SIX LIMITED LIABILITY COMPANY**

By: Suncor Energy (U.S.A.) Inc., Manager

   By: _____

   Name: Steve Ewing

   Title: Director, Rackforward Sales


**H.D.T. SEVEN LIMITED LIABILITY COMPANY**

By: Suncor Energy (U.S.A.) Inc., Manager

   By: _____

   Name: Steve Ewing

   Title: Director, Rackforward Sales


**H.D.T. EIGHT LIMITED LIABILITY COMPANY**

By: Suncor Energy (U.S.A.) Inc., Manager

   By: _____

   Name: Steve Ewing

   Title: Director, Rackforward Sales


**H.D.T. TEN LIMITED LIABILITY COMPANY**

By: Suncor Energy (U.S.A.) Inc., Manager

   By: _____

   Name: Steve Ewing

   Title: Director, Rackforward Sales

**H.D.T. ELEVEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. THIRTEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. FOURTEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. FIFTEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. SIXTEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

       By: _____

       Name:  Steve Ewing

       Title:   Director, Rackforward Sales


**H.D.T. SEVENTEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

       By: _____

       Name:  Steve Ewing

       Title:   Director, Rackforward Sales


**H.D.T. EIGHTEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

       By: _____

       Name:  Steve Ewing

       Title:   Director, Rackforward Sales


**H.D.T. NINETEEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

       By: _____

       Name:  Steve Ewing

       Title:   Director, Rackforward Sales

**H.D.T. TWENTY LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

        By: _____

        Name:  Steve Ewing

        Title:    Director, Rackforward Sales

**H.D.T. TWENTY ONE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

        By: _____

        Name:  Steve Ewing

        Title:    Director, Rackforward Sales

**H.D.T. TWENTY TWO LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

        By: _____

        Name:  Steve Ewing

        Title:    Director, Rackforward Sales

**H.D.T. TWENTY THREE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

        By: _____

        Name:  Steve Ewing

        Title:    Director, Rackforward Sales

**H.D.T. TWENTY FOUR LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. TWENTY FIVE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. TWENTY SIX LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. TWENTY SEVEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. TWENTY EIGHT LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales


**H.D.T. TWENTY NINE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales


**H.D.T. THIRTY LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales


**H.D.T. THIRTY ONE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. THIRTY TWO LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. THIRTY THREE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. THIRTY FOUR LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. THIRTY FIVE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. THIRTY SEVEN LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:   _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales


**H.D.T. THIRTY EIGHT LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales


**H.D.T. THIRTY NINE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales


**H.D.T. FORTY LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By:_____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. FORTY TWO LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

        By:_____

        Name:  Steve Ewing

        Title:   Director, Rackforward Sales

**H.D.T. FORTY THREE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

        By:_____

        Name:  Steve Ewing

        Title:   Director, Rackforward Sales

_____

HOSSEIN D. TARAGHI, an individual

_____

DEBRA TARAGHI, an individual

**W.C.S. ONE LLC**

By:

Name:   Hossein D. Taraghi

Title:   Manager

**WESTERN TRUCK ONE, LLC**

By:

Name:   Hossein D. Taraghi

Title:   Manager

**H.D.T. FORTY TWO LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

**H.D.T. FORTY THREE LIMITED LIABILITY COMPANY**

By:    Suncor Energy (U.S.A.) Inc., Manager

By: _____

Name:  Steve Ewing

Title:   Director, Rackforward Sales

_____

HOSSEIN D. TARAGHI, an individual

_____

DEBRA TARAGHI, an individual

**W.C.S. ONE, LLC**

By:    _____

Name:   Hossein D. Taraghi

Title:    Manager

**WESTERN TRUCK ONE, LLC**

By:    _____

Name:   Hossein D. Taraghi

Title:    Manager

**H.D.T. NINE LIMITED LIABILITY COMPANY**

By:

Name:     Hossein D. Taraghi

Title:     Manager

**H.D.T. TWELVE LIMITED LIABILITY COMPANY**

By:

Name:     Hossein D. Taraghi

Title:     Manager

**H.D.T. THIRTY SIX LIMITED LIABILITY COMPANY**

By:

Name:     Hossein D. Taraghi

Title:     Manager

**EXECUTION VERSION**

## EXHIBIT A

### HDT TRANSFERRED ENTITIES

1. H.D.T. Limited Liability Company
2. H.D.T. One Limited Liability Company
3. H.D.T. Two Limited Liability Company
4. H.D.T. Three Limited Liability Company
5. H.D.T. Four Limited Liability Company
6. H.D.T. Five Limited Liability Company
7. H.D.T. Six Limited Liability Company
8. H.D.T. Seven Limited Liability Company
9. H.D.T. Eight Limited Liability Company
10. H.D.T. Ten Limited Liability Company
11. H.D.T. Eleven Limited Liability Company
12. H.D.T. Thirteen Limited Liability Company
13. H.D.T. Fourteen limited Liability Company
14. H.D.T. Fifteen Limited Liability Company
15. H.D.T. Sixteen Limited Liability Company
16. H.D.T. Seventeen Limited Liability Company
17. H.D.T. Nineteen Limited Liability Company
18. H.D.T. Twenty Limited Liability Company
19. H.D.T. Twenty One Limited Liability Company
20. H.D.T. Twenty Two Limited Liability Company
21. H.D.T. Twenty Three Limited Liability Company
22. H.D.T. Twenty Four Limited Liability Company
23. H.D.T. Twenty Five Limited Liability Company
24. H.D.T. Twenty Six Limited Liability Company
25. H.D.T. Twenty Seven Limited Liability Company
26. H.D.T. Twenty Eight Limited Liability Company
27. H.D.T. Twenty Nine Limited Liability Company
28. H.D.T. Thirty Limited Liability Company
29. H.D.T. Thirty One Limited Liability Company
30. H.D.T. Thirty Two Limited Liability Company
31. H.D.T. Thirty Three Limited Liability Company
32. H.D.T. Thirty Four Limited Liability Company
33. H.D.T. Thirty Five Limited Liability Company
34. H.D.T. Thirty Seven Limited Liability Company
35. H.D.T. Thirty Eight Limited Liability Company
36. H.D.T. Thirty Nine Limited Liability Company
37. H.D.T. Forty Limited Liability Company
38. H.D.T. Forty Two Limited Liability Company
39. H.D.T. Forty Three Limited Liability Company
40. H.D.T. Eighteen Limited Liability Company

EXECUTION VERSION

## EXHIBIT B

## LEASES

| HDT ENTITY NAME | OWNED PROPERTY ADDRESS | STORE # |
|---|---|---|
| H.D.T. Limited Liability Company | Service Station: 20421 E US 24, Woodland Park, CO | 106 |
| H.D.T. One Limited Liability Company | Service Station: 800 S. Wilcox, Castle Rock, CO (OLD Lease lists 18 S. Wilcox) | 104 |
| H.D.T. Two Limited Liability Company | Service Station: 3505 S. Kipling Pkwy, Littleton, CO | 109 |
| H.D.T. Three Limited Liability Company | Service Station: 11399 W US 24, Divide, CO | 115 |
| H.D.T. Four Limited Liability Company | Service Station: 7603 W. 13th Avenue, Lakewood, CO | 111 |
| H.D.T. Five Limited Liability Company | Service Station: 1351 Bridge Street, Brighton, CO | 112 |
| H.D.T. Six Limited Liability Company | Service Station: 227 W. Fillmore Street, Colorado Springs, CO | 113 |
| H.D.T. Seven Limited Liability Company | Service Station: 814 NO Spur 56C, Hershey, NE | 118 |
| H.D.T. Eight Limited Liability Company | Service Station: 1331 W. Eisenhower Blvd., Loveland, CO | 119 |
| H.D.T. Nine Limited Liability Company | **No Lease** | |
| H.D.T. Ten Limited Liability Company | Service Station: 2301 E. 88th Avenue, Thornton, CO | 105 |
| H.D.T. Eleven Limited Liability Company | Service Station: 416 Hwy 87, Walsenburg, CO | 117 |
| H.D.T. Twelve Limited Liability Company | **No Lease** | |
| H.D.T. Thirteen Limited Liability Company | Service Station: 2630 Colorado Blvd., Idaho Springs, CO | 120 |
| H.D.T. Fourteen limited Liability Company | Service Station: 356 Bent Avenue, Las Animas, CO | 121 |
| H.D.T. Fifteen Limited Liability Company | Service Station: 9190 Huron Street, Thornton, CO | 123 |
| H.D.T. Sixteen Limited Liability Company | Service Station: 1228 Royal Gorge Blvd., Canon City, CO | 122 |

EXECUTION VERSION

| | | |
|---|---|---|
| H.D.T. Seventeen Limited Liability Company | Service Station: 2387 W. 72nd Avenue, Denver, CO | 114 |
| H.D.T. Eighteen Limited Liability Company | **No Lease** (HDT 18 owns 2507 E. Platte Ave., Colorado Springs, CO, Store 128, but there is no Lease for this property by HDT 18). | |
| H.D.T. Nineteen Limited Liability Company | Service Station: 2525 Broadway, Grand Junction, CO | 124 |
| H.D.T. Twenty Limited Liability Company | Service Station: 2998 North Avenue, Grand Junction, CO | 125 |
| H.D.T. Twenty One Limited Liability Company | Service Station: 938 S. Townsend Avenue, Montrose, CO | 126 |
| H.D.T. Twenty Two Limited Liability Company | Service Station: 1502 Howard Street, Delta, CO | 127 |
| H.D.T. Twenty Three Limited Liability Company | There is a Lease for 2507 E. Platte Ave., Colorado Springs, CO, but HDT 23 does not own this Property. | 128 |
| H.D.T. Twenty Four Limited Liability Company | Service Station: 1500 N. Main Street, Longmont, CO | 129 |
| H.D.T. Twenty Five Limited Liability Company | Service Station: 440 E. Illinois Street, Sidney, NE | 132 |
| H.D.T. Twenty Six Limited Liability Company | Service Station: 306 E. 1st Street, Ogallala, NE | 131 |
| H.D.T. Twenty Seven Limited Liability Company | Service Station: 123 W. Cranston, Fowler, CO | 133 |
| H.D.T. Twenty Eight Limited Liability Company | Commercial Warehouse: 9849 E. Easter Ave., Centennial, CO | WH 900 |
| H.D.T. Twenty Nine Limited Liability Company | Service Station: 1905 W. Uintah, Colorado Springs, CO | 134 |
| H.D.T. Thirty Limited Liability Company | Service Station: 3201 Lake Avenue, Pueblo, CO | 135 |
| H.D.T. Thirty One Limited Liability Company | Service Station: 2775 Briargate Blvd., Colorado Springs, CO | 136 |
| H.D.T. Thirty Two Limited Liability Company | Service Station: 382 E. Mountain Ave., Fort Collins, CO | 138 |
| H.D.T. Thirty Three Limited Liability Company | Service Station: 816 E. Mulberry Street, Fort Collins, CO | 139 |
| H.D.T. Thirty Four Limited Liability Company | Service Station: 12867 US Hwy 24/285, Buena Vista, CO **– Station Closed** | 137 |
| H.D.T. Thirty Five Limited Liability Company | Service Station: 11000 Hwy 50, Poncha Springs, CO | 141 |

**EXECUTION VERSION**

| | | |
|---|---|---|
| H.D.T. Thirty Six Limited Liability Company | **No Lease** | |
| H.D.T. Thirty Seven Limited Liability Company | Service Station: 504 S. Prairie, Pueblo, CO | 143 |
| H.D.T. Thirty Eight Limited Liability Company | Service Station: 122 S. Lincoln Street, Burlington, CO | 142 |
| H.D.T. Thirty Nine Limited Liability Company | Service Station: 825 Main Street, Fort Morgan, CO | 145 |
| H.D.T. Forty Limited Liability Company | Service Station: 1430 Highway 50, Delta CO | 146 |
| H.D.T. Forty Two Limited Liability Company | Service Station: 1242 S. Prairie Avenue, Pueblo, CO | 147 |
| H.D.T. Forty Three Limited Liability Company | Service Station: 5050 Washington Street, Denver, CO | 148 |

**EXECUTION VERSION**

## EXHIBIT C

## STIPULATION AND STIPULATED JUDGMENT

**[SEE ATTACHED]**

<table>
<tr><td>

**DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO**
1437 Bannock St., Room 256
Denver, CO 80202

</td><td></td></tr>
<tr><td>

**Plaintiffs:**
WESTERN CONVENIENCE STORES, INC., a Colorado corporation; et al.

v.

**Defendant:**
SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation

</td><td>

▲ COURT USE ONLY ▲

Case Number: 2015CV034011

Div.: 209        Ctrm.:

</td></tr>
<tr><td>

Name:           Anthony J. Shaheen, Reg. #14295
                Jessica M. Schmidt, Reg. #37928
Address:        HOLLAND & HART LLP
                555 17th Street, Suite 3200
                Denver, CO  80201-8749
Telephone:      303-295-8054
E-Mail:         AJShaheen@hollandhart.com
                JMSchmidt@hollandhart.com
*Attorneys for Suncor Energy (U.S.A.) Inc.*

Name:           Jeffrey A. Springer, Reg. #6793
                Matthew Holycross, Reg. #40463
Address:        SPRINGER & STEINBERG, P.C.
                1600 Broadway St, Suite 1200
                Denver, CO 80202
Telephone:      303-861-2800
E-Mail:         jspringer@springersteinberg.com
                mholycross@springersteinberg.com
*Attorneys for Plaintiffs*

</td><td></td></tr>
</table>

## STIPULATION AND MOTION FOR ENTRY OF FINAL JUDGMENT

Plaintiffs, by and through their attorneys Springer & Steinberg, PC, and Defendant

Suncor Energy (U.S.A.) Inc. ("Suncor"), by and through its attorneys Holland & Hart, LLP,

hereby stipulate and move for entry of Final Judgment in the attached agreed upon form.

Dated:  February ___, 2016.

_s/ Jeffrey A. Springer_
   Jeffrey A. Springer, Reg. #6793
   Matthew Holycross, Reg. #40463
   SPRINGER & STEINBERG, P.C.
**ATTORNEYS FOR PLAINTIFFS**

_s/ Anthony J. Shaheen_
   Anthony J. Shaheen, Reg. #14295
   Jessica M. Schmidt, Reg. #37928
   HOLLAND & HART LLP
**ATTORNEYS FOR DEFENDANT
SUNCOR ENERGY (U.S.A.) INC.**

## CERTIFICATE OF SERVICE

I certify that on February ___, 2016, a true and correct copy of the foregoing **STIPULATION RE: NON-APPLICATION OF STAY** was electronically served to the following:

Lee M. Kutner
KUTNER BRINEN GARBER, P.C.
1660 Lincoln Street, Suite 1850
Denver, CO  80264
*Attorneys for Plaintiffs*

Jeffrey Springer
Matthew Holycross
SPRINGER & STEINBERG, P.C.
1600 Broadway St, Suite 1200
Denver, CO 80202
*Attorneys for Plaintiffs*


*s/Andrew Murray*

8385007_1

<table>
<tr><td colspan="2">

**DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO**
1437 Bannock St., Room 256
Denver, CO 80202

</td></tr>
<tr><td>

**Plaintiffs:**
WESTERN CONVENIENCE STORES, INC., a Colorado corporation; et al.

v.

