UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 15-23977-TBM |
| WESTERN CONVENIENCE STORES, INC. | ) | |
| EIN: 84-1160742 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## MOTION TO ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH 500 S. LINCOLN, LLC

The Debtor, Western Convenience Stores, Inc. ("Debtor"), by and through its attorneys, Kutner Brinen, P.C., respectfully moves this Court for entry of an order pursuant to 11 U.S.C. §365(a) and Bankruptcy Rules 6006 and 9014 authorizing the Debtor's assumption of a nonresidential real property Lease Agreement with 500 S. Lincoln, LLC ("Landlord"), and as grounds therefor, state as follows:

1. The Debtor filed its voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code on December 28, 2015 ("Petition Date"). The Debtor remains a debtor-in-possession.

2. The Debtor is the operator of a chain of 44 convenience stores that sell gasoline, snack foods, and related products throughout Colorado and Nebraska.

3. The Debtor entered into a pre-petition Lease Agreement (together with all attachments thereto, the "Lease") dated August 31, 2010 with Landlord for the premises located at 500 South Lincoln, Steamboat Springs, Colorado ("Premises"). The Debtor leases real property and improvements consisting of a gas station and convenience store.

4. The initial Lease term was from September 1, 2010 through September 1, 2020. Pursuant to the terms of the Lease, the Lease will be automatically renewed for two additional five (5) year periods, extending the lease through September 1, 2030, unless the Debtor provides written notice of its intent not to renew the Lease. A copy of the Lease is attached hereto as Exhibit A.

5. Bankruptcy Code § 365(d)(4)(A) provides that the Debtor shall surrender any non-residential real property unless it assumes the governing lease the earlier of the date that is 120 days after the Petition Date or the date on which a plan is confirmed.

6.      On April 26, 2016, the Court entered an Order extending the time by which the Debtor was required to assume or reject its nonresidential real property leases by ninety (90) days, through and including July 25, 2016.

7.      The Debtor, in exercising its business judgment, has concluded that the Lease provides a benefit to the Debtor, the estate, and its reorganization effort, and therefore seeks to assume the Lease pursuant to section 365(a) of the Bankruptcy Code. The terms of the Lease are fair and will provide the Debtor with the ability to maintain its operations at the same location at least through September 1, 2020.

8.      The monthly rent for the Premises is $5,796.37, and increases on a yearly basis as set forth on Exhibit B to the Lease. The Debtor is also required to pay common area maintenance charges in addition to the rent. The Debtor can afford the rent on the Premises, and the rent is reasonable for the size and location of the Premises

9.      Assumption or rejection of executory contracts or unexpired leases by a debtor is subject to Court review under the business judgment standard. See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Mile High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

10.     Pursuant to the business judgment test, the debtor's decision to assume or reject an executory contract or an unexpired lease should be approved when the debtor decides, in good faith, that assumption or rejection is beneficial to the estate. *In re Chipwich, Inc.*, 54 B.R. 427, 430-431 (Bankr. S.D.N.Y. 1985) ("it is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate"). Under Section 365(a), "the debtor's business judgment should not be interfered with, absent a showing of bad faith or abuse of business discretion." *Chipwich, Inc.,* 54 B.R. 430-31. As stated by one court, "Court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course." *Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981).

11.     Assumption of the Lease is in the best interest of the Debtor, its creditors and the estate. The Lease provides a benefit to the estate because it will allow the Debtor to continue to operate in the Premises without the disruption that would be caused by moving its operations and inventory. Additionally, the Premises has fixtures, including gas pumps, that are necessary for the Debtor's operations. If the Lease terminates and the Debtor is forced to vacate the Premises,

the Debtor will be forced to either permanently close that location, or expend substantial funds to find a new premises with the necessary fixtures for the Debtor's operations.

12.     The Debtor is current on all lease payments, and the Landlord does not have a pre-petition claim against the Debtor[1].   As a result, no cure is necessary at the time of assumption.

WHEREFORE, the Debtor prays that the Court enter an Order authorizing the assumption of the Lease, and for such further and additional relief as to the Court may deem proper.


Dated: June 9, 2016                          Respectfully submitted,

                                             By:  *s/ Keri L. Riley*
                                                  Lee M. Kutner, #10966
                                                  Keri L. Riley, #47605
                                                  **KUTNER BRINEN, P.C.**
                                                  1660 Lincoln St. Suite 1850
                                                  Denver, CO  80264
                                                  Telephone:  (303) 832-2400
                                                  Telecopy: (303) 832-1510
                                                  E-Mail: klr@kutnerlaw.com

---

[1] Landlord was included on Debtor's Schedule F with a pre-petition claim in the amount of $7,201.48.  In fact, this amount was not due until January 1, 2016, and was therefore paid post-petition in the ordinary course of business.

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 9, 2016, I served by prepaid first class mail a copy of the foregoing **MOTION TO ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH 500 SOUTH LINCOLN, LLC AND NOTICE OF MOTION TO ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH 500 SOUTH LINCOLN, LLC** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and these L.B.R. at the following addresses:

500 South Lincoln, LLC
c/o Jon Peddie
P.O. Box 882978
1065 Crawford Avenue
Steamboat Springs, CO 80488

500 South Lincoln, LLC
c/o James C. Woods
P.O. Box 9911
Denver, CO 80209

500 South Lincoln, LLC
c/o James C. Woods
10 Black Bear Lane
Littleton, CO 80127

500 South Lincoln, LLC
P.O. Box 882978
Steamboat Springs, CO 80488

Kubat Equipment and Service Co.
ATTN: Craig Hoyer
1070 South Galapago Street
Denver, CO 80223

PepsiCo, Inc.
ATTN: Conrad Ragan
1100 Reynolds Blvd.
Winston-Salem, NC 27105

Harpel Oil Company
ATTN: Douglas C. Harpel
5480 Brighton Blvd.
Commerce City, CO 80022

Alan K. Motes, Esq.
U.S. Trustee's Office
1961 Stout Street
Suite 12-200
Denver, CO 80294

Philip A. Pearlman, Esq.
Jamie N. Cotter, Esq.
Spencer Fane, LLP
1700 Lincoln Street
Suite 2000
Denver, CO 80203

John O'Brien, Esq.
Snell & Wilmer, LLP
1200 Seventeenth Street
Suite 1900
Denver, CO 80202-5854

Craig K. Schuenemann, Esq.
Bryan Cave, LLP
1700 Lincoln Street
Suite 4100
Denver, CO 80203-4541

Mark G. Stingley, Esq.
William J. Maloney, Esq.
Bryan Cave, LLP
1200 Main Street
Suite 3800
Kansas City, Missouri 64105

Adam L. Hirsch, Esq.
Kutak Rock, LLP
1801 California Street
Suite 3000
Denver, CO 80202-2658

Erica F. Houck Englert, Esq.
1801 California Street
Suite 3400
Denver, CO 80202

James B. Holden, Esq.
Lynda L. Atkins, Esq.
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203

