UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                          )
                                                )        Case No. 15-23977-TBM
WESTERN CONVENIENCE STORES, INC. )
EIN: 84-1160742                                 )        Chapter 11
                                                )
        Debtor.                                 )

## MOTION TO ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH CICCARELLI ENTERPRISES, LLLP

The Debtor, Western Convenience Stores, Inc. ("Debtor"), by and through its attorneys, Kutner Brinen, P.C., respectfully moves this Court for entry of an order pursuant to 11 U.S.C. §365(a) and Bankruptcy Rules 6006 and 9014 authorizing the Debtor's assumption of a nonresidential real property Lease Agreement with Ciccarelli Enterprises, LLLP ("Landlord"), and as grounds therefor, state as follows:

1.      The Debtor filed its voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code on December 28, 2015 ("Petition Date"). The Debtor remains a debtor-in-possession.

2.      The Debtor is the operator of a chain of 44 convenience stores that sell gasoline, snack foods, and related products throughout Colorado and Nebraska.

3.      The Debtor entered into a pre-petition Lease Agreement (together with all attachments thereto, the "Lease") dated April 17, 2008 with Landlord for the premises located at 12702 Lowell Boulevard, Broomfield, Colorado ("Premises"). The Debtor leases real property and improvements consisting of a gas station and convenience store.

4.      The initial Lease term was from June 1, 2008 through June 30, 2013. Pursuant to the terms of the Lease, the Lease automatically renewed for an additional five (5) period, extending the Lease though June 30, 2018. The Lease further provides two additional automatic renewals of five (5) years, extending the Lease through June 30, 2033, unless the Debtor gives written notice of its intent not to renew the Lease. A copy of the Lease is attached hereto as Exhibit A.

5.   Bankruptcy Code § 365(d)(4)(A) provides that the Debtor shall surrender any non-residential real property unless it assumes the governing lease the earlier of the date that is 120 days after the Petition Date or the date on which a plan is confirmed.

6.   On April 26, 2016, the Court entered an Order extending the time by which the Debtor was required to assume or reject its nonresidential real property leases by ninety (90) days, through and including July 25, 2016.

7.   The Debtor, in exercising its business judgment, has concluded that the Lease provides a benefit to the Debtor, the estate, and its reorganization effort, and therefore seeks to assume the Lease pursuant to section 365(a) of the Bankruptcy Code.  The terms of the Lease are fair and will provide the Debtor with the ability to maintain its operations at the same location at least through June 30, 2018.

8.   The monthly rent for the Premises is $3,320.00, and increases on a yearly basis as set forth on Exhibit B to the Lease.  The Debtor can afford the rent on the Premises, and the rent is reasonable for the size and location of the Premises

9.   Assumption or rejection of executory contracts or unexpired leases by a debtor is subject to Court review under the business judgment standard.  See *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Mile High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986).

10.   Pursuant to the business judgment test, the debtor's decision to assume or reject an executory contract or an unexpired lease should be approved when the debtor decides, in good faith, that assumption or rejection is beneficial to the estate.  *In re Chipwich, Inc.*, 54 B.R. 427, 430-431 (Bankr. S.D.N.Y. 1985) ("it is enough, if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate").  Under Section 365(a), "the debtor's business judgment should not be interfered with, absent a showing of bad faith or abuse of business discretion."  *Chipwich, Inc.,* 54 B.R. 430-31.  As stated by one court, "Court approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course."  *Summit Land Co. v. Allen (In re Summit Land Co.),* 13 B.R. 310, 315 (Bankr. D. Utah 1981).

11.   Assumption of the Lease is in the best interest of the Debtor, its creditors and the estate.  The Lease provides a benefit to the estate because it will allow the Debtor to continue to operate in the Premises without the disruption that would be caused by moving its operations and

inventory. Additionally, the Premises has fixtures, including gas pumps, that are necessary for the Debtor's operations. If the Lease terminates and the Debtor is forced to vacate the Premises, the Debtor will be forced to either permanently close that location, or expend substantial funds to find a new premises with the necessary fixtures for the Debtor's operations.

12.     The Debtor is current on all lease payments, and the Landlord does not have a pre-petition claim against the Debtor[1]. As a result, no cure is necessary at the time of assumption.

WHEREFORE, the Debtor prays that the Court enter an Order authorizing the assumption of the Lease, and for such further and additional relief as to the Court may deem proper.

Dated: June 9, 2016                  Respectfully submitted,

                                     By: _s/ Keri L. Riley_____
                                         Lee M. Kutner, #10966
                                         Keri L. Riley, #47605
                                         **KUTNER BRINEN, P.C.**
                                         1660 Lincoln St. Suite 1850
                                         Denver, CO 80264
                                         Telephone: (303) 832-2400
                                         Telecopy: (303) 832-1510
                                         E-Mail: klr@kutnerlaw.com

---

[1] Landlord was included on Debtor's Schedule F with a pre-petition claim in the amount of $5,254.15  In fact, this amount was not due until January 1, 2016, and was therefore paid post-petition in the ordinary course of business.

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 9, 2016, I served by prepaid first class mail a copy of the foregoing **MOTION TO ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH CICCARELLI ENTERPRISES, LLLP AND NOTICE OF MOTION TO ASSUME NONRESIDENTIAL REAL PROPERTY LEASE AGREEMENT WITH CICCARELLI ENTERPRISES, LLLP** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED. R. BANKR. P. and these L.B.R. at the following addresses:

Ciccarelli Enterprises, LLLP
1010 Pikeview Street
Lakewood, CO 80215

Donna Ciccarelli
Registered Agent
Ciccarelli Enterprises, LLLP
1010 Pikeview Street
Lakewood, CO 80215

Kubat Equipment and Service Co.
ATTN: Craig Hoyer
1070 South Galapago Street
Denver, CO 80223

PepsiCo, Inc.
ATTN: Conrad Ragan
1100 Reynolds Blvd.
Winston-Salem, NC 27105

Harpel Oil Company
ATTN: Douglas C. Harpel
5480 Brighton Blvd.
Commerce City, CO 80022

Alan K. Motes, Esq.
U.S. Trustee's Office
1961 Stout Street
Suite 12-200
Denver, CO 80294

Philip A. Pearlman, Esq.
Jamie N. Cotter, Esq.
Spencer Fane, LLP
1700 Lincoln Street
Suite 2000
Denver, CO 80203

John O'Brien, Esq.
Snell & Wilmer, LLP
1200 Seventeenth Street
Suite 1900
Denver, CO 80202-5854

Craig K. Schuenemann, Esq.
Bryan Cave, LLP
1700 Lincoln Street
Suite 4100
Denver, CO 80203-4541

Mark G. Stingley, Esq.
William J. Maloney, Esq.
Bryan Cave, LLP
1200 Main Street
Suite 3800
Kansas City, Missouri 64105

Adam L. Hirsch, Esq.
Kutak Rock, LLP
1801 California Street
Suite 3000
Denver, CO 80202-2658

Erica F. Houck Englert, Esq.
1801 California Street
Suite 3400
Denver, CO 80202

James B. Holden, Esq.
Lynda L. Atkins, Esq.
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 8th Floor
Denver, CO 80203

Gregory G. Hesse, Esq.
Hunton & Williams, LLP
1445 Ross Avenue
Suite 3700
Dallas, Texas 75202-2799

Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Suite 2200
Denver, CO 80202

Paul G. Urtz, Esq.
Miller & Urtz, LLC
1660 Lincoln Street
Suite 2850
Denver, CO 80264

Darryl S. Laddin, Esq.
Frank N. White, Esq.
Arnall Golden Gregory, LLP
171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363-1031

Samuel M. Kidder, Esq.
Brownstein Hyatt Farber Schreck, LLP
410 17th Street, Suite 2200
Denver, CO 80202-4432

Robert A. Kumin, Esq.
Scott S. Kleypas, Esq.
Robert A. Kumin, P.C.
6901 Shawnee Mission Parkway
Suite 250
Overland Park, KS 66202

Scott A. Clark, Esq.
Burns, Figa & Will, P.C.
Plaza Tower One, Suite 1000
6400 South Fiddlers Green Circle
Greenwood Village, CO 80111

Neal K. Dunning, Esq.
Brown, Berardini, Dunning & Walker, P.C.
2000 South Colorado Boulevard
Tower Two, Suite 700
Denver, CO 80222

Douglas D. Koktavy, Esq.
Douglas D. Koktavy, P.C.
Building B, Suite 120
10200 East Girard Avenue
Denver, CO 80231

Ronald E. Gold, Esq.
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45208

Peter W. Ito, Esq.
ITO Law Group, LLC
1550 Larimer Street
Suite 667
Denver, CO 80202

Jeffrey N. Pomerantz, Esq.
Jeffrey W. Dulberg, Esq.
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067-4100

Gregory S. Bell, Esq.
Bell, Gould, Linder & Scott, P.C.
322 East Oak Street
Fort Collins, CO 80524

NRC Realty & Capital Advisors, LLC
8601 North Scottsdale Road
Suite 310
Scottsdale, AZ 85253

Joseph D. Frank, Esq.
Jeremy C. Kleinman, Esq.
Frank Gecker, LLP
325 North LaSalle Street
Suite 625
Chicago, IL 60654

Soukup Bush & Associates, P.C.
2032 Caribou Drive
Suite 200
Fort Collins, CO 80525

Darryl S. Laddin, Esq.
Frank N. White, Esq.
Arnall Golden Gregory, LLP
171 17th Street NW
Suite 2100
Atlanta, Georgia 30363-1031

Mark Ralston, Esq.
Fishman Jackson, PLLC
13155 Noel Road
Suite 700
Dallas, Texas 75240

A Troy Ciccarelli, Esq.
Ciccarelli & Associates, P.C.
2616 West Alamo Avenue
Littleton, CO 80120

Matthew A. Gold, Esq.
Argo Partners
12 West 37th Street
9th Floor
New York, NY 10018

David J. Lisko, Esq.
633 17th Street
Suite 2300
Denver, CO 80202

Susan L. Martineau, Esq.
12151 Spruce Street
Thornton, CO 80602

Springer & Steinberg, P.C.
1600 Broadway Street
Denver, CO 80202

Vicky Martina

#140

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into as of this 17th day of April, 2008, by and between Ciccarelli Enterprises, LLLP, a Colorado Limited Liability Limited Partnership (the "Landlord"), and Western Convenience Stores, Inc., a Colorado Corporation (the "Tenant").

Landlord and Tenant covenant and agree as follows:

### ARTICLE 1 - PREMISES

1.1  In consideration of the rents, terms, covenants, and agreements set forth in this Lease to be paid, kept, and performed, Landlord grants, demises, and leases to Tenant, and Tenant hereby takes, rents, and leases from Landlord, on the terms, covenants, provisions, and agreements provided in this Lease, the Premises (as hereinafter defined).

1.2  Landlord is seized and possessed of a fee simple title to a certain tract of land in Broomfield, Colorado, described as follows:

See Exhibit A attached hereto and incorporated herein by reference.

1.3  The Land as described on Exhibit A includes all existing improvements required in connection with the use of the Premises (as hereinafter defined) as a convenience store selling petroleum products. The Land, together with all improvements thereon or to be constructed thereon (the "Improvements"), are hereinafter collectively referred to as the "Premises."