**Defendant:**
SUNCOR ENERGY (U.S.A.) INC., a Delaware corporation

</td><td>

▲ COURT USE ONLY ▲

Case Number:  2015CV034011

Div.: 209       Ctrm.:

</td></tr>
<tr><td colspan="2">

| Name: | Anthony J. Shaheen, Reg. #14295 |
| | Jessica M. Schmidt, Reg. #37928 |
| Address: | HOLLAND & HART LLP |
| | 555 17th Street, Suite 3200 |
| | Denver, CO 80201-8749 |
| Telephone: | 303-295-8054 |
| E-Mail: | AJShaheen@hollandhart.com |
| | JMSchmidt@hollandhart.com |

*Attorneys for Suncor Energy (U.S.A.) Inc.*

| Name: | Jeffrey A. Springer, Reg. #6793 |
| | Matthew Holycross, Reg. #40463 |
| Address: | SPRINGER & STEINBERG, P.C. |
| | 1600 Broadway St, Suite 1200 |
| | Denver, CO 80202 |
| Telephone: | 303-861-2800 |
| E-Mail: | jspringer@springersteinberg.com |
| | mholycross@springersteinberg.com |

*Attorneys for Plaintiffs*

</td></tr>
<tr><td colspan="2" align="center">

**FINAL JUDGMENT**

</td></tr>
</table>

Pursuant to the Stipulation and Motion For Entry of Final Judgment (the "Stipulation")

filed by Plaintiffs and Defendant Suncor Energy (U.S.A.) Inc. ("Suncor"), the Court directs entry

of final judgment as follows:

1.     On January 21, 2015, the United States District Court for the District of Colorado entered an Amended Final Judgment (the "Federal Amended Final Judgment"). Under the Federal Amended Final Judgment, Western Convenience Stores, Inc. ("Western"), Hossein Taraghi, and Debra Taraghi are jointly and severally liable to Suncor in the amount of $10,235,179.79, plus interest on this amount at the rate of 7% per annum, less amounts paid to Suncor after entry of the Federal Amendment Final Judgment.

2.     On December 23, 2014, Suncor and Plaintiffs entered into a Forbearance Agreement and other Forbearance Documents (as defined in the Forbearance Agreement), including a Security Agreement, Guaranty Agreement, and a Pledge Agreement.  Western, Hossein Taraghi and Debra Taraghi are the "Debtor" under the foregoing agreements.  All of the other Plaintiffs are "Guarantors" under the foregoing agreements, and guaranteed all of the obligations of Western, Hossein Taraghi, and Debra Taraghi to Suncor, including payment of the amounts owed pursuant to the Federal Amended Final Judgment.  Specifically, the Guarantors are: (i) W.C.S. One, LLC, (ii) Western Truck One, LLC, (iii) H.D.T. Nine Limited Liability Company, (iv) H.D.T. Twelve Limited Liability Company, (v) H.D.T. Eighteen Limited Liability Company ("HDT 18"), (vi) H.D.T. Thirty Six Limited Liability Company, and (vii) the thirty-nine (39) other plaintiffs listed in footnote 1 below (the "HDT Transferred Entities").[1]

---

[1] The HDT Transferred Entities are: (1) H.D.T. Limited Liability Company, (2) H.D.T. One Limited Liability Company, (3) H.D.T. Two Limited Liability Company, (4) H.D.T. Three Limited Liability Company, (5) H.D.T. Four Limited Liability Company, (6) H.D.T. Five Limited Liability Company, (7) H.D.T. Six Limited Liability Company, (8) H.D.T. Seven Limited Liability Company, (9) H.D.T. Eight Limited Liability Company, (10) H.D.T. Ten Limited Liability Company, (11) H.D.T. Eleven Limited Liability Company, (12) H.D.T. Thirteen Limited Liability Company, (13) H.D.T. Fourteen limited Liability Company, (14) H.D.T. Fifteen Limited Liability Company, (15) H.D.T. Sixteen Limited Liability Company, (16) H.D.T. Seventeen Limited Liability Company, (17) H.D.T. Nineteen Limited Liability Company, (18) H.D.T. Twenty Limited Liability Company, (19) H.D.T. Twenty One Limited Liability Company, (20) H.D.T. Twenty Two Limited Liability Company, (21) H.D.T. Twenty Three Limited Liability Company, (22) H.D.T. Twenty Four Limited Liability Company, (23) H.D.T. Twenty Five Limited Liability Company, (24) H.D.T. Twenty Six Limited Liability Company, (25) H.D.T. Twenty Seven Limited Liability Company, (26) H.D.T. Twenty Eight Limited Liability Company, (27) H.D.T. Twenty Nine Limited Liability Company, (28) H.D.T. Thirty Limited Liability Company, (29) H.D.T. Thirty One Limited Liability Company, (30) H.D.T. Thirty Two Limited Liability Company, (31) H.D.T. Thirty Three Limited Liability

3.     On October 16, 2015, a non-curable Event of Default occurred under Section 7.1(p) of the Forbearance Agreement as a result of Western's and H.D.T. Twenty Eight Limited Liability Company's failure to pay amounts due under promissory notes held by VSD 4 LLC. This Event of Default authorized Suncor to exercise all of its rights and remedies under the Forbearance Agreement and other Forbearance Documents.

4.     On October 16, 2015, Suncor properly (i) accelerated all amounts owing under the Forbearance Agreement, (ii) transferred the membership interests in the HDT Transferred Entities to Suncor, (iii) admitted Suncor as the sole member of each of the HDT Transferred Entities, and (iv) removed Mr. Taraghi as manager of each of the HDT Transferred Entities, and appointed Suncor as the manager of each of the HDT Transferred Entities.

5.     On December 15, 2015, Suncor properly (i) transferred the membership interests in HDT 18, (ii) admitted Suncor as the sole member of HDT 18, and (iii) removed Mr. Taraghi and appointed Suncor as the manager of HDT 18.

6.     As of October 16, 2015, Suncor is the owner, sole member, and sole manager of the HDT Transferred Entities and HDT 18.  Mr. Taraghi has no right act on behalf of, or direct the actions of, the HDT Transferred Entities and/or HDT 18.  Suncor is authorized to conduct a Uniform Commercial Code ("UCC") sale of the HDT Transferred Entities and HDT 18.   Suncor is also authorized to conduct a UCC sale of all the personal property owned by Western that is located on the real property owned by any of the HDT Transferred Entities and/or HDT 18.

7.     As of the date hereof, the amount of the Federal Amended Final Judgment that remains owed to Suncor by Debtor, Hossein Taraghi, and Debra Taraghi, jointly and severally, is

---

Company, (32) H.D.T. Thirty Four Limited Liability Company, (33) H.D.T. Thirty Five Limited Liability Company, (34) H.D.T. Thirty Seven Limited Liability Company, (35) H.D.T. Thirty Eight Limited Liability Company, (36) H.D.T. Thirty Nine Limited Liability Company, (37) H.D.T. Forty Limited Liability Company, (38) H.D.T. Forty Two Limited Liability Company, and (39) H.D.T. Forty Three Limited Liability Company.

$7,800,000; and each of the Guarantors is jointly and severally liable to Suncor for this amount. Interest shall accrue on this amount at the rate of 7% per annum, commencing as of the date of entry of this Final Findings of Fact and Judgment.

8.      Any amounts paid by any of the Plaintiffs to Suncor, or collected by Suncor from the assets of Plaintiffs (including through the UCC sales referenced in paragraph 6 above) shall be applied toward the satisfaction of the amounts owed as set forth in paragraph 7 above.

9.      Western and each of the Transferred Entities, except HDT 18 and H.D.T. Thirty Four Limited Liability Company ("HDT 34"), were parties to a lease agreement for one of the following properties (the "Leases"), each of which expired by its terms on December 31, 2015 and was not renewed:

(i)  20421 E. US 24, Woodland Park, CO; (ii) 938 S. Townsend, Montrose, CO; (iii) 800 S. Wilcox, Castle Rock, CO; (iv) 3505 S. Kipling Pkwy., Lakewood, CO; (v) 11399 W. US 24, Divide, CO; (vi) 7603 West 13th  Avenue, Lakewood, CO; (vii) 1351 Bridge St., Brighton, CO; (viii) 227 W. Fillmore St., Colorado Springs, CO; (ix) 814 NO Spur 56C, Hershey, NE; (x) 1331 W. Eisenhower Blvd., Loveland, CO; (xi) 2301 E. 88th Avenue, Thornton, CO; (xii) 416 Hwy. 87, Walsenburg, CO; (xiii) 2630 Colorado Blvd., Idaho Springs, CO; (xiv) 356 Bent Ave., Las Animas, CO; (xv) 9190 Huron Street, Thornton, CO; (xvi) 1228 Royal Gorge Blvd., Canon City, CO; (xvii) 2387 W. 72nd Avenue, Denver, CO; (xviii) 2507 E. Platte Ave., Colorado Springs, CO; (xix) 1500 North Main Street, Longmont, CO; (xx) 2525 Broadway, Grand Junction, CO; (xxi) 2998 North Ave., Grand Junction, CO; (xxii) 938 S. Townsend Ave., Montrose, CO; (xxiii) 1502 Howard Street, Delta, CO; (xxiv) 440 Illinois St., Sidney, NE; (xxv) 306 East 1st Street, Ogallala, NE; (xxvi) 123 W. Cranston, Fowler, CO; (xxvii) 9849 E. Easter Ave., Centennial, CO; (xxviii) 1905 West Uintah, Colorado Springs, CO; (xxix) 3201 Lake Ave., Pueblo, CO; (xxx) 2775 Briargate Blvd., Colorado Springs, CO; (xxxi) 382 E. Mountain Ave., Fort Collins, CO; (xxxii) 826 E. Mulberry St., Fort Collins, CO; (xxxiii) 12867 US Hwy 24/285, Buena Vista, CO; (xxxiv) 11000 HWY 50, Poncha Springs, CO; (xxxv) 504 S. Prairie, Pueblo, CO; (xxxvi) 122 S. Lincoln St., Burlington, CO; (xxxvii) 825 Main St., Fort Morgan, CO; (xxxviii) 1430 Highway 50, Delta, CO; (xxxix) 1242 S. Prairie Ave., Pueblo, CO; (xxxx) 5050 Washington Street, Denver, CO.

10.      HDT 18, and not H.D.T. Twenty Three Limited Liability Company, owns the property located at 2507 E. Platte Avenue, Colorado Springs, CO, and there is no lease between HDT 18 and Western for this property.   HDT 34 owns the property located at 12867 US Hwy 24/285, Buena Vista, CO, and there is no lease between HDT 34 and Western for this property.

WHEREFORE,

Based on the Parties' Stipulation and for the reasons set forth above, Judgment shall enter in favor of Suncor and against Plaintiffs on their first, second, third, fourth, and fifth causes of action in the Complaint.  Plaintiffs shall take nothing on these claims.  Based on the Parties' Stipulation and on the facts and findings set forth in paragraphs 1-10, above, Judgment shall enter in favor of Suncor and against Plaintiffs on their sixth cause of action for declaratory judgment

**IT IS SO ORDERED THIS _____ DAY OF _____, 2016.**

**BY THE COURT:**

_____

Morris B. Hoffman
District Court Judge

**EXECUTION VERSION**

## EXHIBIT D

## UCC SALES PROCESS

1. With respect to the UCC Sale (HDT Transferred Entities), Suncor will send notices, or amended notices, of such UCC Sale to all creditors of H. Taraghi, Debtor, and each HDT Transferred Entity identified by searches for UCC filings conducted with the Colorado Secretary of State not more than 30 days prior the date such notice are sent. Suncor may, but is not obligated to, send notices to such other recipients as Suncor determines appropriate or desirable in its sole discretion.

2. With respect to the UCC Sale (Debtor Personal Property), Suncor will send notices, or amended notices, of such UCC Sale to all creditors of Debtor identified by searches for UCC filings conducted with the Colorado Secretary of State not more than 30 days prior the date such notice are sent. Suncor may, but is not obligated to, send notices to such other recipients as Suncor determines appropriate or desirable in its sole discretion.

3. Suncor will publish notice of the UCC Sales (i) at least once prior to the date of the UCC Sales in at least one publication widely circulated in the State of Colorado, and (ii) at such other times and in such other publications as Suncor determines desirable in its sole discretion.

4. Suncor will conduct the UCC Sales no sooner than 30 days after the termination of the Restructuring Support Period.

**EXECUTION VERSION**

MEMBERSHIP INTEREST PURCHASE AGREEMENT

between

SUNCOR ENERGY (U.S.A.) INC.

and

HOSSEIN TARAGHI

Dated as of January 29, 2016

**EXHIBIT F**

**EXECUTION VERSION**

## TABLE OF CONTENTS

Page

ARTICLE I Definitions ............................................................................................................. 1
    1.01        DEFINITIONS .................................................................................. 1
ARTICLE II Purchase and Sale of Acquired Membership Interests ......................................... 4
    2.01        PURCHASE AND SALE OF ACQUIRED MEMBERSHIP INTERESTS. ...... 4
    2.02        TOTAL CONSIDERATION ................................................................. 4
ARTICLE III Closing ................................................................................................................ 4
    3.01        CLOSING ........................................................................................ 4
    3.02        SELLER CLOSING DELIVERIES ...................................................... 4
    3.03        PURCHASER CLOSING DELIVERIES ............................................... 5
    3.04        AGREEMENTS REGARDING THE CLOSING ...................................... 5
ARTICLE IV Representations and Warranties of Seller .............................................................. 5
    4.01        ORGANIZATION AND STANDING ................................................... 5
    4.02        AUTHORITY; EXECUTION AND DELIVERY ..................................... 5
    4.03        DISCLAIMER OF WARRANTIES. ..................................................... 5
    4.04        BROKERS ....................................................................................... 6
ARTICLE V Representations and Warranties of Purchaser ......................................................... 6
    5.01        NONCONTRAVENTION .................................................................. 6
    5.02        SUFFICIENCY OF FUNDS ............................................................... 6
    5.03        SOLVENCY OF PURCHASER. .......................................................... 6
    5.04        COMPLIANCE WITH APPLICABLE LAWS. ....................................... 7
    5.05        NON-RELIANCE OF PURCHASER ................................................... 7
    5.06        INVESTMENT PURPOSE ................................................................. 7
    5.07        BROKERS ....................................................................................... 7
ARTICLE VI Covenants ............................................................................................................. 8
    6.01        EXPENSES; TRANSFER TAXES. ..................................................... 8
    6.02        TAX MATTERS .............................................................................. 8
    6.03        PRESS RELEASES. .......................................................................... 8
    6.04        REVIVAL OF LIABILITY; RE-CONVEYANCE OF ACQUIRED
                 MEMBERSHIP INTERESTS. ............................................................ 8
ARTICLE VII Conditions Precedent ............................................................................................ 9
    7.01        CONDITIONS TO OBLIGATIONS OF EACH PARTY CLOSING ............ 9
    7.02        CONDITIONS TO OBLIGATION OF SELLER ..................................... 9
ARTICLE VIII Termination .......................................................................................................... 9
    8.01        TERMINATION ............................................................................... 9
    8.02        TERMINATION PROCEDURES ....................................................... 10
    8.03        EFFECT OF TERMINATION ........................................................... 10
ARTICLE IX Indemnification and Related Matters; Assumption of Liabilities ......................... 10
    9.01        INDEMNIFICATION BY PURCHASER ............................................. 10
    9.02        DEFENSE OF THIRD PARTY CLAIMS ............................................ 10
    9.03        LIMITATIONS ON LIABILITY; COVENANT NOT TO SUE ................ 11
    9.04        ASSUMPTION OF LIABILITIES AND OBLIGATIONS.   UPON CLOSING,
                 PURCHASER SHALL ASSUME AND PAY, PERFORM, FULFILL AND
                 DISCHARGE ALL ASSUMED LIABILITIES. ..................................... 12
ARTICLE X General Provisions ................................................................................................ 12
    10.01       EXCLUSIVITY OF AGREEMENT ................................................... 12

EXECUTION VERSION

| | | |
|---|---|---|
| 10.02 | NO THIRD PARTY LIABILITY | 12 |
| 10.03 | ASSIGNMENT | 12 |
| 10.04 | NO THIRD-PARTY BENEFICIARIES | 12 |
| 10.05 | NOTICES | 12 |
| 10.06 | COUNTERPARTS | 13 |
| 10.07 | ENTIRE AGREEMENT | 13 |
| 10.08 | AMENDMENTS | 13 |
| 10.09 | SEVERABILITY | 13 |
| 10.10 | GOVERNING LAW; VENUE | 14 |
| 10.11 | CONFIDENTIALITY. | ERROR! BOOKMARK NOT DEFINED. |
| 10.12 | REASONABLE ATTORNEYS' FEES AND OTHER REASONABLE COSTS. | 15 |
| 10.13 | SPECIFIC PERFORMANCE | 15 |
| 10.14 | WAIVER | 15 |
| 10.15 | CONSTRUCTION | 15 |

**EXECUTION VERSION**

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement, dated as of and effective January 29, 2016 (this "Agreement"), is between Suncor Energy (U.S.A.) Inc., a Delaware corporation ("Seller"), and Hossein Taraghi, an individual ("Purchaser"). Seller and Purchaser are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

### Recitals

A.     Seller and Purchaser are parties to that certain Restructuring Support and Settlement Agreement, dated as of the date hereof, among Seller, Purchaser, Western Convenience Stores, Inc. ("WCS"), the HDT named entities set forth on Exhibit A thereto, Debra Taraghi, WCS One LLC ("WCS One"), Western Truck One, LLC, H.D.T. Nine Limited Liability Company, H.D.T. Twelve Limited Liability Company, and H.D.T. Thirty Six Limited Liability Company (the "Settlement Agreement"), which relates to WCS's Bankruptcy Case pending in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"), filed on December 28, 2015, captioned *In Re: Western Convenience Stores, Inc.*, Case No. 15-23977-TBM (Bankr. D. Colo.).