Gregory G. Hesse, Esq.
Hunton & Williams, LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202-2799

Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Paul G. Urtz, Esq.
Miller & Urtz, LLC
1660 Lincoln Street
Suite 2850
Denver, CO 80264

Darryl S. Laddin, Esq.
Frank N. White, Esq.
Arnall Golden Gregory, LLP
171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363-1031

Samuel M. Kidder, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, CO 80202-4432

Robert A. Kumin, Esq.
Scott S. Kleypas, Esq.
Robert A. Kumin, P.C.
6901 Shawnee Mission Parkway
Suite 250
Overland Park, KS 66202

Scott A. Clark, Esq.
Burns, Figa & Will, P.C.
Plaza Tower One, Suite 1000
6400 South Fiddlers Green Circle
Greenwood Village, CO 80111

Neal K. Dunning, Esq.
Brown, Berardini, Dunning & Walker,
P.C.
2000 South Colorado Boulevard
Tower Two, Suite 700
Denver, CO 80222

Douglas D. Koktavy, Esq.
Douglas D. Koktavy, P.C.
Building B, Suite 120
10200 East Girard Avenue
Denver, CO 80231

Ronald E. Gold, Esq.
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45208

Peter W. Ito, Esq.
ITO Law Group, LLC
1550 Larimer Street
Suite 667
Denver, CO 80202

Jeffrey N. Pomerantz, Esq.
Jeffrey W. Dulberg, Esq.
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067-4100

Gregory S. Bell, Esq.
Bell, Gould, Linder & Scott, P.C.
322 East Oak Street
Fort Collins, CO 80524

NRC Realty & Capital Advisors, LLC
8601 North Scottsdale Road
Suite 310
Scottsdale, AZ 85253

Joseph D. Frank, Esq.
Jeremy C. Kleinman, Esq.
Frank Gecker, LLP
325 North LaSalle Street
Suite 625
Chicago, IL 60654

Soukup Bush & Associates, P.C.
2032 Caribou Drive
Suite 200
Fort Collins, CO 80525

Darryl S. Laddin, Esq.
Frank N. White, Esq.
Arnall Golden Gregory, LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031

Mark Ralston, Esq.
Fishman Jackson, PLLC
13155 Noel Road
Suite 700
Dallas, Texas 75240

A Troy Ciccarelli, Esq.
Ciccarelli & Associates, P.C.
2616 West Alamo Avenue
Littleton, CO 80120

Matthew A. Gold, Esq.
Argo Partners
12 West 37th Street
9th Floor
New York, NY 10018

David J. Lisko, Esq.
633 17th Street
Suite 2300
Denver, CO 80202

Susan L. Martineau, Esq.
12151 Spruce Street
Thornton, CO 80602

Springer & Steinberg, P.C.
1600 Broadway Street
Denver, CO 80202

**Vicky Martina**

#149

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into as of this
31st day of August 2010, by and between 500 S. Lincoln, LLC a Colorado
Limited Liability Company (the "Landlord"), and Western Convenience Stores, Inc., a
Colorado Corporation (the "Tenant").

Landlord and Tenant covenant and agree as follows:

### ARTICLE 1 - PREMISES

1.1 In consideration of the rents, terms, covenants, and agreements set forth in this
Lease to be paid, kept, and performed, Landlord grants, demises, and leases to Tenant,
and Tenant hereby takes, rents, and leases from Landlord, on the terms, covenants,
provisions, and agreements provided in this Lease, the Premises (as hereinafter
defined).

1.2 Landlord is seized and possessed of fee simple title to a certain tract of
Property in Steamboat Springs, Colorado, described as follows ("the Property"):

See Exhibit A

1.3 The Property as described on Exhibit A includes a Building known as Unit
A which contains all existing improvements (including appropriate parking) required
in connection with the use of the Property as a convenience store selling petroleum
products (the "Premises").

1.4 Tenant shall also have the exclusive use of parking spaces denoted 1-10 as well
as any parking available pertaining to the canopy and dispenser area of the Property as
shown on Exhibit A-1 hereto.

1.5 LANDLORD LEASES THE PROPERTY TO TENANT IN ITS PRESENT
CONDITION, AND TENANT ACCEPTS THE PROPERTY "AS IS" AND "WHERE IS",
AND LANDLORD MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR
IMPLIED, WITH RESPECT TO THE PROPERTY OR THE LOCATION, USE,
DESCRIPTION, DESIGN, MERCHANTABILITY, FITNESS FOR USE FOR A
PARTICULAR PURPOSE, CONDITION OR DURABILITY THEREOF, OR AS TO
THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN OR THE
ENVIRONMENTAL CONDITION THEREOF; UNLESS CAUSED BY LANDLORD,
LANDLORD SHALL NOT HAVE ANY RESPONSIBILITY OR LIABILITY WITH
RESPECT TO ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE
PROPERTY OR ANY PORTION THEREOF, AND UNLESS CAUSED BY
LANDLORD, LANDLORD SHALL NOT HAVE ANY RESPONSIBILITY OR
LIABILITY FOR ANY DIRECT OR INDIRECT DAMAGE TO PERSONS OR
PROPERTY RESULTING THEREFROM OR FOR TENANT'S LOSS OF USE OF THE
PROPERTY OR ANY PORTION THEREOF OR ANY INTERRUPTION IN TENANT'S

**Exhibit A**

BUSINESS CAUSED BY TENANT'S INABILITY TO USE THE PROPERTY OR ANY
PORTION THEREOF FOR ANY REASON WHATSOEVER.

## ARTICLE 2 - TERM

2.1  The term of this Lease (the "Base Term") shall commence on the 1st day of
September (the "Effective Date") and shall expire on the day that is 10 years thereafter.
The Base Term, together with any properly exercised Renewal Term (as defined
herein) shall be collectively referred to as the "Term." The renewal periods following
the Base Term for which Tenant will have an option to renew this Lease as herein
provided at Section 2.2 referred to individually as a "Renewal Term" or collectively as
the "Renewal Terms."

2.2. Provided and upon the condition that Tenant shall not then be in default under
the terms of this Lease beyond any applicable grace or cure period, this Lease shall be
automatically renewed for up to two (2) additional 5 year periods without action on the part of
either party hereto. In the event Tenant does not desire to renew this Lease for any of the Renewal
Terms, Tenant shall notify Landlord of it's intention not to renew this Lease at least 180 days prior
to the termination of the then current Lease period, and in the event such notification is not given
by Tenant, this Lease shall be automatically extended as above provided. References to the Term
of this Lease shall include extensions, if any. Except as otherwise expressly stated herein, the
terms and conditions of this Lease shall remain in effect during any extension of the Term
of this Lease.