### ARTICLE 2 - TERM

2.1  The term of this Lease (the "Base Term") shall commence on the 1st. day of June , 2008. or the first day in which Tenant commences it business operation at the Premises, whichever date occurs first (the "Effective Date") and shall expire on the day that is 5 years thereafter, provided, however, if the Effective Date is not the first day of a calendar month, the Base Term shall expire on the last day of the month. The Base Term, together with any properly exercised Renewal Term (as defined herein) shall be collectively referred to as the "Term." The renewal periods following the Base Term for which Tenant will have an option to renew this Lease as provided in Article 3 shall be hereinafter referred to individually as a "Renewal Term" or collectively as the "Renewal Terms."

2.2.  Renewal Option.  Provided and upon the condition that Tenant shall not then be in default under the terms of this Lease beyond any applicable grace or cure

**Exhibit A**

period, this Lease shall be automatically renewed for up to three (3) additional 5 year periods without action on the part of either party hereto. In the event Tenant does not desire to renew this Lease for any of the Renewal Terms, Tenant shall notify Landlord in writing at the current address for notices as set forth herein or as amended of its intention not to renew this Lease at least 120 days prior to the termination of the then current Lease period, and in the event such notification is not given by Tenant, this Lease shall be automatically extended as above provided. References to the Term of this Lease shall include extensions, if any. Except as otherwise expressly stated herein, the terms and conditions of this Lease shall remain in effect during any extension of the Term of this Lease. If Tenant remains in possession of the Premises after the expiration of the Term with or without the written consent of the Landlord, such occupancy shall be a tenancy from month to month; provided, that the minimum rent for such holdover period shall be an amount equal to two (2) times the minimum rent amount last provided for during the Term plus all other additional amounts payable by Tenant hereunder, and upon the terms herein appropriate to a month to month tenancy.

## ARTICLE 3 - RENT

3.1. **Base Rent.** Tenant shall pay Base Rent to Landlord commencing on the 1st. day of June, 2008. or the first day in which Tenant commences it business operations at the Premises., which ever date occurs first. The Base Rent shall be as set forth on *Exhibit B - Schedule of Rents* attached hereto and incorporated herein by reference. Base Rent shall be payable in advance monthly on or before the first day of each month. Base Rent shall be paid via electronic transfer of funds (via ACH transfer or wire transfer), or at Tenant's option, by check sent by ordinary first class mail to Landlord at the address set forth below for Notice or at such other address as Landlord may designate in writing from time to time.

3.2 Tenant covenants and agrees that the Rent to be paid hereunder shall be, except as otherwise expressly provided herein or permitted by law, paid without off-set or deduction. Landlord shall have the right to accept all Rent and other payments, whether full or partial, and to negotiate checks and payments thereof without any waiver of rights, irrespective of any conditions to the contrary sought to be imposed by Tenant. The Base Rent for any partial month shall be prorated based upon the number of days in said month.

3.3 **Additional Rent; Net Lease.** Tenant acknowledges and agrees that it is intended that this Lease will be, except as otherwise expressly stated herein, a completely "net lease" to Landlord, and that Landlord is not responsible for any costs, charges, expenses, and outlays of any nature whatsoever arising from Tenant's use or occupancy of the Premises, except as may be otherwise expressly stated herein Tenant shall pay all charges, impositions, costs, and expenses of every nature and kind relating to the Premises arising during the Term of this Lease, except as herein expressly provided to the contrary. Notwithstanding the foregoing, Tenant shall not be responsible for any

2

(including but not limited to (ute A + B)

costs, charges, or expenses pertaining to Landlord's organizational overhead, the financing or refinancing of the Premises by Landlord. Additional rental items for which Tenant is responsible include, but are not limited to the following:

3.3.1  **REAL ESTATE TAXES AND ASSESSMENTS.** In addition to the rent set forth above, Tenant shall pay to Landlord as additional rent, at the same time and in the same manner as provided for payment of minimum rent in Article 3 hereof, its estimated costs of all of the real property taxes or any tax levied in lieu thereof on the Premises (including special assessments) for any period included in the term of Lease or any extensions thereof, and also its pro rata share of all such taxes levied or assessed thereon for any period, part of which is included in the term of this Lease or any extensions thereof.

3.3.2  For the tax years in which this Lease commences and terminates, the Tenant's obligations under this paragraph shall be apportioned on a per month basis in such proportions as Tenant's tenancy of the Premises bears to 12 months. Tenant's pro rata share shall be based upon estimates made by Landlord of projected taxes due for the subject calendar year. The difference between the estimated taxes and assessments and the actual taxes and assessments due shall be accounted for by Landlord within 60 days following notice to Landlord of the actual charges for the subject year, and the necessary refund by Landlord or additional payment by Tenant in the amount of the difference shall be paid within 30 days following notice to Tenant of the amount due, provided, however, no refund shall be paid Tenant should Tenant be in default of any of its leasehold obligations hereunder until cured. This paragraph shall not be deemed or construed to require Tenant to pay or discharge any inheritance of estate taxes or taxes upon inheritance or right of succession which may be levied against any estate or interest of Landlord, even though such taxes shall become a lien against the Premises.

3.3.3  **Utilities.** At all times during the term of this Lease, the Tenant, in addition to the rents required hereunder, shall pay, prior to delinquency, the costs of all utilities including, but not limited to, gas, propane, electricity, water and sewer used and consumed by the Tenant, its employees, agents, servants, customers and other invitees in the Premises, and to the extent possible shall contract for the same in its own name and on separate meters. The building water meter and the Premises' electric meter panels have been provided by Landlord at Landlord's expense and same are hereby accepted by Tenant in their "AS IS" condition. The cost of any conversion of utilities to other energy sources or the installation of any other utility meters or service hook-up fees shall be borne by Tenant. Throughout the duration of Tenant's occupancy of the Premises, Tenant shall keep such meters and installation equipment in good working order and repair at Tenant's sole cost and expense. Failure to do so may allow Landlord to cause such meters and equipment to be replaced or repaired, and collect the cost thereof from Tenant as additional rent. If such utility charges cannot be separately metered or separately determined, Tenant agrees to pay its pro rata share thereof, which shall be equal to the number of square feet included in the Premises divided by the total

3

number of square feet leased or available for lease utilizing such utilities and which shall be paid in advance on the first day of the month at the same time and place stated in Article 3 for the payment of minimum rent.

3.3.4  The Landlord does not warrant or guarantee the continued availability of any or all of the utility services necessary or desirable for the use of the Premises by the Tenant.  However, in the event of interruption, diminution or cessation of such availability such that Tenant cannot reasonably use the Premises for its intended purpose for  a period of more than 30 days, Tenant shall have the right to terminate this lease upon 30 days written notice to Landlord.

3.3.5  In the event that a deposit is required by a public or quasi-public organization in order to furnish or agree to furnish any service to the Premises, the Tenant agrees and covenants to pay such charge or deposit or its pro rata share thereof. Any money so paid shall not entitle the Tenant to an offset or reduction of its rent liability under this Lease, nor shall the Landlord be obligated to return, repay or credit the Tenant for any money so paid.

3.3.6  Landlord reserves the right to stop the service of any or all of the utilities, herein above described when, in the Landlord's reasonable discretion, such stoppage is necessitated by reason of accident, repairs, inspections, alterations or improvements, until any of the same have been completed.  In such event, Landlord shall not be deemed guilty of a breach of this Lease, nor shall the Tenant be entitled to any abatement of its rent obligations under this Lease on account thereof.

*Common Area Costs*

3.3.7  The Tenant covenants and agrees to pay as additional rent a pro rata share of all costs and expenses incurred by the Landlord in operating and maintaining the parking and common areas, access roads, and other areas actually used or available for use by the Tenant and its employees, agents, servants, customers and other invitees, including, but not by way of limitation, costs of maintaining the landscaping, replacement of plants and planters, (fire,) casualty, public liability and property damage, insurance, repairs, replacements, striping, sealing, resurfacing, lighting, all repair and replacement costs relating to any utility service lines not within the boundary of the Premises, sanitary control, clearing, removal of snow, trash, rubbish, garbage and other refuse, depreciation on machinery and equipment used in such maintenance, the cost of personnel to implement such services, to direct parking, to provide security, and to police the common and parking areas, as well as any other expense relative to same. The liability of the Tenant for the payment of such costs shall be paid as additional rent in advance on the first day of the month at the same time and place stated for the payment of the minimum rent.

4

3.3.8   Tenant's pro rata share shall be based on Landlord's estimates of said costs, and shall be equal to the number of square feet included in the Premises divided by the total number of square feet leased or available for lease in the Shopping Center times the total costs to be paid by the Landlord.  The difference between the estimated costs and the actual costs shall be accounted for by Landlord at Landlord's office within 60 days following the end of Landlord's fiscal year or within 60 days following termination of, or Tenant's default under the terms of this Lease, and the necessary refund by Landlord or additional payment by Tenant, in the amount of the difference shall be paid within 30 days following notice to Tenant of the amount due; provided, however, no refund shall be paid Tenant should Tenant be in default of its leasehold obligations.

3.3.9   Taxes.  In addition to the above, Tenant shall pay before delinquency and as additional rent, all taxes, assessments, license fees (collectively referred to as "Taxes") levied or assessed against all merchandise, personal property, real property, buildings and improvements, and any other obligations which are or may become a lien or levied against the Premises.  Tenant shall provide Landlord with evidence of payment of Taxes promptly upon request.  It is the intention of Tenant and Landlord that all new and increased assessments, taxes, fees, levies, and charges, and all similar assessments, taxes, fees, levies, and charges be included within the definition of Taxes for the purpose of this Lease.

3.3.10   Payments Not Responsibility of Tenant.  Tenant shall not be required to pay any municipal, county, state, or federal income or franchise taxes of Landlord, or any inheritance or transfer taxes of Landlord or annual reporting or other fees in connection with maintaining Landlord's organizational existence under the laws of the State of its formation or creation.

3.3.11   Assessments.  In addition to the above, if any assessment for a capital improvement made by any public or governmental authority shall be levied or assessed against the Premises, and the assessment is payable either in a lump sum or on an installment basis, then Tenant shall have the right to elect the basis of payment.  If Tenant shall elect to pay the assessment on the installment basis, then Tenant shall pay only those installments which shall become due and payable during the Term.

3.3.12   Tenant's Right to Contest Utility Charges, Contest Taxes and Seek Reduction in Assessed Valuation of the Premises.  Tenant, at its cost, shall have the right, at any time, to seek a reduction in the assessed valuation of the Premises or to contest any Taxes or utility charges that are to be paid by Tenant.  If Tenant seeks a reduction or contests any Taxes or utility charges, Tenant must still timely pay all contested assessed Taxes or utility charges  pending a decision by the appropriate State or Federal Governing Body.  Tenant may use any means allowed by statute to protest property tax assessments or utility charges as defined in this Article as long as Tenant remains current as to all other terms and conditions of this Lease.  Any overpayment of Taxes or utilities shall promptly be delivered to Tenant upon receipt by Landlord.