B.     As part of the Settlement Agreement, Seller and Purchaser are entering into this Agreement, pursuant to which Seller will sell to Purchaser all of the issued and outstanding limited liability company membership interests of those entities set forth in Exhibit A to this Agreement (each a "Company" and collectively, the "Companies"), upon the terms and provisions of, and subject to the conditions set forth in, this Agreement.

### Agreement

In consideration of the covenants and agreements contained herein and the other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, agree as follows:

### ARTICLE I

### Definitions

1.01     **Definitions.** Capitalized terms and other terms used in this Agreement have the following respective meanings:

"Acquired Membership Interests" means all of the issued and outstanding limited liability company membership interests of the Companies.

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the opening paragraph of this Agreement.

"Aircraft Security Agreement" means that certain Aircraft Security Agreement, dated December 23, 2014, between WCS One, as grantor, and Seller, as secured party.

"Applicable Law" means, with respect to any Person, any federal, state, local, municipal, foreign or other law, statute, legislation, constitution, or principle of common law, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by any Governmental Entity.

"Assumed Liabilities" means all Claims, costs, expenses, liabilities, and obligations of Seller or the Companies (known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or to become due) of any nature whatsoever, including those relating to the condition, ownership, operation, maintenance, or use of the Companies, or any of their properties, whether arising, or relating to times, before, on or after the Effective Time. Without limiting the generality of the foregoing, the Assumed Liabilities include: (i) all liabilities for Taxes related to the Companies, their ownership, operations, or income; (ii) all liabilities of Seller for transfer, sales, use, and other Taxes arising in connection with the consummation of the Contemplated Transaction or the WCS One Contemplated Transaction; (iii) all environmental liabilities; and (iv) all liabilities and obligations of the Companies under any law, regulation, permit or contract.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Business Day" means any day on which banks in Colorado are open for business other than a Saturday or Sunday.

"Claim" means any claim that may give rise to a Proceeding or result in a Loss, whether based in contract, tort, equity, common law or otherwise.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Company" or "Companies" have the meaning set forth in the Recitals.

"Confirmation Order" has the meaning set forth in the Settlement Agreement.

"Contemplated Transaction" means the purchase and sale of the Acquired Membership Interests pursuant to this Agreement.

"Costs, Expenses and Attorneys' Fees" shall mean all reasonable attorneys' fees, consultants' fees, experts' fees, appraisal fees and costs, receivers' fees, court costs, and all other costs and expenses.

"Effective Time" has the meaning set forth in Section 3.01.

"Final Order" has the meaning set forth in the Settlement Agreement.

"Forbearance Agreement" has the meaning set forth in the Settlement Agreement.

"Forbearance Documents" has the meaning set forth in the Forbearance Agreement.

"Intercompany Debt" has the meaning set forth in Section 5.03(b)(i).

2

"Invalidated Payments" has the meaning set forth in Section 6.04.

"Jet" shall mean the means that certain "Aircraft," "Engines," and other related "Collateral" as such terms are defined in the Aircraft Security Agreement.

"Judgment" means any order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, verdict, sentence, subpoena, writ or award issued, made, entered, rendered or otherwise put into effect by or under the authority of any court, administrative agency, or other Governmental Entity or any arbitrator or arbitration panel.

"Losses" shall mean all losses, costs, expenses (including Costs, Expenses and Attorneys' Fees), liabilities, damages, demands, suits, claims, causes of action, judgments, and sanctions of every kind and character (including civil fines).

"Membership Interest Assignments" has the meaning set forth in Section 3.02.

"Person" means any individual and any firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Plan" has the meaning set forth in the Settlement Agreement.

"Proceeding" means any action, arbitration, claim, hearing, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private) commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"Purchase Price" has the meaning set forth in Section 2.02.

"Representative" means, with respect to any Person, such Person's officers, directors, employees, financial advisors, legal counsel, accountants, consultants, and other representatives and agents.

"Sale Transactions Deadline" has the meaning set forth in the Settlement Agreement.

"Seller" has the meaning set forth in the opening paragraph.

"Seller Parties" means Seller, Seller's Affiliates, and each of their officers, directors, members, managers, employees, and attorneys.

"Seller Closing Deliveries" has the meaning set forth in Section 3.02.

"Settlement Agreement" has the meaning set forth in the Recitals.

"Tax" means all forms of taxation or duties imposed, or required to be collected or withheld, including charges, together with any related interest, penalties or other additional amounts.

"Third Party Claim" has the meaning set forth in Section 9.02(a).

"Third Party Claim Notice" has the meaning set forth in Section 9.02(a).

"Transaction Documents" has the meaning set forth in Section 10.07.

"Transaction Expense" means, with respect to any Person, all fees, costs and expenses (including all Costs, Expenses and Attorneys' Fees) that have been incurred in connection with the Contemplated Transaction.

"UCC Sales" has the meaning set forth in the Settlement Agreement.

"WCS" has the meaning set forth in the Recitals.

"WCS One" has the meaning set forth in the Recitals.

"WCS One Contemplated Transaction" means the purchase and sale of the Jet pursuant to the WCS One Sale Agreement (Jet).

"WCS One Sale Agreement (Jet)" means the purchase and sale agreement of the Jet, owned by WCS One, to be entered into by and between WCS One, as seller, and Seller, as purchaser, contemporaneously with this Agreement.

## ARTICLE II

### Purchase and Sale of Acquired Membership Interests

2.01    **Purchase and Sale of Acquired Membership Interests.**  Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase and receive from Seller, all of Seller's right, title and interest in the Acquired Membership Interests, pursuant to the terms and conditions of this Agreement.

2.02    **Total Consideration.**  The aggregate consideration to be paid by Purchaser to Seller for the purchase of the Acquired Membership Interests shall be $5,000,000.00 (the "Purchase Price"), and the transfer by WCS One of the Jet pursuant to the WCS One Sale Agreement (Jet).

## ARTICLE III

### Closing

3.01    **Closing**.  The purchase and sale of the Acquired Membership Interests shall be consummated at a closing (the "Closing") to be held at the offices of Bryan Cave LLP, 1700 Lincoln Street, Suite 4100, Denver, Colorado, at 10:00 a.m. Denver, Colorado, time, on a date mutually determined by the Parties, but which must occur on a date: (a) no earlier than one Business Day after the date that the Confirmation Order becomes a Final Order, and (b) no later than the Sale Transactions Deadline (the "Closing Date").  Notwithstanding the foregoing and regardless of the time at which funds are actually transmitted, the purchase and sale of the Acquired Membership Interests shall be deemed to have been consummated at 12:01 a.m. Denver, Colorado, time on the Closing Date (the "Effective Time").

3.02    **Seller Closing Deliveries.**  At the Closing, Seller shall deliver to Purchaser the following ("Seller Closing Deliveries"):

(a)    Original Membership Interest certificates representing the Acquired Membership Interests, together with a power of attorney for Membership Interest assignment in substantially the form of **Exhibit B** (each a "Membership Interest Assignment"), executed  and delivered by Seller to, and for the benefit of, Purchaser dated as of the Effective Time; and

(b)      an executed non-foreign status certificate.

3.03     **Purchaser Closing Deliveries**.  At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the Purchaser Price.

3.04     **Agreements Regarding the Closing**.  The representations, warranties, covenants, indemnities and agreements in and contemplated by this Agreement shall survive the Closing or termination of this Agreement in accordance with and subject to this Agreement.

# ARTICLE IV

## Representations and Warranties of Seller

Seller hereby represents and warrants to Purchaser, as of the date of this Agreement and immediately prior to the Effective Time unless otherwise specified, as follows:

4.01     **Organization and Standing**.  Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

4.02     **Authority; Execution and Delivery**.

(a)      Seller has full entity power and authority to execute and deliver this Agreement.

(b)      The execution and delivery by Seller of this Agreement and the consummation by Seller of the Contemplated Transaction has been duly authorized by all necessary corporate action on the part of Seller, and no other action on the part of Seller is necessary to authorize the execution, delivery and performance of this Agreement and the Contemplated Transaction.  Seller has duly executed and delivered this Agreement.

4.03     **Disclaimer of Warranties**.  EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE IV, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER WITH RESPECT TO THE ACQUIRED MEMBERSHIP INTERESTS, THE COMPANIES, OR ANY OF THEIR PROPERTIES, AND ALL OF SELLER'S RIGHT, TITLE AND INTEREST THEREIN IS SOLD AND CONVEYED TO PURCHASER "AS IS", "WHERE IS",  WITH ALL FAULTS AND AT PURCHASER'S OWN RISK. WITHOUT LIMITING  THE FOREGOING, SELLER  EXPRESSLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES (AND PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER  HAS MADE NO REPRESENTATIONS AND WARRANTIES), INCLUDING ANY WARRANTIES OR REPRESENTATIONS, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE AND WHETHER ORAL OR WRITTEN, RELATING TO: (A) TITLE TO THE ACQUIRED MEMBERSHIP INTERESTS, THE PROPERTY OWNED OR LEASED BY THE COMPANIES; (B) THE CONDITION, QUANTITY, QUALITY, CONFORMITY TO MODELS OR SAMPLES, FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY OR NON-INFRINGEMENT OF THE PROPERTY OWNED OR LEASED BY THE COMPANIES; (C) PRICING ASSUMPTIONS, OR QUALITY, QUANTITY OR VALUE OF THE ACQUIRED MEMBERSHIP INTERESTS, OR THE PROPERTY OWNED OR LEASED BY THE COMPANIES; (E) THE ENVIRONMENTAL CONDITION OF THE PROPERTY OWNED OR LEASED BY THE COMPANIES, BOTH SURFACE AND SUBSURFACE; OR (D) ANY OTHER MATTERS CONTAINED IN ANY MATERIALS PROVIDED OR MADE AVAILABLE TO  OR OBTAINED BY PURCHASER.  PURCHASER ACKNOWLEDGES AND AFFIRMS THAT HE IS RELYING SOLELY ON HIS OWN INDEPENDENT ANALYSIS, EVALUATION AND INVESTIGATION OF, AND JUDGMENT WITH RESPECT TO, THE BUSINESS, ECONOMIC, FINANCIAL, LEGAL, TAX OR OTHER CONSEQUENCES OF ACQUIRING THE ACQUIRED MEMBERSHIP INTERESTS.  PURCHASER ASSUMES ALL RISKS THAT THE PROPERTY OWNED OR LEASED BY THE COMPANIES MAY CONTAIN WASTE MATERIALS

(WHETHER TOXIC, HAZARDOUS, EXTREMELY HAZARDOUS OR OTHERWISE) OR OTHER ADVERSE PHYSICAL CONDITIONS, INCLUDING THE PRESENCE OF UNKNOWN ABANDONED PITS, PIPELINES, STORAGE TANKS OR OTHER WASTE OR SPILL SITES THAT MAY NOT BE REVEALED BY PURCHASER'S EVALUATION OR INVESTIGATION. ALL RESPONSIBILITY AND LIABILITY RELATED TO ALL SUCH CONDITIONS, WHETHER KNOWN OR UNKNOWN, FIXED OR CONTINGENT, ARE TRANSFERRED TO PURCHASER, REGARDLESS OF WHEN THE RESPONSIBILITY AND LIABILITY AROSE.

    4.04 **Brokers.**  Seller has not retained any Person to act as a broker or agreed or become obligated to pay, or has taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with any of the Contemplated Transaction.

**ARTICLE V**

**Representations and Warranties of Purchaser**

    Purchaser hereby represents and warrants to Seller as follows:

    5.01 **Noncontravention.**  Neither the execution and delivery of any of this Agreement, nor the consummation or performance of the Contemplated Transaction, will, in any material respect, contravene, conflict with or result in a violation of any Applicable Law or any Judgment to which Purchaser is subject.

    5.02 **Sufficiency of Funds**.  On the Closing Date, Purchaser will have sufficient funds to make the payments required pursuant to Article III, and to perform his obligations with respect to the Contemplated Transaction.

    5.03 **Solvency of Purchaser.**

    (a) (i) Purchaser has reviewed this Agreement and has made such examinations or investigations as are necessary to enable Purchaser to express an informed opinion as to the representations and warranties contained in this Section 5.03, (ii) the financial information, projections, and assumptions that underlie and form the basis for the representations and warranties made in this Section 5.03 were made in good faith and were based on assumptions reasonably believed by the Purchaser to be fair in light of the circumstances existing at the time made and continue to be fair as of the date hereof, (iii) the amount of contingent liabilities referenced in this Section 5.03 has been computed as the amount that, in the light of all the facts and circumstances existing as of the time of such computation, represents the amount that can reasonably be expected to become an actual or matured liability and as accrued in the financial statements of Purchaser, and (iv) Purchaser acknowledges and understands that Seller is relying on the truth and accuracy of the representations and warranties contained in this Section 5.03  in connection with the Contemplated Transaction.

    (b) Based upon the review and examination described in Section 5.03(a) above, as of the date hereof and the Closing Date:

      (i) the present fair market value of the Acquired Membership Interests exceeds the debts and liabilities, including contingent liabilities, of Purchaser, without regard to and excluding any indebtedness outstanding from Purchaser to Affiliates of Purchaser ("Intercompany Debt");

      (ii) the present fair market value of the property and assets of Purchaser is greater than the amount that will be required to pay the probable liability of Purchaser on his debts and

6

other liabilities, including contingent liabilities, as such debts and other liabilities become absolute and matured, other than and excluding any Intercompany Debt;

(iii)     Purchaser does not intend to incur, or believes that he will incur, debts and liabilities, including contingent liabilities, beyond his ability to pay such debts and liabilities as they become absolute and matured;

(iv)     in consummating the Contemplated Transaction, Purchaser does not intend to disturb, delay, hinder, or defraud either present or future creditors or other persons to which Purchaser is or will become, on or after the date hereof, indebted;

(v)     Purchaser, after taking into consideration the Contemplated Transaction, is able to pay his debts (including debts arising from any liability on contingent, subordinated, absolute, fixed, matured or unmatured and liquidated or unliquidated claims) as they mature in the normal course of his business; and

(vi)     the Acquired Membership Interests are reasonably equivalent value for the Purchase Price.