## ARTICLE 3 - RENT

3.1. Tenant shall pay Base Rent to Landlord commencing on the 1st day of
September , 2010. The Base Rent shall be as set forth on *Exhibit B - Schedule of Rents*
attached hereto and incorporated herein by reference. Base Rent shall be payable in
advance monthly on or before the first day of each month. Base Rent shall be paid via
electronic transfer of funds (via ACH transfer or wire transfer), or at Tenant's option,
by check sent by ordinary first class mail to Landlord at such address as Landlord may
designate in writing from time to time. Tenant shall additionally pay to Landlord a
deposit of $5,000.00 with the first months rent. The deposit shall not bear interest for
the benefit of Tenant nor shall the same be held in trust by Landlord for the benefit of
Tenant or its creditors.

3.2 Tenant acknowledges and agrees that it is intended that this Lease will be,
except as otherwise expressly stated herein, a "net lease" to Landlord. Notwithstanding the
foregoing, Tenant shall not be responsible for any costs, charges, or expenses pertaining to
Landlord's organizational overhead or the financing or refinancing of the Premises by
Landlord.

3.2.1. In addition to the rent set forth above, Tenant shall pay to Landlord as
"Additional Rent", in advance and with each rent deposit, tenants estimated percentage
of "Category 1" expenses (Exhibit "D") which, in Landlord's judgment, are required to
properly maintain the Premises and the Property, which amount shall initially be
estimated at $650 per month for any period included in the term of the Lease or any
extensions thereof. Tenant expenses on the entire property shall be calculated and a

reconciliation shall occur on a calendar year basis (to occur on or before March 31), subject to audit by the Tenant. Any adjustments which may be required as a result of such audit shall be paid by one part to the other, as the case may be, within 30 days that the results of such audit are finalized and verified by Landlord and Tenant. The parties shall share the costs of any audit equally. The estimated additional rent for any year shall be the actual amount following reconciliation for the prior year.

3.2.2 At all times during the term of this Lease, the Tenant, in addition to the rents required hereunder, shall pay, prior to delinquency, the costs of all utilities including, but not limited to, gas, propane, electricity, water and sewer used and consumed by the Tenant, its employees, agents, servants, customers and other invitees in the Premises ("Category 2") expenses. If such utility charges cannot be separately metered or separately determined, Tenant agrees to pay its pro rata share thereof, which shall be equal to the number of square feet included in the Premises divided by the total number of square feet leased or available for lease utilizing such utilities.

3.2.3 In the event of interruption, diminution or cessation of availability utility services such that Tenant cannot reasonably use the Premises for its intended purpose for a period of more than 20 days, Tenant shall have the right to terminate this Lease upon 10 days written notice to Landlord provided Tenant shall immediately notify Landlord of any such interruption, diminution or cessation of such utility service and Tenant shall use its best efforts to seek the restoration of such utility services.

3.2.4 Payments Not Responsibility of Tenant. Tenant shall not be required to pay any municipal, county, state, or federal income or franchise taxes of Landlord, or any inheritance or transfer taxes of Landlord or annual reporting or other fees in connection with maintaining Landlord's organizational existence under the laws of the State of its formation or creation.

3.2.5 Tenant, at its cost, shall have the right, at any time, to seek a reduction in the assessed valuation of the Premises or to contest any Taxes or utility charges that are to be paid by Tenant provided that Tenant consults in advance with Landlord prior to taking any action regarding its plans with regard to such intended actions and obtains the Landlord's consent thereto, which consent shall not be unreasonably withheld.

## ARTICLE 4 - ENVIRONMENTAL; PETROLEUM EQUIPMENT

4.1 Upon Lease execution Tenant shall become the owner and operator of all Petroleum Equipment (as defined below) on the Premises, and, accordingly, is further deemed to be such for purposes of compliance with and liabilities arising from all Environmental Laws. At any time during the Term of this Lease, Tenant shall have the right to install or cause to be installed and to maintain, replace, relocate, repair, upgrade and operate petroleum marketing equipment, including, but not limited to, underground or above ground storage tanks and their associated underground or above ground and/or connected piping, and related lines, pumps, dispensers, mechanical, control and directional

equipment, environmental assessment and remediation equipment related thereto (collectively, "Petroleum Equipment"). Upon reasonable written request from Landlord, Tenant shall provide Landlord with a copy of any permit required by any applicable Environmental Laws for the Premises.

4.2 Tenant shall comply with all laws, including Environmental Laws, relating to the use, storage, transportation, dispensing, sale or release of Hazardous Material at the Premises. Without limiting the foregoing, Tenant shall comply with all laws, including Environmental Laws, relating to the Petroleum Equipment, including, without limitation, installation, operation, maintenance, calibration and alarm systems, registration, financial assurances, and closure, and promptly shall implement any and all upgrade requirements promulgated by any government agency and shall obtain and maintain all necessary permits, approvals, registrations, certificates, and authorizations ("Permits") required under Environmental Laws for the Premises and Petroleum Equipment.

4.3 Except as otherwise provided at 4.4 of this Article, as between Landlord and Tenant, all reporting, investigation and/or remediation requirements under any applicable Environmental Laws with respect to any release of Hazardous Material on the Premises during the Term, regardless of the date of discovery, are the responsibility of Tenant, and Tenant shall be solely responsible for all costs incurred in connection with any investigation, monitoring or any cleanup, remediation, removal, or restoration work required of Landlord or Tenant by applicable law and any federal, state, or local governmental agency or political subdivision having jurisdiction over the Premises because of Hazardous Material present in the soil or ground water on, under or emanating from the Premises caused or permitted by Tenant or otherwise relating to Tenant's operations.

4.4 Tenant shall not be responsible for (A) Hazardous Material migrating onto the Premises from off the Premises through no acts, omissions or fault of Tenant ("Off- Premise Third Party Contamination"), (B) the exacerbation of any existing Hazardous Material contamination on the Premises by Landlord, its agents, employees, contractors or lenders, or (C) Hazardous Material brought onto the Premises by Landlord, its agents, employees, contractors, or lenders in violation of Environmental Laws (together, the "Exclusions"). To the extent the Premises are contaminated as of the date of this Lease Agreement, hereto, Landlord agrees to perform or cause to be performed any and all necessary remediation on the Premises to the extent required by applicable Environmental Laws and governmental authorities having jurisdiction. Upon execution of a mutually acceptable access agreement, Tenant agrees to cooperate in permitting reasonable access to the Premises by any party who is responsible for assessment or remediation of contamination on the Premises.

4.5 In the event this Lease expires or is terminated, and any further investigation, remediation or monitoring is required that is the responsibility of Tenant hereunder, Landlord and its lessees, successors and assigns, pursuant to execution of a mutually acceptable access agreement: (i) shall permit, without charge, cost, fee or assessment, Tenant and its agents and representatives reasonable access to the Premises for completing such investigation, remediation, and monitoring and (ii) shall not materially damage, disturb or remove or otherwise unreasonably impede or interfere with such investigation, remediation or monitoring or the associated equipment, installations or

facilities. Tenant shall not unreasonably interfere with use of the Premises or any business operation thereon. Tenant shall not be liable or responsible for any disruption of business or other liabilities, costs or expenses incurred by Landlord or its lessees, successors or assigns that may be caused by Tenant's investigation, remediation or monitoring activities provided that Tenant has acted reasonably in conducting such activities.