5

3.3.13  <u>Landlord Not Required to Join in Proceedings or Contest Brought by Tenant</u>.  Landlord shall not be required to join in any proceeding or contest brought by Tenant unless applicable law requires that the proceeding or contest be brought by or in the name of Landlord or the owner of the Premises.  In that case, Landlord shall join in the proceeding or contest or permit it to be brought in Landlord's name as long as Landlord is not required to bear any cost.  Tenant, on final determination of the proceeding or contest, shall immediately pay or discharge any decision or judgment rendered, together with all costs, charges, interest, and penalties incidental to the decision or judgment.  Tenant will indemnify Landlord for any and all of Landlords costs incurred with respect to Tenants right to contest as set forth in paragraph 3.7 above and herein including, but not limited to, cost for administrative and overhead expenses and reasonable attorney fees and costs.

## ARTICLE 4 - ENVIRONMENTAL; PETROLEUM EQUIPMENT

4.1  Tenant is and shall remain and be the owner and operator of all Petroleum Equipment (as defined below) on the Premises, and, accordingly, is further deemed to be such for purposes of compliance with and liabilities arising from all Environmental Laws (as hereinafter defined).  At any time during the Term of this Lease, Tenant shall have the right to install or cause to be installed and to maintain, replace, relocate, repair, upgrade and operate petroleum marketing equipment, including, but not limited to, underground or above ground storage tanks and their associated underground or above ground and/or connected piping, and related lines, pumps, dispensers, mechanical, control and detectional equipment, environmental assessment and remediation equipment related thereto (collectively, "Petroleum Equipment").  Upon reasonable written request from Landlord, Tenant shall provide Landlord with a copy of any permit required by any applicable Environmental Laws for the Premises.

4.2  Tenant shall comply with all laws, including Environmental Laws, relating to the use, storage, transportation, dispensing, sale or release of Hazardous Material (as hereinafter defined) at the Premises.  Without limiting the foregoing, Tenant shall comply with all laws, including Environmental Laws, relating to the Petroleum Equipment, including, without limitation, installation, operation, maintenance, calibration and alarm systems, registration, financial assurances, and closure, and promptly shall implement any and all upgrade requirements promulgated by any government agency having jurisdiction as soon as practicable, but in no event later than any applicable deadline announced or promulgated by the government agency unless Tenant shall have received an extension of the deadline for compliance from such government agency.  Tenant shall obtain and maintain all necessary permits, approvals, registrations, certificates, and authorizations ("Permits") required under Environmental Laws for the Premises and Petroleum Equipment, and Tenant shall be responsible for all related costs, fees, and charges.  Where cooperation of Landlord is necessary to obtain any such Permits, Landlord shall provide such cooperation but shall not be compelled to become a

6

permittee or co-permittee unless required by Environmental Laws, and all costs, fees and charges shall be reimbursed by Tenant within thirty (30) days of presentation of Landlord's statement of same.  Tenant shall not be in violation of this paragraph in connection with the use, storage, transportation, dispensing or sale of petroleum products or natural gas so long as such use, storage, transportation, dispensing or sale complies with applicable Environmental Laws and governmental authorities having jurisdiction.  Except as provided in a corrective action or similar plan approved by the appropriate governmental authority, Tenant shall not treat or dispose of Hazardous Materials on the Premises.

4.3  Except as otherwise provided in this Article, as between Landlord and Tenant, all reporting, investigation and/or remediation requirements under any applicable Environmental Laws with respect to any release of Hazardous Material on the Premises during the Term, regardless of the date of discovery, are the responsibility of Tenant, and Tenant shall be solely responsible for all costs incurred in connection with any investigation, monitoring or any cleanup, remediation, removal, or restoration work required of Landlord or Tenant by applicable law and any federal, state, or local governmental agency or political subdivision having jurisdiction over the Premises because of Hazardous Material present in the soil or ground water on, under or emanating from the Premises caused or permitted by Tenant or otherwise relating to Tenant's operations.

4.4  Tenant shall not be responsible for (A) Hazardous Material migrating onto the Premises from off the Premises through no acts, omissions or fault of Tenant ("Off-Premise Third Party Contamination"), (B) the exacerbation of any existing Hazardous Material contamination on the Premises by Landlord, its agents, employees, contractors or lenders, or (C) Hazardous Material brought onto the Premises by Landlord, its agents, employees, contractors, or lenders in violation of Environmental Laws (together, the "Exclusions").  To the extent the Premises are contaminated as of the date of this Lease Agreement, and except as provided in the Addendum to Lease Agreement, attached hereto, Landlord agrees to perform or cause to be performed any and all necessary remediation on the Premises to the extent required by applicable Environmental Laws and governmental authorities having jurisdiction.  Upon execution of a mutually acceptable access agreement, Tenant agrees to cooperate in permitting reasonable access to the Premises by any party who is responsible for assessment or remediation of contamination on the Premises.

4.5  Upon the expiration or earlier termination of the Term of this Lease, Tenant shall remove all Petroleum Equipment, complete an investigation of the soil and groundwater conditions beneath the Premises (the "Closeout Investigation") and restore the Premises to its condition immediately prior to installation of the Petroleum Equipment.  The Closeout Investigation (i) shall include collection of soil and groundwater samples in a manner reasonably expected to identify any releases from Petroleum Equipment and analysis of samples for Hazardous Materials, and (ii) shall be

7

performed by a competent environmental professional, approved by Landlord, in accordance with any applicable ASTM standards and a work plan approved by Landlord. Landlord's Approvals shall not be unreasonably withheld. No more than sixty (60) days following expiration or earlier termination of the Term of this Lease, the results of the Closeout Investigation shall be provided to Landlord in a written report prepared by the environmental professional. Tenant shall report, investigate and remediate any Hazardous Materials in soil or groundwater identified in the Closeout Report as required by Article 4.3.

4.6 In the event this Lease expires or is terminated, and any further investigation, remediation or monitoring is required that is the responsibility of Tenant hereunder, Landlord and its lessees, successors and assigns, pursuant to execution of a mutually acceptable access agreement: (i) shall permit, without charge, cost, fee or assessment, Tenant and its agents and representatives reasonable access to the Premises for completing such investigation, remediation, and monitoring and (ii) shall not materially damage, disturb or remove or otherwise unreasonably impede or interfere with such investigation, remediation or monitoring or the associated equipment, installations or facilities. Tenant shall not unreasonably interfere with use of the Premises or any business operation thereon. Tenant shall not be liable or responsible for any disruption of business or other liabilities, costs or expenses incurred by Landlord or its lessees, successors or assigns that may be caused by Tenant's investigation, remediation or monitoring activities provided that Tenant has acted reasonably in conducting such activities.

4.7 Tenant shall indemnify, defend, and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities, liens or losses which arise during or after the Term of this Lease as a result of Tenant's noncompliance with Environmental Laws or any release of Hazardous Material at the Premises during the Term of the Lease, but solely with respect to Tenant's operation of Tenant's business in and about the Premises, Tenant having no obligation to indemnify Landlord from any of the preceding matters if caused by Landlord, its previous tenants, its agents, employees, contractors, lenders, or any business invitee of Landlord, nor shall Tenant be liable to indemnify Landlord from any claim, judgment, damage, penalty, fine, costs, liability, or loss attributable to such person's negligence or intentional misconduct. Without limiting the foregoing, if the presence of any Hazardous Material on the Premises during the Base Term or Renewal Terms results in any contamination of the Premises, Tenant shall promptly take all actions at its sole expense as are reasonably necessary to return the Premises to the condition existing prior to the introduction of any such Hazardous Material to the Premises, but Tenant shall have no obligation to reduce the level of Hazardous Material on the Premises below the unrestricted use threshold for remediation required under applicable Environmental Laws or by government authorities having jurisdiction. This indemnification shall survive the expiration or earlier termination of this Lease.

8

4.8  Articles 4.1, 4.3, 4.6 and 4.7 shall survive the expiration or earlier termination of this Lease.

4.9  The term "Hazardous Material" means any substance, material, or waste which is toxic, ignitable, reactive, or corrosive and which is or becomes regulated by local or state governmental authority or by the United States Government.  The term "Hazardous Material" includes without limitation, any material or substance which is (i) defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," or "hazardous material" by any local or state law, (ii) oil and petroleum products and their by-products, (iii) asbestos-containing materials, (iv) designated as a "hazardous substance" pursuant to the Federal Water Pollution Control Act, (v) defined as a "hazardous waste" pursuant to the Federal Resource Conservation and Recovery Act, or (vi) defined as a "hazardous substance" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act. Hazardous Material does not include cleaning agents used in connection with operation of Tenant's business on the Premises provided such agents are contained and used in accordance with applicable Environmental Laws and manufacturer's requirements and are maintained in quantities consistent with household hazardous waste.

4.10  The term "Environmental Laws" shall mean any law, statute, regulation, order, or rule now or hereafter promulgated by any governmental entity, whether local, state, or federal, relating to air pollution, water pollution, and/or transporting, storing, handling, discharge of or disposal of Hazardous Material, including, without limitation, the following: the Clean Air Act; the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984; the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986; the Toxic Substances Control Act; the Federal Insecticide and Rodenticide Act, as amended; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Hazardous Materials Transportation Act; and the National Environmental Policy Act, all as the same may be amended from time to time.

## ARTICLE 5 - TRADE FIXTURES AND EQUIPMENT

5.1  All Petroleum Equipment, furniture, trade fixtures, all signage and supporting structures, and other equipment of Tenant (including any Tenant-built gasoline canopy and structure), built-in refrigeration equipment (excluding the currently existing built-in refrigeration equipment, walk-in cooler and freezers) shall be personal property notwithstanding their attachment to the Premises, and together with every item of personal property not permanently attached to the Premises (collectively, "Tenant's Personal Property") are to remain and be the property of Tenant. Tenant is to have the right and privilege of removing Tenant's Personal Property at any time during the Term. Without limiting the generality of the foregoing, at or before the commencement of business operations on the Premises, Tenant and Landlord shall conduct a walk-through of the premises, and prepare a list of Tenant's Personal Property which can, at that time,

9

be identified, together with a list of the currently existing built-in refrigeration equipment, walk in cooler and freezers, which list shall be attached to and incorporated in this Lease Agreement as Exhibit C.

5.2  In the event any of Tenant's Personal Property is not removed by Tenant prior to the expiration or earlier termination of this Lease, title thereto shall automatically pass to and vest in Landlord, and Tenant shall thereafter be relieved of any and all responsibility in connection with said equipment.  If Tenant's Personal Property is removed, Tenant promptly shall restore the Premises to their condition immediately prior to the removal of such property to the extent commercially practicable.  If Tenant's Petroleum Equipment is removed, Tenant promptly shall restore the Premises in accordance with Articles 4 and 5 of this Lease.  It is further understood and agreed that the buildings and structures erected on the Premises, including heat and air conditioning equipment, may not be removed by Tenant at the expiration or termination of this Lease.

5.3  Landlord hereby waives any lien right Landlord may have with respect to Tenant's personal property at the Premises, including, without limitation, any so-called "landlord's lien" as may be afforded by the provisions of statutory law.  Although such waiver is self-operative, Landlord agrees to acknowledge such waiver in writing, for the benefit of Tenant or any lender of Tenant, as Tenant may from time to time request.