5.04     **Compliance with Applicable Laws.**  Purchaser is in material compliance with all Applicable Laws.  Purchaser has not received any written notice from any Governmental Entity or any other Person alleging the violation of, or failure to comply with, any Applicable Law.

5.05     **Non-Reliance of Purchaser.**  PURCHASER HEREBY ACKNOWLEDGES THAT HE HAS CONDUCTED HIS OWN INDEPENDENT EVALUATION OF THE COMPANIES AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY SELLER.

5.06     **Investment Purpose; Accredited Investor.**  Purchaser is acquiring the Acquired Membership Interests solely for his own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof.  Purchaser acknowledges that the Acquired Membership Interests are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Acquired Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Purchaser is able to bear the economic risk of holding the Acquired Membership Interests for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment. Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933.

5.07     **Brokers.**  Purchaser has not retained any Person to act as a broker or agreed or become obligated to pay, or has taken any action that might result in any Person claiming to be entitled to receive, any brokerage commission, finder's fee or similar commission or fee in connection with the Contemplated Transaction.

## ARTICLE VI

### Covenants

**6.01     Expenses; Transfer Taxes.**

(a)     Whether or not the Closing takes place, except as otherwise specifically provided herein, all Transaction Expenses incurred by either Party shall be borne by Purchaser.

(b)     Any transfer Taxes, stamp duties, filing fees, registration fees, recordation expenses or other similar Taxes, fees, charges or expenses incurred by Seller, any Company, or any other party in connection with the Contemplated Transaction shall be borne by Purchaser.

**6.02     Tax Matters.**  Purchaser will be responsible, and shall indemnify, defend and hold harmless Seller, for all Taxes due and payable with respect to the Acquired Membership Interests or the assets, income and operations of the Companies, whether or not such Taxes relate to periods of time prior to, on or after the Effective Time.

**6.03     Press Releases.**  Neither Party shall make, or permit any Representative of such Party to make, any public announcement or statement or issue any press release with respect to the Contemplated Transaction or this Agreement.

**6.04     Revival of Liability; Re-conveyance of Acquired Membership Interests.**  If (a)(i) all or any portion of the Purchase Price received by Seller pursuant to this Agreement (the "Affected Portion") is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to a surety, or any other Person liable for any of the obligations evidenced and/or secured by any of the Forbearance Documents, whether directly or indirectly, as a debtor-in-possession or to a receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause, and (ii) if within fifteen (15) calendar days after the occurrence of any of the events in Section 6.04(a)(i), Purchaser fails to cause Seller to be paid the Affected Portion of the Purchase Price (the "Cure Payment"), or (b) any Cure Payment is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to a surety, or any other Person liable for any of the obligations evidenced and/or secured by any of the Forbearance Documents, whether directly or indirectly, as a debtor-in-possession or to a receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause (each, an "Invalidated Payment," and collectively, the "Invalidated Payments"), then (x) the portion of the indebtedness due under the Forbearance Documents equal to the Invalidated Payments and the liens, if any, given to secure the amounts of monies due Seller as evidenced in documents by and among the Parties in existence prior to the execution, approval, and implementation of this Agreement or in connection with this Agreement and the Plan will be revived and will continue in full force and effect as if such payment or proceeds had never been received by Seller, (y) immediately upon written demand by Seller (the "Seller Transfer Demand"), Purchaser shall transfer the Acquired Membership Interests back to Seller by delivering to Seller the following: original Membership Interest certificates representing the Acquired Membership Interests, together with a power of attorney for Membership Interest assignment in substantially the form of **Exhibit B**, executed and delivered by Purchaser to, and for the benefit of, Seller effective as of the date of the Seller Transfer Demand, and (z) notwithstanding anything in this Agreement or the Settlement Agreement to the contrary, Seller shall have the right to re-notice and conduct the UCC Sale (HDT Transferred Entities).

8

# ARTICLE VII

## Conditions Precedent

7.01     **Conditions to Obligations of Each Party Closing.**  The respective obligations of each Party to the transactions that are to be consummated at the Closing shall be subject to the satisfaction or waiver at or prior to the Effective Time of the following conditions:

(a)     No temporary restraining order, preliminary, or permanent injunction or other order issued by any court of competent jurisdiction preventing the consummation of the Contemplated Transaction or the WCS One Contemplated Transaction shall be in effect, nor shall any Proceeding brought by any Governmental Entity, including the Bankruptcy Court, seeking any of the foregoing be pending; and there shall not be any action taken, or any Applicable Law to the Contemplated Transaction or the WCS One Contemplated Transaction that makes the consummation of the Contemplated Transaction or the WCS One Contemplated Transaction illegal.

(b)     The Bankruptcy Court has approved the Settlement Agreement, this Agreement, and the WCS One Sale Agreement (Jet).

7.02     **Conditions to Obligation of Seller.**  The obligation of Seller to consummate the transactions that are to be consummated at the Closing is subject to the satisfaction, as of the Closing Date, of the following further conditions (any of which may be waived by Seller in whole or in part):

(a)     each of the representations and warranties of Purchaser made in this Agreement and of WCS One in the WCS One Sale Agreement (Jet) shall be true and correct in all material respects, as though made on and as of both the date of this Agreement and the WCS One Sale Agreement (Jet), respectively, and the Closing Date;

(b)     Purchaser shall not have breached or be in breach of any provision in this Agreement;

(c)     Purchaser shall be capable of paying the Purchase Price;

(d)     WCS One shall not have breached or be in breach of any provision of the WCS One Sale Agreement (Jet);  and

(e)     WCS One shall be capable of conveying the Jet pursuant to the WCS One Sale Agreement (Jet).

# ARTICLE VIII

## Termination

8.01     **Termination.**

(a)     This Agreement may be terminated at any time prior to the Effective Time:

(i)     by mutual written consent of Purchaser and Seller; or

**EXECUTION VERSION**

(ii)   at any time by Seller if (A) the Bankruptcy Court does not approve (i) the Settlement Agreement, or any portion thereof, or (ii) this Agreement, or (iii) the WCS One Sale Agreement (Jet), or (iv) the Contemplated Transaction, or (v) the WCS One Contemplated Transaction.

(b)   This Agreement automatically terminates if the Closing does not occur by the Closing Date.

8.02   **Termination Procedures.**  If Seller exercises its right to terminate this Agreement pursuant to Article VIII, it shall deliver to Purchaser a written notice specifying the basis thereof.

8.03   **Effect of Termination.**   If this Agreement is terminated and the Contemplated Transaction is abandoned as described in Section 8.01, this Agreement shall become null and void and of no further force and effect and there shall be no liability on the part of any Party or any of its Affiliates or Representatives, except (i) that all indemnification obligations and the provisions of Section 4.03, Section 5.06, Section 6.01, Section 6.04, this Section 8.03, Article IX and Article X shall survive termination, and (ii) after the termination of this Agreement, nothing herein shall relieve any Party from liability for any intentional and material breach of this Agreement.

## ARTICLE IX

### Indemnification and Related Matters; Assumption of Liabilities

9.01   **Indemnification by Purchaser.** From and after the Effective Time, Purchaser shall indemnify the Seller Parties against any Loss that any of the Seller Parties incurs arising out of or relating to:

(a)   any breach by Purchaser of this Agreement, including any (i) representation or warranty, (ii) covenant, or (iii) indemnity obligation;

(b)   any Company, its ownership, its businesses, operations or properties, including the acts or omissions of any Company or its Representatives, or otherwise attributable to any Company or any property owned by any Company, whether relating to Losses that arise before, on or after the Effective Time;

(c)   any Taxes assessed against Seller or the Companies for which Purchaser is responsible pursuant to the terms of this Agreement; and

(d)   any Assumed Liabilities.

9.02   **Defense of Third Party Claims.**

(a)   If any of the Seller Parties receives notice or otherwise obtains knowledge of any Proceeding commenced by any Person that is not a Party hereto (each, a "Third Party Claim") against any of the Seller Parties or any Company that may give rise to an indemnification Claim against Purchaser, then the applicable Seller Party shall deliver to Purchaser a written notice (the "Third Party Claim Notice") describing the Third Party Claim in reasonable detail.  Each applicable Seller Party shall provide timely notice to Purchaser, but the failure to give timely notice shall not affect the rights to receive indemnification.  Each applicable Seller Party shall elect, in its discretion, (i) to defend, at Purchaser's cost and expense, the Third Party Claim with counsel selected by each such Seller Party in its discretion, or (ii) direct Purchaser to assume the defense of any such Third Party Claim, *provided* counsel is

10

reasonably acceptable to each such Seller Party and that such counsel keeps each Seller Party informed of all material developments and events relating to the Third Party Claim.  If any applicable Seller Party reasonably determines that there is a conflict of interest arising from representation by counsel selected by Purchaser, such Seller Party may require Purchaser to select alternative counsel.  Purchaser shall not settle, adjust, or compromise any Third Party Claim without the prior written consent or approval of all applicable Seller Parties, which shall not be unreasonably withheld.

(b)     Subject to the other provisions of this Section 9.02, if Purchaser assumes the defense of any such Third Party Claim, then:

(i)     all costs and expenses incurred by Purchaser and the Seller Parties, including Costs, Expenses and Attorneys' Fees, incurred in connection with such defense, including pursuant to Section 10.07(b), shall be borne solely by Purchaser;

(ii)     Purchaser shall make available to the Seller Parties all non-privileged books, records, and other documents and materials that are under the direct or indirect control of the Purchaser or any of Purchaser's Representatives and that Purchaser's counsel reasonably considers relevant to the defense of such Third Party Claim; and

(iii)     Purchaser shall not admit any liability with respect to such Third Party Claim.

(c)     If any Seller Party elects to defend such Third Party Claim with the assistance of counsel selected by such Seller Parties, in its sole discretion, all actual costs and expenses, including Costs, Expenses and Attorneys' Fees, incurred by such Seller Party in connection therewith shall be paid by Purchaser within 30 days of receipt of an invoice for such costs or expenses.

9.03     **Limitations on Liability; Covenant not to Sue.**

(a)     IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS, ARISING UNDER THIS AGREEMENT OR THE CONTEMPLATED TRANSACTION, BUT EXCLUDING DAMAGES TO WHICH SELLER OR ANY OTHER SELLER PARTY IS ENTITLED (1) UNDER THE EXPRESS PROVISIONS OF ANY STATUTE AND (2) FOR ANY THIRD PARTY CLAIM THAT IS SUBJECT TO INDEMNIFICATION UNDER THIS AGREEMENT.

(b)     Purchaser hereby waives and releases any Claim against the Seller Parties relating to or arising from any Assumed Liabilities.

(c)     Purchaser agrees not to sue, nor initiate nor prosecute any legal, equitable, regulatory or administrative proceedings against any of the Seller Parties that arise out of or are in any way related to this Agreement, the Acquired Membership Interests, the Companies, or the Assumed Liabilities, except to enforce the terms and provisions of this Agreement.  Purchaser further agrees to indemnify the Seller Parties for all Costs, Expenses and Attorneys' Fees incurred by any Seller Parties, who are sued, or against whom any effort is made to execute upon any judgment, by any Person claiming by or through them with respect to any claim referenced above with respect that arise out of or are in any way connected with this Agreement, the Acquired Membership Interests, the Companies, or the Assumed Liabilities.

9.04     **Assumption of Liabilities and Obligations.**   Upon Closing, Purchaser shall assume and pay, perform, fulfill and discharge all Assumed Liabilities.

## ARTICLE X

### General Provisions

10.01     **Exclusivity of Agreement.**  The Parties hereto have voluntarily agreed to define their rights, liabilities, and obligations respecting the subject matter of this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement; and the Parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement.  Furthermore, the Parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all Parties to this Agreement specifically acknowledge that no Party has any special relationship with the other Party or any other party that would justify any expectation beyond that of an ordinary acquirer and an ordinary target in an arm's-length transaction.

10.02     **No Third Party Liability.**  Except as expressly set forth in Article IX of this Agreement, (a) this Agreement may only be enforced against the named Parties hereto; and (b) all Claims that may be based upon, arise out of or related to this Agreement, or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), may be made only against the entities that are expressly identified as Parties; and no officer, director, equityholder, employee or affiliate of any Party (including any Person negotiating or executing this Agreement on behalf of a Party) shall have any liability or obligation with respect to this Agreement or with respect to any Claim that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including a representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement).

10.03     **Assignment.**

(a)     This Agreement shall be binding upon Seller and its successors and assigns (if any) and Purchaser and his heirs and assigns (if any).  This Agreement shall inure to the benefit of Purchaser and Seller and the respective successors and assigns (if any) of the foregoing.

(b)     Purchaser may not assign any of his rights or delegate any of his obligations under this Agreement without Seller's prior written consent, which may be withheld in its sole discretion.

(c)     Seller may assign any of its rights or delegate any of its obligations under this Agreement without Purchaser's consent; provided that Seller cannot delegate any of its obligations unless the assignee also has the authority and ability to perform Seller's obligations under this Agreement.

10.04     **No Third-Party Beneficiaries.**  Except as expressly set forth in Article IX of this Agreement, this Agreement is for the sole benefit of the Parties and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the Parties and such successors and assigns, any legal or equitable rights hereunder.

10.05     **Notices.**  All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed given if delivered by personal, hand-delivery, nationally-recognized overnight courier, postage prepaid, or regular mail, to the Parties at the addresses set forth below or to such other address as the Party to whom notice is to be given may have furnished to the other Party in

writing in accordance herewith.  Any such notice or communication shall be deemed to have been delivered and received (a) in the case of personal, hand-delivery, on the date of delivery, (b) in the case of a nationally-recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date sent, and (c) in the case of mailing, on the third Business Day after that on which the piece of mail containing such communication is posted.

(i)     if to Purchaser, to:

Hossein Taraghi
c/o Springer & Steinberg, P.C.

1600 Broadway, Suite 1200
Denver, CO  80202
Attn: Jeffrey Springer

With a copy to:

Lee M. Kutner
Kutner Brinen Garber, P.C.
1660 Lincoln St., Suite 1850
Denver, CO  80264

(ii)    if to Seller, to:

Suncor Energy (U.S.A.) Inc.
717 Seventeenth St.
Suite 2900
Denver, Colorado  80202
Attention: Director, Legal Affairs Downstream U.S.A.

10.06   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or by e-mail in a .pdf format shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

10.07   **Entire Agreement.**  This Agreement, the WCS One Sales Agreement (Jet), and the Settlement Agreement, the attachments hereto and thereto, and all documents and instruments referred to herein and therein and delivered in connection herewith and therewith (collectively, the "Transaction Documents") contain the entire agreement and understanding among the Parties with respect to the subject matter hereof and thereof, and all prior and contemporaneous negotiations, understandings and agreements between the Parties on the matters contained herein and therein are expressly merged into and superseded by the Transaction Documents.

10.08   **Amendments.**  This Agreement may not be amended except pursuant to the written agreement of each of Purchaser and Seller.

10.09   **Severability.**  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any

13

circumstance, is invalid or unenforceable, (a) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

10.10   **Governing Law; Venue.**

(a)   This Agreement, and all Claims or Proceedings that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any Claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed solely by the internal laws of the State of Colorado, without regard to the conflict-of-law principles of any jurisdiction.