4.6 Tenant shall indemnify, defend, and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities, liens or losses which arise during or after the Term of this Lease as a result of Tenant's noncompliance with Environmental Laws or any release of Hazardous Material at the Premises during the Term of the Lease, but solely with respect to Tenant's operation of Tenant's business in and about the Premises, Tenant having no obligation to indemnify Landlord from any of the preceding matters if caused by Landlord, its previous tenants, its agents, employees, contractors, lenders, or any business invitee of Landlord, nor shall Tenant be liable to indemnify Landlord from any claim, judgment, damage, penalty, fine, costs, liability, or loss attributable to such person's negligence or intentional misconduct.

## ARTICLE 5 - TRADE FIXTURES AND EQUIPMENT

5.1 All Petroleum Equipment, furniture, trade fixtures, all signage and supporting structures, and other equipment of Tenant (excluding any Tenant-built gasoline canopy and structure) shall be personal property notwithstanding their attachment to the Premises, and together with every item of personal property not permanently attached to the Premises (collectively "Tenant's Personal Property") are the property of Tenant. Tenant shall have the right and privilege of removing Tenant's Personal Property at any time during the Term.

5.2 In the event any of Tenant's Personal Property is not removed by Tenant prior to the expiration or earlier termination of this Lease, title thereto shall automatically pass to and vest in Landlord, and Tenant shall thereafter be relieved of any and all responsibility in connection with said equipment. If Tenant's Personal Property is removed, Tenant promptly shall restore the Premises to it's condition immediately prior to the removal of such property to the extent commercially practicable.

5.3 Landlord hereby waives any lien right Landlord may have with respect to Tenant's personal property at the Premises, including, without limitation, any so-called "landlord's lien" as may be afforded by the provisions of statutory law. Although such waiver is self-operative, Landlord agrees to acknowledge such waiver in writing, for the benefit of Tenant or any lender of Tenant, as Tenant may from time to time request.

## ARTICLE 6 — TENANT'S RIGHT TO ALTER AND IMPROVE

6.1 Tenant shall make no alterations or additions to the Premises utilities without first procuring Landlord's reasonable written consent, after delivering to the Landlord the plans and specifications therefore. Tenant shall promptly pay for the costs of all work and shall indemnify Landlord against liens, costs, damages and expenses incurred by Landlord in connection therewith.

6.2 Within five (5) days after notifying Landlord of any planned erection, construction, alteration, removal, addition, repair or other improvement Tenant shall post and keep posted until completion of the work, in a conspicuous place upon the doors providing entrance to the Premises, and shall personally serve upon such contractors or subcontractors performing the work and material men, a notice stating that Landlord's interest in the Premises shall not be subject to any lien for said work.

## ARTICLE 7 - USE OF PREMISES

7.1 Tenant covenants that the Premises shall be used for a convenience food store and for the sale of automotive petroleum products only, and for no other purpose, except with the prior written consent of the Landlord.

7.2 The Landlord shall provide and hereby guarantees use of the Common Areas for egress and ingress at all times and the non-exclusive use of the Tenant, its employees, agents, servants, customers and other invitees, in common with the Landlord and other tenants. As the term is used herein, Common Areas shall mean all of those areas of the Property on which buildings have not been built and which are not subject to the Third Party Lease or other rights of any other person or entity to conduct any activities or about the Property pursuant to law, contract or otherwise, it being agreed that Tenant shall have no rights to the use of the Common Areas which Landlord does not possess upon the effective date of this Lease.

## ARTICLE 8 INSURANCE

8.1 Tenant covenants and agrees that Tenant will carry and maintain, at all times during the Term, at Tenant's sole cost and expense, bodily injury and property damage liability insurance with coverage limits of $1,500,000.00 combined, and $750,000.00 for each occurrence, insuring against any and all liability of Tenant with respect to the Premises or arising out of the maintenance or use thereof issued by a reputable insurance company qualified to do business in Colorado.

8.2 Worker's compensation insurance (or other similar insurance or self insurance program permitted and in compliance with the Legal Requirements of the State of Colorado) covering all persons employed in connection with any work done on or about the Property with respect to which claims for death or bodily injury could be asserted against Landlord, Tenant or the Property, complying with the legal requirements of Colorado.

8.3 Insurance certificates evidencing the coverage required by the Policies shall be deposited with the Landlord by Tenant on the date hereof and thereafter no less frequently than the earlier of annually and thirty (30) days prior to the expiration of such Policies. The form and substance of such certificates shall be satisfactory to Landlord in its reasonable judgment and shall be issued by the insurer or the Tenant's insurance broker. All Policies of property insurance shall name the Landlord as loss payee and additional insured and all liability Policies shall name the Landlord as additional insured and the policies required shall identify the Landlord as the owner of the Property.

8.4 All Policies shall (i) provide that the insurance evidenced thereby shall not be canceled or materially modified without at least thirty (30) days' prior written notice from the insurance carrier to the Landlord.

8.5 Tenant shall comply, at its sole expense, with all of the terms and conditions of all Policies. The Tenant shall deliver to Landlord certificates evidencing the coverage required by the Policies at least thirty (30) days before the earlier of the expiration of the existing insurance period or the due date for all premiums for the renewal of such Policies. In the event Tenant fails to deliver the requisite certificates to Landlord before the applicable delivery dates, Landlord agrees to provide Tenant with written notice of such failure, and Tenant shall have twenty (20) days following the applicable delivery due date to deliver to Landlord the requisite certificates. In the event Tenant still fails to deliver the requisite certificates on or before the twentieth (20th) day following the applicable delivery due date, Landlord shall have the right to purchase, at the expense of Tenant, any substitute or replacement insurance for such Policies. Any such amount paid by Landlord shall constitute Additional Rent hereunder.

## ARTICLE 9 - REPLACEMENT OF IMPROVEMENTS; APPLICATION OF INSURANCE PROCEEDS THERETO

9.1 In case the Building in which the Premises is situated shall be partially or totally destroyed by fire or other casualty so as to become partially or totally untenantable, the same shall be repaired as speedily as possible at the expense of Landlord, to the extent of insurance proceeds available, unless the Tenant shall elect to terminate the Lease.

## ARTICLE 10 - REPAIR AND MAINTENANCE

10.1 During the Term, the Tenant shall, at it's expense, keep and maintain the interior of the Premises in good order and repair including, but not limited to, the interior walls and floors of the Premises as well as the front entry area to the Premises and the loading area allocated for the use of the Tenant. The sidewalk shall be clean and reasonably free from rubbish at all times.

10.2 During the Term, the Landlord, at it's sole expense, shall be responsible for all structural repairs or replacements pertaining to the building, the exterior walls (excluding painting), the roof and the HVAC and electrical equipment providing heat, air conditioning and lighting for the Premises.