## ARTICLE 6 – TENANT'S RIGHT TO ALTER AND IMPROVE

6.1  Tenant shall make no alterations or additions to the Premises, including equipment or appliances installed in connection with the transmission or delivery of the utilities without first procuring Landlord's reasonable written consent, after delivering to the Landlord the plans and specifications therefor.  Tenant shall promptly pay for the costs of all work regardless of the cost, and shall indemnify Landlord against liens, costs, damages and expenses incurred by Landlord in connection therewith, including any attorney fees incurred by Landlord, if Landlord shall be joined in any action or proceeding involving such work.  Under no circumstances shall Tenant commence any such work until Landlord has been provided with certificates evidencing that all the contractors and subcontractors performing the work have in full force and effect adequate workmen's compensation insurance as required by the laws of the State of Colorado, public liability and builders risk insurance in such amounts and according to terms satisfactory to Landlord.

6.2  Within five (5) days after notifying Landlord of any planned erection, construction, alteration, removal, addition, repair or other improvement (Athe work@), Tenant shall post and keep posted until completion of the work, in a conspicuous place upon the doors providing entrance to the Premises, and shall personally serve upon such contractors or subcontractors performing the work and material men, a notice stating that Landlord's interest in the Shopping Center shall not be subject to any lien for said work.

10

6.3   All alterations, additions, improvements on the Premises which are not Tenant's Personal Property as defined in Section 5.1, above, shall become the property of the Landlord at the termination of this Lease and shall remain upon and be surrendered with the Premises as a part thereof, without disturbance, molestation or injury. Any tile, linoleum, carpet or floor covering of similar character which may be cemented or otherwise adhesively affixed to the floor of the Premises shall be and become the property of the Landlord absolutely upon the termination of the Lease. During the term of this Lease, the Tenant shall not remove or damage the above-described improvements and fixtures without the prior reasonable written consent of the Landlord.

## ARTICLE 7 - USE OF PREMISES

7.1   Tenant covenants that the Premises shall be used for a convenience food store and for the sale of automotive petroleum products only, and for no other purpose, except with the prior written consent of the Landlord.

7.2   Notwithstanding anything contained herein to the contrary, Tenant may cease business operations at the Premises ("go dark") provided Tenant continues to pay Rent and all other monetary obligations in this Lease, to perform the other terms and conditions of this Lease expressly including insuring the Premises, and takes all reasonable steps to protect the Premises against vandalism.

7.3   Tenant agrees not to create or, subject to conditions caused by others, allow any nuisance to exist on the Premises, and to abate any nuisance that may arise, promptly and free of expense to Landlord.  This Article shall not apply to petroleum products, which are governed by Article 4.

7.4   Tenant also agrees not to open or operate, directly or indirectly, any other stores substantially like the store being operated on the Premises within a distance of three (3) miles from the boundaries of the Property.

7.5   Tenant agrees to abide by all reasonable rules and regulations adopted by the Landlord with regard to its occupancy of the Premises and its use of the parking and common areas; not to commit any waste upon the Premises or overload the floors thereof; to keep the Premises well lighted and in a neat and clean condition; nor to conduct any auction, fire, bankruptcy, liquidation or going-out-of-business sales thereon without the prior written consent of Landlord; and to operate its business thereon continuously during the term hereof at substantially the same hours as the other tenants unless prevented from doing so by governmental regulations or acts of God.  Tenant understand that the Premises constitutes one of a number of stores in and around the Shopping Center, and that it is desirable and necessary that as many such stores as

11

possible operate under substantially the same rules and regulations and at the same hours.

7.6  **Parking and Common Areas.**  The Landlord shall provide a reasonable area for off-street parking and other common areas for the non-exclusive use of the Tenant, its employees, agents, servants, customers and other invitees, in common with the Landlord, other tenants of the Shopping Center, and their respective employees, agents, servants, customers, and invitees, except when such are being repaired, altered or reconstructed, and except as provided hereinafter.  Landlord shall be deemed to have provided a reasonable area for off-street parking, if the number of parking spaces in the at the Premises/Shopping Center satisfy the requirements of applicable governmental authorities.  As the term is used herein, Common Areas shall mean all those areas of the Premises/Shopping Center on which buildings have not been built.  Tenant shall not at any time interfere with the rights of Landlord and others entitled to similar use of said Common Areas.  Tenant warrants that it has inspected the area and size of the parking areas, and that they are sufficient for its needs.  An excessive use of parking areas by another Tenant which cannot reasonably be controlled by Landlord shall not be a default or breach of the Lease, and shall in no way suspend or terminate any of Tenant's obligations under this Lease.

7.6.1  All parking areas and common areas furnished by the Landlord shall be subject to the reasonable control and management of the Landlord, who shall have the right, but not the obligation, from time to time, to establish, modify and enforce reasonable rules and regulations with respect thereto. The Tenant agrees to abide by all such rules and regulations.

7.6.2  Landlord further reserves the right to change the area, to rearrange the area, and to restrict or eliminate the use of any common and parking areas, and do such other acts in and to said areas as the Landlord shall reasonably determine, provided that the number of parking spaces as required hereunder shall remain substantially the same. All such actions, including such action or inaction as to rules and regulations for the parking and common areas, shall not be deemed an eviction of Tenant or disturbance of Tenant's use of the Premises and Tenant waives any rights it may have to declare an eviction or termination as a result of any such action or inaction. Landlord may, at its reasonable discretion, designate areas for parking by Tenant's employees, and Tenant shall thereafter be responsible to insure that its employees park in the designated areas. Notwithstanding the forgoing, any change in the number or location of parking spaces within the boundary of the Premises shall be subject to the reasonable approval and consent of the Tenant. Should any such change be implemented without Tenant's approval and consent, Tenant shall have the right to terminate this Lease agreement upon 30 days notice to Landlord.

7.7  **Signs and Advertising.**  Tenant shall be obligated to have a sign in accordance with Exhibit D attached hereto.  Tenant shall not erect or install any other type of store

12

front, or other exterior signs without first having obtained the prior written consent and approval of the Landlord. All such signs, shall conform to the criteria set forth in Exhibit D. Tenant shall pay all costs of causing its signs to be erected and maintained. No later than 14 days before execution of this Lease Agreement, the terms and criteria to be included in Exhibit D shall be agreed upon by Landlord and Tenant.

[This space intentionally left blank.]

## ARTICLE 8 - INSURANCE

8.1 Tenant shall not be required to keep the buildings located upon the Premises insured against loss or damage by fire or other casualty and extended coverage, vandalism, malicious mischief and special extended perils.

8.2 Tenant covenants and agrees that Tenant will carry and maintain, at all times during the Term, at Tenant's sole cost and expense, to obtain and maintain in force for the mutual benefit of Landlord and Tenant, bodily injury and property damage liability insurance with coverage limits of $1,500,000.00 combined, and $750,000.00 for each occurrence, insuring against any and all liability of Tenant with respect to the Premises or arising out of the maintenance or use thereof issued by a reputable insurance company qualified to do business in Colorado.

8.3 Tenant shall also maintain property insurance against all risks of physical loss to the Premises and improvements, in an amount not less than $350,000.00. All such bodily injury liability insurance and property damage liability insurance may be provided under umbrella-type policies maintained by Tenant.

8.4 Certificates evidencing such insurance shall be delivered by Tenant to Landlord within thirty (30) days after Landlord's request therefor. The policy(ies) may not be terminated except after thirty (30) days' written notice to Landlord. As often as any such insurance policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent. Landlord shall be named as an additional insured on any and all such policies. During periods of demolition or construction on the Premises, Tenant shall carry and maintain all worker's compensation insurance required by the jurisdiction in which the Premises is located. If

13

Tenant fails to obtain or maintain required insurance coverage, Landlord may obtain such insurance coverage on Tenant's behalf and such premium payments shall be charged as Additional Rent. The Tenant's insurance shall be primary over any insurance that the Landlord might have for such liabilities.

## ARTICLE 9 - REPLACEMENT OF IMPROVEMENTS; APPLICATION OF INSURANCE PROCEEDS THERETO

9.1 DESTRUCTION OF OR DAMAGE TO THE PREMISES. In case the Premises or the Building in which the Premises are situated shall be partially or totally destroyed by fire or other casualty insurable under standard fire and extended coverage insurance so as to become partially or totally untenantable, the same shall be repaired as speedily as possible at the expense of Landlord, to the extent of insurance proceeds available, unless Landlord shall elect not to rebuild as hereinafter provided.

9.2 In case the Premises shall be destroyed or so damaged by fire or other casualty insurable under standard fire and extended coverage insurance as to render more than 33% of the Premises or 33% of the Premises untenantable, Landlord may, at its election, to be exercised by notice given to Tenant not more than 30 days after the occurrence of the damage, terminate this Lease. However, if Landlord shall not elect to terminate this lease, Landlord shall, as promptly as may be reasonable, repair, rebuild or restore any such damage suffered in the Premises as in this Article; provided however, Landlord's obligation shall be limited to restore the Premises to their original condition as of the date they are declared Aready for occupancy.

9.3 In case of casualty to the Premises resulting in damage or destruction, which casualty is not insured against, the Landlord shall be under no obligation to restore, replace, or rebuild the Premises, and this lease shall be deemed terminated on the 30th day after such casualty and of no further force and effect as of the date of such casualty, unless the Landlord elects to restore, repair, replace and rebuild the Premises and so notifies the Tenant in writing within 30 days after such casualty; in that event, this Lease shall continue in full force and effect during the period of such restoration, repairing, replacing or rebuilding. Furthermore, if Landlord so elects to restore, repair, replace or rebuild the premises, Landlord shall proceed with reasonable diligence to do so and place the Premises in substantially the same condition as of the date they are declared Aready for occupancy.

9.4 If such damage or destruction as described in this Article occurs, and this Lease is not so terminated by Landlord, this Lease shall remain in full force and effect, and the parties waive the provision of any law to the contrary. Tenant shall in the event of any such damage or destruction, unless the Lease shall be terminated as provided in this Article, forthwith replace or fully repair all exterior signs, trade fixtures, equipment, display cases and other installations originally installed by Tenant. Tenant agrees during any period of reconstruction, restoration or repair of the Premises and/or of the Building

14

to continue the operation of its business in the Premises to the extent reasonably practicable from the standpoint of good business. If Tenant can continue operation of its business, Tenant's minimum rent shall abate in that same proportion as the number of square feet rendered untenantable bears to the total number of square feet in the Premises. If Tenant cannot continue operation of its business, Tenant's minimum rent shall abate in its entirety until business can reasonably be resumed.

## ARTICLE 10 - REPAIR AND MAINTENANCE

10.1 **Obligation to Maintain the Premises.** During the Term, Tenant shall, at its own expense, keep and maintain the entire Premises in good order and repair, including, but not limited to, the interior, exterior, foundations, floors, walls, roof, and structure of the building; and the sidewalks, curbs, walls, trash enclosures, landscaping with sprinkler system (if installed), light standards, and parking areas which are a part of the Premises. Tenant shall make such repairs and replacements as may be necessary, regardless of whether the benefit of such repair or replacement extends beyond the Term. The Premises shall be returned to Landlord at the termination or expiration of this Lease in good condition, except for ordinary wear and tear and insured casualty, provided Tenant has assigned or paid over to Landlord the entirety of the insurance proceeds payable and the amount of any deductibles in connection with such insured casualty. For as long as Tenant is not in default of any of the terms and conditions of this Lease, Landlord hereby assigns to Tenant all building contractor, subcontractor, and manufacturer's warranties and guarantees applicable to the Premises; and Landlord shall cooperate with Tenant at Tenant's request in any action to enforce such warranties and guarantees. In the event of destruction of the Premises by fire or casualty, the condition of the Premises upon termination of this Lease shall be governed by Article 9.