(b)   Any Proceeding or other legal action relating to this Agreement or the enforcement of any provision of this Agreement (including any Proceeding relating to a Claim for indemnification in accordance with Article IX or for specific performance in accordance with Section (c)) shall be brought or otherwise commenced in any state or federal court located in the County of Denver, Colorado.  Each Party:

(i)   expressly and irrevocably consents and submits to the exclusive jurisdiction of each state and federal court located in the County of Denver, Colorado (and each appellate court located in the State of Colorado) in connection with any such Proceeding;

(ii)   agrees that each state and federal court located in the County of Denver, Colorado shall be deemed to be a convenient forum; and

(iii)   agrees not to assert (by way of motion, as a defense or otherwise), in any such Proceeding commenced in any state or federal court located in the County of Denver, Colorado, any Claim that such Party is not subject personally to the jurisdiction of such court, that such Proceeding has been brought in an inconvenient forum, that the venue of such Proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

(c)   PURCHASER AND SELLER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING RELATING TO OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THE CONTEMPLATED TRANSACTION OR WCS ONE CONTEMPLATED TRANSACTION (INCLUDING ANY ACTION ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR PURCHASER AND SELLER TO ENTER THIS AGREEMENT.

10.11   **Intentionally Omitted.**

10.12   **Reasonable Attorneys' Fees and Other Reasonable Costs.**  Purchaser shall pay all reasonable Costs, Expenses and Attorneys' Fees incurred by Seller of any kind and nature incurred by Seller in the administration or enforcement of this Agreement.

10.13   **Specific Performance.**  The Parties agree that: (a) in the event of any breach or threatened breach by any Party of any covenant, obligation or other provision set forth in this Agreement, the other Parties shall be entitled (in addition to any other remedy that may be available to it) to seek (i) a decree or order of specific performance or mandamus to enforce the observance and performance of such covenant, obligation or other provision, and (ii) an injunction restraining such breach or threatened breach; and (b) no Party shall be required to provide any bond or other security in connection with any such decree, order or injunction or in connection with any related action or Proceeding.

10.14   **Waiver**

(a)      No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b)      No Person shall be deemed to have waived any Claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such Claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

10.15   **Construction.**

(a)      For purposes of this Agreement, whenever the context requires:  the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b)      Each Party acknowledges that it has participated in the drafting of this Agreement, and, as a result, the Parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement.

(c)      As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d)      Except as otherwise indicated, all references in this Agreement to "subsections," "Sections", "Schedules" and "Exhibits" are intended to refer to subsections and Sections of this Agreement, Schedules of this Agreement and Exhibits to this Agreement.

(e)      The words "this Agreement," "hereby," "hereof," "herein," "hereunder," and comparable words refer to all of this Agreement, including the Exhibits and Schedules to this Agreement, and not to any particular Article, Section, preamble, recital, or other subdivision of this Agreement or Exhibit or Schedule to this Agreement.

15

(f)     The headings contained in this Agreement, any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.

**[Signature page to follow]**

The Parties have duly executed this Agreement as of the date first written above.

**SELLER:**

**SUNCOR ENERGY (U.S.A.) INC.,**
a Delaware corporation

By: _____

Name:  Steve Ewing
Title:   Director, Rackforward Sales

**PURCHASER:**

_____

**HOSSEIN TARAGHI,** an individual

The Parties have duly executed this Agreement as of the date first written above.

**SELLER:**

**SUNCOR ENERGY (U.S.A.) INC.,**
a Delaware corporation

By: _____
Name: _____
Title: _____

**PURCHASER:**

**HOSSEIN TARAGHI,** an individual

By: _____
Name: _____
Title: _____

EXECUTION VERSION

## Exhibit A
## Companies

1.  H.D.T. Limited Liability Company
2.  H.D.T. One Limited Liability Company
3.  H.D.T. Two Limited Liability Company
4.  H.D.T. Three Limited Liability Company
5.  H.D.T. Four Limited Liability Company
6.  H.D.T. Five Limited Liability Company
7.  H.D.T. Six Limited Liability Company
8.  H.D.T. Seven Limited Liability Company
9.  H.D.T. Eight Limited Liability Company
10. H.D.T. Ten Limited Liability Company
11. H.D.T. Eleven Limited Liability Company
12. H.D.T. Thirteen Limited Liability Company
13. H.D.T. Fourteen limited Liability Company
14. H.D.T. Fifteen Limited Liability Company
15. H.D.T. Sixteen Limited Liability Company
16. H.D.T. Seventeen Limited Liability Company
17. H.D.T. Nineteen Limited Liability Company
18. H.D.T. Twenty Limited Liability Company
19. H.D.T. Twenty One Limited Liability Company
20. H.D.T. Twenty Two Limited Liability Company
21. H.D.T. Twenty Three Limited Liability Company
22. H.D.T. Twenty Four Limited Liability Company
23. H.D.T. Twenty Five Limited Liability Company
24. H.D.T. Twenty Six Limited Liability Company
25. H.D.T. Twenty Seven Limited Liability Company
26. H.D.T. Twenty Eight Limited Liability Company
27. H.D.T. Twenty Nine Limited Liability Company
28. H.D.T. Thirty Limited Liability Company
29. H.D.T. Thirty One Limited Liability Company
30. H.D.T. Thirty Two Limited Liability Company
31. H.D.T. Thirty Three Limited Liability Company
32. H.D.T. Thirty Four Limited Liability Company
33. H.D.T. Thirty Five Limited Liability Company
34. H.D.T. Thirty Seven Limited Liability Company
35. H.D.T. Thirty Eight Limited Liability Company
36. H.D.T. Thirty Nine Limited Liability Company
37. H.D.T. Forty Limited Liability Company
38. H.D.T. Forty Two Limited Liability Company
39. H.D.T. Forty Three Limited Liability Company
40. H.D.T. Eighteen Limited Liability Company

**Exhibit B**
**Form of Membership Interest Assignment**

**IRREVOCABLE MEMBERSHIP INTEREST**

**ASSIGNMENT SEPARATE FROM CERTIFICATE OF INTEREST**

  **FOR VALUE RECEIVED,** the undersigned ("Transferor") does hereby contribute, convey, assign, transfer and deliver to _____ (the "Transferee") all of its right, title and interest in and to all the outstanding membership interests in [_____, LLC, a _____ limited liability company/_____] (the "Company" and such [membership interests/shares], the "Interests").

The undersigned does irrevocably constitute and appoint the Transferee as its attorney-in-fact, with full power of substitution and re-substitution, to transfer the Interests into the name of the Transferee or its designee on the books of the Company.

Dated as of _____ __, 2016.

Signed sealed and delivered
in the presence of:

**WITNESS:**          **ASSIGNOR:**


_____    _____
Name: _____     [Name]
Address: _____
_____



_____
Name: _____
Address: _____
_____

STATE OF COLORADO    )
              )
COUNTY OF _____ )

  The foregoing instrument was acknowledged before me this _____ day of _____, 2016, by _____, as _____ of _____, a _____.

  Witness my hand and official seal.

  My commission expires: _____

_____
Notary Public

Exhibit B-1

**EXECUTION VERSION**

## JET PURCHASE AND SALE AGREEMENT

THIS JET PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of January 29, 2016 (the "Effective Date"), by and between W.C.S. One, LLC, a Colorado limited liability company ("Seller"), and Suncor Energy (U.S.A.) Inc., a Delaware corporation (the "Purchaser").

### R E C I T A L S:

A.    Seller and Purchaser are parties to that certain Restructuring Support and Settlement Agreement, dated as of the date hereof, among Seller, Purchaser, Western Convenience Stores, Inc. ("WCS"), the HDT named entities set forth on Exhibit A thereto, Debra Taraghi, Hossein Taraghi ("H. Taraghi"), Western Truck One, LLC, H.D.T. Nine Limited Liability Company, H.D.T. Twelve Limited Liability Company, and H.D.T. Thirty Six Limited Liability Company (the "Settlement Agreement"), which relates to WCS's Bankruptcy Case pending in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court"), filed on December 28, 2015, captioned *In Re: Western Convenience Stores, Inc.*, Case No. 15-23977-TBM (Bankr. D. Colo.);

B.    As part of the Settlement Agreement, Seller and Purchaser are entering into this Agreement, pursuant to which Seller will sell to Purchaser the Jet, upon the terms and provisions of, and subject to the conditions set forth in, this Agreement;

C.    H. Taraghi is the sole member and manager of Seller;

D.    Seller is the record owner of the Jet; and

E.    Purchaser desires to purchase and Seller desires to sell the Jet, and Seller desires to permit Purchaser to commence marketing the Jet to third parties, which marketing shall include the ability to assign all or any portion of this Agreement or any of Purchaser's rights set forth in this Agreement to a third party, all in accordance with the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of $10.00 and other good and valuation consideration and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

### ARTICLE 1
### DEFINITIONS

1.1    Definitions.  As used in this Agreement:

"Airworthy Condition" shall mean an airworthy condition according to the guidelines set forth in the manufacturer's maintenance manual, with a valid and effective Standard Certificate of Airworthiness issued by the FAA and any other inspections necessary for the Jet to be current on the manufacturer's standard maintenance program.

"Bill of Sale" shall mean the warranty bill of sale conveying title to the Jet to Purchaser, substantially in the form of **Exhibit A** annexed hereto, duly executed by Seller.

"Business Day" shall mean any day, other than a Saturday or Sunday, on which banks are open for business in Denver, Colorado and in Oklahoma City, Oklahoma.

"Certificate of Airworthiness" shall mean a current and valid United States Standard Certificate of Airworthiness without deviation.

**EXHIBIT G**

"Certificate of Delivery" shall mean a certificate of delivery in substantially the form of **Exhibit B** annexed hereto, duly executed by Purchaser.

"Closing" shall mean the consummation of the sale and purchase of the Jet as contemplated by Article 8 of this Agreement upon completion or satisfaction of all conditions and requirements contemplated by this Agreement.

"Closing Date" shall mean the third Business Day following the Transfer Date, or such earlier date upon Purchaser's acceptance of the Jet and the satisfaction of the other conditions to Closing.

"Confirmation Order" has the meaning set forth in the Settlement Agreement.

"Costs, Expenses and Attorneys' Fees" shall mean all reasonable attorneys' fees, consultants' fees, experts' fees, appraisal fees and costs, receivers' fees, court costs, and all other costs and expenses.

"Default" shall mean any event, act or condition which with notice or lapse of time, or both, would constitute an Event of Default.

"Delivery" shall mean the delivery by Seller to Purchaser of the Jet which shall occur upon the filing of the FAA Bill of Sale with the FAA on the Closing Date after all conditions set forth in Article 7 have been satisfied.

"Discrepancies" is defined in Section 4.2(c).

"Engine Inspection" is defined in Section 4.2.

"Engines" shall mean the two (2) Honeywell ATF3-6A-4C aircraft engines, bearing manufacturer's serial numbers TSN 6403 and TSN 5758.7/6879 and all parts installed thereon, installed on the Jet.

"Escrow Agent" shall mean Insured Aircraft Title Service, Inc., having its principal office at 4848 S.W. 36th Street, Oklahoma City, Oklahoma 73179, U.S.A.

"Event of Default" is defined in Section 12.1.

"FAA" shall mean the United States of America Federal Aviation Administration, or any successor agency thereto.

"FAA Bill of Sale" shall mean the FAA Bill of Sale (AC Form 8050-2) for aircraft conveying title to the Jet to Purchaser.

"Final Order" has the meaning set forth in the Settlement Agreement.

"Forbearance Agreement" has the meaning set forth in the Settlement Agreement.

"Forbearance Documents" has the meaning set forth in the Forbearance Agreement.

"Inspection" is defined in Section 4.1(b)(ii).

"Inspection Warranty" shall mean any warranty given by the inspector for the Inspection in form and substance reasonably acceptable to Purchaser.

"International Registry" is defined in Section 8.1.

"Jet" shall mean one (1) 1986 Dassault-Brequet Falcon 200 (for International Registry purposes Dasault Aviation Falcon 20) aircraft with manufacturer's serial number V31 -H970J and U.S. aircraft registration number N777FC and hereinafter referred to as the "Airframe," together with the Engines and any propellers installed thereon, all parts and the Records.

"Jet Documentation" shall mean the FAA Bill of Sale, the Bill of Sale and the Records.

"Jet Purchase Price" shall mean a total of ten United States Dollars (US $10), *plus* any adjustment upward pursuant to Section 3.2

"Lien" or "Liens" shall mean each of any mortgage, pledge, lien, charge, encumbrance, security interest or lease of any type whatsoever (including any conditional sales agreement, equipment trust agreement or other title retention agreement or prospective interest filed with the International Registry).

"Maintenance Program" shall mean the any maintenance program in which the Jet and/or Engines are currently enrolled.

"Maintenance Program Assignment" shall mean an assignment of the Maintenance Program to Purchaser, in form and substance reasonably acceptable to Purchaser, and acknowledged by the service provider, as provided in Section 5.1(b) and in Section 7.1(a).

"part" or "parts" shall mean each of all avionics, appliances, parts, spare parts, spare wheels, components, galley equipment, instruments, appurtenances, accessories, furnishings, and other equipment or property of whatever nature (including, without limitation, diagrams, china, glassware, covers, and other accessories relating thereto used or assigned to the Jet, but excluding the Engines, any propellers, and Airframe), including those in Seller's possession on the Closing Date.

"Person" means any individual and any firm, corporation, partnership, limited liability company, trust, joint venture, governmental entity or other entity.

"Plan" has the meaning set forth in the Settlement Agreement.

"Records" shall mean originals of all logs, manuals, certificates, data and inspection, modification and restoration records and materials (including those referenced in Section 4.1(b)(ii)) as are required by the FAA to be maintained in respect of the Jet and all documents relating to the Jet including update services in Seller's possession or under Seller's control on the Closing Date.

"Release" means a release document, in a form satisfactory to Purchaser in its sole discretion, releasing Seller from all of Seller's obligations under the Forbearance Documents, subject to the provisions of Section 2(g) of the Settlement Agreement.

"Sale Transactions Deadline" has the meaning set forth in the Settlement Agreement.

"Settlement Agreement" is defined in the Recitals.

"Seller Escrow Fee" is defined in Section 11.2(a).

"Suncor Sale Agreement (LLCs)" has the meaning set forth in the Settlement Agreement.

"Tax Certificate" shall mean any tax exemption certificate or other document required for the sale and delivery of the Jet contemplated hereunder to be exempt from Taxes.

"Taxes" is defined in Section 11.1.

"Test Flight" shall mean the test flight of the Jet conducted as provided in Section 4.1(b)(i).

"Transfer Date" shall mean a date mutually determined by the parties, but which must occur on a date within twenty (21) days after approval of the Settlement Agreement and this Agreement by the Bankruptcy Court, unless extended by Suncor in its sole and absolute discretion.

"Transaction User Entity" is defined in Section 8.2.

"WCS One Contemplated Transaction" means the purchase and sale of the Jet pursuant to this Agreement.

## ARTICLE 2
## SUBJECT MATTER OF SALE

2.1    The Purchase and Sale.  Subject to the terms and conditions of this Agreement, on the Closing Date, Seller shall sell and deliver the Jet to Purchaser, free and clear of all Liens except those in favor of Purchaser, and Purchaser shall purchase and accept delivery from Seller of the Jet.

## ARTICLE 3
## JET PURCHASE PRICE; PAYMENT; DELIVERY INTO ESCROW

3.1    Jet Purchase Price.  On the Closing Date, (i) if Purchaser is the actual purchaser of the Jet, the Jet Purchase Price shall have been deemed paid by Purchaser to Seller through (x) a reduction in the Current Indebtedness (as defined in the Settlement Agreement) equal to the Jet Purchase Price, and (y) delivery of the Release, or (ii) if the actual purchaser is a third party who has taken Purchaser's rights in this Agreement by assignment, the Jet Purchase Price will be paid via wire transfer on the Closing Date, pursuant to wire instructions to be provided to the purchaser by Seller prior to the Closing Date.

3.2    Upward Jet Purchase Price Adjustment.  Upon either, the assignment of this Agreement by Purchaser to a third party, or the sale of the Jet by Purchaser to a third party, the Jet Purchase Price shall be adjusted upward to equal the consideration actually received by Purchaser for either the assignment of this Agreement or the sale of the Jet.