## ARTICLE 11 - QUIET POSSESSION

11.1 It is a further condition of this Lease the Landlord has good and marketable title to the Premises free and clear of all liens and encumbrances set out in Exhibit C; that Landlord has the right to lease the same; that the Premises has unencumbered access to the public rights of way over existing curb cuts on the Premises or over unencumbered private easements; that Landlord warrants and will defend the Premises unto Tenant against the lawful claims of all persons whomsoever; that so

long as the rents are paid in the manner herein provided and the covenants, conditions, and agreements are all and singularly kept, fulfilled, and performed by Tenant. Tenant shall lawfully, peacefully, and quietly hold, occupy, and enjoy the Premises during the Term herein granted without any, hindrance, ejection, or molestation by Landlord or any person claiming under Landlord.

## ARTICLE 12 - RIGHT OF ENTRY

12.1 Landlord reserves the right during the Term of this Lease to enter the Premises at reasonable hours upon prior reasonable notice (except in the event of emergency, meaning imminent threat of injury to person or damage to property, in which event no prior notice shall be necessary) to inspect the same, but has no obligation to make an inspection of the Premises.

## ARTICLE 13 – SUBLETTING AND ASSIGNMENT

13.1 Tenant may sublet the Premises or assign this Lease only with the prior written consent of Landlord, such consent not to be unreasonably withheld, conditioned, or delayed.

13.2 Notwithstanding anything hereinabove contained to the contraly, provided there is no uncured Event of Default (as hereinafter defined) under this Lease, Tenant may, without Landlord's consent, (a) assign, transfer, or sublet it's leasehold interest to a corporation, partnership, limited liability company, or other entity more than fifty percent (50%) of the ownership of which is owned by Tenant, or to a corporation, partnership, limited liability company, or other entity which owns more than fifty percent (50%) of the ownership interest in Tenant, (b) assign its interest in this Lease as collateral in connection with financing of equipment, fixtures, appliances, machinery, or furnishings to be used in connection with its business on the Premises, (c) assign or mortgage this Lease or interest therein as collateral in connection with any of Tenant's financing or refinancing, or (d) with Landlord's prior written consent which shall not be unreasonably withheld, assign its leasehold interest or sublet the Premises in connection with a sale of all or substantially all of the assets of Tenant. Moreover the sale, pledge, or other transfer or conveyance of Tenant's capital stock shall not be construed as an assignment by Tenant of it's interest in this Lease. Tenant shall notify Landlord in writing of the occurrence of any of the foregoing events, and shall provide a true and correct copy of the sublease or assignment and assumption agreement, together with such other documentation supporting or evidencing said event as may be reasonably requested by Landlord.

13.3 Landlord shall execute and deliver to Tenant, within thirty (30) days after receipt of Tenant's request, an estoppel certificate or other statement to be furnished to any prospective assignee, sublessee, or lender of Tenant. Such estoppel certificate or statement shall acknowledge and certify each of the following matters, to the extent each may be true: (a) whether there have been any amendments, modifications, or supplements of any kind to the Lease; (b) that this Lease is in full force and effect; (c) that Tenant is not in violation of or in default under this Lease beyond any applicable grace or

cure period and that Landlord has no claims against Tenant thereunder; (d) the commencement and expiration dates (including all renewals and extensions) of the Term of this Lease; (e) the date through which Rent has been paid; (f) that Landlord consents to such assignment or subletting (if such consent has been given); and (g) such other matters as Tenant or its assignee, sublessee, or mortgagee may reasonably request.

13.4 No such sublease or assignment hereunder, however effected, shall affect or reduce any obligations of Tenant, or the rights of Landlord hereunder, and all obligations of Tenant hereunder shall continue in full effect as the obligations of a principal and not of a guarantor or surety, as though no sublease or assignment had been made.

## ARTICLE 14 - SURRENDER UPON TERMINATION OF LEASE

14.1 Tenant shall, on the expiration or the sooner termination of the Term of this Lease, surrender to Landlord the Premises, including all buildings, replacements, changes, additions, and Improvements constructed or placed by Tenant thereon, except for Tenant's Personal Property, broom- clean, free of subtenancies, and in good condition and repair, reasonable wear and tear and insured casualty excepted. Any equipment, trade fixtures, or personal property belonging to Tenant or any sub-tenant, if not removed upon such expiration or termination, shall automatically become the property of Landlord without any payment or offset therefore and Tenant shall thereafter be relieved of any and all responsibility in connection with said equipment. If said equipment is removed, Tenant promptly shall restore the Premises to their condition immediately prior to the removal of such property to the extent commercially practicable.

14.2 At or prior to expiration or termination of the Term of this Lease, Tenant shall have the right, but not the obligation, to remove any exterior signage or architectural design which is a trademark, logo, or identifying feature of Tenant's business or any other trademark, logo, or identifying feature owned by Tenant or any of its affiliates or subsidiaries. If said signage or architectural designs are removed, Tenant, at its own expense, promptly shall repair and restore the Premises to its condition immediately prior to the removal of such signage or architectural designs to the extent commercially practicable.

## ARTICLE 15 - DEFAULT BY TENANT

15.1 The occurrence of any of the following events (each an "Event of Default" after expiration of any applicable cure period) shall constitute a default by Tenant. Any of the following occurrences or acts shall constitute an "Event of Default" under this Lease:

(i) If Tenant:

(A) Defaults in paying any installment of Basic Rent, Additional Rent or Rental Expense and such default continues for five (5) days after Tenant receives notice of such default from Landlord;

(B) Fails to keep in full force and effect any insurance coverage required to be maintained by Tenant hereunder; or

(C) Fails to timely pay any taxes other costs for which it is obligated under this Lease when due but subject to Tenant's right to contest property valuation as provided in this Lease:

(ii) If Tenant defaults in the performance of any other covenant, agreement or obligation on the part of Tenant to be performed under this Lease and such default continues uncured for a period of thirty (30) days after the earlier of the date Landlord gives Tenant written notice of such default or the date Tenant otherwise learned of the default, provided, however, that in the case of a default which Tenant is able to remedy with reasonable diligence, but not within a period of thirty (30) days, if Tenant commences within such period of thirty (30) days to remedy the default and thereafter prosecutes the remedying of such default with commercially reasonable diligence, the period of time after learning of such default within which to remedy the default shall be extended for such period not to exceed an additional sixty (60) days as may be reasonable to remedy the same with commercially reasonable diligence; or

(iii) If Tenant files a petition of bankruptcy or for reorganization or for an arrangement pursuant to the Bankruptcy Code, or is adjudicated a bankrupt or becomes insolvent or makes an assignment for the benefit of its creditors, or admits in writing its inability to pay its debts generally as they become due, or is dissolved, or suspends payment of its obligations, or takes any corporate action in furtherance of any of the foregoing; or

(iv) If a petition or answer is filed proposing the adjudication of Tenant as a bankrupt, or its reorganization pursuant to the Bankruptcy Code, and (A) Tenant consents to the filing thereof, or (B) such petition or answer is not discharged or denied within ninety (90) days after the filing thereof; or

(v) If a receiver, trustee or liquidator (or other similar official) is appointed for or takes possession or charge of Tenant, or Tenant's estate or interest in all or any portion of the Property, and is not discharged within ninety (90) days thereafter, or if Tenant consents to or acquiesces in such appointment; or

(vi) If the Property is left unattended, unsecured and without maintenance and the Property remains unattended, unsecured and without maintenance for a period of five (5) days following written notice of such condition from Landlord.