10.2 **Obligation to Keep the Premises Clear.** Tenant shall keep the Premises, including sidewalks adjacent to the Premises and loading area allocated for use of Tenant, clean and reasonably free from rubbish and debris at all times. Tenant shall store all trash and garbage within the Premises and arrange for regular pickup and cartage of such trash and garbage at Tenant's expense.

10.3 **Capital Expenditure in Last Two Years.** Notwithstanding the foregoing, in the event Tenant makes a capital expenditure under this Article 10 or under Article 3, within the last 2 years of the Term or any renewal thereof (providing no uncured Event of Default exists under this Lease), Tenant shall receive a credit upon the expiration of this Lease, which credit shall be calculated by: (i) dividing the remaining useful life of the capital improvement upon Lease expiration by the total useful life of the capital improvement and then (ii) multiplying the result obtained in (i) above by the reasonable cost of the capital expenditure. "Capital expenditure" as used herein shall mean those expenditures incurred in connection with the roof, parking lot or HVAC equipment located on the Premises, the reasonable and actual cost of which exceeds $10,000.00. Any credit due Tenant pursuant to the terms hereof shall be paid by Landlord to Tenant within 30 days of the expiration of this Lease.

15

___ .1  Tenant Shall Not Render Premises Liable For Any Lien.  Tenant shall have no right, authority, or power to bind Landlord, or any interest of Landlord in the Premises, nor to render the Premises liable for any lien or right of lien for the payment of any claim for labor, material, or for any charge or expense incurred to maintain, to repair, or to make alterations, additions, and improvements to the Premises.  Tenant shall in no way be considered the agent of Landlord in the construction, erection, modification, repair, or alteration of the Premises.  Notwithstanding the above, Tenant shall have the right to contest the legality or validity of any lien or claim filed against the Premises.  No contest shall be carried on or maintained by Tenant after the time limits in the sale notice of the Premises for any such lien or claim unless Tenant (i) shall have duly paid the amount involved under protest; (ii) shall have procured and recorded a lien release bond from a bonding company acceptable to Landlord in an amount not less than one and one-half (1 1/2) times the amount involved; or (iii) shall have procured a stay of all proceedings to enforce collection.  Upon a final adverse determination of any contest, Tenant shall pay and discharge the amount of the lien or claim determined to be due, together with any penalties, fines, interest, cost, and expense which may have accrued, and shall provide proof of payment to Landlord.

## ARTICLE 11 - QUIET POSSESSION

11.1  It is a further condition of this Lease that Landlord has a good and marketable title to the Premises free and clear of all liens and encumbrances; that Landlord has the right to lease the same; that the Premises have unencumbered access to public rights of way over existing curb cuts on the Premises or over unencumbered private easements; that Landlord warrants and will defend the Premises unto Tenant against the lawful claims of all persons whomsoever; that so long as the rents are paid in the manner herein provided and the covenants, conditions, and agreements are all and singularly kept, fulfilled, and performed by Tenant, Tenant shall lawfully, peacefully, and quietly hold, occupy, and enjoy the Premises during the Term herein granted without any let, hindrance, ejection, or molestation by Landlord or any person claiming under Landlord.

## ARTICLE 12 - RIGHT OF ENTRY

12.1  Landlord reserves the right during the Term of this Lease to enter the Premises at reasonable hours upon prior reasonable notice (except in the event of emergency, meaning imminent threat of injury to person or damage to property, in which event no prior notice shall be necessary) to show the same or inspect the same, but has no obligation to make an inspection of the Premises.

## ARTICLE 13 - SUBLETTING AND ASSIGNMENT

16

13.1  Tenant may sublet the Premises or assign this Lease only with the prior written consent of Landlord, such consent not to be unreasonably withheld, conditioned, or delayed.

13.2  Notwithstanding anything hereinabove contained to the contrary, provided there is no uncured Event of Default (as hereinafter defined) under this Lease, Tenant may, without Landlord's consent, (a) assign, transfer, or sublet its leasehold interest to a corporation, partnership, limited liability company, or other entity more than fifty percent (50%) of the ownership of which is owned by Tenant, or to a corporation, partnership, limited liability company, or other entity which owns more than fifty percent (50%) of the ownership interest in Tenant, (b) assign its interest in this Lease as collateral in connection with financing of equipment, fixtures, appliances, machinery, or furnishings to be used in connection with its business on the Premises, (c) assign or mortgage this Lease or interest therein as collateral in connection with any of Tenant's financing or refinancing, or (d) with Landlord's prior written consent which shall not be unreasonably withheld, assign its leasehold interest or sublet the Premises in connection with a sale of all or substantially all of the assets of Tenant.  Moreover, the sale, pledge, or other transfer or conveyance of Tenant's capital stock shall not be construed as an assignment by Tenant of its interest in this Lease.  Tenant shall notify Landlord in writing of the occurrence of any of the foregoing events, and shall provide a true and correct copy of the sublease or assignment and assumption agreement, together with such other documentation supporting or evidencing said event as may be reasonably requested by Landlord.

13.3  Landlord shall execute and deliver to Tenant, within thirty (30) days after receipt of Tenant's request, an estoppel certificate or other statement to be furnished to any prospective assignee, sublessee, or lender of Tenant.  Such estoppel certificate or statement shall acknowledge and certify each of the following matters, to the extent each may be true: (a) whether there have been any amendments, modifications, or supplements of any kind to the Lease; (b) that this Lease is in full force and effect; (c) that Tenant is not in violation of or in default under this Lease beyond any applicable grace or cure period and that Landlord has no claims against Tenant thereunder; (d) the commencement and expiration dates (including all renewals and extensions) of the Term of this Lease; (e) the date through which Rent has been paid; (f) that Landlord consents to such assignment or subletting (if such consent has been given); and (g) such other matters as Tenant or its assignee, sublessee, or mortgagee may reasonably request.

13.4  When consent is specifically required by Landlord herein, Tenant shall pay to Landlord a fee of Seven Hundred and Fifty  ($750.00) to compensate Landlord for the time and expense of reviewing any request and documentation regarding assignment or subletting.  Landlord shall have no liability of any kind for not consenting to an assignment or subletting.  No consent to assignment or subletting shall be granted if Tenant is then in default under this lease.  Landlord shall receive (i) all increases in minimum rents, and (ii) all increases in percentage rents resulting from

17

increases of the percentage ratio paid by an assignee or sublessee.    Tenant shall not share to any extent in such rents.

## ARTICLE 14 - SURRENDER UPON TERMINATION OF LEASE

14.1  Subject to the provisions of Articles 4 and 5 hereof, Tenant shall, on the expiration or the sooner termination of the Term of this Lease, surrender to Landlord the Premises, including all buildings, replacements, changes, additions, and Improvements constructed or placed by Tenant thereon, except for Tenant's Personal Property, broom-clean, free of subtenancies, and in good condition and repair, reasonable wear and tear and insured casualty excepted.  Any equipment, trade fixtures, or personal property belonging to Tenant or any sub-tenant, if not removed upon such expiration or termination, shall automatically become the property of Landlord without any payment or offset therefor and Tenant shall thereafter be relieved of any and all responsibility in connection with said equipment.  If said equipment is removed, Tenant promptly shall restore the Premises to their condition immediately prior to the removal of such property to the extent commercially practicable.

14.2  At or prior to expiration or termination of the Term of this Lease, Tenant shall have the right, but not the obligation, to remove any exterior signage or architectural design which is a trademark, logo, or identifying feature of Tenant's business or any other trademark, logo, or identifying feature owned by Tenant or any of its affiliates or subsidiaries.  If said signage or architectural designs are removed, Tenant, at its own expense, promptly shall repair and restore the Premises to its condition immediately prior to the removal of such signage or architectural designs to the extent commercially practicable.

## ARTICLE 15 - DEFAULT BY TENANT

15.1  **Event of Default**.  The occurrence of any of the following events (each an "Event of Default" after expiration of any applicable cure period) shall constitute a default by Tenant:

15.2  Failure by Tenant to pay rent (minimum rent, percentage rent, or any other amounts payable hereunder) when due.  Notwithstanding the foregoing, or any other provision in this Lease to the contrary, if any rental is not received when due, Landlord shall notify Tenant, in writing, and Tenant shall have 7 days from the date of receipt of Landlord's notice to cure any such failure to pay rental.  If such rental is not received by Landlord within the 7 day period after Tenant's receipt of Landlord's notice, then Tenant shall be in default.

15.2.1  Tenant shall also be in default if Tenant: (i) is adjudicated a bankrupt or insolvent, or (ii) files, or threatens to file, a petition in bankruptcy or for reorganization or for the adoption of an arrangement under the Bankruptcy

18

Act or now and the latter amended), or (iii) makes an assignment of it property for the benefit of its creditors other than as allowed specifically herein.

15.3 Failure by Tenant to perform or comply with any provision of this Lease (other than as set forth above) if failure is not cured within thirty (15) days after receipt of notice from Landlord to Tenant describing such failure. If, however, the failure cannot reasonably be cured within such cure period, Tenant shall not be in default of this Lease if Tenant commences to cure the failure within such cure period and diligently and in good faith continues to cure the failure. In addition, if the only mechanism by which a failure could be cured would be the filing of a claim under Landlord's policy of title insurance, then Landlord and Tenant shall work in concert in the filing of such a claim, and Tenant shall not be in default of this Lease if such a claim is actually filed and ultimately paid or otherwise settled by the insurer (to the reasonable satisfaction of Landlord) and Landlord is thus made whole.

15.4 Landlord shall have the right to re-enter and repossess the Premises only upon order of Court, except where Tenant has vacated or abandoned the Premises.

15.5 Tenant shall be in default if Tenant shall vacate or abandon the Premises. In such event, Landlord shall have the right, at its election, either:

15.5.1 To give Tenant written notice of Landlord's intention to terminate this Lease on the date of such given notice or any later date specified therein, and on such specified date Tenant's right to possession of the Premises shall cease and this Lease shall thereupon be terminated; or

15.5.2 Without further notice, to reenter and take possession of the Premises, or any part thereof, and repossess the same as Landlord's former estate, and expel Tenant and those claiming through or under Tenant, and remove the effects of either or both without being deemed guilty or any manner of trespass and without prejudice to any remedies for arrears of rent or preceding breach of covenants. Should Landlord elect to reenter as provided in this section, or should Landlord take possession pursuant to legal proceedings or any notice provided by law, Landlord may, from time to time, without terminating this Lease, relet the Premises, or any part thereof, on behalf of Tenant for such term or terms, and at such rent or rents, and upon such other terms and conditions as Landlord may deem advisable (which may include concessions and free rent) with the right to make alterations and repairs to the Premises. No such reentry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease, unless a written notice of termination be given to Tenant.

15.6 In the event Landlord does not elect to terminate this Lease, but on the contrary, elects to take possession, then such repossession shall not relieve Tenant of its

19

obligations and liability under this Lease, all of which shall survive such repossession. In the event of such repossession, Tenant shall pay to Landlord as rent

    15.6.1. The minimum rent and percentage rent (computed on the basis of the percentage rent paid during the preceding percentage rent period closest to the date of default) and other sums as hereinbefore provided, which would be payable hereunder if such repossession had not occurred; less

    15.6.2. The net proceeds, if any, of any reletting, or the value of the Landlord's use, if any, of the Premises after deducting all of Landlord's expenses in connection with such reletting, including, but without limitation, all repossession costs, brokerage commissions, legal expenses, attorney fees, expenses of employees, necessary alteration costs and expenses of preparation for such reletting.