3.3    Delivery to Escrow Agent.  Within fifteen (15) Business Days of execution of this Agreement by both parties, (a) Seller will deliver executed copies of the Jet Documentation to the Escrow Agent, and (b) Purchaser will deliver the Release to the Escrow Agent.

## ARTICLE 4
## MARKETING; INSPECTION, TECHNICAL ACCEPTANCE AND DELIVERY

4.1    Marketing. Purchaser may market the Jet at any time after the Effective Date, and may permit any potential third party purchaser to exercise any of the rights set forth in this Article 4.

4.2    Inspection and Technical Acceptance.

**EXECUTION VERSION**

    (a)    <u>Visual Inspection</u>. Upon three Business Days prior notice, Seller shall make the Jet and its Records available to Purchaser for a visual inspection by Purchaser at Centennial Airport, Englewood, Colorado, or such other airport where the Jet is being hangared at that time (the "<u>Visual Inspection</u>").

    (b)    <u>Test Flight and Pre-Purchase Inspection</u>.

    (i)    <u>Test Flight</u>. Upon three Business Days prior notice, Seller shall make the Jet available for one or more test flights from Centennial Airport, Englewood, Colorado, or such other airport where the Jet is being hangared at that time, of up to two (2) hours duration (each a "<u>Test Flight</u>"). Purchaser shall pay or reimburse Seller for all fuel costs and pilot expenses for the Test Flight. Seller shall supply the pilots, unless Purchaser requests to use its own pilots, for the Test Flights and shall maintain operational control of the Jet at all times. Up to two (2) of Purchaser's representatives may be on board the Jet for the Test Flights. Seller shall (A) provide evidence of Seller's insurance and maintain such insurance at all times during the Test Flights; (B) operate the Test Flights at all times in accordance with FAA Regulations and other applicable laws and regulations; and (C) provide pilots for the Test Flights who have licenses in good standing, are duly qualified, current and rated in the Jet and who meet the standards established by the FAA and by Seller's insurance. During the Test Flights, Purchaser shall be permitted to confirm that the Jet systems and avionics appear to be in fully operational condition as determined according to manufacturer's published specifications. In the event any repair or maintenance of the Jet is required in order to conduct any Test Flight, Purchaser shall have the right, but not the obligation, to conduct any repair or maintenance at Purchaser's sole cost and expense; provided, Seller shall not have any obligation to conduct or pay for any such repair or maintenance work, unless otherwise required pursuant to a separate provision of this Agreement.

    (ii)    <u>Pre-Purchase Inspection</u>. Upon three Business Days prior notice, Purchaser shall have the right to conduct a pre-purchase inspection by inspectors selected by Purchaser (the "<u>Inspection</u>") of the Jet, and Seller will promptly deliver the Jet for the Inspection. All costs relating to the Inspection shall be borne by Purchaser. The Inspection shall consist of some or all of appropriate or desirable inspections, including a window/windshield inspection and engine boroscopes, as Purchaser shall determine in its sole discretion. During the Inspection, Seller shall make available for inspection by Purchaser: (A) all Airframe and Engine logbooks, (B) work orders for the Jet's most recent inspections, plus all other work orders and records for all inspections, repairs and service to the Jet during the preceding twelve (12) months, and (C) all other records requested by Purchaser and flight, maintenance, parts and component manuals and wiring diagrams associated with the Jet.

    (c)    <u>Airworthy Condition</u>. At the end of the Inspection, the inspectors shall deliver to Purchaser and Seller a written Inspection report, upon which Purchaser shall be entitled to rely, including a list of all discrepancies, if any, identified during the Inspection, including those specific discrepancies which must be corrected for the delivery of the Jet in an Airworthy Condition (the "<u>Discrepancies</u>") and the aggregate cost to correct the Discrepancies.

    (d)    <u>Delivery</u>. The Jet shall be delivered to Purchaser by Seller on the Closing Date at Centennial Airport, Englewood, Colorado or at such other place as to which Purchaser and Seller may agree in writing.

    4.3    <u>Title and Risk of Loss</u>. Title to the Jet shall be transferred from Seller to Purchaser upon Delivery. Until Delivery, Seller shall bear all risk of loss, injury, or destruction or damage of the Jet. After Delivery, Purchaser shall bear all risk of loss, injury, or destruction or damage of the Jet.

## ARTICLE 5
## CONDITION OF JET

5.1     Closing Conditions.

(a)     Condition of Jet. At Closing, Seller shall deliver the Jet to Purchaser (i) in the condition documented by the completed Inspection with no known damage history (except as specifically disclosed as part of the Inspection); (ii) with good and marketable title, free and clear of all Liens and rights of others (other than Liens in favor of Purchaser); (iii) with a complete and current set of Records in English or translated to English at Seller's expense including all 337s, field approvals, log books, inspection documents (including phase inspections), maintenance status sheets, insurance records, repair and completion documents, flight, maintenance, parts and components manuals, complete wiring diagrams and all engineering drawings and reports regarding any corrosion or corrosion correction or repair and all other records in Seller's possession or under Seller's control; and (iv) with, to the extent documented as existing at the Inspection, all avionics, equipment, aircraft structures, components, accessories and systems identified by the Inspection as necessary for the Jet to be in an Airworthy Condition or otherwise material to the customary use and operation of the Jet in the ordinary course.

(b)     Transfer of Warranties and Programs. Seller, at Purchaser's election, exercisable in its sole discretion, shall execute and deliver the Maintenance Program Assignment and shall transfer any and all transferable manufacturer's warranties, subscription services and, if applicable, service maintenance programs to Purchaser as permitted by the terms of such warranties or programs, as applicable.  All warranties and programs shall be fully paid up and current as of the date of Delivery. Seller shall be responsible for all transfer fees.

5.2     **DISCLAIMER**.    EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN SECTIONS 5.1(a) AND 9.1 OF THIS AGREEMENT OR IN THE BILL OF SALE, (i) THE JET IS BEING SOLD ON AN "AS IS, WHERE IS" BASIS, AND (ii) SELLER MAKES NO, AND PURCHASER WAIVES ANY OTHER, WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE JET OR ANY ASPECT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO THE AIRWORTHINESS OR CONDITION OF THE JET, ANY OBLIGATION OR LIABILITY IN TORT, NEGLIGENCE, OR WITH RESPECT TO FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE.

## ARTICLE 6
## ESCROW AGENT

6.1     Escrow Agent.  By its execution of the Consent and Joinder below, Escrow Agent hereby agrees that it shall hold and disburse all documents deposited with Escrow Agent in escrow upon the terms and conditions of this Agreement.

## ARTICLE 7
## CONDITIONS PRECEDENT

7.1     Conditions Precedent to Purchaser's Obligations.  The obligations of Purchaser to consummate the transaction contemplated hereby are subject to and conditional upon the following conditions having been met (or waived in writing by Purchaser) on or before the Closing Date:

(a)    Escrow Agent shall have received the original executed FAA Bill of Sale, an AC Form 8050-135, the original executed Bill of Sale, any Tax Certificate, and the Maintenance Program Assignment to Purchaser, all effective as of Delivery.

(b)    All representations and warranties of Seller made pursuant to this Agreement shall be true and correct as of the Closing Date.

(c)    The Closing Date shall occur prior to the Transfer Date, and there shall be no continuing Event of Default by Seller pursuant to Section 12.1.

(d)    The Jet is in the condition required by Article 5.

(e)    Seller shall be an approved Transaction User Entity and shall designate Escrow Agent as its administrator for purposes of the Convention and the Protocol.

## ARTICLE 8
## CLOSING

8.1    Delivery.

(a)    Disbursement of Escrow Documents and FAA Filings.    On the Closing Date, upon the satisfaction or waiver of the conditions precedent in Section 7.1 and, unless waived by Purchaser, upon confirmation by the Escrow Agent that the Jet is free and clear of Liens and encumbrances of record at the FAA and the International Registry (other than those in favor of Purchaser), Purchaser shall deliver, prior to 11:00 a.m. Oklahoma City, Oklahoma time, written executed instructions to Escrow Agent directing Escrow Agent to (i) release out of escrow and file with the FAA the Form 8050-135, the FAA Bill of Sale and an Aircraft Registration Application and FAA limited liability company statement, if applicable, and date, release out of escrow and deliver to Purchaser the Jet Documentation, and (ii) release out of escrow to Seller, the Release.    Seller hereby directs Escrow Agent to act upon written direction of Purchaser, without any further confirmation.

(b)    International Registry Filing. Each of Purchaser and Seller will register with the International Registry at their own expense in a manner required to effect consent and acceptable registration of this transaction with the International Registry in accordance with the requirements of the Convention.  Purchaser shall have no right to, and hereby agrees that it will not, register, consent to or allow any third party to register with the International Registry any international interest or prospective international interest with respect to the Airframe or the Engines on the Jet until after title to the aircraft has been conveyed to Purchaser.  Seller and Purchaser agree to approve Escrow Agent for purposes of International Registry filings.  Upon receipt electronically of Purchaser's initiation of its Contract of Sale filing (the "Initiated Filing"), Seller shall promptly take all steps necessary to consent to a valid registration of an International Interest at the International Registry (as hereinafter defined) of a Contract of Sale evidencing the sale of the Jet by Seller to Purchaser (collectively the "Cape Town Registration"), provided, that such Initiated Filing correctly describes the Jet (and the Engines and any propellers) and correctly describes the Seller and the Purchaser. For purposes of this Agreement, "International Registry" shall mean the international registry created pursuant to the Convention on International Interests in Mobile Equipment (the "Convention") and the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment ("Protocol"), both signed in Cape Town, South Africa on November 16, 2001, together with regulations, procedures, rules, amendments, supplements, and revisions thereto.  For purposes of this Agreement, "Contract of

7

Sale," "International Interest," and "Transaction User Entity" shall have the meanings given them in the Convention, Protocol or the relevant Regulations, as applicable. Upon Purchaser's request, made from time to time, Seller shall provide reasonable assistance to Purchaser after Closing at Purchaser's cost to correct any erroneous information contained in the registration of the sale of the Jet with the International Registry.

(c)     Post-Closing Deliveries.  At Closing, Escrow Agent shall (i) date and deliver, out of escrow, the executed Certificate of Delivery and any Tax Certificate required to be maintained or filed by Seller, to or as directed by Seller, and (ii) date and deliver to Purchaser any Tax Certificate required to be maintained or filed by Purchaser to or as directed by Purchaser.

## ARTICLE 9
## REPRESENTATIONS, WARRANTIES AND COVENANTS

9.1     Seller's Representations and Warranties.  Seller represents, warrants and covenants to Purchaser that:

(a)     At the date hereof and at the time of Delivery of the Jet, Seller has and will have the right to sell the Jet to Purchaser, together with full power and lawful authority to deliver the Jet to Purchaser, and upon delivery of the Bill of Sale to Purchaser, Purchaser shall receive title to the Jet, free and clear of all Liens (other than Liens in favor of Purchaser).

(b)     At the time of Delivery of the Jet, the Jet Documentation, the Maintenance Program, and all Records will be in the condition and up to the standards required by Section 5.1 of this Agreement.

(c)     Seller is a limited liability company duly organized and in good standing in the State of Colorado.

(d)     Seller has the right and power to execute, deliver and perform its obligations under this Agreement, and the execution, delivery and performance of this Agreement by Seller has been duly authorized by all necessary action, and will not violate, breach or contravene any provisions of law or the articles or certificate of organization or formation or operating agreement of Seller, as the case may be, or any license or permit under which Seller conducts its business, will not result in the breach of or constitute a default under any indenture, credit or loan agreement, mortgage or other instrument to which Seller is a party or by which Seller may be bound, and this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms.

9.2     Seller's Covenants.

(a)     Revival of Liability.  If (1)(i) the sale of the Jet pursuant to this Agreement is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to a surety, or any other Person liable for any of the obligations evidenced and/or secured by any of the Forbearance Documents, whether directly or indirectly, as a debtor-in-possession or to a receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause, and (ii) if within fifteen (15) calendar days after the occurrence of any of the events in Section 9.2(a)(1)(i), WCS One fails to cause Suncor Energy (U.S.A.) Inc. to be paid $500,000 (the "Cure Payment"), or (2) any Cure Payment is subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, to a surety, or any other Person liable for any of the obligations evidenced and/or secured by any of

8

**EXECUTION VERSION**

the Forbearance Documents, whether directly or indirectly, as a debtor-in-possession or to a receiver or any other Person under any bankruptcy law, state or federal law, common law or equitable cause (each, an "Invalidated Transfer"), then the portion of the indebtedness due under the Forbearance Documents reduced by the WCS One Contemplated Transaction and the liens, if any, given to secure the amounts of monies due Suncor Energy (U.S.A.) Inc. as evidenced in documents by and among the parties in existence prior to the execution, approval, and implementation of this Agreement or in connection with this Agreement and the Plan will be revived and will continue in full force and effect as if such indebtedness had never been reduced.

9.3     Purchaser's Representations and Warranties.    Purchaser represents, warrants and covenants to Seller that:

(a)     Purchaser has the right and power to execute, deliver and perform its obligations under this Agreement, and the execution, delivery and performance of this Agreement by Purchaser has been duly authorized by all necessary action, and will not violate, breach or contravene any provisions of law or the articles of organization or operating agreement of Purchaser or any license or permit under which Purchaser conducts its business, and will not result in the breach of or constitute a default under any indenture, credit or loan agreement, mortgage or other instrument to which Purchaser is a party or by which Purchaser may be bound, and this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms.

(b)     After Delivery, Purchaser shall promptly file any Tax Certificate with the proper authority as required by law.

9.4     Survival of Warranties.  All representations and warranties of the parties contained in this Agreement shall be fully effective and true as of the Closing Date, shall survive the Closing Date, and shall not be limited by any investigation or due diligence performed by a party hereto.

**ARTICLE 10**
**PROGRAMS AND WARRANTIES**

10.1    Seller's Assignment.  As of Delivery, if requested by Purchaser, Seller shall assign and transfer to Purchaser the Maintenance Program enrollment, together with any other Jet warranties or maintenance programs to the extent such programs are permitted by their terms to be assigned or transferred. At Purchaser's request, Seller will use its best efforts to give Purchaser reasonable assistance in enforcing the rights of Purchaser arising under such warranties or maintenance programs and the Maintenance Program Assignment.

**ARTICLE 11**
**TAXES AND EXPENSES**

11.1    Payment of State and Local Taxes.

(a)     Purchaser's Taxes.  Any and all taxes, not including income taxes, excises, duties, assessments, fines or penalties ("Taxes") arising solely out of the ownership, use, operation, or lease of the Jet after Delivery, and prior to subsequent sale to a third party, in any manner accruing, levied, assessed or imposed by any state or any subdivision or agency thereof having jurisdiction shall be the sole responsibility and liability of Purchaser ("Purchaser's Taxes").

9

     (b)    <u>Seller's Taxes</u>.  Seller shall have sole responsibility and liability for any and all Taxes whatsoever including, without limitation, sales, use and similar Taxes and any other Taxes, including personal property Taxes in any manner accruing, levied, assessed or imposed in connection with the sale and delivery of the Jet contemplated hereunder or Seller's ownership, use, operation, or lease of the Jet prior to Delivery by any state, subdivision or agency thereof having jurisdiction or by a taxing authority wherever located on the sale and delivery of the Jet contemplated hereunder and which are not Purchaser's Taxes (all such non-excluded taxes, excises and assessments being hereinafter referred to as "<u>Seller's Taxes</u>"), and Seller hereby agrees to indemnify Purchaser for any and all such Seller's Taxes.