15.2 Failure by Tenant to pay rent when due. Notwithstanding the foregoing, or any other provision in this Lease to the contrary, if any rental is not received when due, Landlord shall notify Tenant, in writing, and Tenant shall have 10 days from the date of receipt of Landlord's notice to cure any such failure to pay rental. If such rental is not received by Landlord within the 10 day period after Tenant's receipt of Landlord's notice, then Tenant shall be in default. If an Event of Default shall occur and be continuing, Landlord shall have the option to do any one of the following without any notice or demand, in addition to and not in limitation of any other remedies permitted by law or this Lease, including by way of example and no limitation, seeking specific performance:

(i)     Maintain the Lease in full force and effect, and have the right to sue Tenant for the recovery of monthly Basic Rent, Additional Rent and Rental Expense as same becomes due for and during the entire unexpired portion of the Term of the Lease. If it is necessary for Landlord to bring suit against Tenant in order to collect such sums, Landlord has the right to allow monthly Basic Rent and Additional Rent charges to accumulate and to bring an action on several or all of the accrued Basic Rent, Additional Rent and/or Rental Expense charges due at any one time.   Any such suit shall not prejudice the right of Landlord to bring a similar action for any subsequent Basic Rent, Additional Rent and/or Rental Expense as it falls due.

(ii)     Terminate Tenant's rights under this Lease (but not its obligations) and repossess the Property.   In such event, Landlord shall have the right to immediate possession of the Property and may re-enter the Property, change the locks and remove all persons and property therefrom without being guilty in any manner of trespass or otherwise; and any and all damages to Tenant, or persons holding under Tenant, by reason of such re-entry are hereby expressly waived; and any such termination of Tenant's rights under the Lease or re-entry on the part of Landlord shall be without prejudice to any remedy available to Landlord for arrears of Basic , Additional Rent breach of contract, damages or otherwise, nor shall the termination of  Tenant's rights under this Lease by Landlord acting under this subsection be deemed in any manner to relieve Tenant from the obligation to pay the Basic Rent, Additional Rent and/or Rental Expense when due or to become due as provided in this Lease for and during the entire unexpired portion (or what would have been the entire unexpired portion) of the Term (including the Renewal Terms). In the event of termination of  Tenant's rights under this Lease and repossession by Landlord as provided in this subsection, Landlord shall have the further right, but not the obligation, to:

(A)     Tenant shall pay as damages to Landlord, upon any such termination of Tenant's rights under this Lease, such sum as at the time of such termination of Tenant's rights equals the amount of the excess, if any, of the then present value of all the Basic Rent, Additional Rent and Rental Expense which would have been due and payable hereunder during the entire unexpired portion (or what would have been the entire unexpired portion) of the Term of this Lease over and above the then present rental value of the Property (in its AS IS condition) for the same period.  For purposes of present value calculations, Landlord and Tenant stipulate and agree to a discount rate equal to [six percent (6%)] per annum, as of the date Tenant's rights under this Lease, is or are terminated.

15.3  No receipt of moneys by Landlord from Tenant after a termination of this Lease by Landlord shall reinstate, continue or extend the Term of this Lease or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payments due under paragraph 15.2 of this Article 15.   After the commencement of suit for possession of the Property, Landlord may demand, receive and collect any moneys due or thereafter falling due without in any manner affecting such suit, order or judgment.  Tenant hereby waives any and all rights of redemption provided by any law, statute or ordinance now in effect or which may hereafter be enacted.

15.4  The word "re-enter", as used in this Lease, shall not be restricted to its technical legal meaning, but is used in the broadest sense.  No such taking of possession

of the Property by Landlord shall constitute an election to terminate the Term of this Lease unless notice of such intention is given to Tenant or unless a court decrees such termination.

15.5  No right or remedy herein conferred upon or reserved to Landlord is intended to be exclusive of any other right or remedy, and every right and remedy shall be cumulative and in addition to any other legal or equitable right or remedy given hereunder, or at any time existing.  The failure of Landlord to insist upon the strict performance of any provision or to exercise any option, right, power or remedy contained in this Lease shall not be construed as a waiver or a relinquishment thereof for the future. Receipt by Landlord of any Basic Rent or Additional Rent or any other sum payable hereunder with knowledge of the breach of any provision contained in this Lease, may cure a then existing Event of Default, but in no event shall such receipt constitute a waiver of such breach and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless made under signature of an authorized representative of Landlord.

## ARTICLE 16 — DEFAULT BY LANDLORD

16.1  Landlord shall be in default if Landlord fails to perform any provision of this Lease required of it and the failure is not cured within thirty (30) days after Landlord's receipt of notice from Tenant describing such failure. If, however, the failure cannot reasonably be cured within the cure period, Landlord shall not be in default under this Lease if Landlord commences to cure the failure within the cure period and diligently and in good faith continues to cure the failure. Notices given under this Article shall specify the alleged breach and the applicable Lease provisions. If Landlord shall at any time be in default beyond the applicable notice and cure period, Tenant shall, at its option, have the right to cure such default on Landlord's behalf, or the right to terminate this Lease Agreement. Any sums expended by Tenant in so doing, and all reasonably necessary incidental costs and expenses incurred in connection therewith, including reasonable attorneys' fees, shall be payable by Landlord to Tenant within thirty (30) days following demand by Tenant, and if Landlord shall not have paid such sums to Tenant within ninety (90) days after demand, Tenant shall be entitled to deduct or offset such sums against any rent otherwise payable to Landlord under this Lease.

## ARTICLE 17 — CONDEMNATION

17.1  If the whole of the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding, all rent shall be paid up to that date, and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease, except to the extent that Landlord recovers all or some portion of the value of the leasehold interest as compensation for the Premises acquired or condemned.

17.2  If a part of the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, and in the event that such partial taking shall be so extensive that the Tenant is unable to operate in the remainder

substantially the business being conducted on the Premises immediately prior to such taking, then from the day of such taking and for a period of ten (10) days thereafter. Tenant shall have the right either to terminate this Lease and declare the same null and void by giving written notice thereof within said period to the Landlord or, alternatively, to continue in the possession of the remainder of the Premises under the terms herein provided, except that the minimum rent shall be reduced in such just proportion as the nature, value and extent of the part so taken bears to the whole of the Premises.