    15.6.3. Tenant shall pay such rent (including 1/12th of the percentage rent owing as aforesaid) to Landlord on the days on which the minimum rent would have been payable hereunder if possession had not been retaken, and Landlord shall be entitled to receive the same from Tenant on each such day. If Landlord shall be required to commence any action or proceeding to collect the foregoing amounts, or to enforce any other obligation of the Tenant under this Lease, Landlord shall be entitled to a reimbursement of all costs and expenses incurred in said matter, including reasonable attorney fees.

    15.7. If, however, this Lease is terminated by Landlord, by reason of any default by Tenant, or terminated by a court of lawful jurisdiction, Landlord shall be entitled to recover as damages from the Tenant the excess, if any, of the minimum rent reserved in this Lease for the balance of the term hereof over the then reasonable rental value of the Premises for the same period, plus all of Landlord's costs of reletting the Premises including, but not limited to, repair, alteration and preparation of said Premises for reletting, and any brokerage commission paid or due to any agent of Landlord, which amounts shall be immediately due and payable by Tenant to Landlord. It is agreed that the then @reasonable rental value@ shall be the amount of rent which Landlord may then reasonably obtain as rent for the remaining balance of the term. In addition, all costs incurred in connection with collecting such sum, including reasonable attorney fees and costs, shall be recoverable by Landlord from Tenant.

    15.8. In the event that the Landlord commences summary proceedings in the nature of a forcible entry and detainer or unlawful detention for nonpayment of minimum rent, percentage rent, additional rent, or for Tenant's failure to perform its other obligations hereunder, commencement of such proceedings (including but not

20

limited to the delivery of notice and process thereon, regardless of whether such proceedings are actually commenced, shall not be deemed to terminate the Lease.

15.9  In the event that the Tenant fails to pay when the same are due and payable any minimum rent, percentage rent, additional rent or any obligation hereof which may be satisfied by the payment of money, Tenant shall pay a penalty of seven percent (7%) of the amount of any late payment.  The late charge will be in addition to and not a substitute for the legal rate of interest which may be assessed pursuant to any judgment obtained in a court of law for nonpayment of rent.  The late charge shall not affect any other right which the Landlord may assert.   Additionally, Tenant shall pay a $25.00 charge for any checks written to Landlord which are returned due to insufficient funds.

## ARTICLE 16 – DEFAULT BY LANDLORD

16.1  Landlord shall be in default if Landlord fails to perform any provision of this Lease required of it and the failure is not cured within thirty (30) days after Landlord's receipt of notice from Tenant describing such failure.  If, however, the failure cannot reasonably be cured within the cure period, Landlord shall not be in default under this Lease if Landlord commences to cure the failure within the cure period and diligently and in good faith continues to cure the failure.  Notices given under this Article shall specify the alleged breach and the applicable Lease provisions.  If Landlord shall at any time be in default beyond the applicable notice and cure period, Tenant shall, at its option, have the right to cure such default on Landlord's behalf, or the right to terminate this Lease Agreement.  Any sums expended by Tenant in so doing, and all reasonably necessary incidental costs and expenses incurred in connection therewith, including reasonable attorneys' fees, shall be payable by Landlord to Tenant within thirty (30) days following demand by Tenant, and if Landlord shall not have paid such sums to Tenant within ninety (90) days after demand, Tenant shall be entitled to deduct or offset such sums against any rent otherwise payable to Landlord under this Lease.

## ARTICLE 17 – CONDEMNATION

17.1  If the whole of the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use of purpose, then the term of this Lease shall cease and terminate as of the date of title vesting in such proceeding, all rent shall be paid up to that date, and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease, except to the extent that Landlord recovers all or some portion of the value of the leasehold interest as compensation for the Premises acquired or condemned.

17.2  If the whole of the parking areas for the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, then the

21

term of this lease shall cease and terminate as of the date of title vesting in such proceeding, unless Landlord at its own expense, should elect to take immediate steps to provide other parking facilities within a reasonable distance from the Building, to allow parking space ratio between the parking areas and the gross area of the buildings in the Shopping Center sufficient to satisfy applicable governmental authorities. In the event that Landlord shall provide such other parking facilities, then this Lease shall continue in full force and effect. Notwithstanding the forgoing, any change in the number or location of parking spaces within the boundary the Premises shall be subject to the reasonable area approval and consent of the Tenant. Should any such change be implemented without Tenant's approval and consent, Tenant shall have the right to terminate this Lease agreement upon 30 days notice to Landlord.

17.3  If a part of the Premises shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose, and in the event that such partial taking shall be so extensive that the Tenant is unable to operate in the remainder substantially the business being conducted on the Premises immediately prior to such taking, then from the day of such taking and for a period of ten (10) days thereafter, Tenant shall have the right either to terminate this Lease and declare the same null and void by giving written notice thereof within said period to the Landlord or, alternatively, to continue in the possession of the remainder of the Premises under the terms herein provided, except that the minimum rent shall be reduced in such just proportion as the nature, value and extent of the part so taken bears to the whole of the Premises.

17.4  If a part of the parking area of the Premises should be acquired or condemned by eminent domain for any public or quasi-public use or purpose, no rights under this Lease shall be affected, if the remaining number of parking spaces satisfy the requirements of applicable governmental authorities.  If the remaining number of parking spaces do not so conform, Landlord may, at its election, take immediate steps to provide substitute additional parking facilities within a reasonable distance from the Building, to allow parking space ratios sufficient to satisfy applicable government authorities. If Landlord shall fail to provide additional parking spaces, Tenant shall have the right to terminate this Lease by giving written notice thereof to Landlord, or to continue in possession of the Premises pursuant to the terms thereof.  Notwithstanding the forgoing, any change in the number or location of parking spaces within the boundary the Premises shall be subject to the reasonable and approval and consent of the Tenant.  Should any such change be implemented without Tenant's approval and consent, Tenant shall have the right to terminate this Lease agreement upon 30 days notice to Landlord.

17.5  In the event that the Tenant shall terminate this Lease as provided herein, such termination shall be as of the date of Tenant's written notice (but rent shall be due until Tenant's surrender of the Premises), and Tenant shall have no claim against Landlord for the value of the unexpired term of this Lease, or for damages of any kind except as provided in Section 17.1, above.

22

17.6  In the event of a partial taking which is not extensive enough to render the Premises unsuitable for the business of the tenant, then Landlord shall promptly restore the Premises to a condition comparable to its condition at the time of such taking, less the portion lost in the taking, and this Lease shall continue in full force and effect except that the minimum rent shall be reduced in the manner provided herein above.

17.7  As regards to any obligations of Landlord described in this Article, in no event shall Landlord be required to spend an amount in excess of the amount available to Landlord from the award for any part of the Premises or parking area taken.  This provision shall not, however, abridge the Tenant's right to terminate this Lease Agreement as provided for herein.

17.8  In the event of any condemnation or taking as aforesaid, whether in whole or in part, the Tenant shall not be entitled to any part of the award paid for such condemnation, and Landlord shall receive the full amount of such award , except to the extent that Landlord recovers all or some portion of the value of the leasehold interest as compensation for the Premises acquired or condemned.  Tenant shall also have the right to claim and recover from the condemning authority, but not from the Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss which Tenant might incur in removing Tenant's merchandise, furniture, fixtures, leasehold improvements and equipment.

## ARTICLE 18 - RIGHT OF FIRST REFUSAL

18.1  If Landlord, at any time during the Term receives any bona fide offer from a third party to purchase the Premises, which offer Landlord in good faith intends to accept, Landlord shall notify Tenant in writing, giving the name and address of the offeror and the price, terms, and conditions of such offer, and shall supply Tenant with a copy of the offer.  Tenant shall have ten (10) business days from and after the receipt of such notice from Landlord in which to elect to purchase the Premises on the terms and conditions contained in said bona fide offer.  If Tenant does not elect to purchase, and Landlord sells the Premises to the third party making such offer, then the purchaser shall take the Premises subject to and burdened with all the terms, provisions, and conditions of this Lease, and the rights of Tenant under this Lease (including, without limitation, this right of first refusal) as against the new owner shall not be lessened or diminished by reason of the change of ownership.  If Tenant purchases the Premises, then contemporaneously with the conveyance of the property to Tenant this Lease shall, at Tenant's option, terminate, without further notice; Tenant shall thereupon be released and discharged from all future rentals and other obligations on the part of Tenant to be paid, kept, and performed; and the parties thereafter shall be released from all liabilities and obligations under this Lease with respect to the Premises, with the exception of

23

those obligations that survive the expiration or earlier termination of this Lease. Tenant hereby agrees to sign a non-disclosure and confidentiality agreement with Landlord and prospective purchaser relative to the disclosure provided herein and prior to Tenant's receipt of said disclosures.

## ARTICLE 19 - SUBORDINATION, ATTORNMENT, AND ESTOPPEL

19.1  Subject to and conditioned upon the full satisfaction of all other provisions of this Lease, this Lease and the leasehold estate created hereby shall be, at the option and upon written declaration of Landlord, subject, subordinate, and inferior to the lien and estate of any mortgages and all renewals, extensions, or replacements thereof, now or hereafter imposed by Landlord upon the Premises; provided, however, that this Lease shall not be subordinate to any mortgage or any renewal, extension, or replacement thereof, unless and until Landlord provides Tenant with an agreement (the "Non-Disturbance Agreement"), signed and acknowledged by each holder of any such mortgage setting forth that so long as no Event of Default has occurred, Landlord's and Tenant's rights and obligations hereunder shall remain in force and Tenant's right to possession shall be upheld.  Tenant shall, promptly following a request by Landlord and after receipt of the Non-Disturbance Agreement, execute and acknowledge any subordination agreement or other documents reasonably required to establish of record the priority of any such encumbrance over this Lease, so long as such agreement does not otherwise increase Tenant's obligations or diminish Tenant's rights hereunder.

19.2  In the event of foreclosure of any mortgage, whether superior or subordinate to this Lease, then (i) this Lease shall continue in force; (ii) Tenant's quiet possession shall not be disturbed so long as no Event of Default has occurred; (iii) Tenant shall attorn to and recognize the mortgagee or purchaser at foreclosure sale (the "Successor Landlord") as Tenant's landlord for the remaining Term of this Lease.

19.3  Tenant shall execute and deliver to Landlord, within thirty (30) days after receipt of Landlord's request, any estoppel certificate or other statement to be furnished to any prospective purchaser of or any lender against the Premises.  Such estoppel certificate shall acknowledge and certify each of the following matters, to the extent each may be true: (i) that this Lease is in effect and not subject to any rental offsets, claims, or defenses to its enforcement; (ii) the commencement and termination dates of the Term; (iii) that Tenant is paying rent on a current basis; (iv) that this Lease constitutes the entire agreement between Tenant and Landlord relating to the Premises; (v) that Tenant has accepted the Premises and is in possession thereof; (vi) that this Lease has not been modified, altered, or amended except in specified respects by specified instruments; (vii) that Tenant has no notice of any prior assignment, hypothecation, or pledge of rents or this Lease; and (viii) that neither Tenant nor, to the knowledge of Tenant, Landlord is in default under this Lease beyond any applicable cure or grace period.  Tenant shall also, upon request of Landlord, certify and agree for the benefit of any lender against the Premises ("Lender") that Tenant will not look to such Lender: (a) as being liable for any

31

act or omission of Landlord, (b) as being obligated to cure any defaults of Landlord under this Lease which occurred prior to the time Lender, its successor or assigns, acquired Landlord's interest in the Premises by foreclosure or otherwise, (c) as being bound by any payment of rent or additional rent by Tenant to Landlord for more than one (1) month in advance; or (d) as being bound by Landlord to any amendment or modification of this Lease without Lender's written consent.