     (c)    <u>Post-Closing Assistance</u>.  Seller and Purchaser shall provide each other, at the other's request, from time to time, with reasonable assistance necessary to permit the other party to receive an exemption from any and all Taxes arising out of the sale and delivery of the Jet to Purchaser.

11.2    <u>Expenses</u>.

     (a)    <u>Seller's Expenses</u>.  Seller shall be responsible for paying the fees of any broker or agent representing Seller in connection with this transaction, one-half of all fees and expenses of Escrow Agent for services provided by Escrow Agent pursuant to this Agreement ("<u>Seller Escrow Fee</u>"), and all fees and expenses of Seller's counsel in connection with the negotiation, execution, closing, delivery and amendment of this Agreement.  Seller also shall be responsible for paying FAA recording fees in connection with the filing of documents with the FAA prior to Delivery, to the extent such filings are made to release any Liens or otherwise clear title issues related to the Jet.  Seller hereby agrees that (i) should any claims, demands, liabilities, damages, losses, judgments and expenses of any kind be made against Purchaser for commissions, fees or other expenses payable by Seller pursuant to this <u>Section 11.2(a)</u>, or (ii) should Purchaser incur any expenses in successfully enforcing its rights and remedies under this Agreement against Seller, Seller shall hold Purchaser free and harmless from any and all such claims, demands, liabilities, damages, losses, judgments and expenses and shall pay or reimburse Purchaser for Purchaser's enforcement expenses (including legal fees, costs and related expenses) in connection therewith.

     (b)    <u>Purchaser's Expenses</u>.  Purchaser shall be responsible for paying Purchaser's broker's fees (if any), one-half of all fees and expenses of Escrow Agent for services provided by Escrow Agent pursuant to this Agreement ("<u>Purchaser Escrow Fee</u>") and all fees and expenses of Purchaser's counsel in connection with the negotiation, execution, closing, delivery and amendment of this Agreement.  Purchaser shall also be responsible for paying FAA recording fees in connection with the filing of documents with the FAA upon closing of the purchase and sale of the Jet and the fee charged by the International Registry for registration of the Contract of Sale evidencing the sale of the Jet from Seller to Purchaser.

**ARTICLE 12**
**DEFAULTS BY SELLER**

12.1    <u>Seller's Defaults</u>.  The occurrence of any one or more of the following events shall constitute an "<u>Event of Default</u>" by Seller hereunder:

     (a)    Seller's failure to tender for delivery on or prior to the Transfer Date, the Jet in the condition agreed upon in <u>Section 5.1</u> or Seller's failure to deliver or cause Seller to deliver the

**EXECUTION VERSION**

Jet Documentation, unless an Event of Default by Purchaser as described in <u>Section 13.1</u> previously shall have occurred and be continuing

(b)     Seller's failure to satisfy any other condition precedent to Delivery which is to be performed by Seller, as set forth in this Agreement, which is not cured within five (5) Business Days after written notice of Default by Purchaser.

(c)     Any representation or warranty made by Seller in <u>Section 9.1</u> of this Agreement shall be false as of the date when made or at the Closing Date.

(d)     Failure of the Jet to be delivered for Inspection by Seller as provided in this Agreement.

(e)     Failure of Seller to observe or perform any other material obligation of Seller under this Agreement, which is not cured within five (5) Business Days after written notice of Default by Purchaser.

(f)     The Closing has not occurred on or prior to the Closing Date as a result of an event described in subsections (a) – (e) above.

12.2     <u>Purchaser's Remedies</u>.  If any Event of Default by Seller described in <u>Section 12.1</u> occurs, Purchaser shall have the right to demand specific performance pursuant to <u>Section 14.10</u>, or terminate this Agreement upon written notice to Seller and Escrow Agent, and Seller shall on demand, reimburse Purchaser for the costs of all test-flights, inspections and any movement and crew locations costs related to the Jet, together with the Purchaser Escrow Fee and any and all out-of-pocket documentation costs and legal expenses and costs incurred (including those provided for in Section 15.3 below, if any) by Purchaser related to the transaction contemplated (collectively, the "<u>Reimbursable Expenses</u>").

**ARTICLE 13**
**LOSS OR DAMAGE TO JET**

13.1     <u>Loss or Damage to Jet Loss or Damage</u>.  Should the Jet be damaged prior to Delivery in any manner and to any extent, Purchaser may, but shall be under no obligation to, terminate this Agreement, and thereafter neither Purchaser, Seller, nor Escrow Agent shall have any further obligations or liability under this Agreement other than payment of Purchaser's Escrow Fee and Seller's Escrow Fee to Escrow Agent.  If Purchaser elects not to terminate this Agreement, Purchaser shall be entitled to receive and retain any insurance proceeds payable with respect to such damage or loss, and Seller agrees to fully cooperate with Purchaser in prosecuting any such insurance claim and shall pay over to Purchaser any insurance proceeds received by Seller, whether prior to or after Closing.

## ARTICLE 14
## MISCELLANEOUS

14.1   <u>Exclusivity of Agreement</u>.  The parties hereto have voluntarily agreed to define their rights, liabilities, and obligations respecting the subject matter of this Agreement exclusively in contract pursuant to the express terms and provisions of this Agreement; and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement. Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with the other party or any other party that would justify any expectation beyond that of an ordinary acquirer and an ordinary target in an arm's-length transaction.

14.2   <u>Assignment.</u>

(a)  This Agreement shall be binding upon Seller and its successors and assigns (if any) and Purchaser and its successors and assigns (if any).  This Agreement shall inure to the benefit of Purchaser and Seller and the respective successors and assigns (if any) of the foregoing.

(b)  Seller may not assign any of its rights or delegate any of its obligations under this Agreement without Purchaser's prior written consent, which may be withheld in its sole discretion.

(c)  Purchaser may assign this Agreement, in whole or in part, or any of its rights or delegate any or all of its obligations under this Agreement without Seller's consent.

14.3   <u>Notices</u>.  All notices and other communications pursuant to this Agreement shall be in writing and shall be deemed given if delivered by personal, hand-delivery, nationally-recognized overnight courier, postage prepaid, or regular mail, to the Parties at the addresses set forth below or to such other address as the Party to whom notice is to be given may have furnished to the other Party in writing in accordance herewith.  Any such notice or communication shall be deemed to have been delivered and received (a) in the case of personal, hand-delivery, on the date of delivery, (b) in the case of a nationally-recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date sent, and (c) in the case of mailing, on the third Business Day after that on which the piece of mail containing such communication is posted.

(i)   if to Seller, to:

W.C.S. One, LLC
c/o Springer & Steinberg, P.C.
1600 Broadway, Suite 1200
Denver, CO  80202
Attn: Jeffrey Springer

With a copy to:

Lee M. Kutner
Kutner Brinen Garber, P.C.
1660 Lincoln St., Suite 1850
Denver, CO  80264

(ii)     if to Purchaser, to:

          Suncor Energy (U.S.A.) Inc.
          717 Seventeenth St.
          Suite 2900
          Denver, Colorado  80202
          Attention: Director, Legal Affairs Downstream U.S.A.

      14.4    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.  The exchange of copies of this Agreement and of signature pages by facsimile or by e-mail in a .pdf format shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes.

      14.5    <u>Entire Agreement</u>.  This Agreement, the Suncor Sales Agreement (LLCs), and the Settlement Agreement, the attachments hereto and thereto, and all documents and instruments referred to herein and therein and delivered in connection herewith and therewith (collectively, the "<u>Transaction Documents</u>") contain the entire agreement and understanding among the Parties with respect to the subject matter hereof and thereof, and all prior and contemporaneous negotiations, understandings and agreements between the Parties on the matters contained herein and therein are expressly merged into and superseded by the Transaction Documents.

      14.6    <u>Amendments</u>.  This Agreement may not be amended except pursuant to the written agreement of each of Purchaser and Seller.

      14.7    <u>Severability</u>.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

      14.8    <u>Governing Law; Venue</u>.

        (a)  This Agreement, and all claims that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed solely by the internal laws of the State of Colorado, without regard to the conflict-of-law principles of any jurisdiction.

        (b)  Any legal action relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced in any state or federal court located in the County of Denver, Colorado.  Each party:

      (1)    expressly and irrevocably consents and submits to the exclusive jurisdiction of each state and federal court located in the County of Denver, Colorado (and each appellate court located in the State of Colorado) in connection with any such proceeding;

      (2)    agrees that each state and federal court located in the County of Denver, Colorado shall be deemed to be a convenient forum; and

      (3)    agrees not to assert (by way of motion, as a defense or otherwise), in any such proceeding commenced in any state or federal court located in the County of Denver, Colorado, any claim that such party is not subject personally to the jurisdiction of such court, that such proceeding has been brought in an inconvenient forum, that the venue of such proceeding is improper or that this Agreement or the subject matter of this Agreement may not be enforced in or by such court.

      (c) PURCHASER AND SELLER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING RELATING TO OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF EITHER PARTY ARISING OUT OF OR RELATED IN ANY MANNER WITH THE WCS ONE CONTEMPLATED TRANSACTION (INCLUDING ANY ACTION ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER IS A MATERIAL INDUCEMENT FOR PURCHASER AND SELLER TO ENTER THIS AGREEMENT.

    14.9   <u>Reasonable Attorneys' Fees and Other Reasonable Costs</u>.  Seller shall pay all reasonable Costs, Expenses and Attorneys' Fees incurred by Purchaser of any kind and nature incurred by Purchaser in the administration or enforcement of this Agreement.

    14.10  <u>Specific Performance</u>.  The parties agree that: (a) in the event of any breach or threatened breach by any party of any covenant, obligation or other provision set forth in this Agreement, the other parties shall be entitled (in addition to any other remedy that may be available to it) to seek (i) a decree or order of specific performance or mandamus to enforce the observance and performance of such covenant, obligation or other provision, and (ii) an injunction restraining such breach or threatened breach; and (b) no party shall be required to provide any bond or other security in connection with any such decree, order or injunction or in connection with any related action or proceeding.

    14.11  <u>Waiver.</u>

      (a) No failure on the part of any Person to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Person in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy.

(b) No Person shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Person; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

14.12   Construction.

(a) For purposes of this Agreement, whenever the context requires:  the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; the feminine gender shall include the masculine and neuter genders; and the neuter gender shall include the masculine and feminine genders.

(b) Each party acknowledges that it has participated in the drafting of this Agreement, and, as a result, the parties hereto agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

(c) As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

(d) Except as otherwise indicated, all references in this Agreement to "subsections," "Sections", "Schedules" and "Exhibits" are intended to refer to subsections and Sections of this Agreement, Schedules of this Agreement and Exhibits to this Agreement.

(e) The words "this Agreement," "hereby," "hereof," "herein," "hereunder," and comparable words refer to all of this Agreement, including the Exhibits and Schedules to this Agreement, and not to any particular Article, Section, preamble, recital, or other subdivision of this Agreement or Exhibit or Schedule to this Agreement.

(f) The headings contained in this Agreement, any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

SELLER:                                                    PURCHASER:

W.C.S. ONE, LLC                                            SUNCOR ENERGY (U.S.A.) INC.

By: _____                                   By: _____
Name: _Hossein Taraghi_                                   Name: _____
Title: _mgr_                                               Title: _____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

SELLER:                                          PURCHASER:

W.C.S. ONE, LLC                                  SUNCOR ENERGY (U.S.A.) INC.


By: _____                 By: _____
Name: _____                 Name:  Steve Ewing
Title: _____                 Title:   Director, Rackforward Sales

**EXECUTION VERSION**

### CONSENT AND JOINDER

Purchaser and Seller desire that Escrow Agent act as document holder and stakeholder for the sale and purchase of the Jet as provided in the Agreement, and the Escrow Agent accepts such appointment. The parties acknowledge that the Escrow Agent is acting as a document holder and stakeholder only, its duties being purely ministerial, at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent or trustee for either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any act or omission unless it involves willful misconduct or gross negligence on its part.

Insured Aircraft Title Service, Inc.'s agreement to serve as the Escrow Agent is conditioned on the following limitation. Notwithstanding the provisions contained in this or any agreement between Purchaser and Seller, the competent courts of the State of Oklahoma or the United States District Court for the Western District of Oklahoma shall have exclusive jurisdiction to hear all disputes against the Escrow Agent and no other courts shall have any jurisdiction whatsoever in respect of such disputes against the Escrow Agent. Should a dispute arise between Purchaser and Seller relating to the Agreement or any funds or other items which are in the possession of the Escrow Agent, the Escrow Agent shall be entitled to interplead any funds or other items in its possession with the competent courts of the State of Oklahoma or the United States District Court for the Western District of Oklahoma. The foregoing shall not affect the governing law and jurisdiction provisions contained in the Agreement to the extent that any dispute is between only Purchaser and Seller and does not involve the Escrow Agent in any manner.

The undersigned, Insured Aircraft Title Service, Inc., does hereby consent to and join in the foregoing Agreement hereby agreeing to act as Escrow Agent in accordance with the provisions of the Agreement applicable to the Escrow Agent.

ESCROW AGENT:

INSURED AIRCRAFT TITLE SERVICE, INC.


By: _____

Name: _____

Title: _____

**EXECUTION VERSION**

## EXHIBIT A

### BILL OF SALE FOR AIRCRAFT

_____, a limited liability company organized and existing under the laws of the State of _____ ("Seller"), in consideration of Ten Dollars and of other good and valuable consideration, receipt of which is hereby acknowledged, paid to Seller by _____, a limited liability company organized and existing under the laws of the State of _____ ("Purchaser"), pursuant to that certain Jet Purchase Agreement, dated as of the _____ day of _____, 20__, by and among Seller, Purchaser and Insured Aircraft Title Service, Inc. ("Escrow Agent") (the "Agreement", capitalized terms used but not defined herein shall have the respective meaning ascribed to such terms in the Agreement), does hereby bargain, sell, assign and transfer to said Purchaser, its successors and assigns, the following property:

One (1) _____ aircraft (together with all equipment, components and accessories installed thereon or used in connection therewith), with manufacturer's serial number _____ and U.S. aircraft registration number _____, complete with two (2) _____ _____ aircraft engines, bearing manufacturer's serial numbers _____ (left) and _____ (right) [and two (2) _____ ____-bladed propellers bearing manufacturer's serial numbers _____ (left) and _____ (right)], together with all parts (as defined in the Agreement) and Records (as defined in the Agreement).

TO HAVE AND TO HOLD, the said property to Purchaser, its successors and assigns, to its and their own use, forever.

**SELLER HEREBY WARRANTS TO PURCHASER THAT THERE IS HEREBY CONVEYED TO PURCHASER TITLE TO THE AIRCRAFT, FREE AND CLEAR OF ALL LIENS (AS DEFINED IN THE AGREEMENT). EXCEPT AS OTHERWISE SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE AND EXCEPT FOR THE WARRANTIES GIVEN BY SELLER IN SECTION 9.1 OF THE AGREEMENT, (i) THE AIRCRAFT IS BEING SOLD ON AN "AS IS, WHERE IS" BASIS, AND (ii) SELLER MAKES NO, AND PURCHASER WAIVES ANY OTHER, WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE AIRCRAFT OR ANY ASPECT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY WITH RESPECT TO THE AIRWORTHINESS OR CONDITION OF THE AIRCRAFT, ANY OBLIGATION OR LIABILITY IN TORT, NEGLIGENCE OR WITH RESPECT TO FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, AND ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE.**

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of _____.

Dated as of the _____ day of _____, 20__.

_____

By: _____
Name: _____
Title: _____

EXECUTION VERSION

## EXHIBIT B

### CERTIFICATE OF DELIVERY

THIS CERTIFICATE OF DELIVERY is delivered, as of the date set forth below, by _____ _____ (the "Purchaser"), to _____ ("Seller"), pursuant to that certain Jet Purchase Agreement by and between Purchaser, Seller and Insured Aircraft Title Service, Inc. ("Escrow Agent") dated as of the ____ day of _____, 20__ (the "Agreement").