## ARTICLE 18 - RIGHT OF FIRST REFUSAL

18.1 If Landlord, at any time during the Term receives any bona fide offer from a third party to purchase the Property upon which the Premises is located, which offer Landlord in good faith intends to accept, Landlord shall notify Tenant in writing, giving the name and address of the offeror and the price, terms, and conditions of such offer, and shall supply Tenant with a copy of the offer. Tenant shall have ten (10) business days from and after the receipt of such notice from Landlord in which to elect to purchase the Property on the terms and conditions contained in said bona fide offer. If Tenant does not elect to purchase, and Landlord sells the Premises to the third party making such offer, then the purchaser shall take the Property and the Premises subject to and burdened with all the terms, provisions, and conditions of this Lease, and the rights of Tenant under this Lease (including, without limitation, this right of first refusal) as against the new owner shall not be lessened or diminished by reason of the change of ownership. If Tenant purchases the Property, then contemporaneously with the conveyance of the property to Tenant this Lease shall terminate, without further notice; Tenant shall thereupon be released and discharged from all future rentals and other obligations on the part of Tenant to be paid, kept, and performed; and the parties thereafter shall be released from all liabilities and obligations under this Lease with respect to the Premises.

18.2 In addition to the Right of First Refusal described above the Landlord hereby also grants a Right of First Refusal to Tenant pertaining to the Liquor Store Lease regarding Unit B of the Building. The Right of First Refusal pertaining to Liquor Store Lease shall be subject to the same terms and conditions set forth above relative to the Right of First Refusal concerning the Property. Specifically, in the event the Liquor Store becomes available at any time or in the event of default by the Tenant or in the event of expiration of the Lease or sublease of the Lease the Tenant shall have the right to exercise it's Right of First Refusal on the same terms and conditions that may be offered by a bona fide third party or as may be negotiated by and between the Landlord and the Tenant. Tenant shall have the option, within 30 days of notice, to be assigned the liquor store lease (attached hereto as Exhibit "E") in the event the liquor store tenant defaults or leaves through a negotiated departure.

## ARTICLE 19 - SUBORDINATION, ATTORNMENT, AND ESTOPPEL

19.1 Subject to and conditioned upon the full satisfaction of all other provisions of this Lease, this Lease and the leasehold estate created hereby shall be, at the option and upon written declaration of Landlord, subject, subordinate, and inferior to the lien and estate of any mortgage and all renewals, extensions, or replacements thereof,

now or hereafter imposed by Landlord upon the Premises; provided, however, that this Lease shall not be subordinate to any mortgage or any renewal, extension, or replacement thereof, unless and until Landlord provides Tenant with an agreement (the "Non- Disturbance Agreement"), signed and acknowledged by each holder of any such mortgage setting forth that so long as no Event of Default has occurred, Landlord's and Tenant's rights and obligations hereunder shall remain in force and Tenant's right to possession shall be upheld. Tenant shall, promptly following a request by Landlord and after receipt of the Non-Disturbance Agreement, execute and acknowledge any subordination agreement or other documents reasonably required to establish of record the priority of any such encumbrance over this Lease, so long as such agreement does not otherwise increase Tenant's obligations or diminish Tenant's rights hereunder.

19.2 In the event of foreclosure of any mortgage, whether superior or subordinate to this Lease, then (i) this Lease shall continue in force; (ii) Tenant's quiet possession shall not be disturbed so long as no Event of Default has occurred; (iii) Tenant shall attorn to and recognize the mortgagee or purchaser at foreclosure sale (the "Successor Landlord") as Tenant's landlord for the remaining Term of this Lease.

19.3 Tenant shall execute and deliver to Landlord, within thirty (30) days after receipt of Landlord's request, any estoppel certificate or other statement to be furnished to any prospective purchaser of or any lender against the Premises. Such estoppel certificate shall acknowledge and certify each of the following matters, to the extent each may be true: (i) the commencement and termination dates of the Term; iii) that Tenant is paying rent on a current basis; (iii) that this Lease constitutes the entire agreement between Tenant and Landlord relating to the Premises; (iv) that Tenant has accepted the Premises and is in possession thereof; (v) that this Lease has not been modified, altered, or amended except in specified respects by specified instruments.

## ARTICLE 20 — NOTICES

20.1 Any notice or communication to be given under this Lease shall be in writing and shall be deemed to have been given: (i) when delivered, if delivered by hand, (ii) five (5) days after being deposited in the United States Post Office, certified mail, postage prepaid, return receipt requested, if mailed, or (iii) on the day after deposit with any nationally or regionally recognized overnight courier service which requires proof of delivery. Notices shall be addressed as follows:

By Tenant to Landlord:

500 S. Lincoln LLC
c/o Jon Peddie
P.O. Box 882978
1065 Crawford Avenue
Steamboat Springs, CO 80488

500 S. Lincoln LLC
c/o James C. Woods
POB 9911
Denver, Co. 80209
10 Black Bear Lane
Littleton, Co. 80127

By Landlord to Tenant:

Western Convenience Stores Inc.
9849 E. Easter Ave
Centennial, CO 80112

20.2 The parties have the right from time to time to change their respective addresses by giving at least five (5) days written notice to the other party in accordance with the foregoing procedures for giving notice, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

## ARTICLE 21- GENERAL PROVISIONS

21.1 Personal Property and Inventory. On execution of this Lease by Landlord and Tenant the Parties shall determine the Inventory and Personal Property (if any) to be purchased by the Tenant. Upon such determination and agreement upon the purchase price the Tenant shall tender to Landlord the amount due and owing within 2 days of the Effective Date of this Lease.

21.2 Binding Effect. The provisions of this Lease shall be binding on and inure to the benefit of the parties hereto, their legal representatives, successors, and permitted assigns and sublessees.

21.3 Whole Agreement. This Lease contains all of the agreements and representations between the parties with respect to the subject matter hereof. None of the terms of this Lease shall be waived or modified to any extent, except by written instrument signed and delivered by both parties.

21.4 Duplicate Counterparts. This Lease may be executed in one or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

21.5 Governing Law. This Lease shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado.

21.6 Amendments of Modifications. No amendment or modification of this Lease or any approvals or permissions of the Landlord required under this Lease shall be valid or binding unless reduced in writing and executed by the parties hereto in the same manner as the execution of this Lease.

21.7 Force Majeure. Whenever a period of time is herein provided for either party to do or perform any act or thing, there shall be excluded from the computation of such period of time any delays due to strikes, riots, acts of God, shortages of labor or any cause or causes, whether or not similar to those enumerated, beyond the parties' reasonable control or the reasonable control of their agents, servants, employees and contractor engaged by them to perform work in connection with this Lease.

21.8 Reimbursement of Attorney Fees and Costs. In the event either party takes legal action against the other in order to enforce the terms of this Lease, the party in whose favor final judgment is entered shall be entitled to recover from the other party its reasonable attorney fees and costs.

21.9 Easements. The Landlord shall have the right to grant, any easement on, over, under and above the Premises for such purpose as Landlord determines, provided that such easement will not materially interfere with Tenant's business.

21.10 Time of the Essence. Time is of the essence hereof, and each party shall perform its obligations and conditions hereunder within the time hereby required.