### ARTICLE 20 - APPLICATION OF INSURANCE PROCEEDS BY LANDLORD'S MORTGAGEE

20.1  In the event that Landlord mortgages its title to or interest in the Premises, then Landlord may request that the name of Landlord's mortgagee be added in addition to Landlord's name to any and all policies of insurance required to be carried by Tenant hereunder.

### ARTICLE 21 – NOTICES

21.1  Any notice or communication to be given under this Lease shall be in writing and shall be deemed to have been given: (i) when delivered, if delivered by hand, (ii) three (3) days after being deposited in the United States Post Office, certified mail, postage prepaid, return receipt requested, if mailed, or (iii) on the day after deposit with any nationally or regionally recognized overnight courier service which requires proof of delivery.  Notices shall be addressed as follows:

By Tenant to Landlord:

    Ciccarelli Enterprises, LLLP
    Attn: Donna Ciccarelli
    1010 Pikeview Street
    Lakewood, CO  80215

By Landlord to Tenant:

    Western Convenience Stores, Inc.
    9849 E. Easter Avenue
    Centennial, CO  80112

21.2  The parties have the right from time to time to change their respective addresses by giving at least five (5) days written notice to the other party in accordance with the foregoing procedures for giving notice, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

21.3  All notices and other communications required or permitted under this Lease which are addressed as provided in this Article if delivered personally against

25

proper receipt or by confirmed facsimile, shall be effective upon delivery, (ii) if delivered by certified or registered mail, return receipt requested with postage prepaid, shall be effective 4 business days after deposit in the United States mail, or (iii) by Federal Express or similar overnight courier service with courier fees paid by the sender, shall be effective the next business day after deposit with the courier within its deadline for deposit for next business day delivery, as the case may be.

## ARTICLE 22

[This Article intentionally left blank.]

26

## ARTICLE 23 – GENERAL PROVISIONS

23.1 **Binding Effect**. The provisions of this Lease shall be binding on and inure to the benefit of the parties hereto, their legal representatives, successors, and permitted assigns and sublessees.

23.2 **Whole Agreement**. This Lease contains all of the agreements and representations between the parties with respect to the subject matter hereof. None of the terms of this Lease shall be waived or modified to any extent, except by written instrument signed and delivered by both parties.

23.3 **Severability**. If any provision of this Lease shall be declared invalid or unenforceable, the remainder of this Lease shall continue in full force and effect.

23.4 **Duplicate Counterparts**. This Lease may be executed in one or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

23.5 **Recording Of Lease**. This Lease shall not be recorded. At the request of either party and at Tenant's expense, the parties hereto shall execute a Memorandum of Lease, in recordable form, specifying the commencement and termination dates, a description of the Premises, and any other provisions which either party may desire to incorporate therein.

23.6 **Governing Law**. This Lease shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado. Tenant consent to the enforcement by Landlord of Tenant's obligations hereunder in the District Court in and for the City and County of Broomfield, State of Colorado.

23.7 **Relationship Of The Parties**. Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating a relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent nor any other provision contained herein, nor any acts of the parties hereto are other than the relationship of landlord and tenant. Whenever herein the singular number is used the same shall include the plural, and the masculine gender shall include the female and neuter genders. The numerical headings or titles to the paragraphs are not a part of this Lease and shall have no effect upon the construction or interpretation of any part hereof.

27

23.8  Authority   The individuals signing this Lease personally warrant that they have the right and power to enter into this Lease on behalf of Landlord and Tenant, to grant the rights granted under this Lease, and to undertake the obligations undertaken in this Lease.

23.9  Interpretation   This Lease has been negotiated by the parties hereto and by the respective attorneys for each party.  The parties represent and warrant to one another that each has, by counsel or otherwise, actively participated in the negotiation and preparation of this Lease for execution.  In the event of a dispute concerning the interpretation of this Lease, each party waives the doctrine that an ambiguity should be interpreted against a party who drafted the document.

23.10  Landlord's Subsequent Leasing Activities.  Ninety (90) days prior to the expiration of the Lease period, or ninety (90) days prior to any option period granted or ninety (90) days prior to any renegotiated Lease period, Landlord has the right to commence activities in an attempt to lease these demised premises.  Such activities that Landlord will be allowed to do will include, but not limited to, prominently displaying a sign on the subject store front advertising the space for lease, showing the subject space to prospective Tenants during normal business hours and advertising the subject premises for lease in local newspapers.

23.11  Representatives.  The Tenant acknowledges and agrees that it has not relied upon any statements, representations, agreements or warranties, except such as are expressed in this Lease.

23.12  Amendments of Modifications.  No amendment or modification of this Lease or any approvals or permissions of the Landlord required under this Lease shall be valid or binding unless reduced in writing and executed by the parties hereto in the same manner as the execution of this Lease.

23.13  Grammatical Changes.  Wherever the words ALandlord@ and ATenant@ are used in this Lease, they shall include ALandlords@ and ATenants@ and shall apply to person, both men and women, companies, partnerships and corporations.  Wherever the words Amortgage@ or Amortgages@ are used herein, the same shall deemed to include a deed of trust or trust deed, and the word Alender@ shall include a mortgagee of a mortgage or a beneficiary of a deed of trust or trust deed.  All references to the term of this Lease shall include any extension of the term, except as otherwise provided.  All references to Tenant shall include Tenant's guarantors, assignees or sublessees.  All references to the singular shall include the plural, and vice versa.

23.14  Section Headings.  The section headings are inserted herein only for convenience of reference and shall in no way define, limit or describe the scope or intent of any provisions of the Lease

28

23.15  Force Majeure.  Whenever a period of time is herein provided for either party to do or perform any act or thing, there shall be excluded from the computation of such period of time any delays due to strikes, riots, acts of God, shortages of labor or any cause or causes, whether or not similar to those enumerated, beyond the parties' reasonable control or the reasonable control of their agents, servants, employees and contractor engaged by them to perform work in connection with this Lease.

23.16  Personal Property Taxes.  Tenant shall pay before delinquency any personal property taxes attributable to the furniture, fixtures, merchandise, equipment, or other personal property situated on the Premise. If any such personal property taxes are levied against the Landlord or Landlord's property, and if Landlord pays the same (which Landlord shall have the right to do) or if the assessed value of Landlord's premises is increased by the inclusion therein of a value placed on such property, and if Landlord pays the taxes based on such increased assessment (which the Landlord shall have the right to do), Tenant upon demand shall repay to Landlord the taxes so levied against the Landlord or the proportion of such taxes resulting from such increase in the assessment.

23.17  Non-Waiver.  No waiver of condition or covenant of this Lease by either party hereto shall be deemed to imply or constitute a further waiver by such party of the same or any other condition or covenant.  No act or thing done by Landlord or Landlord's agents during the term hereof shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing signed by Landlord.  The delivery of Tenant's keys to any employee or agent of Landlord shall not constitute a termination of the Lease unless a written agreement has been entered into with Landlord to this effect.  No payment by Tenant, nor receipt from Landlord, of a lesser amount than the minimum monthly rent herein stipulated shall be deemed to be other than on an account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check, or payment as rent, be deemed an accord and satisfaction, and Landlord shall accept such check for payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy available to the Landlord.  If this Lease be assigned, or if the Premises or any part thereof be sublet or occupied by anyone other than the Tenant, the Landlord may collect rent from the assignee, subtenant or occupant and apply the net amount collected to the rent herein reserved but no such collection shall be deemed a waiver of the covenant herein against assignment and subletting, or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of the Tenant from the complete performance by the Tenant of the covenants herein contained on the part of the Tenant to be performed.

23.18  Reimbursement of Attorney Fees and Costs:  In the event either party takes legal action against the other in order to enforce the terms of this Lease, the party in whose favor final judgment is entered shall be entitled to recover from the other party its reasonable attorney fees and costs

29

23.19. **Landlord's Consent**. Whenever Landlord's consent is required hereunder, such consent shall be given in Landlord's reasonable discretion, unless specifically provided for herein.

23.20. **Estoppel Statement of Lease**. Tenant agrees upon request from time to time from Landlord to execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications), stating the Lease Commencement Date, stating that Tenant has accepted and occupied the Premises, that Tenant has not paid rent in advance, that Tenant is not aware of prior assignments of this Lease by Landlord, that Tenant has no offsets against the rent or claims against Landlord, the amount of monthly rent due, and the date to which minimum rent, percentage rent and other charges have been paid.

23.21. **Enlarging the Shopping Center**. As provided aforesaid, Tenant acknowledges that the Landlord hereby reserves the right from time to time to enlarge the Shopping Center by constructing other buildings on portions of the property with or without any new parking or common areas, and by including within the existing Shopping Center other properties now or hereafter owned by Landlord adjacent to the Property, and constructing on such additional property buildings and parking areas and common areas. In this event, such new buildings, properties, common areas and parking areas shall be treated as though they were originally a part of the Shopping Center and at the election of Landlord all common expenses, utility costs, real property taxes and other pro rata payments herein required of Tenant shall be appropriately adjusted to include any additional square footage contained in such new buildings or comprising additional properties added to the Shopping Center. Until Landlord makes such election, Tenant's pro rata share shall continue as though such enlargement had not occurred.

23.21.1 Notwithstanding the forgoing, any change in the number or location of parking spaces within the boundary the Premises shall be subject to the reasonable and approval and consent of the Tenant. Should any such change be implemented without Tenant's approval and consent, Tenant shall have the right to terminate this Lease agreement upon 30 days notice to Landlord.

23.21.2 Notwithstanding the forgoing, any increase of more than 10% in common expenses, utility costs, real property taxes and other pro rata payments herein required of Tenant shall be subject to the reasonable and approval and consent of the Tenant. Should any such increase be implemented without Tenant's approval and consent, Tenant shall have the right to terminate this Lease agreement upon 30 days notice to Landlord.

23.22  Easements.  The Landlord shall have the right to grant any easements on, over, under and above the Premises for such purposes as Landlord determines, provided that such easements will not materially interfere with Tenant's business.

23.23  Time of the Essence.  Time is of the essence hereof, and each party shall perform its obligations and conditions hereunder within the time hereby required.

23.24  Unenforceability.  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

23.25  Rights and Remedies.  The remedies of the Landlord shall be cumulative, and no one of them shall be construed as exclusive of the other, or any remedy provided by law.  The rights and remedies provided hereunder shall survive the termination of this Lease.

23.26  Financial Statements.  Tenant and any guarantors of Tenant's obligations hereunder shall provide their most recent financial statement(s) including statements of income and expense and statements of net worth within 15 days following the request of Landlord.  Landlord may request said statements once during any year.  Said statements shall be verified as being true and correct.