Purchaser hereby states and confirms to Seller that Purchaser has at _____ Airport (____), State of _____, in accordance with the provisions of the Agreement, accepted the following:

One (1) _____ aircraft (together with all equipment, components and accessories installed thereon or used in connection therewith), with manufacturer's serial number _____ and U.S. aircraft registration number _____, complete with two (2) _____ _____ aircraft engines, bearing manufacturer's serial numbers _____ (left) and _____ (right) [and two (2) _____ ____-bladed propellers bearing manufacturer's serial numbers _____ (left) and _____ (right)], together with all parts (as defined in the Agreement) and Records (as defined in the Agreement).

PURCHASER ACKNOWLEDGES THAT IT HAS INSPECTED THE AIRCRAFT, ENGINES AND PARTS AND THE RECORDS RELATING THERETO. SUBJECT TO THE REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN THE BILL OF SALE FOR THE AIRCRAFT DATED OF EVEN DATE FROM SELLER TO PURCHASER AND AS SET FORTH IN SECTION 9.1 OF THE AGREEMENT, WHICH BY THEIR EXPRESS TERMS SURVIVE THE CLOSING AND DELIVERY OF THE AIRCRAFT TO PURCHASER, EXECUTION AND DELIVERY OF THIS CERTIFICATE BY PURCHASER SHALL BE CONCLUSIVE EVIDENCE FOR ALL PURPOSES THAT THE AIRCRAFT, ENGINES, ANY PROPELLERS, PARTS AND RECORDS RELATED THERETO ARE SATISFACTORY TO PURCHASER AND IN ACCORDANCE WITH THE AGREEMENT.

Date of Delivery: _____, 20__

Time of Delivery: _____ a.m./p.m. local time

IN WITNESS WHEREOF, Purchaser has executed and delivered this instrument as of the date first above written.

_____

By: _____
Name: _____
Title: _____

**Western Convenience Stores, Inc.**
**Chapter 11 Bankruptcy No. 15-23977-TBM**

**List of Creditors- Subject to Change based upon Proof of Claim**

| Creditor Name | Claim Amount | Proof of Claim No. |
|---|---|---|
| 500 South Lincoln, LLC | $7,201.48 | |
| 52/80 Designs | $1,790.10 | |
| A-1 Backflow | $134.95 | |
| A-1 Backflow | $60.00 | |
| Ace Ice Co., Inc. d/b/a Front Range Ice | $3,019.38 | |
| ACI Services | $1,478.00 | |
| Affiliated Wastewater Environmental Serv | $3,879.00 | |
| Affordable Water Service, Inc. | $135.00 | |
| Ahlers Baking, Inc. | $1,703.24 | |
| AHT Cooling Systems USA, Inc. | $575.28 | |
| Alert Security, Inc. | $101.97 | |
| All Temp Services, Inc. | $395.70 | |
| American Express Bank FSB | $532,000.00 | |
| AmuseMints | $213.00 | |
| Arctic Glacier/Icehouse | $558.75 | |
| Arrowhead Distributing Co. | $6,663.70 | |
| Atmos Energy | $335.41 | |
| B & B Petroleum, LLC | $45.31 | |
| B & K Distributing, Inc. | $2,097.40 | |
| Bauer Built, Inc. | $1,689.14 | |
| Baywatch Enterprises | $392.36 | |
| Best Western | $244.50 | |
| Beverage Distributing | $4,170.35 | |
| Big Family Foods, Inc. | $666.91 | |
| BIMBO | $2,527.27 | 16 |
| Black Hills Energy | $2,169.77 | |
| Blazer Electric Supply co. | $277.95 | |
| Blue Rhino Corp. | $15,446.00 | |
| Blue Ridge Distributing | $159.50 | |
| Board of Water Works of Pueblo Colorado | $176.05 | |
| Bristol Brewing Co. | $333.50 | |
| Breakthru Bevereage | $7,984.13 | 11 |
| Brown Transfer Company | $71.82 | |
| Cabo Partners, LLC | $1,500.00 | |
| Calplus Mfg. Corporation | $829.50 | |
| Canon Business Solutions Central, Inc. | $595.41 | |
| Cash-Wa Distributing | $15,117.91 | 15 ($18,921.90) |
| Casper's Donuts, LLC | $2,812.92 | |
| CDOT Property Management | $235.00 | |

**EXHIBIT H**

| | | |
|---|---|---|
| Central Distributing | $4,023.52 | |
| Century Link | $124.01 | |
| CGRS, Inc. | $402,802.56 | |
| Chamber of Commerce Heart of the Rockies | $200.00 | |
| Charles Dowden | $1,391.44 | |
| Ciccarelli Enterprises, LLLP | $5,254.15 | |
| Cintas Corporation | $93.59 | |
| Citi Business Card | $14,027.53 | |
| City of Grand Junction | $19.60 | |
| City of Thornton | $230.10 | |
| City of Fort Collins | $2,358.41 | 8 |
| Coca Cola | $15,645.04 | |
| Coca Cola Bottling Co. High Country | $4,005.42 | |
| Coca Cola Refreshments USA, Inc. | $9,724.84 | |
| Colorado Department of Revenue | $1,281,108.00 | 7 |
| Colorado Logos, Inc. | $16,500.00 | |
| Colorado Lottery | $509,498.53 | |
| Colorado Petroleum Products Co. | $19,791.30 | |
| Colorado Springs Utilities | $686.73 | |
| Comcast | $107.33 | |
| Complete Door Systems, Inc. | $474.15 | |
| Compufact Research, Inc. | $1,180.54 | |
| Coors Distribution of North Platte | $10,031.08 | |
| Corporate Grounds Maintenance, llc | $1,237.03 | |
| Cranmore Fire Protection | $60.00 | |
| Creager Mercantile | $867.16 | |
| Crestview Water & Sanitation | $87.23 | |
| Crystal Clear Water Treatment | $275.50 | |
| Culligan - Ogallala | $23.54 | |
| Culligan of Denver | $31.00 | |
| CWPMA | $3,181.00 | |
| DAGS, LLC | $5,000.00 | |
| Daylight Donuts - La Junta | $2,442.75 | |
| Days Inn - Sidney | $127.23 | |
| Deli Express | $33,560.80 | |
| Delta-Montrose Electric Association | $1,973.53 | |
| Dietrich Distributing | $3,797.95 | |
| DMF Bait Co. | $1,942.74 | |
| Don Ramon's Burritos | $166.50 | |
| Douglas County Septic | $1,187.50 | 2 |
| Drydun, Inc./Shield Services, Inc. | $12.87 | |
| Eagle Emblems, Inc. | $1,163.85 | |
| Earthgrains | $16.65 | |
| Eaton Sales & Service, LLC | $477.68 | |
| eCignatures, Inc. | $1,001.65 | |

| | | |
|---|---|---|
| El Paso county Treasurer | $15,207.21 | 3 |
| Elite Snow Removal | $8,000.00 | |
| Envirotech Pest Solutions | $476.00 | |
| Evers General Construction Co. | $2,438.36 | |
| Express Toll | $126.20 | 5 |
| Falson Office Products Co. | $508.39 | |
| Federal Express | $1,150.53 | |
| Ferrellgas Propane | $9,987.71 | 10 |
| Freeman Signs, Inc. | $594.69 | |
| Frito-Lay, Inc. | $73,494.38 | |
| Frosty Freeze West, LLC | $2,406.63 | |
| G. Bradford Enterprises, Inc. | $102.97 | |
| GCR Tire Centers | $1,291.40 | |
| GE Capital Commercial, Inc. | $7,160,000.00 | |
| Gehl's Guernsey Farms, Inc. | $100.00 | |
| Global Petroleum Electronic Builders | $3,604.00 | |
| Grainger | $5,694.03 | 14 |
| Gustave A Larson Company | $5,254.89 | |
| Hampton Inn North Platte | $115.55 | |
| Hampton Inn Pueblo | $580.85 | |
| Hampton Inn Steamboat Springs | $344.22 | |
| Harpel Oil Co. | $3,092,518.59 | |
| Hendrix Outdoors | $1,008.48 | |
| Henning Brothers Leasing | $147.00 | |
| High Plains | $10,382.10 | |
| High Plains Bank | $1,641,604.65 | 4 |
| Hiland Dairy Foods Company, LLC | $4,513.05 | |
| Hi-Way Distributing | $25,186.52 | |
| Home Fresh Foods | $1,551.57 | |
| Home Lumber & Supply Co. | $322.39 | |
| HR Direct | $742.27 | |
| Hubert Company | $726.35 | |
| inCommm New E-Pay LLC | $2,029.76 | |
| Ingle Supply Company | $468.88 | |
| Intermountain Distributing Company | $28,819.41 | |
| Intermountain Rural Electric Assoc. | $6,623.79 | |
| International Wholesale Supply | $13,345.86 | |
| Investigative Resources | $817.50 | |
| Iron Mountain | $128.76 | |
| J.E. Adams Industries, Ltd. | $177.36 | |
| J-8 Equipment Company, Inc. | $1,801.94 | |
| JIA, LLC d/b/a Santiagos | $112.50 | |
| Jimco Sales and Manufacturing | $2,923.13 | |
| John Masterson | $235.00 | |
| Johnson Brothers Finocchiaro | $670.00 | |
| Johnstone Supply | $545.96 | |

| | | |
|---|---|---|
| Kent News Co., LLC | $21,780.73 | |
| Krispy Kreme | $9,939.71 | |
| KSG Distributing | $1,594.25 | |
| Kubat Equpment and Service Co. | $30,479.91 | |
| L. Frances Camel Company | $2,485.00 | |
| Larry's Glass | $4,231.71 | |
| Loomis | $47,375.48 | |
| Ludvik Propane Gas | $231.79 | |
| Mark VII Equipment, Inc. | $28,115.14 | 13 ($36,185.45) |
| Matheson Tri-Gas, Inc. | $772.27 | |
| MC2 Equipment and Parts | $279.71 | |
| McLane Western, Inc. | $517,205.66 | |
| Meier Business Systems, Inc. | $324.35 | |
| Micro Center | $466.87 | |
| MK 19 Investments, LLC | $8,198.19 | |
| Mountain States Specialties, Inc. | $510.24 | |
| Multiline International Imports, Inc. | $2,905.20 | |
| Nabisco | $69.97 | |
| Nebraska Logos, Inc. | $2,400.00 | |
| Nebraska Lottery | $836.20 | |
| Net Sales, Inc. | $335.20 | |
| New Age Beverage Company | $10,082.51 | |
| NMC Exchange, LLC | $335.99 | |
| North Platte Bulletin | $65.00 | |
| Northeast Fire Safety | $35.00 | |
| Northwest Concessions Supply | $5,374.00 | |
| Northwest Fire Extinguisher | $64.83 | |
| Northwest Parkway, LLC | $2.00 | |
| NuCo2, LLC | $928.90 | |
| Offen Petroleum, Inc. | $2,364,053.00 | |
| Office Pride | $3,234.98 | |
| Opis | $1,781.76 | |
| Parker Car Care Partners, LLC | $3,495.00 | |
| Paulson Enterprises | $3,253.13 | |
| PDI | $2,011.50 | |
| PenSys, Inc. | $2,871.67 | |
| Pepsi Cola of Western Nebraska | $8,518.90 | |
| Pepsi-Cola Denver | $78,002.26 | |
| Pioneer Distributing Co. | $5,509.65 | |
| Platinum Sign Company, LLC | $575.00 | |
| Polisnelli Shughart, P.C. | $386.50 | |
| Presto-X | $202.26 | |
| Property Tax Advisors, Inc. | $2,637.00 | |
| Public Service Co. | $19,316.18 | 8 |
| Purchase Power | $1,947.49 | |
| Quality Sound and Communications | $135.00 | |

| | | |
|---|---|---|
| Quill Corporation | $1,649.90 | |
| Ramons Burritos | $8,285.96 | |
| Rampart Supply, Inc. | $352.95 | |
| Red Bull Distribution Co. of Colorado | $60,161.69 | |
| Red Hawk Fire & Security | $942.75 | |
| Reddy Ice Corporation | $3,185.00 | |
| Republic National Distributing Co. | $4,018.87 | |
| Republic National Distributing Co. | $4,043.19 | |
| Resource Environmental Group Services | $3,253.13 | |
| Rising Sun Bakery | $2,415.61 | |
| Rocky Mountain Coors Distributing Co. | $11,110.45 | |
| Rocky Mountain Electronic Security LLC | $71.85 | |
| Rocky Mountain Ice Corp. | $1,029.80 | |
| Rocky Mountain Petroleum Services | $22,717.77 | |
| Rocky Mountain Pipeline | $14,530.85 | |
| Rocky Mountain Pipeline System | $169,508.65 | |
| Rye Septic Service | $1,500.00 | |
| Ryko | $958.73 | |
| Safe Systems, Inc. | $240.00 | |
| Salida Fire Extinguisher | $49.00 | |
| Sandhills Distributing | $6,049.20 | |
| Santiago's Johnstown, LLC | $1,462.50 | |
| Santiagos Mexican Restaurant | $21,125.25 | |
| Scent Bomb | $79.60 | |
| Seven Up/RC Bottling | $29,693.78 | |
| Snell Services, Inc. | $5,356.51 | |
| Snowball Distribution | $20,153.15 | |
| Southern Foods Group d/b/a Meadow Gold | $45,351.00 | |
| Southern Wine & Spirits | $3,779.65 | |
| Spectrum Screen Print & Design | $1,051.06 | |
| Springer and Steinberg | $550.00 | |
| Standard Sales Co. - Colo. Springs | $10,343.80 | |
| Standard Sales Co., LP - Pueblo | $1,365.30 | |
| Steamboat Ice Co., LLC | $6,449.10 | |
| Sterling Distributing | $2,020.00 | |
| Stone Paving Co. | $450.00 | |
| Stone Sales and Marketing, LLC | $328.18 | |
| Suncor Energy (USA), Inc. | $5,000,000.00 | |
| Superior Alarm & Fire Protection | $132.00 | |
| Superior Firewood | $276.75 | |
| Surveillance - Video.com | $2,198.36 | |
| Sutherland Rodeo | $60.00 | |
| Swire Coca Cola | $164,021.04 | |
| Sysco Lincoln | $10,227.50 | |
| Tanya Faye Enterprises dba Santiagos | $6,390.00 | |
| Taste of Paradise | $729.50 | |

| | | |
|---|---|---|
| TEBO Store Fixtures | $6,404.47 | 12 |
| Telvent DTN | $1,049.90 | |
| Terminix Processing Center | $447.00 | |
| The Brenmar Company, Inc. | $2,653.88 | |
| The Style N, Inc. | $10,133.72 | |
| Tielke's Sandwich | $2,577.61 | |
| Titan Distributing, LLC | $2,983.50 | |
| TNCI | $3,348.61 | |
| Topics Entertainment | $155.44 | |
| Transpac, Inc. | $852.78 | |
| Tri County Fire Protection | $398.27 | |
| Ultimax, Inc. | $1,536.56 | |
| Valiant Store Fixtures | $1,940.63 | |
| Verizon Wireless | $6,118.15 | |
| Virgil Curry | $448.38 | |
| VSD 4, LLC | $4,246,242.00 | |
| Wells Fargo Bank | $117,866.61 | 1 |
| Wells Fargo Financial Leasing | $94,362.40 | 6 |
| Western Resources Group | $30.00 | |
| Wildwest Munchies | $107,319.67 | |
| Wyoming Beverage of Wyoming | $7,411.07 | |
| Yant Equipment, Inc. | $1,399.40 | |
| | | |
| **Total Claims** | **$28,567,287.04** | |