21.11 Unenforceability. If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

Executed this _____ of September, 2010

Landlord:

500 S. Lincoln LLC

By _____
It's Manager

Tenant:

Western Convenience Stores Inc.

By _____
It's President

Exhibit A
LEGAL DESCRIPTION

A part of the SE1/4SE1/4 of Section 17, Township 6 North, Range 84 West, of the 6th P.M., bounded by a line described as follows:

Beginning at a point on the East line of said Section from which the Southeast corner thereof bears S 00"05'00" W 1230.2 feet;
thence S 00'05'00" W along said East line, 205.2 feet;
thence N 86'17'00" W 246.5 feet, more or less, to a point on the Easterly right of way line of U.S. Highway 40;
thence Northerly along said right of way line, 190 feet, more or less, to a pint from which the point of beginning bears S 89'55'00" E;
thence S 89'55'00" E 246 feet to the point of beginning;

LESS AND EXCEPT that part thereof known as Fox Creek according to the plat recorded April 26, 1995 at File No. 12196.

COUNTY OF ROUTT, STATE OF COLORADO

Exhibit A-1
Parking Allocation



24 PARKING STALLS REQ'D

I T E   P L A N

MOND SHAMROCK RENOVATION
South Lincoln Avenue

ovember 1997

WEST ELEVATION
737 Lincoln Avenue
Steamboat Springs
970.879.2020

Exhibit B
Schedule of Rents

| Base Term Year | 1 | $5,000.00 | $60.000.00 |
|---|---|---|---|
| | 2 | $5,150.00 | $61.800.00 |
| | 3 | $5,304.50 | $63.654.00 |
| | 4 | $5,463.64 | $65.563.62 |
| | 5 | $5,627.54 | $67,530.53 |
| | 6 | $5,796.37 | $69,556.44 |
| | 7 | $5,970.26 | $71,643.14 |
| | 8 | $6,149.37 | $73,792.43 |
| | 9 | $6,633.85 | $76,006.20 |
| | 10 | $6,523.87 | $78,286.39 |

| 1st Renewal Term | 1 | $6,179.58 | $80,634.98 |
|---|---|---|---|
| | 2 | $6,921.17 | $83,054.03 |
| | 3 | $7,128.80 | $85,545.65 |
| | 4 | $7,342.67 | $88,112.02 |
| | 5 | $7,562.95 | $90,755.38 |

| 2nd Renewal Term | 1 | $7,789.84 | $93,478.04 |
|---|---|---|---|
| | 2 | $8,023.53 | $96,282.39 |
| | 3 | $8,264.24 | $99,170.86 |
| | 4 | $8,512.17 | $102,145.98 |
| | 5 | $8,767.53 | $105,210.36 |

EXHIBIT "C"

Updated title commitment (to be attached)

# stewart title

## WRITTEN OWNERSHIP AND ENCUMBRANCE REPORT

Order No. 926902                                   Date: 4/6/2010

Customer Ref.: 500 South Lincoln Avenue

### LEGAL DESCRIPTION:

SEE ATTACHED LEGAL DESCRIPTION

### APPARENT OWNER OF RECORD:

500 S. Lincoln LLC, a Colorado limited liability company

### Deeds of Trust, Mortgages and Liens which purport to affect the above described property, as disclosed by the records of the Clerk and Recorder of Routt County, Colorado between the effective dates of January 31, 1997 to March 18, 2010:

1.  SEE ATTACHED

The liability of Stewart Title, its affiliates and associates, for any errors or omissions affecting or relating to the information appearing in this report is strictly limited to the amount paid for this report. The aforementioned liability is limited to the customer who ordered this report. There are no expressed or implied warranties assuring or representing that this report is reliable for title information and, therefore, should be verified by a Commitment for Title Insurance.

No representation is made as to the completeness, validity, or legal sufficiency of the documents referenced herein, nor have any of such documents been examined to determine whether or not there are any exceptions, reservations, encumbrances or other matters which might be detrimental to Title.

No search has been made for any reservations, restrictions, covenants, easements, rights of way, mineral interests, water rights, and any other encumbrances which are not a deed of trust, mortgage or lien.

_Melanie Lang_
Authorized Representative

MELANIE LANG
Authorized Representative of Stewart Title

# stewart title

Exhibit A
LEGAL DESCRIPTION

File Number: 926002

A part of the SE1/4SE1/4 of Section 17, Township 6 North, Range 84 West, of the 6th P.M., bounded by a line described as follows:

Beginning at a point on the East line of said Section from which the Southeast corner thereof bears S 00°05'00" W 1230.2 feet;
thence S 00°05'00" W along said East line, 205.2 feet;
thence N 86°17'00" W 246.5 feet, more or less, to a point on the Easterly right of way line of U.S. Highway 40;
thence Northerly along said right of way line, 190 feet, more or less, to a point from which the point of beginning bears S 89°55'00" E;
thence S 89°55'00" E 246 feet to the point of beginning;

LESS AND EXCEPT that part thereof known as Fox Creek according to the plat recorded April 26, 1995 at File No. 12196.

COUNTY OF ROUTT, STATE OF COLORADO

# stewart title

EXHIBIT B

Order No.: 92n902

A Deed of Trust dated April 27, 2005, executed by 500 S. Lincoln, LLC, to the Public Trustee, to secure an indebtedness of $1,604,641.64 in favor of Vectra Bank Colorado, National Association recorded May 2, 2005 as Reception No. 617970.

Assignment of Rents recorded May 2, 2005 as Reception No. 617971.

Financing Statement from 500 S. Lincoln, LLC, debtor(s) to Vectra Bank Colorado, National Association secured party, recorded May 2, 2005 as Reception No. 617972, giving notice of a security interest pursuant to the Uniform Commercial Code.

A Deed of Trust dated July 13, 2007, executed by 500 S. Lincoln, LLC, to the Public Trustee, to secure an indebtedness of $500,000.00 in favor of Vectra Bank Colorado, National Association recorded July 25, 2007 as Reception No. 661075.

Assignment of Rents recorded July 25, 2007 as Reception No. 661076.

EXHIBIT "D"

Common expense Calculation

| Tenant | | % of total | Category 1 | Category 2 |
|--------|--------|-----------|-----------|-----------|
| C-Store | 2,100 | 22.53% | 50.43% | 70.84% |
| Canapy | 2,600 | 27.90% | | |
| | | | | |
| Liquor Store | 1,580 | 16.95% | 16.95% | 25.16% |
| Auto Shop | 3,040 | 32.62% | 32.62% | |
| | | | | |
| | 9,320 | | 100.00% | 100.00% |

Category 1 expenses – Site maintenance
      Property tax, landscape maint/repair, snow, trash, driveway maintenance and related expenses that are not separately billed

Category 2 expenses – Front Building Specific
      Sewer/water, gas, exterior maintenance of the structure, roof (excluding major repairs or replacement) and all utility charges i.e. HVAC and electricity.

EXHIBIT "E"

Steamboat Discount Liquor lease (to be attached)