23.27  Limitation of Landlord's Partners' Liability.  In no event shall Landlord be liable to Tenant for any failure of any other tenant in the Shopping Center to operate its business.  Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that there shall be absolutely no personal liability on the part of general or limited partners of Landlord, or any owners of an interest in Landlord's business, their successors, assigns, legally appointed representatives, or any mortgagee in possession (for the purposes of this paragraph collectively referred to as "Landlord") with respect to any of the terms, covenants and conditions of this Lease, and that Tenant shall look solely to the equity of Landlord in the Shopping Center of which the Premises are a part for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of liability to be absolute and without any exceptions whatsoever.

23.28  Interpretation and Venue.  The term of this Lease shall be interpreted according to the laws of the State of Colorado.  Tenant consents to the enforcement by

31

LEGAL DESCRIPTION:

LOT 4
COLUMBINE MEADOWS FILING NO. 2 REPLAT A
CITY OF BROOMFIELD, COUNTY OF ADAMS, COLORADO.

CERTIFICATION:

THIS IS TO CERTIFY THAT ON ___JULY 27TH___ 1994, THE LOT
BOUNDARIES SHOWN HEREON WERE LOCATED UNDER MY SUPERVISION, AND
THAT ALL LOT DIMENSIONS, EASEMENTS AND RIGHTS-OF-WAY SHOWN ARE
FROM OFFICIAL PLATS. THIS SURVEY DOES NOT CONSTITUTE A TITLE SEARCH
TO DETERMINE OWNERSHIP OR EASEMENTS OF RECORD. DONE BY MARK D.
SCHEAR. IN MY PROFESSIONAL OPINION MONUMENTS FOUND ARE ORIGINAL
MONUMENTS, AND WERE ACCEPTED AS SAME. BOUNDARY MONUMENTS ONLY
ARE TO BE USED FOR THE ESTABLISHMENT OF FENCE, BUILDING, OR OTHER
FUTURE IMPROVEMENT LINES. LOCATION OF ALL EASEMENTS, AND RIGHTS-OF-
WAY IN EVIDENCE OR KNOWN TO ME ON THE PREMISES ON THIS DATE ARE
ACCURATELY SHOWN TO THE BEST OF MY KNOWLEDGE AND BELIEF.

ACCORDING TO COLORADO LAW YOU MUST COMMENCE ANY LEGAL ACTION
BASED UPON ANY DEFECT IN THIS SURVEY WITHIN THREE YEARS AFTER YOU
FIRST DISCOVER SUCH DEFECT. IN NO EVENT, MAY ANY ACTION BASED UPON
ANY DEFECT IN THIS SURVEY BE COMMENCED MORE THAN TEN YEARS FROM
THE DATE OF THE CERTIFICATION SHOWN HEREON.

MARK DOUGLAS SCHEAR, PLS 18476
FOR AND ON THE BEHALF OF
TIMBERLINE SURVEYING, INC.

EXHIBIT A



Exhibit B
Schedule of Rents

| Base Term Year | 1 | $2,604 | $31,248 |
|---|---|---|---|
| | 2 | $2,821 | $33,852 |
| | 3 | $3,038 | $36,456 |
| | 4 | $3,038 | $36,456 |
| | 5 | $3,038 | $36,456 |

| 1st Renewal Term | 1 | $3,129 | $37,550 |
|---|---|---|---|
| | 2 | $3,223 | $38,676 |
| | 3 | $3,320 | $39,836 |
| | 4 | $3,419 | $41,032 |
| | 5 | $3,522 | $42,262 |

| 2nd Renewal Term | 1 | $3,628 | $43,530 |
|---|---|---|---|
| | 2 | $3,736 | $44,836 |
| | 3 | $3,848 | $46,181 |
| | 4 | $3,964 | $47,567 |
| | 5 | $4,083 | $48,994 |

| 3rd Renewal Term | 1 | $4,205 | $50,464 |
|---|---|---|---|
| | 2 | $4,331 | $51,978 |
| | 3 | $4,461 | $53,537 |
| | 4 | $4,595 | $55,143 |
| | 5 | $4,733 | $56,797 |

Landlord: _____

Tenant: _____

EXHIBIT C

Tenant's Personal Property

(Pursuant to Article 5.1, at or before the commencement of business operations on the Premises, Tenant and Landlord shall conduct a walk-through of the premises, and prepare a list of Tenant's Personal Property.)

EXHIBIT D
Signage

Page D2          Canopy Signage
Page D3.         Monument Sign
Page D4          Building Sign



Page D2





Page D4

## ADDENDUM TO LEASE AGREEMENT

THIS ADDENDUM TO LEASE AGREEMENT ("Addendum") is made and entered into as of this _17th_ day of ___April___, by and between Ciccarelli Enterprises, LLLP, a Colorado Limited Liability Limited Partnership (the "Landlord"), Western Convenience Stores, Inc., a Colorado Corporation (the "Tenant") and Valero Retail Holdings, Inc., a Delaware Corporation ("Valero").

WHEREAS, Landlord and Tenant have entered the forgoing Lease Agreement; and

WHEREAS, Valero previously removed underground petroleum storage tanks from, and performed petroleum related corrective action activities at, the Premises; and

WHEREAS, Valero received a no further action letter from the Colorado Division of Oil and Public Safety Remediation Section of March 2, 2006; and

WHEREAS, residual petroleum constituents may remain in soil at the Premises; and

WHEREAS, Tenant intends to install certain improvements and equipment, including underground petroleum storage tanks identified in Exhibit A hereto (the "Improvements"), at the Premises; and

WHEREAS, Valero has agreed to pay for the additional (incremental) cost of handling and managing contaminated soil encountered during construction activities on the Premises.

NOW THEREFORE, in consideration of the mutual promises herein, the Parties covenant and agree as follows:

1. Tenant shall provide Valero written notice and notice by telephone of any grading or excavation activities on the Premises at least ten (10) days prior to undertaking any such activities.

2. Tenant shall allow one or more employees, contractors or agents of Valero to be present on the Premises during grading or excavation activities and to inspect and collect samples of any soil disturbed by such grading or excavation activities, so long as Valero's employees, contractors or agents do not unreasonably interfere with Tenant's activities.

3. Tenant shall stockpile potentially impacted soil onsite during testing and Valero shall be responsible for evaluating potentially impacted soil during grading and excavation activities on the Premises, determining whether petroleum constituents are present in the soil in concentrations exceeding Colorado Tier 1 Risk Based Screening Levels (RBSLs) or the Total Petroleum Threshold Value, collectively "Contaminated Soil"

4. Valero shall pay any costs associated with evaluating soil contaminated with petroleum constituents and Valero shall pay reasonable incremental costs for handling and disposal of Contaminated Soil, i.e., the costs above those related to the handling and disposal of uncontaminated soil. For example,

the reasonable costs difference between the cost of disposing of Contaminated Soil and the cost of disposing of uncontaminated soil shall be paid by Valero. Reasonable incremental costs do not include rush charges, overtime charges, or holiday charges or charges for handling and disposal that go beyond what is required by law for the Contaminated Soil. To the extent Tenant incurs any costs associated with evaluating, handling or disposing of soil or groundwater, it shall submit a request for payment, along with supporting documentation, including but not limited to detailed invoices from contractors and subcontractors, to Valero no later than thirty (30) days after incurring such costs. Valero shall pay Tenant all evaluation costs and reasonable incremental handling and disposal costs reflected in a request for payment within thirty (30) days after receipt of a request for payment.

5.   Any notice, request or communication to be given under this Addendum shall be in writing and shall be deemed to have been given: (i) when delivered, if delivered by hand, (ii) three (3) days after being deposited in the United States Post Office, certified mail, postage prepaid, return receipt requested, if mailed, or (iii) on the day after deposit with any nationally or regionally recognized overnight courier service which requires proof of delivery. Notices shall be addressed as follows:

To Landlord:

Ciccarelli Enterprises, LLLP
Attn: Donna Ciccarelli
1010 Pikeview Street
Lakewood, CO 80215

To Tenant:

Western Convenience Stores, Inc.
9849 E. Easter Avenue
Centennial, CO 80112

To Valero:

Valero Retail Holdings, Inc.
Attn: Roger Levin
5590 B Havana Street
Denver, Colorado 80239
303-373-5057

The parties have the right from time to time to change their respective addresses by giving at least five (5) days written notice to the other parties in accordance with the foregoing procedures for giving notice, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

6.   Nothing in this Addendum shall be deemed an admission of liability or a waiver of any defenses to liability.

7.   Unless otherwise defined herein, capitalized terms shall have the meaning set forth in the Lease Agreement.

2

8.   This Addendum shall expire upon completion of the Improvements or first delivery of any petroleum products to any underground storage tank installed by Tenant, its contractors or agents, whichever occurs first.

9.   No amendment or modification of this Addendum shall be valid or binding unless reduced in writing and executed by the parties hereto in the same manner as the execution of this Addendum.

10.  This Addendum has been negotiated by the parties hereto and by the respective attorneys for each party. The parties represent and warrant to one another that each has, by counsel or otherwise, actively participated in the negotiation and preparation of this Addendum for execution. In the event of a dispute concerning the interpretation of this Addendum, each party waives the doctrine that an ambiguity should be interpreted against a party who drafted the document.

11.  This Addendum shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado. The parties consent to the enforcement of the obligations hereunder in the District Court in and for the City and County of Broomfield, State of Colorado.

12.  This Addendum may be executed in one or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

13.  The provisions of this Addendum shall be binding on and inure to the benefit of the parties hereto, their legal representatives, and successors. This Addendum cannot be assigned without the written consent of all the parties.

14.  The prevailing party or parties in any proceeding before a court or arbitrator shall be entitled to recover its reasonable attorneys' fees and costs from the other party or parties.

LANDLORD:                                VALERO:

Ciccarelli Enterprises, LLLP             Valero Retail Holdings, Inc.

By: _[signature]_                        By: _____

TENANT:

Western Convenience Stores, Inc.

By: _____

3

8. This Addendum shall expire upon completion of the Improvements or first delivery of any petroleum products to any underground storage tank installed by Tenant, its contractors or agents, whichever occurs first.

9. No amendment or modification of this Addendum shall be valid or binding unless reduced in writing and executed by the parties hereto in the same manner as the execution of this Addendum.

10. This Addendum has been negotiated by the parties hereto and by the respective attorneys for each party. The parties represent and warrant to one another that each has, by counsel or otherwise, actively participated in the negotiation and preparation of this Addendum for execution. In the event of a dispute concerning the interpretation of this Addendum, each party waives the doctrine that an ambiguity should be interpreted against a party who drafted the document.

11. This Addendum shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado. The parties consent to the enforcement of the obligations hereunder in the District Court in and for the City and County of Broomfield, State of Colorado.

12. This Addendum may be executed in one or more counterparts, each of which shall be an original and all of which shall constitute one and the same instrument.

13. The provisions of this Addendum shall be binding on and inure to the benefit of the parties hereto, their legal representatives, and successors. This Addendum cannot be assigned without the written consent of all the parties.

14. The prevailing party or parties in any proceeding before a court or arbitrator shall be entitled to recover its reasonable attorneys' fees and costs from the other party or parties.

LANDLORD:                                VALERO:

Ciccarelli Enterprises, LLLP             Valero Retail Holdings, Inc.



By: _____              By: _____

TENANT:

Western Convenience Stores, Inc.

By: _____

3

